**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| JIANKANG BU,<br><br>Plaintiff,<br><br>v.<br><br>IDEAL POWER INC.,<br><br>Defendant. | No. 1:26-cv-01557-RP<br><br>Honorable Robert Pitman |

**DEFENDANT IDEAL POWER INC.'S MOTION TO DISMISS
AND SUPPORTING MEMORANDUM OF LAW**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 2

ARGUMENT .......... 4

I. STANDARD OF REVIEW .......... 4

II. THE COMPLAINT FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS UNDER EXCHANGE ACT SECTIONS 10(B) OR 18(A) .......... 6

A. The B-TRAN Allegation .......... 6

B. The SymCool IQ Allegation .......... 7

C. The CEO Retirement And Accounting Firm Disclosure .......... 9

III. THE COMPLAINT DOES NOT PLEAD STOCK PURCHASES AFFECTED BY MISSTATEMENTS AND FAILS TO ESTABLISH THAT RSU VESTINGS CONSTITUTE "PURCHASES" UNDER THE EXCHANGE ACT .......... 10

IV. PLAINTIFF CANNOT PLEAD RELIANCE UNDER EITHER EXCHANGE ACT SECTIONS 10(B) OR 18(A) .......... 12

V. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION UNDER EXCHANGE ACT SECTIONS 10(B) AND 18(A) .......... 14

VI. THE COMPLAINT DOES NOT PLEAD SCIENTER .......... 15

VII. MOST OF PLAINTIFF'S CLAIMS ARE TIME BARRED .......... 16

CONCLUSION .......... 17

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 4

*Atari Corp. v. Ernst & Whinney*,
981 F.2d 1025 (9th Cir. 1992) ... 13

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ... 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 4

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) ... 2, 10, 11

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ... 5, 10, 14, 15

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ... 5

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ... 12, 13

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ... 7, 12, 13

*In re Cendant Corp. Sec. Litig.*,
81 F. Supp. 2d 550 (D.N.J. 2000) ... 11

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
540 F. Supp. 2d 800 (S.D. Tex. 2007) ... passim

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
238 F. Supp. 3d 799 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019) ... 10, 15

*In re Enron Corp. Sec., Derivative & "ERISA" Litigation*,
465 F. Supp. 2d 687 (S.D. Tex. 2006) ... 17

*In re F45 Training Holdings, Inc. Sec. Litig.*,
No. 1:22-CV-01291-DAE, 2025 WL 4230711 (W.D. Tex. Feb. 21, 2025) ... 9

*Landry v. GMAC Mortg.*,
No. CV H-12-0014, 2012 WL 12903540 (S.D. Tex. Aug. 15, 2012) ......................................5

*Linenweber v. Southwest Airlines Co.*,
693 F. Supp. 3d 661 (N.D. Tex. 2023) ..........................................................................6

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ........................................................................................14

*Lovelace v. Software Spectrum Inc.*,
78 F.3d 1015 (5th Cir. 1996) ..........................................................................................6

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) ..........................................................................................6

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ........................................................................................15

*Petrobras America, Inc. v. Samsung Heavy Indus. Co.*,
9 F.4th 247 (5th Cir. 2021) ............................................................................................6

*Royalty Clearinghouse, Ltd. v. CTS Props., Ltd.*,
No. A-16-CV-1342-LY-ML, 2017 WL 5071340 (W.D. Tex. July 12, 2017)........................17

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ....................................................................................9, 15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..................................................................................................4, 5, 15

**STATUTES AND RULES**

Section 3(a)(13) of the Securities Exchange Act of 1934,
15 U.S.C. § 78c(a)(13)..................................................................................................10

Section 10(b) of the Securities Exchange Act of 1934,
15 U.S.C. § 78j(b) ............................................................................................... passim

Section 18(a) of the Securities Exchange Act of 1934
15 U.S.C. § 78r(a) ............................................................................................... passim

Private Securities Litigation Reform Act,
15 U.S.C. § 78u-4 ................................................................................................ passim

15 U.S.C. § 78u-4(b)(1) ....................................................................................................5

15 U.S.C. § 78u-4(b)(2) ...............................................................................................5, 15

Rule 10b-5, 17 CFR 240.10b-5 .......... 1

Federal Rule of Civil Procedure 9(b) .......... 1, 5

Federal Rule of Civil Procedure 12(b)(6) .......... 1, 4

## PRELIMINARY STATEMENT

Defendant Ideal Power Inc. ("Ideal Power" or the "Company") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Complaint of Plaintiff Jiankang Bu ("Plaintiff" or "Bu") pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

Plaintiff, a former Chief Technology Officer ("CTO") of Ideal Power who by his own account possessed direct personal knowledge of the Company's internal operations, filed this pro se complaint with a one-page attachment asserting unspecified claims ("Complaint" or "Compl.") under the Securities Exchange Act of 1934 ("Exchange Act"). But whether his claims are intended to be under Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5 (codified at 17 CFR 240.10b-5) thereunder, or under Section 18(a), 15 U.S.C. § 78r(a),[1] the Complaint should be dismissed with prejudice because it fails virtually every element of both and does not come close to satisfying the PSLRA's heightened pleading requirements.

The Complaint identifies no actionable misstatement. Its two substantive allegations rest on fundamental mischaracterizations of the Company's actual public disclosures. The B-TRAN Allegation conflates the results of qualification testing with independent third-party prequalification testing. The SymCool IQ Allegation ignores the well-established, SEC-disclosed meaning of "product launch" in the Company's product development and commercialization lifecycle—a meaning that encompasses precisely the design-iteration stage that Plaintiff describes.

Beyond the absence of any false statement, the Complaint pleads no facts establishing scienter, identifies no corrective disclosure or other event to support loss causation, and—most remarkably—is brought by a plaintiff who, as the Company's CTO, possessed the very information

---

[1] Of the express or implied causes of action under the Exchange Act, only Sections 10(b) and 18(a) are arguably available here.

he now claims the market lacked, thereby negating the possibility that he relied on public statements. In addition, the Complaint fails to allege that Plaintiff acquired his shares through any transaction that qualifies as a "purchase" under the Exchange Act. To the extent Plaintiff received his shares through restricted stock unit ("RSU") grants that vested automatically over time as part of his employment compensation, his claims face an additional threshold barrier: an RSU vesting, which occurs passively without any contemporaneous investment decision by the recipient, does not constitute a "purchase or sale" sufficient to confer standing under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), and its progeny.

Each of these independent deficiencies—none of which can be cured through amendment—requires dismissal with prejudice. Finally, Plaintiff's claims are largely, if not completely, time barred.

## STATEMENT OF FACTS

Ideal Power is a technology company headquartered in Austin, Texas, engaged in the development and commercialization of its patented B-TRAN (bi-directional bi-polar transistor) semiconductor technology. The Company's shares trade on the Nasdaq Stock Market under the ticker symbol "IPWR." According to its annual statements filed with the SEC, the Company generated $37,728 in commercial revenue in fiscal year 2025 and $86,032 in fiscal year 2024.

Plaintiff is a resident of Temecula, California who served as Chief Technology Officer of Ideal Power during the period relevant to his allegations. Bu filed this action pro se on June 9, 2026, seeking $81,553.07 in damages.

The Complaint consists of approximately one page of vague and conclusory allegations. It asserts two categories of purported misstatements but fails to identify which speakers made them, which specific documents contain the alleged misstatements, or when the alleged misstatements were made. Plaintiff does not provide any direct quotes of them.

*First*, Plaintiff alleges that in the "Q2 2025 Earning Report," Ideal Power "published fraudulent info about qualification results of BTRAN product: claimed completed qualification with zero failure," and that as "the CTO then, [he] clearly reported in [his] weekly progress that failure was more than 50%." Compl. ¶ 1a[2] (the "B-TRAN Allegation").

*Second*, Plaintiff alleges that "[b]etween 2023-2024, Ideal Power Inc. released Press Release, held interviews online, posted on social media such as 'LinkedIn', to boast Ideal Power launched a new product 'SymCool IQ' with excellent features and performances, but this product never existed. The design was not available until May 11, 2025, when [Plaintiff] first reported to Ideal Power Inc Board, that a possible design that may make such products." *Id.* at ¶ 1b (the "SymCool IQ Allegation").

Plaintiff states that he reported these concerns to the FBI Austin Division and had an interview with FBI agents on August 14, 2025. *Id.* at ¶ 2. He also references the Company's November 3, 2025, announcement of CEO Dan Brdar's retirement, despite just being reelected in June 2025. Finally, Plaintiff states that the Company "announced that it contracted BPM LLP as [its] independent registered public accounting firm." *Id.* at ¶ 3.

According to the Complaint, Plaintiff acquired 19,609 shares of Ideal Power common stock between 2021 and 2025. *Id.* at ¶ 4. The Complaint does not specify how Plaintiff acquired these shares—whether through open-market purchases, RSU grants that vested automatically over time, stock option exercises, or some combination thereof. The claimed four-year span of Plaintiff's stock acquisitions masks potentially fatal infirmities in the Complaint: First, the SymCool IQ Allegation concerns statements supposedly made in 2023-2024. Thus, any acquisitions from 2021

[2] Citations to paragraph numbers of the Complaint are to the Statement of Claim attached as Section III of the Complaint.

or 2022 could not have been made at an artificial price or in reliance on any misstatements about SymCool IQ. Second, the only cited document relating to the B-TRAN Allegation is the "Q2 2025 Earning Report"—either the Q2 10-Q or the 8-K, both filed on August 14, 2025. Plaintiff sold all his shares between August 18 and September 25, 2025—commencing just four days after his FBI interview on August 14, 2025, giving him only four days to acquire shares at prices that could have been inflated by the Earning Report's alleged misstatement about B-TRAN. No corrective disclosure or market-wide revelation preceded or accompanied his sales, and the Complaint does not allege any.

At the time of CEO Brdar's retirement on November 3, 2025, and the related public disclosures, Plaintiff had sold all of his Ideal Power stock and was no longer an investor in the Company.

The Complaint contains no allegations supporting the elements of reliance, scienter, or loss causation. The alleged misstatements, which are described only vaguely, mischaracterize the Company's clear and accurate disclosures.

## ARGUMENT

### I. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In securities fraud cases, the PSLRA imposes additional heightened pleading requirements that are "more exacting" than even Federal Rule of Civil Procedure 9(b)'s requirement of pleading fraud with particularity. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason

or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), and that inference must be "at least as compelling as any opposing inference of nonfraudulent intent," *Tellabs*, 551 U.S. at 314.

Plaintiff asserts unspecified claims under the Securities Exchange Act of 1934, but only Sections 10(b) and 18(a) are conceivably relevant. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). The Complaint fails to adequately plead elements (1), (2), (3), (4), and (6).

To state a claim under Section 18(a), a plaintiff must allege: (1) a material misrepresentation in a document filed with the SEC pursuant to the Exchange Act; (2) reliance on that specific document; (3) purchase of a security at a price affected by the alleged misstatement; and (4) economic damages caused by that reliance. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n.31 (1976); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 800, 812–13 (S.D. Tex. 2007). The Complaint fails to adequately plead all of these elements. Plaintiff's pro se status does not reduce or alter the pleading standards. *Landry v. GMAC Mortg.*, No. CV H-12-0014, 2012 WL 12903540, at *6 (S.D. Tex. Aug. 15, 2012), *report and recommendation adopted*, No. CV H-12-14, 2012 WL 12903541 (S.D. Tex. Sept. 17, 2012) ("Even though a pro se complaint is to be held to less stringent standards than formal pleadings drafted by lawyers, it must still meet the heightened pleading standard under Rule 9(b) for fraud-based causes of action.").

## II. THE COMPLAINT FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENTS OR OMISSIONS UNDER EXCHANGE ACT SECTIONS 10(B) OR 18(A)

The Complaint fails to identify any materially false or misleading statement with the particularity the PSLRA demands. It does not quote any specific statement, identify any speaker, cite any particular filing or press release by date, or explain with specificity why any statement was misleading when made. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001) (PSLRA requires identification of each specific misleading statement and the reasons for its misleading character). Beyond this threshold pleading failure, each category of allegation fails to identify an actionable misstatement.

### A. The B-TRAN Allegation

Without citing a specific document or quoting specific language, the Complaint alleges the Company, in its "Q2 2025 Earning Report," "published fraudulent info about qualification results of BTRAN product: claimed completed qualification with zero failure." But neither the Q2 2025 Form 10-Q nor the Q2 2025 Form 8-K, both dated August 14, 2025, contain such a statement. Declaration of Matthew M. Riccardi, dated August 24, 2026 ("Riccardi Decl."), Exs. 1 and 2, respectively.[3] The press release attached to the 8-K makes clear that the completion of "third-party automotive qualification testing" was among a number of 2025 milestones the Company was working towards at the time of the filing, confirming that the Company stated that qualification remained an ongoing step rather than a completed event, as Plaintiff's allegation suggests. Riccardi Decl., Ex. 2 at 6.

---

[3] "SEC filings . . . may be properly judicially noticed to the extent that they are 'considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents.'" *Petrobras America, Inc. v. Samsung Heavy Indus. Co.*, 9 F.4th 247, 255 (5th Cir. 2021) (quoting *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)). The same applies to earnings call transcripts. *Linenweber v. Southwest Airlines Co.*, 693 F. Supp. 3d 661, 674 (N.D. Tex. 2023).

Even if Plaintiff is instead referring to statements made in the Q2 2025 earnings call held on August 14, 2025, nothing there supports his claim either. The statements made during the earnings call concern prequalification testing, not qualification testing as alleged in the Complaint. During the call, former CEO Dan Brdar stated that "[W]e successfully completed the third-party automotive ***prequalification*** and reliability testing of B-TRAN discrete die last month, achieving 0 die failures." Riccardi Decl., Ex. 3 at 6 (emphasis added). Thus, the Company stated it completed "prequalification" testing—not "completed qualification" as the Complaint alleges. Prequalification is a distinct, preliminary testing phase. Mr. Brdar explained the distinction during the earnings call: "what is a good practice is to actually take devices and take them through those test cycles before you actually do all the runs for official qualification. You can do with a smaller number of devices. It helps you find out, are there any issues with your packaging design . . . prequalification just gives you that early look into any issues you might have." *Id.* at 12.

The Complaint thus mischaracterizes what the Company said and therefore does not allege an actionable misstatement under Sections 10(b) or 18(a). In addition, any allegation based on the earnings call transcript fails under Section 18(a) because it is not in a document filed with the SEC pursuant to the Exchange Act. *In re Alstom SA*, 406 F. Supp. 2d 433, 479 (S.D.N.Y. 2005) ("Section 18 applies only to documents filed pursuant to the Exchange Act."); *In re Enron*, 540 F. Supp. 2d at 813.

**B. The SymCool IQ Allegation**

Plaintiff alleges that the Company "boast[ed] Ideal Power launched a new product 'SymCool IQ' with excellent features and performances, but this product never existed," and that "[t]he design was not available until May 11, 2025." Compl. ¶ 1b. He points generally to press releases, online interviews, and social media posts but again does not cite any specific document,

identify any speaker, or quote the allegedly misleading language. As a result, the Complaint fails to satisfy the PSLRA's pleading requirements as to the SymCool IQ Allegation.

The SymCool IQ Allegation also mischaracterizes language the Company uses. The term "launch," as used by the Company has a specific, disclosed meaning. In the Company's Q1 2025 Form 10-Q, for example, the Company describes the timing of product launch, prototyping, customer feedback, design iteration, and full commercial release and makes clear that design work happens *after* product launch: "Upon product launch, we design and build initial prototypes for testing and to solicit customer feedback." Riccardi Decl., Ex. 4 at 11. The Q1 2025 Form 10-Q further explains that testing and customer feedback may lead to changes in the product design, final prototypes, and additional testing before "full commercial release." *Id.* Thus, the term "product launch" describes only the start of a lengthy and ongoing process of designing, prototyping, testing, customer evaluation, feedback-driven design changes and potentially commercializing a product. It is not a representation that the final design or full commercial release of a product has been completed or even that a physical product yet exists. Plaintiff's allegation that a "possible design" of SymCool IQ was not available until May 11, 2025, does not support any inference that prior statements were false. To the contrary, it supports the truth of Ideal Power's description of its product design process and is consistent with the Company's earlier statements about the "launch" of SymCool IQ.

Plaintiff's personal view of when a product merits the label "launched" does not override the Company's publicly disclosed definition. The Company told investors—in its SEC filings—that "product launch" precedes design completion and full commercial release. Investors, including Plaintiff, were on notice that a "launched" product was still being designed. A disagreement between a former employee and his employer over the appropriate use of

commercialization terminology such as the term "launch" does not support any claims of securities fraud.

Finally, to the extent the Complaint challenges characterizations of SymCool IQ as having "excellent features and performances," such statements constitute non-actionable corporate puffery—vague, optimistic characterizations "too general to cause a reasonable investor to rely upon [them]." *In re F45 Training Holdings, Inc. Sec. Litig.*, No. 1:22-CV-01291-DAE, 2025 WL 4230711, at *11 (W.D. Tex. Feb. 21, 2025); *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). This is particularly evident where the Company's public filings disclosed only $86,032 in total commercial revenue for fiscal year 2024, signaling to any reasonable investor the early and speculative stage of product commercialization. Riccardi Decl., Ex. 5 at 18.

### C. The CEO Retirement And Accounting Firm Disclosure

The Complaint references Ideal Power's announcement of CEO Dan Brdar's retirement but does not identify any falsity in that disclosure. Compl. ¶ 3. The November 3, 2025, Form 8-K factually states that "[o]n October 31, 2025," Mr. Brdar "gave notice of his retirement from all positions with the Company, effective November 2, 2025." Riccardi Decl., Ex. 6 at 2.

The Complaint also claims that, at the same time of the announcement of Mr. Brdar's retirement, the Company "announced that it contracted BPM LLP as [its] independent registered public accounting firm" (Compl. ¶ 3) even though BPM has been the Company's auditor since 2013.

The Complaint does not allege how these disclosures were false or misleading, does not connect them to Plaintiff's earlier stock transactions (which concluded in September 2025), and does not articulate any theory under which a factual disclosure of an executive transition or accounting firm engagement constitutes securities fraud. These allegations fail to state a claim.

## III. THE COMPLAINT DOES NOT PLEAD STOCK PURCHASES AFFECTED BY MISSTATEMENTS AND FAILS TO ESTABLISH THAT RSU VESTINGS CONSTITUTE "PURCHASES" UNDER THE EXCHANGE ACT

Claims under Sections 10(b) and 18(a) of the Exchange Act are only available when a plaintiff has purchased shares at prices artificially inflated by the alleged misstatements. *Dura*, 544 U.S. at 341–42; *In re Enron*, 540 F. Supp. 2d at 813. Plaintiff alleges that he acquired a total of 19,609 shares between 2021 and 2025 (Compl. ¶ 4), that the Company made "false statements about business status, from 2021 to 2024," and that the "Q2 2025 Earning Report" contained misstatements (Compl. ¶ 1). But that is insufficient to meet the pleading requirements because it is impossible, based on these vague, general, and conclusory allegations, to tell whether Plaintiff's share acquisitions constitute purchases for purposes of the Exchange Act and which acquisitions Plaintiff contends were affected by which alleged misstatements and thus which acquisitions were allegedly made at artificially inflated prices. *Dura*, 544 U.S. at 341–42; *In re Enron*, 540 F. Supp. 2d at 813.

To the extent Plaintiff received shares through RSU grants that were part of the Company's standard employee compensation that vested during his employment as CTO, such vestings do not constitute "purchases" within the meaning of Section 3(a)(13) of the Exchange Act. Under *Blue Chip Stamps*, standing to bring claims under Section 10(b) and Rule 10b-5 is limited to actual purchasers or sellers of securities. 421 U.S. at 730. While Section 3(a)(13) defines "purchase" broadly to include "any contract to buy, purchase, or otherwise acquire," courts have recognized that the antifraud provisions are designed to protect investors who make volitional investment decisions based on available market information. *Id*. at 737–38; *see also, In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 835–36 (S.D. Tex. 2017) ("When an employee does not give anything of value for stock other than the continuation of employment nor independently bargains for . . . stock, as when the employee receives his stock through a company-

wide stock option plan there is no purchase or sale of securities." (internal citations and quotations omitted)), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019); *In re Cendant Corp. Sec. Litig.*, 81 F. Supp. 2d 550, 556 (D.N.J. 2000) (dismissing Section 10(b) claims brought by employees who received stocks through a company-wide plan, holding that because the employees "remained as at-will . . . employees with the same responsibilities and compensation," they provided no cognizable consideration for the securities and were not "purchasers").

RSU vesting is fundamentally different from an open-market purchase: the shares are delivered automatically upon satisfaction of time-based conditions without any contemporaneous investment decision by the recipient. At no point during the vesting process does the RSU holder evaluate market information, assess the stock price, or decide whether to "buy" the security. The absence of any volitional, market-facing transaction distinguishes RSU vestings from the investment decisions that *Blue Chip Stamps* and its progeny's purchaser-seller requirement is designed to protect. The Complaint's failure to allege facts establishing that Plaintiff's share acquisitions involved any investment decision—let alone one connected to the alleged misrepresentations—is an independent ground for dismissal.

Separate from the question of whether Plaintiff is a purchaser, as a matter of simple chronology, he cannot plead that his stock acquisitions in 2021 or 2022 were affected by misstatements regarding the "launch" of SymCool IQ because those acquisitions pre-date the alleged misstatements. As noted above, the SymCool IQ Allegation concerns statements supposedly made in 2023-2024. And Plaintiff cannot plead that stock acquisitions made before August 14, 2025, were affected by misstatements about B-TRAN testing because the document relating to the B-TRAN Allegation he cites is the "Q2 2025 Earning Report"—either the Q2 10-Q

or the 8-K, both filed with the SEC on August 14, 2025 (and only four days before he started selling his shares in the Company). The disclosures about the resignation of the CEO were after Plaintiff sold his Ideal Power shares.

## IV. PLAINTIFF CANNOT PLEAD RELIANCE UNDER EITHER EXCHANGE ACT SECTIONS 10(B) OR 18(A)

Reliance is an element of both Section 10(b) and Section 18(a) claims. *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988); *In re Enron*, 540 F. Supp. 2d at 813. For claims under Section 10(b), a plaintiff may invoke a rebuttable presumption of reliance based on the integrity of the market price based on the fraud-on-the-market theory. *Id*. at 247. However, this presumption is rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . ." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281 (2014) (quoting *Basic*, 485 U.S. at 268–69). Under Section 18(a), a plaintiff must establish that he or she relied on the specific SEC filing containing the alleged misstatement (so-called "eyeball reliance") when he or she made the decision to buy or sell. *In re Alstom*, 406 F. Supp. 2d at 479.

The fraud-on-the-market presumption is unavailable here to the extent Plaintiff acquired his shares through RSU grants that vested as part of his employee compensation. Those vestings were not transactions "in" the market—shares were delivered directly from the Company without any arm's-length purchase at the prevailing market price. Because the fraud-on-the-market theory requires that the plaintiff "traded the [securities]" in an efficient market at the price set by the market, *Basic*, 485 U.S. at 247, 248 n.27, it has no application to non-market, non-negotiated compensation arrangements in which the recipient pays no purchase price and makes no investment decision. Plaintiff therefore cannot invoke the fraud-on-the-market presumption and must demonstrate actual, direct reliance.

But Plaintiff cannot do so because his own allegations establish that he possessed direct, personal knowledge of the allegedly true facts throughout the period he acquired shares. As CTO, Plaintiff alleges, he personally prepared weekly progress reports documenting a "more than 50%" failure rate in B-TRAN testing and personally reported to the Board in May 2025 regarding his design of SymCool IQ. A plaintiff who already possesses information sufficient to know that public statements are false cannot claim reliance on those statements. *See Halliburton*, 573 U.S. at 281–82 (fraud-on-the-market presumption is rebuttable by showing that plaintiff was not misled); *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992) ("If the investor already possesses information sufficient to call the representations into question, he cannot claim later that he relied on or was deceived by the lie . . . because the securities laws create liability only when there is substantial likelihood that the misrepresentation significantly altered the total mix of information that the investor possesses.").

Plaintiff cannot simultaneously maintain that (a) he knew the Company's public statements were false based on his direct personal knowledge as CTO, and (b) he relied on those same statements—or the market price incorporating them—in deciding to acquire or hold shares. These positions are irreconcilable, and Plaintiff's reliance claim therefore fails as a matter of law under Section 10(b).

Plaintiff likewise cannot establish reliance under Section 18(a), which requires "eyeball reliance"—proof that he actually read and relied on the specific SEC filing containing the alleged misstatement when making the decision to buy or sell. *In re Alstom*, 406 F. Supp. 2d at 479. This requirement is incompatible with RSU vestings, which occur automatically without any decisional moment at which the recipient reviews an SEC filing before acquiring shares. The vesting occurs regardless of what any filing states. Moreover, Plaintiff has not identified any document filed with

the SEC pursuant to the Exchange Act that he allegedly both reviewed and relied on in making any investment decision. *See id.*

## V. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION UNDER EXCHANGE ACT SECTIONS 10(B) AND 18(A)

A plaintiff must allege that the defendant's fraud caused the claimed economic loss—typically through a "corrective disclosure" or some other event that reveals the truth to the market and causes the stock price to decline from its price allegedly inflated by the misstatements. *See Dura*, 544 U.S. at 342; *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255–56 (5th Cir. 2009).

The Complaint identifies no corrective disclosure. Plaintiff sold his shares between August 18 and September 25, 2025—commencing just four days after his FBI interview on August 14, 2025. There is no allegation that any public corrective disclosure or any other event revealed the alleged fraud to the market, caused the stock price to decline, or preceded Plaintiff's sales. To the contrary, the timeline strongly suggests that Plaintiff's decision to sell was triggered by his personal FBI interview—not by any market-wide revelation.

Without a corrective disclosure or other cognizable loss causation theory, Plaintiff cannot establish that any alleged misrepresentation caused his losses. His losses, if any, are attributable to his own decision to sell based on personal circumstances unrelated to any market correction. In other words, taking Plaintiff's allegations as true, he acquired and sold his shares at prices that were artificially inflated by the alleged misstatements and therefore did not realize any loss due to price inflation caused by the alleged misstatements. The Complaint therefore fails to plead loss causation. See *Lormand*, 565 F.3d at 255–56.

The Complaint's loss causation theory also fails if Plaintiff acquired his shares through the granting and vesting of RSUs. Under *Dura*, a plaintiff's "loss" from securities fraud is measured by the artificial inflation in the price at which the plaintiff transacted, not the total decline in

portfolio value. 544 U.S. at 342–44. A plaintiff who acquired shares at no cost through equity compensation and later sold them has realized a gain on every share sold—not a loss attributable to any alleged fraud. If Plaintiff paid nothing, he has not suffered a loss. *In re Enron*, 238 F. Supp. 3d at 897 (holding that loss causation and damages cannot be calculated where "[p]laintiffs have not claimed that they individually bargained for their stock options").

## VI. THE COMPLAINT DOES NOT PLEAD SCIENTER

The PSLRA requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). For Section 10(b) purposes, scienter means an intent to deceive, manipulate, or defraud. In the Fifth Circuit, severe recklessness may also suffice, but only where the conduct is an extreme departure from ordinary care and presents an obvious danger of misleading investors of which the defendant must have been aware. *See Owens v. Jastrow*, 789 F.3d 529, 535–36 (5th Cir. 2015); *Southland Securities Corp.*, 365 F.3d at 366. The Court must "consider plausible, nonculpable explanations for the defendant's conduct," and the inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The Complaint fails this standard by a wide margin.

The PSLRA requires a Plaintiff to plead particular facts supporting a strong inference that a specific decision-maker possessed an intent to deceive, manipulate, or defraud or acted with severe recklessness—not generic allegations that contrary information existed somewhere within the organization. *See Owens*, 789 F.3d at 535–36; *Southland Sec. Corp.*, 365 F.3d at 366. The Complaint does not connect any individual's fraudulent intent to any specific statement. Regarding the B-TRAN Allegation, Plaintiff alleges that he "clearly reported in my weekly progress that failure was more than 50%." Compl. ¶ 1a. But the Complaint does not identify: (i) who received these weekly progress reports; (ii) who made the challenged public statement in the "Earning

Report"; (iii) whether the recipients of Plaintiff's reports had any role in preparing, reviewing, or approving the "Earning Report"; or (iv) what any individual decision-maker knew or believed about the allegedly mischaracterized testing results at the time of the challenged statement. Similarly, the SymCool IQ Allegation fails to support any inference that any author of the "Press Release" or social media posts, or speaker at an interview, acted with scienter—not surprisingly, since the SymCool IQ Allegation itself isn't false.

Plaintiff's own allegations, when coupled with what the Company really said, undermine scienter because he has not actually alleged any misstatements. As to B-TRAN testing: Plaintiff alleges a "more than 50%" failure rate in qualification testing. But, as explained above, the statement in the Q2 2025 earnings call referenced zero failures for third-party prequalification testing, not qualification testing. As to SymCool IQ: Plaintiff's May 11, 2025, Board-presentation theory does not establish that the Board knew the Company's statements about the "launch" of SymCool IQ were false. To the contrary, as explained above, Company disclosures clearly explained that product launch was the start of a long process that included designing the product. His reporting a possible design to the Board in May 2025 is consistent with that. There is thus no basis for any inference that the Board or anyone at the Company intended to deceive, manipulate, or defraud or acted with severe recklessness.

## VII. MOST OF PLAINTIFF'S CLAIMS ARE TIME BARRED

Plaintiff alleges that he personally knew the true facts contradicting the Company's public statements at the time they were made, which means the limitations period began running immediately upon each statement. Section 18(a) requires a plaintiff to file suit within one year of discovering the facts underlying the claim. *In re Enron Corp. Sec., Derivative & "ERISA" Litigation*, 465 F. Supp. 2d 687, 713 (S.D. Tex. 2006). Section 10(b) has a two-year statute of limitations. *Royalty Clearinghouse, Ltd. v. CTS Props., Ltd.*, No. A-16-CV-1342-LY-ML, 2017

WL 5071340, at *16 (W.D. Tex. July 12, 2017), *report and recommendation adopted*, No. A-16-CV-1342-LY, 2017 WL 5127241 (W.D. Tex. Aug. 4, 2017) (citing *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010)). Therefore, claims under Section 18(a) based on statements pre-dating June 9, 2025, and claims under Section 10(b) based on statements pre-dating June 9, 2024, are time-barred.

**CONCLUSION**

For the foregoing reasons, Defendant Ideal Power Inc. respectfully requests that this Court grant its Motion to Dismiss and dismiss the Complaint with prejudice.

DATED: August 24, 2026

**ASHURST PERKINS COIE US LLP**

By: */s/ John R. Hardin*
John R. Hardin
john.hardin@ashurstperkins.com
ASHURST PERKINS COIE US LLP
2699 Howell Street, Suite 700
Dallas, TX 75204
Telephone: +1.214.965.7700

Matthew M. Riccardi
(*pro hac vice pending)*
matthew.riccardi@ashurstperkins.com
ASHURST PERKINS COIE US LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.262.6900

*Attorneys for Ideal Power Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2026, I electronically filed the foregoing Defendant Ideal Power Inc.'s Memorandum of Law in Support of its Motion to Dismiss with the Clerk of the Court using the CM/ ECF system and caused service of same via email to the below party of record:

Jiankang Bu (pro se)
45190 Key Circle
Temecula, CA 92592
Tel. 951-666-0355
Email: jiankang.bu@gmail.com

*/s/ John R. Hardin*
John R. Hardin