**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| JIANKANG BU,<br><br>Plaintiff,<br><br>v.<br><br>IDEAL POWER INC.,<br><br>Defendant. | No. 1:26-cv-01557-RP<br><br>Honorable Robert Pitman |

**DECLARATION OF MATTHEW M. RICCARDI**
**IN SUPPORT OF DEFENDANT IDEAL POWER INC.'S**
**MOTION TO DISMISS AND SUPPORTING MEMORANDUM**

I, Matthew M. Riccardi, declare as follows:

1. I am a partner at Ashurst Perkins Coie US LLP, attorneys for Defendant Ideal Power Inc. ("Ideal Power" of "Defendant") in the above-captioned case. I submit this Declaration in support of Defendant's Motion to Dismiss the Complaint.

2. I am of sound mind, over the age of 21, have never been convicted of a felony, and am fully authorized and competent to make this declaration. This declaration is made upon my personal knowledge, except where otherwise noted. If called to testify to said statements, I could and would testify competently thereto. I am an attorney at law, duly licensed to practice before all state and federal courts of the State of New York.

3. Attached hereto as **Exhibit 1** is a true and correct copy of Ideal Power Inc.'s Q2 2025 Form 10-Q filed with the Securities and Exchange Commission on August 14, 2025.

4. Attached hereto as **Exhibit 2** is a true and correct copy of Ideal Power Inc.'s Current Report on Form 8-K filed with the Securities and Exchange Commission on August 14, 2025, together with the press release attached thereto as an exhibit.

5. Attached hereto as **Exhibit 3** is a true and correct copy of the transcript of Ideal Power Inc.'s Q2 2025 earnings call held on August 14, 2025.

6. Attached hereto as **Exhibit 4** is a true and correct copy of Ideal Power Inc.'s Q1 2025 Form 10-Q filed with the Securities and Exchange Commission on May 15, 2025.

7. Attached hereto as **Exhibit 5** is a true and correct copy of Ideal Power Inc.'s Form 10-K for fiscal year 2025 filed with the Securities and Exchange Commission on March 27, 2026.

8. Attached hereto as **Exhibit 6** is a true and correct copy of Ideal Power Inc.'s Current Report on Form 8-K filed with the Securities and Exchange Commission on November 3, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 24, 2026, in New York, New York, by:

Matthew M. Riccardi

# EXHIBIT 1

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2025**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______________ to _______________**

**Commission File Number 001-36216**

## IDEAL POWER INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **14-1999058** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**5508 Highway 290 West, Suite 120**
**Austin, Texas 78735**
(Address of principal executive offices)
(Zip Code)

**(512) 264-1542**
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | IPWR | The Nasdaq Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark whether the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the issuer is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of August 12, 2025, the issuer had 8,498,014 shares of common stock, par value $0.001, outstanding.

## TABLE OF CONTENTS


| | | |
|---|---|---|
| **PART I** | FINANCIAL INFORMATION | 3 |
| **Item 1.** | Unaudited Condensed Financial Statements | 3 |
| | Balance Sheets at June 30, 2025 and December 31, 2024 | 3 |
| | Statements of Operations for the three and six months ended June 30, 2025 and 2024 | 4 |
| | Statements of Cash Flows for the six months ended June 30, 2025 and 2024 | 5 |
| | Statements of Stockholders' Equity for the three-month periods during the six months ended June 30, 2025 and 2024 | 6 |
| | Notes to Unaudited Financial Statements | 7 |
| **Item 2.** | Management's Discussion and Analysis of Financial Condition and Results of Operations | 12 |
| **Item 3.** | Quantitative and Qualitative Disclosures About Market Risk | 15 |
| **Item 4.** | Controls and Procedures | 15 |
| **PART II** | OTHER INFORMATION | 15 |
| **Item 1.** | Legal Proceedings | 15 |
| **Item 1A.** | Risk Factors | 15 |
| **Item 2.** | Unregistered Sales of Equity Securities and Use of Proceeds | 16 |
| **Item 3.** | Defaults Upon Senior Securities | 16 |
| **Item 4.** | Mine Safety Disclosures | 16 |
| **Item 5.** | Other Information | 16 |
| **Item 6.** | Exhibits | 17 |
| **SIGNATURES** | | 18 |

Table of Contents

## PART I-FINANCIAL INFORMATION

### ITEM 1. UNAUDITED CONDENSED FINANCIAL STATEMENTS

**IDEAL POWER INC.**
**Balance Sheets**
**(unaudited)**

| | June 30, 2025 | December 31, 2024 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 11,105,553 | $ 15,842,850 |
| Accounts receivable, net | 8,175 | 692 |
| Inventory | 77,387 | 96,406 |
| Prepayments and other current assets | 233,528 | 356,658 |
| Total current assets | 11,424,643 | 16,296,606 |
| Property and equipment, net | 382,451 | 415,232 |
| Intangible assets, net | 2,681,808 | 2,611,998 |
| Right of use asset | 441,325 | 483,497 |
| Other assets | 17,789 | 19,351 |
| Total assets | $ 14,948,016 | $ 19,826,684 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 152,715 | $ 104,117 |
| Accrued expenses | 663,642 | 374,012 |
| Current portion of lease liability | 87,915 | 82,681 |
| Total current liabilities | 904,272 | 560,810 |
| Long-term lease liability | 358,446 | 403,335 |
| Other long-term liabilities | 946,957 | 1,007,375 |
| Total liabilities | 2,209,675 | 1,971,520 |
| Commitments and contingencies (Note 5) | | |
| Stockholders' equity: | | |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 8,499,335 shares issued and 8,498,014 shares outstanding at June 30, 2025 and 8,336,812 shares issued and 8,335,491 shares outstanding at December 31, 2024 | 8,499 | 8,337 |
| Additional paid-in capital | 125,950,104 | 125,327,300 |
| Treasury stock, at cost, 1,321 shares at June 30, 2025 and December 31, 2024 | (13,210) | (13,210) |
| Accumulated deficit | (113,207,052) | (107,467,263) |
| Total stockholders' equity | 12,738,341 | 17,855,164 |
| Total liabilities and stockholders' equity | $ 14,948,016 | $ 19,826,684 |

The accompanying notes are an integral part of these condensed financial statements.

Table of Contents

**IDEAL POWER INC.**
**Statements of Operations**
**(unaudited)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| Revenue | $ 1,275 | $ 1,331 | $ 13,278 | $ 80,070 |
| Cost of revenue | 3,477 | 17,474 | 34,339 | 85,972 |
| Gross loss | (2,202) | (16,143) | (21,061) | (5,902) |
| Operating expenses: | | | | |
| Research and development | 1,900,019 | 1,562,747 | 3,468,011 | 2,929,640 |
| General and administrative | 897,239 | 947,384 | 1,797,060 | 1,801,072 |
| Sales and marketing | 341,033 | 359,739 | 679,193 | 676,350 |
| Total operating expenses | 3,138,291 | 2,869,870 | 5,944,264 | 5,407,062 |
| Loss from operations | (3,140,493) | (2,886,013) | (5,965,325) | (5,412,964) |
| Interest income, net | 103,728 | 223,948 | 225,536 | 281,273 |
| Net loss | $ (3,036,765) | $ (2,662,065) | $ (5,739,789) | $ (5,131,691) |
| Net loss per share - basic and diluted | $ (0.33) | $ (0.31) | $ (0.63) | $ (0.69) |
| Weighted average number of shares outstanding - basic and diluted | 9,116,519 | 8,514,581 | 9,109,225 | 7,417,260 |

The accompanying notes are an integral part of these condensed financial statements.

Table of Contents

**IDEAL POWER INC.**
**Statements of Cash Flows**
**(unaudited)**

| | Six Months Ended June 30, 2025 | Six Months Ended June 30, 2024 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $ (5,739,789) | $ (5,131,691) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 182,107 | 163,871 |
| Amortization of right of use asset | 42,172 | 34,948 |
| Write-off of capitalized patent | - | 62,073 |
| Write-off of fixed assets | 1,201 | 14,459 |
| Gain on lease termination | - | (15,319) |
| Stock-based compensation | 714,625 | 745,600 |
| Decrease (increase) in operating assets: | | |
| Accounts receivable | (7,483) | 68,669 |
| Inventory | 19,019 | 1,788 |
| Prepaid expenses and other assets | 124,692 | 160,007 |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | 48,598 | (174,464) |
| Accrued expenses and other liabilities | 229,212 | 135,175 |
| Lease liability | (39,655) | (36,046) |
| Net cash used in operating activities | (4,425,301) | (3,970,930) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (41,128) | (64,036) |
| Acquisition of intangible assets | (179,209) | (174,968) |
| Net cash used in investing activities | (220,337) | (239,004) |
| | | |
| Cash flows from financing activities: | | |
| Net proceeds from issuance of common stock and pre-funded warrants | - | 15,724,818 |
| Exercise of options and warrants | 110 | 86,757 |
| Payment of taxes related to restricted stock unit vestings | (91,769) | (11,579) |
| Net cash provided by (used in) financing activities | (91,659) | 15,799,996 |
| | | |
| Net increase (decrease) in cash and cash equivalents | (4,737,297) | 11,590,062 |
| Cash and cash equivalents at beginning of period | 15,842,850 | 8,474,835 |
| Cash and cash equivalents at end of period | $ 11,105,553 | $ 20,064,897 |

The accompanying notes are an integral part of these condensed financial statements.

Table of Contents

**IDEAL POWER INC.**
**Statements of Stockholders' Equity**
**For the Three-Month Periods during the Six Months Ended June 30, 2025 and 2024**
**(unaudited)**

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | Shares | Amount | | |
| Balances at December 31, 2024 | 8,336,812 | $ 8,337 | $125,327,300 | 1,321 | $ (13,210) | $(107,467,263) | $ 17,855,164 |
| Vesting of restricted stock units | 12,479 | 12 | (9,358) | - | - | - | (9,346) |
| Stock-based compensation | - | - | 384,595 | - | - | - | 384,595 |
| Net loss for the three months ended March 31, 2025 | - | - | - | - | - | (2,703,024) | (2,703,024) |
| Balances at March 31, 2025 | 8,349,291 | 8,349 | 125,702,537 | 1,321 | (13,210) | (110,170,287) | 15,527,389 |
| Vesting of restricted stock units | 40,044 | 40 | (82,463) | - | - | - | (82,423) |
| Exercise of pre-funded warrants | 110,000 | 110 | - | - | - | - | 110 |
| Stock-based compensation | - | - | 330,030 | - | - | - | 330,030 |
| Net loss for the three months ended June 30, 2025 | - | - | - | - | - | (3,036,765) | (3,036,765) |
| Balances at June 30, 2025 | 8,499,335 | $ 8,499 | $125,950,104 | 1,321 | $ (13,210) | $ (113,207,052) | $ 12,738,341 |
| | | | | | | | |
| Balances at December 31, 2023 | 5,998,018 | $ 5,998 | $ 107,116,362 | 1,321 | $ (13,210) | $ (97,049,450) | $ 10,059,700 |
| Issuance of common stock and pre-funded warrants | 1,366,668 | 1,367 | 13,651,296 | - | - | - | 13,652,663 |
| Exercise of options | 8,334 | 8 | 86,749 | - | - | - | 86,757 |
| Vesting of restricted stock units | 9,679 | 10 | (10) | - | - | - | - |
| Stock-based compensation | - | - | 381,019 | - | - | - | 381,019 |
| Net loss for the three months ended March 31, 2024 | - | - | - | - | - | (2,469,626) | (2,469,626) |
| Balances at March 31, 2024 | 7,382,699 | 7,383 | 121,235,416 | 1,321 | (13,210) | (99,519,076) | 21,710,513 |
| Issuance of common stock and pre-funded warrants | 300,000 | 300 | 2,071,855 | - | - | - | 2,072,155 |
| Vesting of restricted stock units | 12,539 | 12 | (11,591) | - | - | - | (11,579) |
| Stock-based compensation | - | - | 364,581 | - | - | - | 364,581 |
| Net loss for the three months ended June 30, 2024 | - | - | - | - | - | (2,662,065) | (2,662,065) |
| Balances at June 30, 2024 | 7,695,238 | $ 7,695 | $123,660,261 | 1,321 | $ (13,210) | $(102,181,141) | $ 21,473,605 |

The accompanying notes are an integral part of these condensed financial statements.

**IDEAL POWER INC.**
**Notes to Financial Statements**
**(unaudited)**

**Note 1 - Organization and Description of Business**

Ideal Power Inc. (the "Company") was incorporated in Texas in May 2007 under the name Ideal Power Converters, Inc. The Company changed its name to Ideal Power Inc. and re-incorporated in Delaware in July 2013. With headquarters in Austin, Texas, the Company is focused on the further development and commercialization of its Bidirectional bipolar junction TRANsistor (B-TRAN®) solid-state switch technology.

Since its inception, the Company has financed its research and development efforts and operations primarily through the sale of common stock and pre-funded warrants. The Company's continued operations are dependent upon, among other things, its ability to obtain adequate sources of funding through future revenues, follow-on stock offerings, issuances of warrants, debt financing, co-development agreements, government grants, sale or licensing of developed intellectual property or other alternatives.

**Note 2 - Summary of Significant Accounting Policies**

Basis of Presentation

The accompanying unaudited condensed financial statements have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission (the "SEC") for Form 10-Q. Accordingly, certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. The balance sheet at December 31, 2024 has been derived from the Company's audited financial statements included in its Annual Report on Form 10-K filed with the SEC on March 28, 2025.

In the opinion of management, these financial statements reflect all normal recurring, and other adjustments, necessary for a fair presentation. These financial statements should be read in conjunction with the audited financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2024. Operating results for interim periods are not necessarily indicative of operating results for an entire fiscal year or any other future periods.

Segment Information

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the Company's CODM. The CODM reviews financial information presented on a company-wide basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. As such, the Company has determined that it operates as one operating segment. The Company has concluded that net income (loss) is the measure of segment profitability. The CODM assesses performance for the Company, monitors budget versus actual results and determines how to allocate resources based on net income (loss) as reported in the statements of operations. There are no other expense categories regularly provided to the CODM that are not already included in the financial statements herein.

During the six months ended June 30, 2025 and 2024, the Company did not generate material international revenues and as of June 30, 2025 and December 31, 2024, the Company did not have material assets located outside of the United States.

Net Loss Per Share

In accordance with Accounting Standards Codification ("ASC") 260, shares issuable for little or no cash consideration are considered outstanding common shares and included in the computation of basic net loss per share. As such, for the three and six months ended June 30, 2025 and 2024, the Company included pre-funded warrants to purchase shares of common stock in its computation of net loss per share. The pre-funded warrants were issued in March 2024 and November 2019 with an exercise price of $0.001. See Note 7.

In periods with a net loss, no common share equivalents are included in the computation of diluted net loss per share because their effect would be anti-dilutive. At June 30, 2025 and 2024, potentially dilutive shares outstanding amounted to 1,287,558 and 1,763,733 shares, respectively, and exclude pre-funded warrants to purchase shares of common stock.

Recent Accounting Pronouncements

Management does not believe that any recently issued, but not yet effective, accounting standard, if adopted, would have a material impact on the Company's financial statements.

Table of Contents

**Note 3 - Intangible Assets**

Intangible assets, net consisted of the following:

| | June 30, 2025 (unaudited) | December 31, 2024 |
|---|---|---|
| Patents | $ 1,949,489 | $ 1,770,374 |
| Trademarks | 22,861 | 22,767 |
| Other intangible assets | 1,843,036 | 1,843,036 |
| | 3,815,386 | 3,636,177 |
| Accumulated amortization - patents | (389,303) | (349,279) |
| Accumulated amortization - other intangible assets | (744,275) | (674,900) |
| | $ 2,681,808 | $ 2,611,998 |

At June 30, 2025 and December 31, 2024, the Company capitalized $707,305 and $541,081, respectively, for costs related to patents that have not been awarded. Cost related to patents that have not yet been awarded are not amortized until patent issuance.

At June 30, 2025 and December 31, 2024, the Company capitalized $22,861 and $22,767, respectively, for costs related to trademarks. Costs related to indefinite life trademarks are not amortized but are subject to evaluation for potential impairment.

Amortization expense amounted to $
54,699 and $109,399 for the three and six months ended June 30, 2025, respectively, and $53,905 and $106,602 for the three and six months ended June 30, 2024, respectively. Amortization expense for the succeeding five years and thereafter is $109,399 (remaining six months of 2025), $218,798 (2026-2029) and $967,051 (thereafter).

**Note 4 - Lease**

In March 2021, the Company entered into a lease agreement (the "Original Lease") for 4,070 square feet of office and laboratory space located in Austin, Texas ("the Original Suite"). The commencement of the lease occurred on June 1, 2021 and the initial term of the lease was 63 months. The actual base rent in the first year of the lease was $56,471 and was net of $18,824 in abated rent over the first three months of the lease term. The annual base rent in the second year of the lease was $77,330 and increased by $2,035 in each succeeding year of the lease. In addition, the Company was required to pay its proportionate share of operating costs for the building under this triple net lease.

In April 2024, the Company entered into a first amendment and relocation agreement (the "Amended Lease") with its landlord. Under the Amended Lease, the Company relocated to another, larger suite in the same office building. The Amended Lease is for 5,775 square feet of office and laboratory space (the "New Suite") and, upon occupancy, replaced the 4,070 square feet of office and laboratory space previously leased by the Company. The term of the Amended Lease expires sixty-two (62) months from July 1, 2024, the commencement date. The annual base rent for the first year of the Amended Lease was $118,388 and the annual base rent increases approximately 2.75% each year during the lease term. The Company is required to pay its proportionate share of operating costs for the building under this triple net lease.

In accordance with ASC 842, the Company accounted for the modification of the lease contract as a separate lease contract. The lease for the Original Suite terminated on June 30, 2024 and the Company recorded a gain on the termination of the lease for the Original Suite of $15,319 in general and administrative expenses. The Company recognized a right of use asset and a corresponding liability for the Amended Lease on the commencement date. For purposes of calculating the right of use asset and lease liability, the Company estimated its incremental borrowing rate at 8.5% per annum.

Future minimum payments under the Amended Lease are as follows:

| **For the Year Ended December 31,** | |
|---|---|
| 2025 (remaining) | $ 60,810 |
| 2026 | 123,297 |
| 2027 | 126,703 |
| 2028 | 130,197 |
| 2029 | 88,579 |
| Total lease payments | 529,586 |
| Less: imputed interest | (83,225) |
| Total lease liability | 446,361 |
| Less: current portion of lease liability | (87,915) |
| Long-term lease liability | $ 358,446 |

Table of Contents

At June 30, 2025, the remaining lease term was 50 months.

For the three months ended June 30, 2025 and 2024, operating cash flows for lease payments totaled $29,597 and $20,011, respectively, and for the six months ended June 30, 2025 and 2024, operating cash outflows for lease payments totaled $59,194 and $39,852, respectively. For the three months ended June 30, 2025 and 2024, operating lease cost, recognized on a straight-line basis, totaled $30,856 and $19,736, respectively, and for the six months ended June 30, 2025 and 2024, operating lease cost, recognized on a straight-line bases, totaled $61,712 and $38,754, respectively.

**Note 5 - Commitments and Contingencies**

License Agreements

In 2015, the Company entered into a licensing agreement which expires in February 2033. Per the agreement, the Company has an exclusive royalty-free license, included in intangible assets, associated with semiconductor power switches which enhances its intellectual property portfolio. The Company pays $100,000 annually under this agreement.

In 2023, the Company amended a 2021 license agreement which expires in February 2034. Per the agreement, the Company has an exclusive royalty-free license, included in intangible assets, associated with semiconductor drive circuitry which enhances its intellectual property portfolio. The Company pays $
50,000 annually under this agreement.

At June 30, 2025, the estimated present value of future payments under the licensing agreements was $1,096,957 with $150,000 due and payable in the next twelve months. The Company is accruing interest for future payments related to these agreements.

Legal Proceedings

The Company may be subject to litigation from time to time in the ordinary course of business. The Company is not currently party to any legal proceedings.

Indemnification Obligations

The employment agreements of Company executives include an indemnification provision whereby the Company shall indemnify and defend, at the Company's expense, its executives so long as an executive's actions were taken in good faith and in furtherance of the Company's business and within the scope of the executive's duties and authority.

**Note 6 - Equity Incentive Plan**

In May 2013, the Company adopted the 2013 Equity Incentive Plan (as amended and restated, the "Plan") and reserved shares of common stock for issuance under the Plan, which was last amended in June 2023. The Plan is administered by the Compensation Committee of the Company's Board of Directors. At June 30, 2025, 213,555 shares of common stock were available for issuance under the Plan.

A summary of the Company's stock option activity and related information is as follows:

| | Stock Options | | Weighted Average Exercise Price | Weighted Average Remaining Life (in years) |
|---|---|---|---|---|
| Outstanding at December 31, 2024 | 509,414 | $ | 7.56 | 4.6 |
| Forfeited/Expired | (93,000) | $ | 6.26 | |
| Outstanding at June 30, 2025 | 416,414 | $ | 7.85 | 4.9 |
| Exercisable at June 30, 2025 | 412,414 | $ | 7.80 | 4.9 |

A summary of the Company's restricted stock unit (RSU) and performance stock unit (PSU) activity is as follows:

| | RSUs | PSUs |
|---|---|---|
| Outstanding at December 31, 2024 | 331,715 | 114,000 |
| Granted | 115,873 | 80,000 |
| Vested | (72,934) | - |
| Forfeited | (39,750) | - |
| Outstanding at June 30, 2025 | 334,904 | 194,000 |

Table of Contents

During the six months ended June 30, 2025, the Company granted 38,660 RSUs to Board members, 80,000 PSUs and 40,000 RSUs to executives and 37,213 RSUs to employees under the Plan. The estimated fair value of these equity grants was $982,283, of which $178,288 was recognized in stock-based compensation expense totaling $
714,625 for the six months ended June 30, 2025.

At June 30, 2025, there was $2,236,333 of unrecognized compensation cost related to non-vested equity awards granted under the Plan. That cost is expected to be recognized over a weighted average period of 0.9 years.

**Note 7 - Warrants**

At June 30, 2025 and December 31, 2024, the Company had 342,240 warrants outstanding with a weighted average exercise price of $8.90 per share. At June 30, 2025 and December 31, 2024, the Company had 653,827 and 763,827 pre-funded warrants outstanding, respectively, with an exercise price of $0.001 per share. During the six months ended June 30, 2025, a warrant holder exercised 110,000 prefunded warrants for exercise proceeds of $110. The weighted average remaining life, excluding the pre-funded warrants with no expiration date, of the outstanding warrants is 0.1 years.

At June 30, 2025, all warrants were exercisable, although the warrants held by certain of the Company's warrant holders may be exercised only to the extent that the total number of shares of common stock then beneficially owned by such warrant holder does not exceed
4.99% (or, at the investor's election, 9.99%) of the outstanding shares of the Company's common stock.

Table of Contents

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS REPORT**

This report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 and the provisions of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act. These statements include, but are not limited to, statements regarding our future financial performance, liquidity, business condition and results of operations, expectations regarding future expenses and gross margins, future business plans, and expectations regarding design wins and other business developments. Forward-looking statements give our current expectations or forecasts of future events. You can identify these statements by the fact that they do not relate strictly to historical or current facts. You can find many (but not all) of these statements by looking for words such as “approximates,” “believes,” “hopes,” “expects,” “anticipates,” “estimates,” “projects,” “intends,” “plans,” “would,” “should,” “could,” “may” or other similar expressions in this report. In particular, these include statements relating to future actions, prospective products, applications, customers, technologies, future performance or results of anticipated products, expenses, and financial results. These forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from our historical experience and our present expectations or projections. Factors that could cause actual results to differ from those discussed in the forward-looking statements include, but are not limited to:

- our history of losses;
- our ability to generate revenue;
- our limited operating history;
- the size and growth of markets for our technology;
- regulatory developments that may affect our business;
- our ability to successfully develop new products and the expected performance of those products;
- the performance of third-party consultants and service providers whom we have and will continue to rely on to assist us in development and commercialization of our B-TRAN® and related packaging and drive circuitry;
- the rate and degree of market acceptance for our B-TRAN® and current and future B-TRAN® products;
- the time required for third parties to redesign, test and certify their products incorporating our B-TRAN®;
- our ability to successfully commercialize our B-TRAN® technology;
- our ability to secure strategic partnerships with semiconductor fabricators and others related to our B-TRAN® technology;
- our ability to obtain, maintain, defend and enforce intellectual property rights protecting our technology;
- the success of our efforts to manage cash spending, particularly prior to the commercialization of our B-TRAN® technology at scale;
- trade protectionism, tariffs, and other barriers to trade that impact the availability or cost of the raw materials and components used in our products;
- general economic conditions and events, including inflation, and the impact they may have on us and our potential partners and licensees;
- our dependence on the global supply chain and impacts of supply chain disruptions;
- our ability to obtain adequate financing in the future, if and when we need it;
- the impact of global health pandemics on our business, financial condition and results of operations;
- our success at managing the risks involved in the foregoing items; and
- other factors discussed in this report.

The forward-looking statements are based upon management’s beliefs and assumptions and are made as of the date of this report. We undertake no obligation to publicly update or revise any forward-looking statements included in this report, except as required by applicable law. You should not place undue reliance on these forward-looking statements.

Unless otherwise stated or the context otherwise requires, the terms “Ideal Power,” “we,” “us,” “our” and the “Company” refer to Ideal Power Inc.

Table of Contents

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q as well as our audited 2024 financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2024. In addition to historical information, the discussion and analysis here and throughout this Form 10-Q contains forward-looking statements that involve risks, uncertainties and assumptions. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain factors, including, but not limited, to those set forth under "Risk Factors" in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2024.*

**Overview**

Ideal Power Inc. is located in Austin, Texas. We are solely focused on the further development and commercialization of our Bidirectional bipolar junction TRANsistor (B-TRAN®) solid-state switch technology.

To date, operations have been funded primarily through the sale of common stock and pre-funded warrants.

We are in the process of commercializing our B-TRAN® technology and have launched our first two commercial products, the SymCool® Power Module and SymCool® IQ Intelligent Power Module. We generated $13,278 in revenue in the six months ended June 30, 2025.

<u>Product Launches</u>

In early 2023, we launched our first commercial product, the SymCool® Power Module. This multi-die B-TRAN® module is designed to meet the very low conduction loss needs of the solid-state circuit breaker ("SSCB") market. We commenced shipment of SymCool® Power Modules to fulfill customer orders in 2024.

In late 2023, we launched our second commercial product, the SymCool® IQ Intelligent Power Module ("IPM"). The SymCool® IQ IPM builds on the multi-die packaging design of our SymCool® Power Module and adds an integrated intelligent driver optimized for bidirectional operation. This product targets several markets including renewable energy, energy storage, electric vehicle ("EV") charging and other industrial applications. We announced our first order for this product in late 2024.

Upon product launch, we design and build initial prototypes for testing and to solicit customer feedback. Based on the results of testing and customer feedback, we incorporate any necessary changes into the product design, build final prototypes and complete additional testing prior to full commercial release. To date, our customers have purchased prototypes in small quantities for evaluation and provided us feedback that has been incorporated into our final product designs. We expect significantly higher volume orders from customers once we secure a design win from them, and they start to build inventory in advance of launching their OEM product. For the product launches described above, we would expect the time from announcing a design win to the sale of the related OEM product to be roughly one year, although it may vary considerably depending on the customer. We would expect a significantly longer design cycle for automotive applications. Design wins are expected to result in significant revenue growth for us over time as product life cycles tend to be relatively long for power electronics products as changing to another technology would require an OEM to redesign their product. See "First Design Win" below.

<u>Development Agreement</u>

In 2022, we announced, and began the first phase of, a product development agreement with Stellantis, a top 10 global automaker, for a custom B-TRAN® power module for use in the automaker's EV drivetrain inverters in its next generation EV platform. In the first phase of the program, we provided packaged B-TRAN® devices, test kits and technical data to Stellantis for their evaluation. In 2023, we secured, and began the second phase of, this program. In the second phase of the program, we collaborated with Stellantis and the program partners, including both the program's packaging company and the organization building the initial drivetrain inverter, to supply B-TRAN® devices for integration into the custom power module and inverter designs. Also, as part of the second phase of the program, we provided Stellantis a comprehensive test plan for the testing required to achieve certification to automotive standards for B-TRAN®. The test plan was subsequently approved as submitted. In 2024, we successfully completed the second phase of the program. The next phase of the program builds on the completion of deliverables from the prior two program phases and transitions to Stellantis' production team. We are currently finalizing the timing and scope of work for the next phase of the program with Stellantis. This phase is expected to include the extensive testing of the custom B-TRAN® module to meet automotive certification standards enabling B-TRAN® to be the core of the powertrain inverter for the automaker's next-generation EVs.

Table of Contents

Customer Engagements

We have announced several engagements and/or initial orders with large companies, including a second top 10 global automaker, a third global automaker, a top 10 global provider of power conversion solutions to the solar industry, three global diverse power management market leaders, five tier 1 automotive suppliers, a global power conversion supplier and others. These companies intend to test and evaluate, or are already in the process of testing and evaluating, our technology for use in their applications. These engagements could lead to future design wins or custom development agreements. We also announced agreements with four distribution partners. We may add other distribution partners in the future.

First Design Win

In late 2024, we announced our first design win for SSCBs with one of the largest circuit protection equipment manufacturers in Asia serving the industrial and utility markets. In connection with this design win, we entered into a joint development agreement for a SSCB product incorporating multiple B-TRAN® devices. The agreement includes the product design, prototype builds and testing of the SSCB, which was targeted for completion in the second quarter of 2025, to be followed by commercial sales later in the year. We completed our deliverables under the agreement in the first quarter of 2025, three months ahead of schedule. We expect to announce additional design wins and/or custom development agreements in the second half of 2025.

**Results of Operations**

**Comparison of the three months ended June 30, 2025 to the three months ended June 30, 2024**

*Revenue.* Revenue was $1,275 for the three months ended June 30, 2025, compared to $1,331 in the three months ended June 30, 2024. Revenue in the three months ended June 30, 2025 and 2024 related to initial orders from customers evaluating our technology for use in their applications.

*Cost of Revenue.* Cost of revenue was $3,477 for the three months ended June 30, 2025, compared to $17,474 in the three months ended June 30, 2024. Cost of revenue in the three months ended June 30, 2025 related to initial low volume shipments of our products while cost of revenue in the three months ended June 30, 2024 related to initial high cost, low volume shipments of prototype products.

*Research and Development Expenses.* Research and development expenses increased by $337,272, or 22%, to $1,900,019 in the three months ended June 30, 2025 from $1,562,747 in the three months ended June 30, 2024. The increase was due to higher semiconductor fabrication costs of $283,932, personnel costs of $104,640 and other B-TRAN® development spending of $5,211, partly offset by lower packaging and prototyping costs of $56,511.

*General and Administrative Expenses.* General and administrative expenses decreased by $50,145, or 5%, to $897,239 in the three months ended June 30, 2025 from $947,384 in the three months ended June 30, 2024. The decrease was due to lower investor relations spending of $75,897 and asset impairments of $66,315 in the three months ended June 30, 2024, partly offset by higher personnel costs of $42,226, stock-based compensation expense of $18,240 and other spending of $16,282 and a gain on lease modification of $15,319 in the three months ended June 30, 2024.

*Sales and Marketing Expenses.* Sales and marketing expenses decreased by $18,706, or 5%, to $341,033 in the three months ended June 30, 2025 from $359,739 in the three months ended June 30, 2024. The decrease was due to lower personnel costs of $36,424 and stock-based compensation expense of $28,499, partly offset by higher search and placement fees of $27,924, consulting fees of $15,086 and other spending of $3,207.

*Loss from Operations.* Our loss from operations for the three months ended June 30, 2025 was $3,140,493, or 9% higher, as compared to the $2,886,013 loss from operations for the three months ended June 30, 2024, for the reasons discussed above.

*Interest Income, Net.* Net interest income was $103,728 for the three months ended June 30, 2025, compared to $223,948 for the three months ended June 30, 2024, due primarily to the impact of a declining cash balance on interest earned on our money market account.

*Net Loss.* Our net loss for the three months ended June 30, 2025 was $3,036,765, or 14% higher, as compared to a net loss of $2,662,065 for the three months ended June 30, 2024, for the reasons discussed above.

**Comparison of the six months ended June 30, 2025 to the six months ended June 30, 2024**

*Revenue.* Revenue was $13,278 for the six months ended June 30, 2025, compared to $80,070 in the six months ended June 30, 2024. For the six months ended June 30, 2025, our revenue included product sales and development revenue related to our first design win. For the six months ended June 30, 2024, our revenue was primarily related to the completion of the second phase of our development agreement with Stellantis. We expect revenue to increase modestly in the second half of 2025.

*Cost of Revenue.* Cost of revenue was $34,339 for the six months ended June 30, 2025, compared to $85,972 in the six months ended June 30, 2024. Cost of revenue in the six months ended June 30, 2025 related primarily to initial low volume shipments of our products. Cost of revenue in the six months ended June 30, 2024 related primarily to our development agreement with Stellantis. We expect negative gross margin from product revenue at low volumes with significant improvement in gross margins as we commence higher volume production and shipments in the future.

Table of Contents

*Research and Development Expenses.* Research and development expenses increased by $538,371, or 18%, to $3,468,011 in the six months ended June 30, 2025 from $2,929,640 in the six months ended June 30, 2024. The increase was due to higher semiconductor fabrication costs of $335,220, personnel costs of $264,645 and other B-TRAN® development spending of $42,908, partly offset by lower packaging and prototyping costs of $104,402. We expect higher research and development expenses in the second half of 2025 as compared to the first half of 2025 as we continue development of our B-TRAN® technology. There will also be quarter-to-quarter variability to research and development expenses due to the timing of semiconductor fabrication runs and other development activities.

*General and Administrative Expenses.* General and administrative expenses decreased slightly by $4,012, or less than 1%, to $1,797,060 in the six months ended June 30, 2025 from $1,801,072 in the six months ended June 30, 2024. We expect modestly higher general and administrative expenses, exclusive of stock-based compensation, in the second half of 2025 as compared to the first half of 2025.

*Sales and Marketing Expenses.* Sales and marketing expenses increased by $2,843, or less than 1%, to $679,193 in the six months ended June 30, 2025 from $676,350 in the six months ended June 30, 2024. We expect higher sales and marketing expenses in the second half of 2025 as compared to the first half of 2025 as we further commercialize our B-TRAN® technology.

*Loss from Operations.* Our loss from operations for the six months ended June 30, 2025 was $5,965,325, or 10% higher, as compared to the $5,412,964 loss from operations for the six months ended June 30, 2024, for the reasons discussed above.

*Interest Income, Net.* Net interest income was $225,536 for the six months ended June 30, 2025 compared to $281,273 for the six months ended June 30, 2024 due primarily to the impact of a declining cash balance on interest earned on our money market account.

*Net Loss.* Our net loss for the six months ended June 30, 2025 was $5,739,789, or 12% higher, as compared to a net loss of $5,131,691 for the six months ended June 30, 2024, for the reasons discussed above.

**Liquidity and Capital Resources**

We have incurred losses since inception. We have funded our operations to date primarily through the sale of common stock and pre-funded warrants.

At June 30, 2025, we had cash and cash equivalents of $11.1 million. Our net working capital at June 30, 2025 was $10.5 million. We had no outstanding debt at June 30, 2025.

We believe that our cash and cash equivalents on hand will be sufficient to meet our ongoing liquidity needs for at least the next twelve months from the date of filing this Quarterly Report on Form 10-Q; however, we may require additional funds in the future to fully implement our plan of operation and there can be no assurance that, if needed, we will be able to secure additional debt or equity financing on terms acceptable to us or at all. Although we believe we have adequate sources of liquidity over the long term, the success of our operations, the global economic outlook, and the pace of sustainable growth in our markets could each impact our business and liquidity.

Operating activities in the six months ended June 30, 2025 resulted in cash outflows of $4,425,301, which were due to the net loss for the period of $5,739,789, partly offset by stock-based compensation of $714,625, depreciation and amortization of $182,107 and favorable balance sheet timing and other non-cash items of $417,756.

Operating activities in the six months ended June 30, 2024 resulted in cash outflows of $3,970,930 which were due to the net loss for the period of $5,131,691, partly offset by stock-based compensation of $745,600, depreciation and amortization of $163,871, favorable balance sheet timing of $155,129 and other non-cash items of $96,161.

We expect an increase in cash outflows from operating activities in the remainder of 2025 as we further develop and commercialize our B-TRAN® technology.

Investing activities in the six months ended June 30, 2025 and 2024 resulted in cash outflows of $220,337 and $239,004, respectively, for the acquisition of intangible assets and fixed assets.

Financing activities in the six months ended June 30, 2025 resulted in net cash outflows of $91,659 with a cash outflow of $91,769 in tax payments related to the vesting of restricted stock units slightly offset by a cash inflow of $110 from the exercise of pre-funded warrants.

Table of Contents

Financing activities in the six months ended June 30, 2024 resulted in cash inflows of $15,724,818 in net proceeds from the public offering of our common stock and pre-funded warrants and $86,757 from the exercise of stock options, partly offset by $11,579 in tax payments related to the vesting of restricted stock units.

**Critical Accounting Estimates**

There have been no significant changes during the six months ended June 30, 2025 to the critical accounting estimates disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations in our Annual Report on Form 10-K for the fiscal year ended December 31, 2024.

**Trends, Events and Uncertainties**

There are no material changes from trends, events or uncertainties disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2024.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

As a smaller reporting company, we are not required to provide this information.

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the Company's reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. The Company's disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that this information is accumulated and communicated to management, including the principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. The Company conducted an evaluation (pursuant to Rule 13a-15(b) of the Exchange Act), under the supervision and with the participation of its Chief Executive Officer (principal executive officer) and its Chief Financial Officer (principal financial officer) of the effectiveness of the Company's disclosure controls and procedures as of June 30, 2025 and has concluded that, as of June 30, 2025, the Company's disclosure controls and procedures are effective.

**Changes in Internal Control over Financial Reporting**

There have been no material changes in our internal controls over financial reporting that occurred during the quarter ended June 30, 2025 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**Limitations on the Effectiveness of Controls**

Control systems, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control systems' objectives are being met. Further, the design of any system of controls must reflect the fact that there are resource constraints, and the benefits of all controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of error or mistake. Control systems can also be circumvented by the individual acts of some persons by collusion of two or more people, or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures.

**PART II-OTHER INFORMATION**

**ITEM 1. LEGAL PROCEEDINGS**

We may be subject to litigation from time to time in the ordinary course of business. We are not currently party to any legal proceedings.

**ITEM 1A. RISK FACTORS**

There are no material changes from the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2024.

Table of Contents

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

None.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

Not applicable.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

During the three months ended June 30, 2025, no director or officer of the Company adopted or terminated a "Rule 10b5-1 trading arrangement" or non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408(a) of Regulation S-K.

Table of Contents

**ITEM 6. EXHIBITS**

| Exhibit Number | Document |
|---|---|
| 31.1* | Certification of Principal Executive Officer pursuant to Exchange Act Rule, 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification of Principal Financial Officer pursuant to Exchange Act Rule, 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification pursuant to 18 U.S.C. 1350, adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS* | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 10.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document and contained in Exhibit 101). |

* Filed herewith
** Furnished herewith

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: August 14, 2025

**IDEAL POWER INC.**

By: /s/ R. Daniel Brdar
R. Daniel Brdar
Chief Executive Officer

By: /s/ Timothy W. Burns
Timothy W. Burns
Chief Financial Officer

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO SECTION 302(a) OF THE SARBANES-OXLEY ACT OF 2002**

I, R. Daniel Brdar, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Ideal Power Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 14, 2025

/s/ R. Daniel Brdar
R. Daniel Brdar
Chief Executive Officer (Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO SECTION 302(a) OF THE SARBANES-OXLEY ACT OF 2002**

I, Timothy W. Burns, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Ideal Power Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 14, 2025

/s/ Timothy W. Burns
Timothy W. Burns
Chief Financial Officer (Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the periodic report of Ideal Power Inc. (the "Company") on Form 10-Q for the quarter ended June 30, 2025 as filed with the Securities and Exchange Commission (the "Report"), we, R. Daniel Brdar, Chief Executive Officer (Principal Executive Officer) and Timothy W. Burns, Chief Financial Officer (Principal Financial Officer) of the Company, hereby certify as of the date hereof, solely for purposes of Title 18, Chapter 63, Section 1350 of the United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of our knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated.

Date: August 14, 2025

/s/ R. Daniel Brdar
R. Daniel Brdar
Chief Executive Officer (Principal Executive Officer)

/s/ Timothy W. Burns
Timothy W. Burns
Chief Financial Officer (Principal Financial Officer)

# EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**WASHINGTON, D.C. 20549**

---

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

**Date of report (Date of earliest event reported): August 14, 2025**

---

# IDEAL POWER INC.

(Exact name of registrant as specified in Charter)

| **Delaware** | **001-36216** | **14-1999058** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File No.) | (IRS Employee Identification No.) |

**5508 Highway 290 West, Suite 120**
**Austin, Texas, 78735**
(Address of Principal Executive Offices)

**512-264-1542**
(Issuer Telephone number)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the Registrant under any of the following provisions (see General Instruction A.2 below).

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b)).
☐ Pre-commencement communications pursuant to Rule 13e-(c) under the Exchange Act (17 CFR 240.13(e)-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock | IPWR | Nasdaq Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

---

**ITEM 2.02 RESULTS OF OPERATIONS AND FINANCIAL CONDITION**

On August 14, 2025, Ideal Power Inc. (the "Company") issued a press release announcing its financial results for the three months ended June 30, 2025. The press release is included as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated by reference in its entirety into this Item 2.02. The press release contains forward-looking statements regarding the Company and includes cautionary statements identifying important factors that could cause actual results to differ materially from those anticipated.

The Company will host a conference call with investors to discuss the results. The conference call will begin at 10:00 a.m. Eastern time on Thursday, August 14, 2025. The call may be accessed in the U.S. by dialing 1-888-506-0062 and using passcode 422159. A webcast and replay of the call may be found at https://www.webcaster4.com/Webcast/Page/2987/52771.

The information furnished under this Item 2.02 of this Current Report on Form 8-K, including Exhibit 99.1, shall not be deemed to be "filed" for the purposes of Section 18 of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, or otherwise subject to the liabilities of that Section. The information in this Item 2.02, including Exhibit 99.1, shall not be deemed incorporated by reference into any filing under the Securities Act of 1933, as amended, or the Exchange Act regardless of any general incorporation language in such filing.

**ITEM 9.01 FINANCIAL STATEMENTS AND EXHIBITS**

(d) *Exhibits.*

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release, dated August 14, 2025. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Current Report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: August 14, 2025

IDEAL POWER INC.

By: /s/ Timothy Burns
Timothy Burns
Chief Financial Officer

**Exhibit 99.1**

# Ideal Power Reports Second Quarter 2025 Financial Results

AUSTIN, TX - August 14, 2025 -- Ideal Power Inc. (Nasdaq: IPWR) ("Ideal Power," the "Company," "we," "us" or "our"), developer and innovative provider of the highly efficient and broadly patented B-TRAN® bidirectional semiconductor power switch, reports results for its second quarter ended June 30, 2025.

"Our first design win customer is nearing completion of their B-TRAN®-enabled solid-state circuit breaker (SSCB) prototype testing. Following their initial product rollout later this year, we anticipate this OEM will expand its offerings to include a suite of B-TRAN®-enabled SSCBs with a wide range of power ratings, presenting us with a significant revenue growth opportunity. Furthermore, we are now collaborating with our fourth and fifth global Tier 1 automotive suppliers as the automotive industry looks for low-loss, solid-state solutions for electric vehicle (EV) contactors. In addition, we're thrilled that Stellantis has internally approved a purchase order for custom development and packaged B-TRAN® devices targeting multiple electric vehicle applications. This strategic win will enable multiple uses of B-TRAN® across Stellantis' EV platforms," stated Dan Brdar, President and Chief Executive Officer of Ideal Power.

**Key Second Quarter and Recent Operational Highlights**

Execution to our B-TRAN® commercial roadmap continues, including:

- Shipped updated solid-state circuit breaker prototypes with additional capabilities to our first design win customer. The customer is nearing completion of their SSCB prototype testing and is about to start gathering feedback on this new product from their end customers ahead of the B-TRAN®-enabled product launch later this year.

- Entered into a collaboration with a fourth global Tier 1 automotive supplier. We anticipate they will begin evaluating B-TRAN® in the near term and our understanding is that they plan to launch a formal solid-state EV contactor program within the next few months.

- Secured order from a fifth global Tier 1 automotive supplier for several B-TRAN®-enabled devices. The customer will evaluate these devices as part of their innovative solid-state EV contactor design implementation.

- Stellantis' order for custom development and packaged devices targeting multiple EV applications was approved internally with Ideal Power's receipt pending. We remain actively engaged with Stellantis, meeting regularly with them and their program partners on both EV contactor and drivetrain inverter programs and collaborating with them on automotive qualification and related requirements.

- Added partnership with Kaimei Electronic Corp. to distribute Ideal Power's products to their existing and prospective customers throughout Asia, alongside their own product portfolio. Asia is the world's largest market for power electronics, and Asian companies typically adopt new technologies faster than their European and U.S. counterparts.

- Shipped SSCB reference designs to several large companies currently evaluating our technology for SSCB or EV contactor applications. This includes two previously announced Forbes Global 500 power management market leaders, as well as our fourth and fifth global Tier 1 automotive suppliers.

- B-TRAN® Patent Estate: Currently at 96 issued B-TRAN® patents with 47 of those issued outside of the United States and 74 pending B-TRAN® patents. Current geographic coverage includes North America, China, Taiwan, Japan, South Korea, India, and Europe.

**Second Quarter 2025 Financial Results**

- Cash used in operating and investing activities in the second quarter of 2025 was $2.5 million compared to $2.2 million in the second quarter of 2024.

- Cash used in operating and investing activities in the first half of 2025 was $4.6 million compared to $4.2 million in the first half of 2024.

- Cash and cash equivalents totaled $11.1 million at June 30, 2025.

- No long-term debt was outstanding at June 30, 2025.

- Operating expenses in the second quarter of 2025 were $3.1 million compared to $2.9 million in the second quarter of 2024 driven primarily by higher research and development spending.

- Net loss in the second quarter of 2025 was $3.0 million compared to $2.7 million in the second quarter of 2024.

**2025 Milestones**

For 2025, the Company has set the following milestones:

- Secure next phase of development program with Stellantis

✔ Completed deliverables in 1H 2025 related to first design win

- Capture additional design wins / custom development agreements
- Start initial sales ramp in second half of year
- Increase power rating of products
- Complete third-party automotive qualification testing

**Conference Call and Webcast: Second Quarter 2025**

The Company will hold a conference call on Thursday, August 14, 2025 at 10:00 AM Eastern Time to discuss its results and host a question-and-answer session. Analysts and investors may pose questions for management during the live conference call.

Interested persons may access the live conference call by dialing 888-506-0062 (U.S./Canada callers) or 973-528-0011 (international callers), using passcode 422159. It is recommended that participants call or log in 10 minutes ahead of the scheduled start time to ensure proper connection. An operator will register your name and organization. An audio replay will be available one hour after the live call until Midnight on August 28, 2025 by dialing 877-481-4010 using passcode 52771.

The live webcast and interactive Q&A will be accessible on the Company's Q2 conference call webcast portal HERE. The webcast will be archived on the Company’s website for future viewing.

**Upcoming Investor Conference**

**H.C. Wainwright 27th Annual Global Investment Conference in New York on September 8, 2025**

Ideal Power plans to participate at the H.C. Wainwright in New York on September 8, 2025. Conference attendees are encouraged to register and request a one-on-one meeting HERE with Ideal Power on September 8 or contact your H.C. Wainwright representative.

The live, interactive webcast and slide presentation will be accessible on the Company's Investor Relations website under the Events tab HERE. The timing of Ideal Power’s presentation webcast and additional information about this conference will be provided by the Company when it is available.

**About Ideal Power Inc.**

Ideal Power (NASDAQ: IPWR) is the developer and innovative provider of its broadly patented bidirectional semiconductor power switch, creating highly efficient and ecofriendly energy control solutions for electric vehicle, electric vehicle charging, renewable energy, energy storage, UPS/data center, solid-state circuit breaker and other industrial and military applications. The Company is focused on its patented Bidirectional, Bipolar Junction Transistor (B-TRAN®) semiconductor technology. B-TRAN® is a unique double-sided bidirectional AC switch that delivers substantial performance improvements over today’s conventional power semiconductors. Ideal Power’s B-TRAN® can reduce conduction and switching losses, complexity of thermal management and operating cost in AC power switching and control circuitry. For more information, visit the Company’s website at www.IdealPower.com, on LinkedIn, on Twitter, and on Facebook.

**Safe Harbor Statement**

All statements in this release that are not based on historical fact are “forward-looking statements” within the meaning of the Private Securities Litigation Reform Act of 1995 and the provisions of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. While Ideal Power’s management has based any forward-looking statements included in this release on its current expectations, the information on which such expectations were based may change. Such forward-looking statements include, but are not limited to, statements regarding the pending status of our order from Stellantis for custom development enabling multiple uses of B-TRAN® across Stellantis’ EV platforms, our expectation that the OEM from our first design win will launch its first B-TRAN®-enabled product this year and expand its offering in the future to include a suite of B-TRAN®-enabled SSCBs with a wide range of power ratings, and our understanding that the fourth global Tier 1 automotive supplier we are collaborating with will launch a formal solid-state EV contactor program within the next few months. These forward-looking statements rely on a number of assumptions concerning future events and are subject to a number of risks, uncertainties and other factors, many of which are outside of our control that could cause actual results to materially differ from such statements. Such risks, uncertainties, and other factors include, but are not limited to, the success of our B-TRAN® technology, including whether the patents for our technology provide adequate protection and whether we can be successful in maintaining, enforcing and defending our patents, our inability to predict with precision or certainty the pace and timing of development and commercialization of our B-TRAN® technology, the rate and degree of market acceptance for our B-TRAN®, the impact of global health pandemics on our business, supply chain disruptions, and the expected performance of future products incorporating our B-TRAN®, and uncertainties set forth in our quarterly, annual and other reports filed with the Securities and Exchange Commission. Furthermore, we operate in a highly competitive and rapidly changing environment where new and unanticipated risks may arise. Accordingly, investors should not place any reliance on forward-looking statements as a prediction of actual results. We disclaim any intention to, and undertake no obligation to, update or revise forward-looking statements, except as required by applicable law.

**Ideal Power Investor Relations Contact**

Jeff Christensen
Darrow Associates Investor Relations
jchristensen@darrowir.com
703-297-6917

**IDEAL POWER INC.**
**Balance Sheets**
**(unaudited)**

| | June 30, 2025 | December 31, 2024 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 11,105,553 | $ 15,842,850 |
| Accounts receivable, net | 8,175 | 692 |
| Inventory | 77,387 | 96,406 |
| Prepayments and other current assets | 233,528 | 356,658 |
| Total current assets | 11,424,643 | 16,296,606 |
| | | |
| Property and equipment, net | 382,451 | 415,232 |
| Intangible assets, net | 2,681,808 | 2,611,998 |
| Right of use asset | 441,325 | 483,497 |
| Other assets | 17,789 | 19,351 |
| Total assets | $ 14,948,016 | $ 19,826,684 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 152,715 | $ 104,117 |
| Accrued expenses | 663,642 | 374,012 |
| Current portion of lease liability | 87,915 | 82,681 |
| Total current liabilities | 904,272 | 560,810 |
| | | |
| Long-term lease liability | 358,446 | 403,335 |
| Other long-term liabilities | 946,957 | 1,007,375 |
| Total liabilities | 2,209,675 | 1,971,520 |
| | | |
| Stockholders' equity: | | |
| Common stock | 8,499 | 8,337 |
| Additional paid-in capital | 125,950,104 | 125,327,300 |
| Treasury stock | (13,210) | (13,210) |
| Accumulated deficit | (113,207,052) | (107,467,263) |
| Total stockholders' equity | 12,738,341 | 17,855,164 |
| Total liabilities and stockholders' equity | $ 14,948,016 | $ 19,826,684 |

**IDEAL POWER INC.**
**Statements of Operations**
**(unaudited)**

| | Quarter Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2025 | 2024 | 2025 | 2024 |
| Commercial revenue | $ 1,275 | $ 1,331 | $ 13,278 | $ 80,070 |
| Cost of commercial revenue | 3,477 | 17,474 | 34,339 | 85,972 |
| Gross profit (loss) | (2,202) | (16,143) | (21,061) | (5,902) |
| Operating expenses: | | | | |
| Research and development | 1,900,019 | 1,562,747 | 3,468,011 | 2,929,640 |
| General and administrative | 897,239 | 947,384 | 1,797,060 | 1,801,072 |
| Sales and marketing | 341,033 | 359,739 | 679,193 | 676,350 |
| Total operating expenses | 3,138,291 | 2,869,870 | 5,944,264 | 5,407,062 |
| Loss from operations | (3,140,493) | (2,886,013) | (5,965,325) | (5,412,964) |
| Interest income, net | 103,728 | 223,948 | 225,536 | 281,273 |
| Net loss | $ (3,036,765) | $ (2,662,065) | $ (5,739,789) | $ (5,131,691) |
| Net loss per share - basic and fully diluted | $ (0.33) | $ (0.31) | $ (0.63) | $ (0.69) |
| Weighted average number of shares outstanding - basic and fully diluted | 9,116,519 | 8,514,581 | 9,109,225 | 7,417,260 |

**IDEAL POWER INC.**
**Statements of Cash Flows**
**(unaudited)**

| | Six Months Ended June 30, 2025 | Six Months Ended June 30, 2024 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net Loss | $ (5,739,789) | (5,131,691) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 182,107 | 163,871 |
| Amortization of right of use asset | 42,172 | 34,948 |
| Write-off of capitalized patents | - | 62,073 |
| Write-off of property and equipment | 1,201 | 14,459 |
| Gain on lease termination | - | (15,319) |
| Stock-based compensation | 714,625 | 745,600 |
| Decrease (increase) in operating assets: | | |
| Accounts receivable | (7,483) | 68,669 |
| Inventory | 19,019 | 1,788 |
| Prepaid expenses and other current assets | 124,692 | 160,007 |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | 48,598 | (174,464) |
| Accrued expenses and other liabilities | 229,212 | 135,175 |
| Lease liability | (39,655) | (36,046) |
| Net cash used in operating activities | (4,425,301) | (3,970,930) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (41,128) | (64,036) |
| Acquisition of intangible assets | (179,209) | (174,968) |
| Net cash used in investing activities | (220,337) | (239,004) |
| | | |
| Cash flows from financing activities: | | |
| Net proceeds from issuance of common stock and pre-funded warrants | - | 15,724,818 |
| Exercise of options and warrants | 110 | 86,757 |
| Payment of taxes related to restricted stock unit vesting | (91,769) | (11,579) |
| Net cash provided by (used in) financing activities | (91,659) | 15,799,996 |
| | | |
| Net Increase (decrease) in cash and cash equivalents | (4,737,297) | 11,590,062 |
| Cash and cash equivalents at beginning of period | 15,842,850 | 8,474,835 |
| Cash and cash equivalents at end of the period | $ 11,105,553 | $ 20,064,897 |

# EXHIBIT 3

S&P Global
Market Intelligence

# Ideal Power Inc. NasdaqCM:IPWR

# FQ2 2025 Earnings Call Transcripts

## Thursday, August 14, 2025 2:00 PM GMT

## S&P Global Market Intelligence Estimates

| | -FQ2 2025- | | | -FQ3 2025- | -FY 2025- | -FY 2026- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| EPS (GAAP) | (0.25) | (0.33) | NM | (0.34) | (1.32) | NA |
| Revenue (mm) | 0.02 | 0.00 | ▼ (100.00 %) | 0.00 | 0.01 | NA |

Currency: USD
Consensus as of Aug-15-2025 1:39 PM GMT




- EPS (GAAP) -

| | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| FQ4 2024 | NA | (0.29) | NM |
| FQ1 2025 | (0.30) | (0.30) | NM |
| FQ2 2025 | (0.25) | (0.33) | NM |

COPYRIGHT © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents

Call Participants .................................................................................. 3
Presentation .................................................................................. 4
Question and Answer .................................................................................. 9

COPYRIGHT © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Call Participants

EXECUTIVES

**R. Daniel Brdar**

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

ANALYSTS

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

ATTENDEES

**Jeff Christensen**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Presentation

### Operator

Good morning, ladies and gentlemen, and welcome to the Ideal Power Second Quarter 2025 Results Conference Call. [Operator Instructions] As a reminder, this event is being recorded.

I would now like to turn the conference over to Jeff Christensen. Please go ahead.

### Jeff Christensen

Thank you, Kelly. And good morning, everyone. Thank you for joining the Ideal Power's Second Quarter 2025 Results Conference Call. With me on the call are Dan Brdar, President and Chief Executive Officer; and Tim Burns, Chief Financial Officer.

Ideal Power's second quarter 2025 financial results press release is available on the company's website at idealpower.com. Before we begin, I'd like to remind everyone that statements made on the call and webcast, including those regarding future financial results and company prospects, are forward-looking and may be subject to a number of risks and uncertainties that could cause actual results to differ materially from those described in the call. Please refer to the company's SEC filings for a list of associated risks.

We would also refer you to the company's website for more supporting company information.

Now I'd like to turn the call over to Ideal Power's President and CEO, Dan Brdar. Dan?

### R. Daniel Brdar

Thank you, Jeff. I appreciate everyone joining us today. I'm eager to share an update on our progress since the start of the second quarter. I'll begin with the key highlights since the beginning of the second quarter and discuss the most significant developments with additional context to highlight their significance. Afterwards, I'll turn things over to Tim to discuss our financial results. We look forward to your questions after our prepared remarks.

First, we shipped updated solid-state circuit breaker prototypes to our first design win customer. These updated prototypes incorporate additional capabilities into the device driver that were requested by the customer to further differentiate their product offering. The customer is completing their prototype testing, and we'll soon begin gathering feedback on this new product from their targeted end customers ahead of the product launch of their first B-TRAN-enabled solid-state circuit breaker product planned for later this year.

Second, we entered into a collaboration with a fourth global Tier 1 automotive supplier. We shipped them packaged devices, a reference design, and driver to enable them to evaluate B-TRAN, and our understanding is that they plan to launch a formal solid-state EV contactor program within the next few months. Third, one of our distributors introduced our products to a fourth global automaker and the automakers' preferred Tier 1 supplier. They ordered numerous packaged B-TRAN devices, SymCool power modules, solid-state circuit breaker reference design boards, and drivers. The customer will evaluate B-TRAN as part of their innovative solid-state EV contactor design implementation.

The same distributor also introduced our products to a fifth automotive OEM for a potential EV contactor program. We're now collaborating with a total of 5 automakers, including 4 of the top 10 global automakers.

Fourth, Stellantis formally informed us that they are issuing a purchase order to us for custom development and package devices targeting multiple EV applications, broadening our collaboration with one of the world's largest automakers prior to the launch of the EV contactor program.

Fifth, we added a partnership with Kaimei Electronic Corp. to distribute Ideal Power's products to their existing and prospective customers throughout Asia alongside their own product portfolio. Asia is the world's largest market for power electronics, and Asian companies typically adopt new technologies faster than their European and U.S. counterparts. They started introducing B-TRAN to their customer base.

Sixth, we shipped solid-state circuit breaker reference designs to several large companies currently evaluating our technology for solid-state circuit breakers or EV contactor applications. This includes 2 previously announced Forbes Global 500 power management market leaders, as well as our fourth and fifth global Tier 1 automotive suppliers that we added in late June.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

And seventh, we successfully completed the third-party automotive prequalification and reliability testing of B-TRAN devices with 0 failures. We expect to complete full third-party automotive qualification and reliability testing later this year.

Let's briefly turn to what we've repeatedly been hearing and seeing from current and prospective customers. There's a growing interest in our B-TRAN technology, both for industrial and automotive applications, particularly for circuit protection applications such as solid-state circuit breakers, transfer switches, and EV contactors, where ultra-low conduction losses are enabling for the applications. For these applications, we're typically competing against silicon carbide devices, and the consistent message we are hearing from prospective customers at the cost and conduction losses of solid-state solutions using silicon carbide are too high.

A recent example of this is our first design win customer. This customer is one of the largest circuit protection equipment manufacturers in Asia, targeting data centers, industrial and utility markets, and renewable energy applications. This customer sent us their 20-amp unidirectional silicon carbide breaker prototypes that did not meet their cost and performance requirements. We reworked them and sent them back a 63-amp bidirectional B-TRAN breaker with a 60% reduction in losses compared to the silicon carbide prototypes. Obviously, this is a significant performance improvement with much higher power density while achieving lower total losses using silicon devices that are at a lower price point than silicon carbide devices.

Since then, we provided the customer with updated prototype breakers, incorporating additional capabilities they requested to be put into the device drivers to accommodate some innovative ideas on the capabilities they want to add to their breaker product. The customer is testing the updated prototypes now, and they'll be soliciting feedback from their customers on these prototypes in the near term with a particular focus on data center customers.

Following this feedback cycle, they plan to move forward with a product launch of their first B-TRAN-enabled solid-state circuit breaker this year, and we're excited to collaborate with this customer and launching additional B-TRAN-enabled breakers across various power ratings in the future.

As we previously mentioned, and based on the first design win customers' projections, the initial product from this customer could translate to several hundred thousand dollars of revenue for Ideal Power in its first year of sales, with the opportunity to exceed millions of dollars in revenue for us in the second year of sales. Importantly, this is just the beginning. Its initial product -- this initial product is anticipated to be the first of several products from this customer that will incorporate B-TRAN into solid-state circuit breakers. This customer provides a variety of circuit breaker products across various power ratings, and it's expected that they could add a full family of solid-state circuit breakers at ratings similar to their current family of electromechanical breakers.

Importantly, our development agreement with this customer does not constrain us in any way from working with other companies interested in our technology for solid-state circuit breaker solutions. In fact, the work that we've done with this customer can be leveraged to benefit current and future customers, aiming to bring solid-state circuit breaker products to market.

Due to the increased customer engagement from Asia and the magnitude of the opportunity for the region for industrial applications beyond our first design win customer, we're in the process of adding a sales director and field applications engineer for the region. We're seeing increased interest in B-TRAN for circuit breakers and static transfer switches for data centers. In both circuit breakers and transfer switches, a smaller solid-state solution would replace bulky, slower-acting electromechanical solutions.

Solid-state circuit breakers and data centers protect against faults and offer the same advantages as solid-state circuit breakers and utility and other industrial applications. Transfer switches for data centers are used to minimize or eliminate server downtime by quickly switching the power source to backup power when needed. Transfer switches are critical as data centers strive for better than 9 or better than 99.999% uptime. It's also important to note that waste heat is a critical issue for data centers, and the B-TRAN-enabled switchgear, like circuit breakers and transfer switches, have ultra-low conduction losses and generate significantly less waste heat relative to competing solid-state solutions.

We're excited that our B-TRAN is an enabler for customers seeking solutions for solid-state switchgear in data centers.

Moving on to another exciting market for B-TRAN, electric and hybrid electric vehicles, including EV contactors. For those of you unfamiliar with EV contactors, a contactor can be thought of similarly to a solid-state circuit breaker for an electric vehicle that isolates the battery from electrical subsystems during both fault conditions and planned maintenance for improved safety. Traditional electromechanical contactors aren't fast enough and do not offer programmability or diagnostic capabilities. Also, auto OEMs need a solution that is very fast-acting to protect the batteries and the systems connected to the battery to prevent a runaway event, injury, or other damage.

Stellantis and multiple other global automakers, as well as numerous Tier 1 automotive suppliers, are already looking at B-TRAN for solid-state EV contactor applications. They, along with others in the industry, appear to have uniformly decided that an

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

electromechanical contactor is not the right solution for electric vehicles due to the slow speed of electromechanical devices and the need for enhanced safety, programmability, and diagnostic capabilities.

The application of B-TRAN and EVs is exemplified by our expected purchase order from Stellantis, encompassing custom development and package devices aimed at multiple EV applications. The order has been approved by Stellantis internally, and we expect to receive their purchase order in the near term. The primary deliverables under this order are a nontraditional double-sided custom semiconductor package design, numerous B-TRAN dies in this custom package, and related drive circuitry. The custom package is required by the unique thermal management design Stellantis intends to adopt for its next-generation electric vehicle platforms.

The combination of B-TRAN and Stellantis' thermal management design allows for commonality of parts in multiple locations within its EV, including the drivetrain, contactors, and other high-power EV applications, and across its EV platforms. This new order is intended to form the basis for a common power semiconductor and packaging design for both the drivetrain and contactor programs. The order will represent significant and continued progress for Stellantis as they implement their EV strategy. As this order will enable multiple uses of B-TRAN and Stellantis' EV platforms, we're excited about our broadening collaboration and the customer validation of the benefits B-TRAN can provide to high-power EV applications.

We remain actively engaged with Stellantis, meeting regularly with them and their program partners on both the planned EV contactor and current drivetrain inverter programs and collaborating with them on automotive qualification and related requirements.

Turning to other automotive customers. We added our fourth and fifth global Tier 1 automotive suppliers to our roster of engagements. For the fourth global Tier 1 automotive supplier, we're engaged with our engineering teams from both the U.S. and Asia. They have B-TRAN devices in their lab, and we'll be evaluating B-TRAN in the near term. Our understanding is that they expect to launch a formal solid-state EV contactor program within the next few months.

For the fifth global Tier 1 supplier, we've begun shipping the numerous packaged B-TRAN devices, SymCool power modules, solid-state circuit breaker reference design boards, and drivers that they'll evaluate for an innovative solid-state EV contactor design. Both these Tier 1 suppliers serve several top 10 global automotive OEMs.

Moving on to the macroeconomic level. Investors have asked about tariffs and evolving trade policies. While the tariff situation is very fluid, we continue to expect minimal impact on our operations from tariffs in place today. Importantly, power semiconductors are exempt from many tariff locations currently in effect or in some cases, are capped at a low tariff rate. This limits the potential impact on us. Although the situation remains dynamic, as evidenced by recent tariff adjustments with China, we're well-positioned to mitigate the impact of future changes in tariffs and trade policies and other supply chain risks.

Our asset-light outsourced business model, leveraging the large investment already made in silicon wafer processing and packaging, enables flexibility. Additionally, our dual sourcing approach in different geographic regions strengthens our supply chain resilience and optionality with wafer fabrication and packaging in different parts of the world. Importantly, our supply chain strategy is entirely independent of China, further insulating us from regional geopolitical and trade uncertainties and any potential trade conflicts between the U.S. and China.

Looking briefly at innovation, we intend to increase the power rating of our product later this year, and updated data sheets will be issued accordingly. We've been conservative in how we've rated our technology, which customers have told us they appreciate as we're introducing a new technology to their markets and applications. As we get more and more testing hours and go through reliability testing, including third-party automotive prequalification testing, we're finding that we have more than ample margin in our design to increase the power rating of our products. Higher product ratings will allow customers to design their products to perform at higher ratings with the same number of devices or to hold their product ratings constant but potentially utilize fewer B-TRAN devices in their application, either of which make their product even more competitive in the marketplace.

The work to complete the testing and release new data sheets for the upgraded products is in progress and on track. As I mentioned earlier, we successfully completed the third-party automotive prequalification and reliability testing of B-TRAN discrete die last month, achieving 0 die failures. Test results indicate the double-sided cool packaging utilized for B-TRAN devices is much more robust than semiconductor packages utilizing wire bonding, as wire bonding is a common point of failure in semiconductor packaging.

For example, to meet automotive qualification standards, packaged devices must withstand 15,000 power cycles without failure. Our devices recently passed 50,000 power cycles without any failures. In addition, the prequalification allowed us to identify and implement packaging improvements to optimize the design for easier assembly for high-volume manufacturing and to reduce cost. The production of multiple wafer runs required for high-volume automotive qualification testing is nearing completion. The gating

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

item for completing the device packaging is the tooling for the encapsulation of the packaged devices, which has been ordered, and our packaging supplier is expecting its delivery in the next few weeks.

We previously mentioned orders this year are not dependent on the successful completion of automotive qualification. However, achieving third-party automotive qualification would provide additional confidence to industrial customers regarding B-TRAN's long-term reliability. It also provides evidence of reliability under conditions, including extremes of humidity and temperature that surpass those needed for industrial applications. And since engineers tend to be conservative when adopting new technologies, automotive qualification would potentially speed up the rollout of B-TRAN-based products by early adopters in our initial target industrial markets.

Our B-TRAN patent estate continues to grow. Currently, we have 96 issued B-TRAN patents, with 47 of those issued outside of the United States. Our patent coverage spans North America, China, Taiwan, Japan, South Korea, India, and Europe, all representing our high-priority patent coverage geographies. As a result of our continued innovation, our list of pending B-TRAN patents is now at 74. To safeguard our intellectual property further, we treat the proven double-sided wafer process flow we develop to make our devices as a trade secret and do not disclose the identity of and work under strict confidentiality with our wafer fabrication partners. So even if a competitor studied our patents, they wouldn't have the know-how to fabricate the device.

In summary, we're excited about the expected purchase order from Stellantis, which targets multiple EV applications and will precede the new EV contactor program with Stellantis. Our first design win customer is completing their solid-state circuit breaker prototype testing in advance of their planned B-TRAN-enabled product launch later this year. We anticipate that following their initial product rollout, this OEM will broaden its product lineup to include a variety of B-TRAN-enabled solid-state circuit breakers across multiple power ratings, which could lead to significant revenue growth for us.

We view solid-state switchgear for data centers and other industrial facilities and grid infrastructure, including solid-state circuit breakers from this first design win customer, as our path to significant revenue growth and profitability. Additionally, we're now collaborating with our fourth and fifth global Tier 1 automotive suppliers and additional top 10 global automakers as the automotive industry is seeking low-loss solid-state solutions for EV contactors.

Looking forward, we're confident we'll deliver against all our milestones for 2025. This year, in addition to the current program with Stellantis, we're expecting a second development program with them, additional design wins and/or customer development agreements for circuit protection applications with global companies, the start of our revenue ramp, an increase in the power rating of our products, and the completion of third-party automotive qualification.

Now I'd like to hand the call over to Tim Burns to review our financials. Tim?

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

Thank you, Dan, and good morning, everyone. Our second quarter 2025 cash burn from operating and investing activities was $2.5 million, up from $2.2 million in the second quarter of 2024 and up from $2.1 million in the first quarter of 2024. Our Q2 cash burn was at the lower end of our guidance of $2.5 million to $2.7 million. Our cash burn from operating and investing activities for the first half of 2025 was $4.6 million, up from $4.2 million in the first half of 2024.

We continue to manage expenses prudently and aggressively.

We expect third quarter 2025 cash burn to increase to approximately $2.7 million to $2.9 million, with a full year 2025 cash burn just over $10 million, with the increase primarily due to the hiring of additional sales and engineering personnel. This compares to a 2024 cash burn of $9.2 million, excluding the benefit of warrant proceeds.

Cash and cash equivalents totaled $11.1 million at June 30, 2025. We have no debt and a clean capital structure. We recorded modest revenue for the second quarter of 2025 as customers continue to evaluate our technology. While initial orders from large companies evaluating our products for potential inclusion in their OEM products will be small, we expect order sizes to increase as customers start to prototype their OEM products and progress through their design cycles and roll out B-TRAN-based products.

Looking at the balance of 2025, we expect to see the start of our sales ramp with revenue from product development activities, the launch of the first B-TRAN-enabled breaker by our first design win customer, and other product sales. Operating expenses were $3.1 million in the second quarter of 2025 compared to $2.9 million in the second quarter of 2024, with the increase due to higher wafer fabrication and engineering personnel costs.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

We expect both research and development and sales and marketing spending to increase modestly in the coming quarters due to recent and future hiring and costs associated with our development and commercialization efforts. We also continue to expect some quarter-to-quarter variability in operating expenses, particularly our research and development spending due to the timing of semiconductor fabrication runs, product development, other research and development activities and hiring. The timing of equity grants and related stock-based compensation expense recognition will also cause variability in our quarterly operating expenses.

Net loss in the second quarter of 2025 was $3 million compared to $2.7 million in the second quarter of 2024. Considering our asset-light business model, no debt, and modest planned cash burn, we have sufficient liquidity on our balance sheet to fund operations through at least mid-2026. We'll potentially see several sources of funds over the next year, such as product sales, development agreements, and other commercial agreements with upfront payments. Additionally, we're exploring strategic relationships with our well-capitalized and large global partners, with these opportunities strengthening as we further advance these customer relationships. As a publicly traded company, we also have access to the capital markets, if necessary, providing us with additional financial flexibility.

At the end of June, we had 8,498,014 shares outstanding, 945,318 options and stock units outstanding, 6,827 prefunded warrants outstanding, and 342,240 warrants outstanding. At June 30, 2025, our fully diluted share count was 10,439,399 shares. The 342,240 warrants outstanding at June 30, 2025, expired unexercised earlier this month, so there are no warrants remaining in our fully diluted share count.
At this time, I'd like to open up the call for questions. Operator?

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] You have a question coming from Casey Ryan with WestPark Capital.

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

This is an exciting update. I did spur some questions, particularly around Stellantis. I think how do we think about the opportunity with them? I think you're mentioning platform, which is helpful. But to sort of boil it down for us in the public, I think Stellantis has 16 brands, but you mentioned it's maybe for an EV vehicle, but what's the right way to think about your exposure? Like could you be exposed to all 16 brands? Are you exposed to all EVs within the 16 brands? Or is there some other way to sort of simplify what the opportunity there is?

**R. Daniel Brdar**

Yes. I mean our understanding from discussions with them is they want commonality across their brands and their EV platform. So you would see us in multiple brands that people would recognize. There will be some brands like Maserati, where they will probably go with higher cost solutions like silicon carbide, where cost is not an issue, and people aren't worried so much about range because it's a different application. But they really want to have a common EV platform since they've got to continue to support their combustion vehicles, they don't want to have multiple iterations for every brand of what their new EV products are going to look like.

So it gives us a pretty broad opportunity across a broad range of mid-sized vehicles for new brands.

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

So it's certainly fair for us to think it may be multiple brands, maybe not all 16, but certainly more than 1, and then multiple vehicles possibly.

**R. Daniel Brdar**

They clearly plan on it being multiple brands. They've made that very clear to us. And part of this work that they're -- they've told us that we're getting a purchase order for is to also start to drive some commonality even within the EV. Originally, the drivetrain and EV contactor programs were very separate. They were going separate paths. And this work is to actually converge on the semiconductor and packaging design prior to getting the contactor program awarded, because they really want to have that same solution in both of those parts of the vehicle. So it gives us commonality in what we are going to provide for multiple applications within the EV.

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

I think in the past, we've talked about the contactors potentially being in the hundreds of dollars of content per vehicle. If you were in the -- like total vehicle across all these opportunities, I mean, would that number sort of move higher to sort of closer to 4 figures? Or would it still be in the hundreds, but possibly higher than the contactors alone, I guess?

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

Yes. So we estimate the total power semiconductor content in the EV about $1,100. The biggest part of that actually is the drivetrain inverter itself. EV contactor to maybe $300 of that content. So it's most of the content. The other content you're looking at is things like the onboard charger, which may use lower-power devices or MOSFETs. But for us, it's really the drivetrain inverter. I think I heard Onsemi at one point say they had about $750 of content in the drivetrain inverter for power semiconductors. So I've heard that number out there, but it's several hundred dollars for the inverter.

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

One thing that we've talked about, and like I think moving to commercial revenue is a very exciting thing for the second half of '25. But I'm curious, in terms of your design win opportunities and how they come to you, how would you classify those in terms of

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

volume of opportunities? Just as we're curious about all the applications of your technology, would you say that known design win opportunities for you sort of number in the like 10, because we're sort of talking about automotive people primarily? Or are they potentially in the hundreds of thousands in terms of where you guys could be consumed or sort of considered as an upgrade solution?

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

Could you clarify that a little bit, Casey, on…

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

We'll know. I'm just saying how many design opportunities are you guys seeing out there in the marketplace separate from what you've talked about already, to sort of what's on your sales pipeline board, essentially? Like how big is that funnel is what I'm sort of curious about.

**R. Daniel Brdar**

Yes. I mean it continues to grow. I mean if you look at the automotive side, it's more discrete because there are just less players there. So there's 5 global auto OEMs, 4 of which are in the top 10, and 5 Tier 1 suppliers. Now if we look at the industrial side, there's many, many more because there are a lot of companies that we are working with that are interested in solid-state circuit breakers. They range in size from very large companies that people would recognize of -- and I'm not saying these are them by name, but they would be companies like a Siemens or an Eaton or Schneider, to some midsized companies that are also looking to try and find a way to take market share from the big folks.

So our earlier design wins are clearly going to be on the industrial side. We'll get funded programs through the Tier 1s and the automotive companies since their design cycles are longer. But a lot of our effort right now is really focusing on the industrial applications where we'll have our first wins.

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

And then you mentioned silicon carbide and the cost issue. I'm just curious, technically, and how you guys feel about this, would customers prefer silicon carbide cost not being an issue? Or is that not always the case? And not that silicon carbide will ever get the cost parity with your solution, but I'm just curious how customers think about that.

**R. Daniel Brdar**

I'll use our first design win customer as the example. The breaker that they sent to us that was silicon carbide, cost was a problem, but the biggest issue was it got too hot. It wouldn't meet the standards even at 20-amp unidirectional applications. So we were actually to give them breakers back that had 3x the power density. They were 63 amp breakers that we sent them back, and they were bidirectional, which is what they need, particularly on DC applications. The temperature rise in them meets the codes and standards.

So it's heat is the big problem because the conduction losses are high in silicon carbide.

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

And then kind of the last question. You guys also mentioned in the script data center opportunities. Can your products be integrated into an environment, say, a data center, as a hybrid solution? Like can some of your products be consumed, but also be in a mixed environment with older technology as well?

**R. Daniel Brdar**

Yes. What we're seeing is they're prioritizing where there's really a need for speed that impacts the quality of the power on the data center. So speed of transfer switches, speed of breakers. We don't expect that a given data center is going to swap out every breaker all at once. They'll do that in kind of a staged fashion. So you'll just have one part of the data center that will perform at a different level and have different diagnostic capabilities than what it may have been built with 5, 10 years ago.

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So there's ample opportunity in existing markets and not just in greenfield builds, essentially. That's what I was curious about.

**R. Daniel Brdar**

Yes. I mean for data centers, the big issue for them is electricity is the biggest operating cost. So while they want to have faster-acting solutions to enable them to maximize their uptime, waste heat that comes from some of the solutions that are out there that are silicon carbide-based doesn't help them because it raises their electricity usage, which works against their business model. So I think there's a great opportunity for us as people look to modernize the data centers to actually replace things that are existing as well as be in the new builds.

**Casey Ryan**
*WestPark Capital, Inc., Research Division*

Well, that's another great market for your technology. I think that's it for me. But look, this is a very exciting update. I think we're getting to sort of an important demarcation line as you get closer to commercial revenue.

**Operator**

I would now like to turn the floor over to Jeff Christensen to take any questions from the webcast. Jeff?

**Jeff Christensen**

Thank you, Kelly. Our first question is a lot of that was submitted by investors is a lot of semiconductor specialists agree that the technology is excellent, and it's a game changer for niche solid-state circuit breakers, EV hybrid applications and more. What are the challenge to closing sales? Are there any technical challenges? And are there any -- are there 1 or 2 issues the company needs to overcome? Or are there issues more individual for each company?

**R. Daniel Brdar**

There's -- there haven't really been any technical challenges. The biggest issue really is just the education process. You think about things like silicon carbide MOSFETs, they've been around for 25 years. So engineers learned about them in school. They've worked with them previously. Our technology is new. So you've got to get the engineering community through that education process. You got to get devices in their hands, get them in the lab, working with them, get comfortable with them. It's also part of why we do things like present papers at the Applied Power Electronics Conference every year. We've got an article coming out in the IEEE magazine this year to really help discontinue that education to the technical community to get them through that learning process, so they're comfortable adopting a new technology.

**Jeff Christensen**

Thank you. Our next submitted question is, what is Ideal Power doing to drive sales ramp and increase product awareness?

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

Yes. So for us, we're taking really several paths to market. We have our own internal sales team. We have distributor relationships. We have sales reps. We have a new partnership with Kaimei, where they'll actually be selling our products alongside their own. We're also continuing to increase awareness in the technical community. Dan had mentioned there's going to be an article about B-TRAN and solid-state circuit breaker applications in the next issue of IEEE magazine. We also actively attend trade shows. We've been to APEC and PCIM earlier this year. We'll be at the upcoming ECCE conference in Philadelphia. And we also recently launched a global solid-state circuit breaker campaign that incorporates the test results that Dan had mentioned related to our first design win that show that B-TRAN significantly outperforms silicon carbide MOSFETs in breakers.

So this advantage really carries over to other solid-state switchgear applications like EV contactors, another application we're targeting. So we're really taking a multipronged approach in terms of getting B-TRAN into the trade press and also just really increase awareness.

**Jeff Christensen**

Thank you. The next submitted question is, I'm new to Ideal Power. In simple terms, what is an IGBT and what are the advantages of Ideal Power's B-TRAN compared to an IGBT?

**R. Daniel Brdar**

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

An IGBT, it's a unidirectional semiconductor device that functions as an electronic switch that controls the flow of energy for various applications. IGBTs are used for high voltage, high current applications like power converters for electric vehicles or EV charging or energy storage and renewable energy, industrial motor drives and other industrial and utility applications. IGBTs are a big market. It's about a $10 billion market today with a lot of growth expected over the coming decades just due to the increasing electrification of society.

The primary advantage of B-TRAN over an IGBT is that B-TRAN offers improved performance and bidirectionality. And bidirectionality is increasingly important as we use batteries more and more because you need to control the flow of energy during charging and discharging of the battery. So you see solar coupled with energy storage, you see electric vehicles, you see EV charging with backup batteries for buffer capability. So in terms of performance, B-TRAN has significantly lower conduction losses and it's more efficient. So it produces less heat than IGBTs. That allows OEM products to be smaller and more efficient because the size of a lot of power electronics, like a power converter, are driven by the need to dissipate waste heat. So it really comes down to being able to provide a high-level performance.

And the big issue really for a lot of these bidirectional applications is any time you're using an IGBT, you need 4 devices to make a bidirectional switch. You need pairs of IGBTs and diodes to control the flow in either direction. So there's more parts that will fail, there's more cost, and there's significantly higher loss, about 5x higher conduction loss for bidirectional switch using conventional things like IGBTs.

So you end up with a more efficient solution using B-TRAN and one that can actually be lower cost because it's a lower cost bidirectional switch and lower lifetime cost for the OEMs.

**Jeff Christensen**

The next question is, when will Ideal Power get to cash flow breakeven?

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

Yes. So for us, it really depends on product and customer mix. Obviously, the pace of adoption is going to influence that. But what it really comes down to is it only takes a few key design wins for us to get to cash flow breakeven. We're engaged with large global companies that are evaluating our technology for their applications. And landing even a single design win can generate millions or even in excess of $10 million in revenue annually for Ideal Power. So it just comes down to, again, which design wins happen at what time, and just really the pace of adoption, but it will not take us much to get there. We can do it with just solid-state circuit breakers. Obviously, we'll have contributions from development programs around electric vehicles, but it's really the industrial markets will get us there.

**Jeff Christensen**

So I'll ask the next question. It's about the auto qualification. So I'm going to combine some questions that were asked by a couple of different people. But what can you repeat and clarify -- can you repeat and clarify results on automotive testing? What does prequalification mean? And how are you able to make modifications during the testing?

**R. Daniel Brdar**

Sure. Good question. When you go through automotive qualification, you have to submit many packaged devices from multiple wafer runs. So it can't just be you cherry-picked the best devices from a particular run. You have to show that you've got commonality performance across several wafer runs and many devices from each of those runs. So what is a good practice is to actually take devices and take them through those test cycles before you actually do all the runs for official qualification. You can do with a smaller number of devices. It helps you find out, are there any issues with your packaging design that can't withstand maybe humidity or temperature, because auto qualification testing is fairly expensive, and it takes many, many, many, many devices, hundreds or a couple of thousand devices to get through it all.

So it's really -- prequalification is to make sure are there any design issues you need to be aware of for the devices? Or are there any areas with the packaging? And the one thing that we saw that we want to improve was are the devices that we've had packaged so far have not had tooling for encapsulation, and we think that would be a thing that would make the package even more robust. So we did some things that actually also will help us with a design that will be better suited for -- on the packaging side for high-volume production in terms of making it easier to assemble. So prequalification just gives you that early look into any issues you might have, so that before you run all the wafers and do all the packaging for the hundreds of devices that go into testing, you've already addressed those issues and you know you can pass with a good degree of confidence.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Jeff Christensen**

And then another question regarding the qualification is, does the process, as we move to finalize that qualification, including the prequalifications, is that -- any comment you can make about the inflow from industrial -- other industrial automotive customers that were previously hesitant to jump into the new technology?

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

Yes. So I think overall, the more test data that you have that you can share with customers, the easier it is to get them to adopt the technology. So obviously, we've generated a lot of test data through our works with Stellantis to date. It's similar here with our first design win customer. We have some really great data now we can share for solid-state circuit breaker applications. We have -- we had no die failures through prequalification. We can share that data with industrial customers. So we think all of these things will help adoption. And then when you get to actual auto qualification, I mean, that should certainly help because the automotive standards are much more stringent than industrial standards, has extremes of median temperature, you just don't have the industrial test. So all of those things should act to really help with adoption.

**R. Daniel Brdar**

And just one comment on that. Part of why we did this is to generate some of this data because when you do have a new technology, there is a -- I won't say reluctance, but customers are conservative. And people that understand IGBTs, for example, understand that the most common reason that IGBTs fail is a fail of the wire bonding that's used to bond the die to the package. Since we don't use wire bonding, we have a different approach in terms of how our package comes together. We wanted to generate the data that showed that not only do we pass the 15,000 power cycles needed to meet auto qualification, we kept running them. And to be able to go to those customers and say, not only do we pass that criteria, we've passed 50,000 power cycles without a failure. It really helps with the technical customers that you're working with to be comfortable that the device is actually ready for adoption for their application.

**Jeff Christensen**

Thank you. There are many submitted questions from investors, and thanks for that. [Operator Instructions]. The next question is that was submitted is you've definitely shown a lot of the commercial progress. The stock price seems to be lagging the progress you made. What do you think the Street is underappreciating or overlooking at this point?

**R. Daniel Brdar**

Yes. I would say, given the macro trends that are out there, things like renewable energy, EV adoption, proliferation of data centers, I mean they're really driving the increasing use of power semiconductors. So we think we're commercializing our technology at a great time. We certainly have near-term opportunities to secure agreements with multiple large global companies beyond just our first design win customer in Stellantis. We bring a solution in silicon that provides significant performance advantages over conventional technologies. It's enabling for applications like solid-state circuit breakers and EV contactors.

So while we're not going to sit here and speculate on why the Street is not valuing -- really valuing the enormous opportunity ahead of us, we would expect that to change as we continue to announce some of these design wins, some more custom development agreements, and we start showing revenue here in the coming quarters. So for us, we can't focus on what our specific stock price is on a given day or what the market is -- what's in favor or not with the market. It's really focusing on executing and getting those commercial announcements out, and we expect that it will take care of itself.

**Jeff Christensen**

The next submitted question is, which market do you see that will contribute the most to the company's initial revenue ramp?

**R. Daniel Brdar**

It's clearly going to be the solid-state circuit breaker market. We've got so many companies that are engaged with us now. We've got the first design win with the customer. We know that they've got other plans for other products. And fortunately, the design cycles on industrial products are significantly shorter than what you see for getting through the long design cycles on the automotive side. So our focus is really going to remain driving the opportunities in the solid-state circuit breaker market, the closure, because once the first company moves forward, you're no longer the first person to do something. So I think it kind of takes some of the pressure off some of the other customer teams to say, okay, people have already been through this evaluation. I'm not missing anything, and I'm comfortable with making sure I've got a competing product.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Jeff Christensen**

Do you think -- the next submitted question is, do you think we will be -- our most successful markets could be outside the United States, especially given the recent shift in the administration away from EVs?

**R. Daniel Brdar**

I think that's certainly shaping up to be the case here. Asia, in particular, tends to adopt new technologies quicker. The first design win that we've got is an Asian customer. We're seeing multiple Asian customers that we're working with, even in the Tier 1s that we're working with now. EVs -- I mean, it's a global opportunity, but I think we will see much of what we are doing on the circuit breaker side and on the EV side start to materialize in opportunities outside of the U.S. first. And then in general, U.S. companies seem to move more slowly than what we see for a lot of the Asian companies we're working with, which is fine. It will just they'll come in behind it with their own version of the products. But it's a good insightful question there. I think we will see the growth first outside of the U.S.

**Jeff Christensen**

Okay. What is the cost of -- the next submitted question is, what are the cost of 4 devices in a traditional IGBT that B-TRAN replaces versus the cost of the B-TRAN?

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

Yes. So at scale of B-TRAN, a single B-TRAN should be at about a 10% or 20% premium to a single IGBT. So if you're looking at a bidirectional application, I mean, it's significant cost savings because you need to include 2 IGBTs and also have 2 blocking diodes in that solution. So B-TRAN is actually a much less expensive alternative in terms of first cost. And also, if you look at lifetime cost, it's also obviously going to help because you're going to have smaller OEM products, you can have less surface area to dissipate heat, less complex thermal management systems, overall smaller OEM product designs, just because there's lower losses. So it's really both not just a first cost advantage when you're talking about bidirectional applications, but it's also a lifetime cost advantage as well.

**Jeff Christensen**

The next submitted question is, of the companies you're currently working with, how many of you are you continuing to have engagement with in the last 6 months, and the other in the last 12 months. So any one of those time frames?

**Timothy W. Burns**
*CFO, Secretary & Treasurer*

Jeff, can you repeat that? It's unclear what you're asking there.

**Jeff Christensen**

Yes. So of the companies that you've said you're currently working -- you're working with, you've worked with, how many have you engaged with in the last 6 months or 12 months? I guess the question is it all of them? Or the question I think is, is it all of them or any of them missing now?

**R. Daniel Brdar**

No one's missing there. Some of them, particularly large companies, move slowly, but all the companies that we have been engaged with, we continue to be engaged with.

**Jeff Christensen**

And then there are -- the next submitted question is there a recent marketing literature about a new technology called an insulated gate transistor oscillator, or IGTO. Would this technology be directly competitive to B-TRAN?

**R. Daniel Brdar**

I did look at that. We had our guys look at it, too. There's really not much technical data available. There's no data sheets or anything for the product. But based on our review, it looks like it's an incremental improvement to a unidirectional IGBT. It's also not clear how it would apply to the overall IGBT market because the things that were done there will certainly create challenges to be able to reach

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

both high voltage and high current. It's part of why you don't see MOSFETs used for high voltage and high current. It incorporates some of the same technology that limits where MOSFETs can go.

But at the end of the day, it's a variant of an IGBT. So you would still need 4 devices, pairs of this improved IGBT and diodes to make a bidirectional switch. And as a result, the conduction losses would be much higher than what you would get using a single B-TRAN.

**Jeff Christensen**

The next submitted question is, please update us on the future expectations with large power global management companies that you're working with.

**R. Daniel Brdar**

So again, I'm not sure I understand the question, but on the companies that we're looking at power management market leaders, I mean, they're really looking at things right now like solid-state circuit breakers, right? So there hasn't been a change necessarily in the last few months. I mean it's obviously -- we're continuing to educate some of those companies. They're evaluating our technology. They have it in the lab. So we're continuing to make progress, but their expectations haven't changed. I would say the one thing, maybe in that regard, is we've had some potential customers that are a little bit surprised that silicon carbide doesn't perform as well in that application as they may have expected it to, because it's considered a high-performance product. But -- the reality is conduction losses are not the strength of silicon carbide MOSFET. So that's where our technology has a significant advantage at a lower cost point than silicon carbide, because it's not just that silicon is cheaper than silicon carbide, it's also that we really outperform silicon carbide in that application significantly.

**Jeff Christensen**

Thank you. That concludes our question-and-answer session. I would now like to hand the call back over to Dan Brdar for closing remarks.

**R. Daniel Brdar**

I just want to thank everybody for participating in today's call and for the really good questions. We look forward to sharing B-TRAN commercial announcements before our next update call. Operator, you may end the call.

**Operator**

Thank you. This concludes today's conference. All parties may disconnect, and have a great day.

Copyright © 2025 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2025 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2025 S&P Global Market Intelligence.

# EXHIBIT 4

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2025**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______________ to _______________**

**Commission File Number 001-36216**

## IDEAL POWER INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **14-1999058**<br>(I.R.S. Employer Identification No.) |

**5508 Highway 290 West, Suite 120**
**Austin, Texas 78735**
(Address of principal executive offices)
(Zip Code)

**(512) 264-1542**
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | IPWR | The Nasdaq Capital Market |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark whether the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the issuer is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of May 12, 2025, the issuer had 8,348,420 shares of common stock, par value $0.001, outstanding.

Table of Contents

**TABLE OF CONTENTS**


| | | |
|---|---|---|
| **PART I** | FINANCIAL INFORMATION | 3 |
| **Item 1.** | Unaudited Condensed Financial Statements | 3 |
| | Balance Sheets at March 31, 2025 and December 31, 2024 | 3 |
| | Statements of Operations for the three months ended March 31, 2025 and 2024 | 4 |
| | Statements of Cash Flows for the three months ended March 31, 2025 and 2024 | 5 |
| | Statements of Stockholders' Equity for the three months ended March 31, 2025 and 2024 | 6 |
| | Notes to Unaudited Financial Statements | 7 |
| **Item 2.** | Management's Discussion and Analysis of Financial Condition and Results of Operations | 11 |
| **Item 3.** | Quantitative and Qualitative Disclosures About Market Risk | 13 |
| **Item 4.** | Controls and Procedures | 13 |
| **PART II** | OTHER INFORMATION | 14 |
| **Item 1.** | Legal Proceedings | 14 |
| **Item 1A.** | Risk Factors | 14 |
| **Item 2.** | Unregistered Sales of Equity Securities and Use of Proceeds | 14 |
| **Item 3.** | Defaults Upon Senior Securities | 14 |
| **Item 4.** | Mine Safety Disclosures | 14 |
| **Item 5.** | Other Information | 14 |
| **Item 6.** | Exhibits | 15 |
| **SIGNATURES** | | 16 |

Table of Contents

**PART I-FINANCIAL INFORMATION**

**ITEM 1. CONDENSED FINANCIAL STATEMENTS**

**IDEAL POWER INC.**
**Balance Sheets**
**(unaudited)**

| | March 31, 2025 | December 31, 2024 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 13,696,852 | $ 15,842,850 |
| Accounts receivable, net | 8,535 | 692 |
| Inventory | 89,337 | 96,406 |
| Prepayments and other current assets | 313,034 | 356,658 |
| Total current assets | 14,107,758 | 16,296,606 |
| | | |
| Property and equipment, net | 389,579 | 415,232 |
| Intangible assets, net | 2,615,852 | 2,611,998 |
| Right of use asset | 462,621 | 483,497 |
| Other assets | 18,570 | 19,351 |
| Total assets | $ 17,594,380 | $ 19,826,684 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 155,707 | $ 104,117 |
| Accrued expenses | 455,219 | 374,012 |
| Current portion of lease liability | 85,270 | 82,681 |
| Total current liabilities | 696,196 | 560,810 |
| | | |
| Long-term lease liability | 381,128 | 403,335 |
| Other long-term liabilities | 989,667 | 1,007,375 |
| Total liabilities | 2,066,991 | 1,971,520 |
| | | |
| Commitments and contingencies (Note 5) | | |
| | | |
| Stockholders' equity: | | |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 8,349,291 shares issued and 8,347,970 shares outstanding at March 31, 2025 and 8,336,812 shares issued and 8,335,491 shares outstanding at December 31, 2024 | 8,349 | 8,337 |
| Additional paid-in capital | 125,702,537 | 125,327,300 |
| Treasury stock, at cost, 1,321 shares at March 31, 2025 and December 31, 2024 | (13,210) | (13,210) |
| Accumulated deficit | (110,170,287) | (107,467,263) |
| Total stockholders' equity | 15,527,389 | 17,855,164 |
| Total liabilities and stockholders' equity | $ 17,594,380 | $ 19,826,684 |

The accompanying notes are an integral part of these condensed financial statements.

Table of Contents

**IDEAL POWER INC.**
**Statements of Operations**
**(unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | **2025** | **2024** |
| Revenue | $ 12,003 | $ 78,739 |
| Cost of revenue | 30,862 | 68,498 |
| Gross profit (loss) | (18,859) | 10,241 |
| Operating expenses: | | |
| Research and development | 1,567,992 | 1,366,893 |
| General and administrative | 899,821 | 853,688 |
| Sales and marketing | 338,160 | 316,611 |
| Total operating expenses | 2,805,973 | 2,537,192 |
| Loss from operations | (2,824,832) | (2,526,951) |
| Interest income, net | 121,808 | 57,325 |
| Net loss | $ (2,703,024) | $ (2,469,626) |
| Net loss per share - basic and diluted | $ (0.30) | $ (0.39) |
| Weighted average number of shares outstanding - basic and diluted | 9,101,851 | 6,319,939 |

The accompanying notes are an integral part of these condensed financial statements.

Table of Contents

**IDEAL POWER INC.**
**Statements of Cash Flows**
**(unaudited)**

| | Three Months Ended March 31, 2025 | Three Months Ended March 31, 2024 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss | $ (2,703,024) | $ (2,469,626) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 90,476 | 81,121 |
| Amortization of right of use asset | 20,876 | 16,157 |
| Write-off of property and equipment | 1,201 | 10,217 |
| Stock-based compensation | 384,595 | 381,019 |
| Decrease (increase) in operating assets: | | |
| Accounts receivable | (7,843) | (70,000) |
| Inventory | 7,069 | (27,912) |
| Prepaid expenses and other assets | 44,405 | 211,438 |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | 51,590 | (23,086) |
| Accrued expenses and other liabilities | 63,499 | 32,357 |
| Lease liability | (19,618) | (16,980) |
| Net cash used in operating activities | (2,066,774) | (1,875,295) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (11,324) | (29,611) |
| Acquisition of intangible assets | (58,554) | (73,939) |
| Net cash used in investing activities | (69,878) | (103,550) |
| | | |
| Cash flows from financing activities: | | |
| Payment of taxes upon vesting of restricted stock units | (9,346) | - |
| Net proceeds from issuance of common stock and pre-funded warrants | - | 13,652,663 |
| Exercise of options | - | 86,757 |
| Net cash provided by (used in) financing activities | (9,346) | 13,739,420 |
| | | |
| Net increase (decrease) in cash and cash equivalents | (2,145,998) | 11,760,575 |
| Cash and cash equivalents at beginning of period | 15,842,850 | 8,474,835 |
| Cash and cash equivalents at end of period | $ 13,696,852 | $ 20,235,410 |

The accompanying notes are an integral part of these condensed financial statements.

Table of Contents

**IDEAL POWER INC.**
**Statements of Stockholders' Equity**
**For the Three Months Ended March 31, 2025 and 2024**
**(unaudited)**

| | Common Stock | | Additional Paid-In | Treasury Stock | | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Capital | Shares | Amount | Deficit | Equity |
| Balances at December 31, 2023 | 5,998,018 | $ 5,998 | $ 107,116,362 | 1,321 | $ (13,210) | $ (97,049,450) | $ 10,059,700 |
| Issuance of common stock and pre-funded warrants | 1,366,668 | 1,367 | 13,651,296 | - | - | - | 13,652,663 |
| Exercise of options | 8,334 | 8 | 86,749 | - | - | - | 86,757 |
| Vesting of restricted stock units | 9,679 | 10 | (10) | - | - | - | - |
| Stock-based compensation | - | - | 381,019 | - | - | - | 381,019 |
| Net loss for the three months ended March 31, 2024 | - | - | - | - | - | (2,469,626) | (2,469,626) |
| Balances at March 31, 2024 | 7,382,699 | $ 7,383 | $ 121,235,416 | 1,321 | $ (13,210) | $ (99,519,076) | $ 21,710,513 |
| | | | | | | | |
| Balances at December 31, 2024 | 8,336,812 | $ 8,337 | $ 125,327,300 | 1,321 | $ (13,210) | $ (107,467,263) | $ 17,855,164 |
| Vesting of restricted stock units | 12,479 | 12 | (9,358) | - | - | - | (9,346) |
| Stock-based compensation | - | - | 384,595 | - | - | - | 384,595 |
| Net loss for the three months ended March 31, 2025 | - | - | - | - | - | (2,703,024) | (2,703,024) |
| Balances at March 31, 2025 | 8,349,291 | $ 8,349 | $ 125,702,537 | 1,321 | $ (13,210) | $ (110,170,287) | $ 15,527,389 |

The accompanying notes are an integral part of these condensed financial statements.

**IDEAL POWER INC.**
**Notes to Condensed Financial Statements**
**(unaudited)**

**Note 1 - Organization and Description of Business**

Ideal Power Inc. (the "Company") was incorporated in Texas in May 2007 under the name Ideal Power Converters, Inc. The Company changed its name to Ideal Power Inc. and re-incorporated in Delaware in July 2013. With headquarters in Austin, Texas, the Company is focused on the further development and commercialization of its Bidirectional bipolar junction TRANsistor (B-TRAN®) solid-state switch technology.

Since its inception, the Company has financed its research and development efforts and operations primarily through the sale of common stock and pre-funded warrants. The Company's continued operations are dependent upon, among other things, its ability to obtain adequate sources of funding through future revenues, follow-on stock offerings, issuances of warrants, debt financing, co-development agreements, government grants, sale or licensing of developed intellectual property or other alternatives.

**Note 2 - Summary of Significant Accounting Policies**

Basis of Presentation

The accompanying unaudited condensed financial statements have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission (the "SEC") for Form 10-Q. Accordingly, certain information and footnote disclosures normally included in financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations. The balance sheet at December 31, 2024 has been derived from the Company's audited financial statements included in its Annual Report on Form 10-K filed with the SEC on March 28, 2025.

In the opinion of management, these financial statements reflect all normal recurring, and other adjustments, necessary for a fair presentation. These condensed financial statements should be read in conjunction with the audited financial statements included in the Company's Annual Report on Form 10-K for the year ended December 31, 2024. Operating results for interim periods are not necessarily indicative of operating results for an entire fiscal year or any other future periods.

Segment Information

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the Company's CODM. The CODM reviews financial information presented on a company-wide basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. As such, the Company has determined that it operates as one operating segment. The Company has concluded that net income (loss) is the measure of segment profitability. The CODM assesses performance for the Company, monitors budget versus actual results, and determines how to allocate resources based on net income (loss) as reported in the statements of operations. There are no other expense categories regularly provided to the CODM that are not already included in the financial statements herein.

During the three months ended March 31, 2025 and 2024, the Company did not generate material international revenues and as of March 31, 2025 and December 31, 2024, the Company did not have material assets located outside of the United States.

Net Loss Per Share

In accordance with Accounting Standards Codification 260, shares issuable for little or no cash consideration are considered outstanding common shares and included in the computation of basic net loss per share. As such, for the three months ended March 31, 2025 and 2024, the Company included pre-funded warrants to purchase shares of common stock in its computation of net loss per share. The pre-funded warrants were issued in March 2024 and November 2019 with an exercise price of $0.001. See Note 7.

In periods with a net loss, no common share equivalents are included in the computation of diluted net loss per share because their effect would be anti-dilutive. At March 31, 2025 and 2024, potentially dilutive shares outstanding amounted to 1,330,380 and 1,630,595 shares, respectively, and exclude pre-funded warrants to purchase shares of common stock.

Recent Accounting Pronouncements

Management does not believe that any recently issued, but not yet effective, accounting standard, if adopted, would have a material impact on the Company's financial statements.

Table of Contents

**Note 3 - Intangible Assets**

Intangible assets, net consisted of the following:

| | March 31, 2025 | December 31, 2024 |
|---|---|---|
| Patents | $ 1,828,834 | $ 1,770,374 |
| Trademarks | 22,861 | 22,767 |
| Other intangible assets | 1,843,036 | 1,843,036 |
| | 3,694,731 | 3,636,177 |
| Accumulated amortization - patents | (369,291) | (349,279) |
| Accumulated amortization - other intangible assets | (709,588) | (674,900) |
| | $ 2,615,852 | $ 2,611,998 |

At March 31, 2025 and December 31, 2024, the Company capitalized $586,649 and $541,081, respectively, for costs related to patents that have not been awarded. Cost related to patents that have not yet been awarded are not amortized until patent issuance.

At March 31, 2025 and December 31, 2024, the Company capitalized $22,861 and $22,767, respectively, for costs related to trademarks. Costs related to indefinite life trademarks are not amortized but are subject to evaluation for potential impairment.

Amortization expense amounted to $ 54,700 and $52,697 for the three months ended March 31, 2025 and 2024, respectively. Amortization expense for the succeeding five years and thereafter is $164,099 (remaining nine months of 2025), $218,798 (2026-2029) and $967,051 (thereafter).

**Note 4 - Lease**

In March 2021, the Company entered into a lease agreement (the "Original Lease") for 4,070 square feet of office and laboratory space located in Austin, Texas (the "Original Suite"). The commencement of the lease occurred on June 1, 2021 and the initial term of the lease was 63 months. The actual base rent in the first year of the lease was $56,471 and was net of $18,824 in abated rent over the first three months of the lease term. The annual base rent in the second year of the lease was $77,330 and increased by $2,035 in each succeeding year of the lease. In addition, the Company was required to pay its proportionate share of operating costs for the building under this triple net lease.

In April 2024, the Company entered into a first amendment and relocation agreement (the "Amended Lease") with its landlord. Under the Amended Lease, the Company relocated to another, larger suite in the same office building. The Amended Lease is for 5,775 square feet of office and laboratory space (the "New Suite") and, upon occupancy, replaced the 4,070 square feet of office and laboratory space previously leased by the Company. The term of the Amended Lease expires sixty-two (62) months from July 1, 2024, the commencement date. The annual base rent for the first year of the Amended Lease is $118,388 and the annual base rent increases approximately 2.75% each year during the lease term. The Company is required to pay its proportionate share of operating costs for the building under this triple net lease.

In accordance with ASC 842, the Company accounted for the modification of the lease contract as a separate lease contract. The lease for the Original Suite terminated on June 30, 2024 and the Company recorded a gain on the termination of the lease for the Original Suite of $ 15,319 in general and administrative expenses. The Company recognized a right of use asset of $524,025 and a corresponding lease liability for the Amended Lease on the commencement date. For purposes of calculating the right of use asset and lease liability, the Company estimated its incremental borrowing rate at 8.5% per annum.

Future minimum payments under the Amended Lease are as follows:

| For the Year Ended December 31, | |
|---|---|
| 2025 (remaining) | $ 90,407 |
| 2026 | 123,297 |
| 2027 | 126,703 |
| 2028 | 130,197 |
| 2029 | 88,579 |
| Total lease payments | 559,183 |
| Less: imputed interest | (92,785) |
| Total lease liability | 466,398 |
| Less: current portion of lease liability | (85,270) |
| Long-term lease liability | $ 381,128 |

At March 31, 2025, the remaining lease term was 53 months.

For the three months ended March 31, 2025 and 2024, operating cash flows for lease payments totaled $29,597 and $19,841, respectively. For the three months ended March 31, 2025 and 2024, operating lease cost, recognized on a straight-line basis, totaled $30,856 and $19,018, respectively.

Table of Contents

**Note 5 - Commitments and Contingencies**

License Agreements

In 2015, the Company entered into a licensing agreement which expires in February 2033. Per the agreement, the Company has an exclusive royalty-free license, included in intangible assets, associated with semiconductor power switches which enhances its intellectual property portfolio. The Company pays $100,000 annually under this agreement.

In 2023, the Company amended a 2021 license agreement which expires in February 2034. Per the agreement, the Company has an exclusive royalty-free license, included in intangible assets, associated with semiconductor drive circuitry which enhances its intellectual property portfolio. The Company pays $
50,000 annually under this agreement.

At March 31, 2025, the estimated present value of future payments under the licensing agreements was $1,139,667 with $150,000 due and payable in the next twelve months. The Company is accruing interest for future payments related to these agreements.

Legal Proceedings

The Company may be subject to litigation from time to time in the ordinary course of business. The Company is not currently party to any legal proceedings.

Indemnification Obligations

The employment agreements of Company executives include an indemnification provision whereby the Company shall indemnify and defend, at the Company's expense, its executives so long as an executive's actions were taken in good faith and in furtherance of the Company's business and within the scope of the executive's duties and authority.

**Note 6 - Equity Incentive Plan**

In May 2013, the Company adopted the 2013 Equity Incentive Plan (as amended and restated, the "Plan") and reserved shares of common stock for issuance under the Plan, which was last amended in June 2023. The Plan is administered by the Compensation Committee of the Company's Board of Directors. At March 31, 2025, 210,777 shares of common stock were available for issuance under the Plan.

A summary of the Company's stock option activity and related information is as follows:

| | Stock Options | Weighted Average Exercise Price | Weighted Average Remaining Life (in years) |
|---|---|---|---|
| Outstanding at December 31, 2024 | 509,414 | $ 7.56 | 4.6 |
| Outstanding at March 31, 2025 | 509,414 | $ 7.56 | 4.3 |
| Exercisable at March 31, 2025 | 501,414 | $ 7.48 | 4.3 |

A summary of the Company's restricted stock unit (RSU) and performance stock unit (PSU) activity is as follows:

| | RSUs | PSUs |
|---|---|---|
| Outstanding at December 31, 2024 | 331,715 | 114,000 |
| Granted | 46,676 | - |
| Vested | (13,665) | - |
| Outstanding at March 31, 2025 | 364,726 | 114,000 |

During the three months ended March 31, 2025, the Company granted 38,660 RSUs to Board members and 8,016 RSUs to employees under the Plan. The estimated fair value of these equity grants was $340,001, $75,251 of which was recognized during the three months ended March 31, 2025.

At March 31, 2025, there was $2,238,092 of unrecognized compensation cost related to non-vested equity awards granted under the Plan. That cost is expected to be recognized over a weighted average period of 1.0 years.

**Note 7 - Warrants**

At March 31, 2025 and December 31, 2024, the Company had 342,240 warrants outstanding with a weighted average exercise price of $8.90 per share. At March 31, 2025 and December 31, 2024, the Company had 763,827 pre-funded warrants outstanding, respectively, with an exercise price of $0.001 per share. The weighted average remaining life, excluding the pre-funded warrants with no expiration date, of the outstanding warrants is 0.3 years.

At March 31, 2025, all warrants were exercisable, although the warrants held by certain of the Company's warrant holders may be exercised only to the extent that the total number of shares of common stock then beneficially owned by such warrant holder does not exceed
4.99% (or, at the investor's election, 9.99%) of the outstanding shares of the Company's common stock.

Table of Contents

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS REPORT**

This report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 and the provisions of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act. These statements include, but are not limited to, statements regarding our future financial performance and expenses,, business condition and results of operations, future business plans, expectations regarding design wins and other business developments, and pursuing additional government funding. Forward-looking statements give our current expectations or forecasts of future events. You can identify these statements by the fact that they do not relate strictly to historical or current facts. You can find many (but not all) of these statements by looking for words such as "approximates," "believes," "hopes," "expects," "anticipates," "estimates," "projects," "intends," "plans," "would," "should," "could," "may" or other similar expressions in this report. In particular, these include statements relating to future actions, prospective products, applications, customers, technologies, future performance or results of anticipated products, expenses, and financial results. These forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from our historical experience and our present expectations or projections. Factors that could cause actual results to differ from those discussed in the forward-looking statements include, but are not limited to:

- our history of losses;
- our ability to generate revenue;
- our limited operating history;
- the size and growth of markets for our technology;
- regulatory developments that may affect our business;
- our ability to successfully develop new products and the expected performance of those products;
- the performance of third-party consultants and service providers whom we have and will continue to rely on to assist us in development and commercialization of our B-TRAN® and related packaging and drive circuitry;
- the rate and degree of market acceptance for our B-TRAN® and current and future B-TRAN® products;
- the time required for third parties to redesign, test and certify their products incorporating our B-TRAN®;
- our ability to successfully commercialize our B-TRAN® technology;
- our ability to secure strategic partnerships with semiconductor fabricators and others related to our B-TRAN® technology;
- our ability to obtain, maintain, defend and enforce intellectual property rights protecting our technology;
- the success of our efforts to manage cash spending, particularly prior to the commercialization of our B-TRAN® technology at scale;
- trade protectionism, tariffs, and other barriers to trade that impact the availability or cost of the raw materials and components used in our products;
- general economic conditions and events, including inflation, and the impact they may have on us and our potential partners and licensees;
- our dependence on the global supply chain and impacts of supply chain disruptions;
- our ability to obtain adequate financing in the future, if and when we need it;
- the impact of global health pandemics on our business, financial condition and results of operations;
- our success at managing the risks involved in the foregoing items; and
- other factors discussed in this report.

The forward-looking statements are based upon management's beliefs and assumptions and are made as of the date of this report. We undertake no obligation to publicly update or revise any forward-looking statements included in this report, except as required by applicable law. You should not place undue reliance on these forward-looking statements.

Unless otherwise stated or the context otherwise requires, the terms "Ideal Power," "we," "us," "our" and the "Company" refer to Ideal Power

Inc.

Table of Contents

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the financial statements and related notes included elsewhere in this Quarterly Report on Form 10-Q as well as our audited 2024 financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2024. In addition to historical information, the discussion and analysis here and throughout this Form 10-Q contains forward-looking statements that involve risks, uncertainties and assumptions. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain factors, including, but not limited, to those set forth under "Risk Factors" in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2024.*

**Overview**

Ideal Power Inc. is located in Austin, Texas. We are solely focused on the further development and commercialization of our Bidirectional bipolar junction TRANsistor (B-TRAN®) solid-state switch technology.

To date, operations have been funded primarily through the sale of common stock and pre-funded warrants.

We are in the process of commercializing our B-TRAN® technology and have launched our first two commercial products, the SymCool® Power Module and SymCool® IQ Intelligent Power Module. We generated $12,003 and $78,739 in revenue in the three months ended March 31, 2025 and 2024, respectively.

Product Launches

In early 2023, we launched our first commercial product, the SymCool® Power Module. This multi-die B-TRAN® module is designed to meet the very low conduction loss needs of the solid-state circuit breaker ("SSCB") market. We commenced shipment of SymCool® Power Modules to fulfill customer orders in 2024.

In late 2023, we launched our second commercial product, the SymCool® IQ Intelligent Power Module ("IPM"). The SymCool® IQ IPM builds on the multi-die packaging design of our SymCool® Power Module and adds an integrated intelligent driver optimized for bidirectional operation. This product targets several markets including renewable energy, energy storage, electric vehicle ("EV") charging and other industrial applications. We announced our first order for this product in late 2024.

Upon product launch, we design and build initial prototypes for testing and to solicit customer feedback. Based on the results of testing and customer feedback, we incorporate any necessary changes into the product design, build final prototypes and complete additional testing prior to full commercial release. To date, our customers have purchased prototypes in small quantities for evaluation and provided us feedback that has been incorporated into our final product designs. We expect significantly higher volume orders from customers once we secure a design win from them, and they start to build inventory in advance of launching their OEM product. For the product launches described above, we would expect the time from announcing a design win to the sale of the related OEM product to be roughly one year, although it may vary considerably depending on the customer. We would expect a significantly longer design cycle for automotive applications. Design wins are expected to result in significant revenue growth for us over time as product life cycles tend to be relatively long for power electronics products as changing to another technology would require an OEM to redesign their product. See "First Design Win" below.

Development Agreement

In 2022, we announced, and began the first phase of, a product development agreement with Stellantis, a top 10 global automaker, for a custom B-TRAN® power module for use in the automaker's EV drivetrain inverters in its next generation EV platform. In the first phase of the program, we provided packaged B-TRAN® devices, test kits and technical data to Stellantis for their evaluation. In 2023, we secured, and began the second phase of, this program. In the second phase of the program, we collaborated with Stellantis and the program partners, including both the program's packaging company and the organization building the initial drivetrain inverter, to supply B-TRAN® devices for integration into the custom power module and inverter designs. Also, as part of the second phase of the program, we provided Stellantis a comprehensive test plan for the testing required to achieve certification to automotive standards for B-TRAN®. The test plan was subsequently approved as submitted. In 2024, we successfully completed the second phase of the program. The next phase of the program builds on the completion of deliverables from the prior two program phases and transitions to Stellantis' production team. We are currently finalizing the scope of work for the next phase of the program with Stellantis. This phase is expected to include the extensive testing of the custom B-TRAN® module to meet automotive certification standards enabling B-TRAN® to be the core of the powertrain inverter for the automaker's next-generation EVs.

Customer Engagements

We have announced several engagements and/or initial orders with large companies, including a second top 10 global automaker, a third global automaker, a top 10 global provider of power conversion solutions to the solar industry, two global diverse power management market leaders, three tier 1 automotive suppliers, a global power conversion supplier and others. These companies intend to test and evaluate, or are already in the process of testing and evaluating, our technology for use in their applications. These engagements could lead to future design wins or custom development agreements. We also announced agreements with three distribution partners. We may add other distribution partners in the future.

First Design Win

In late 2024, we announced our first design win for SSCBs with one of the largest circuit protection equipment manufacturers in Asia serving the industrial and utility markets. In connection with this design win, we entered into a joint development agreement for a SSCB product incorporating multiple B-TRAN® devices. The agreement includes the product design, prototype builds and testing of the SSCB, which was targeted for completion in the second quarter of 2025, to be followed by commercial sales later in the year. We completed our deliverables under the agreement in the first quarter of 2025, three months ahead of schedule. We expect to announce additional design wins and/or custom development agreements in 2025.

Table of Contents

**Results of Operations**

**Comparison of the three months ended March 31, 2025 to the three months ended March 31, 2024**

*Revenue.* Revenue was $12,003 for the three months ended March 31, 2025, compared to $78,739 for the three months ended March 31, 2024. For the three months ended March 31, 2025, our revenue included product sales and development revenue related to our first design win. For the three months ended March 31, 2024, our revenue was from the completion of the second phase of our development agreement with Stellantis.

*Cost of Revenue.* Cost of commercial revenue was $30,862 for the three months ended March 31, 2025, compared to $68,498 for the three months ended March 31, 2024. For the three months ended March 31, 2025, our cost of revenue included cost of product sales and development expenses related to our first design win. For the three months ended March 31, 2024, our cost of revenue related to the completion of the second phase of our development agreement with Stellantis.

*Research and Development Expenses.* Research and development expenses increased by $201,099, or 15%, to $1,567,992 in the three months ended March 31, 2025 from $1,366,893 in the three months ended March 31, 2024. The increase was due to higher personnel costs of $160,005 and semiconductor fabrication costs of $51,288, partly offset by lower other B-TRAN® development spending of $10,194. We expect higher quarterly research and development expenses in the remainder of 2025 as compared to the first quarter of 2025 as we continue development of our B-TRAN® technology. There will also be quarter-to-quarterly variability to research and development expenses due to the timing of semiconductor fabrication runs and other development activities.

*General and Administrative Expenses.* General and administrative expenses increased by $46,133, or 5%, to $899,821 in the three months ended March 31, 2025 from $853,688 in the three months ended March 31, 2024. The increase was due to higher personnel costs of $57,394, stock-based compensation expense of $14,076 and other spending of $18,746, partly offset by lower investor relations spending of $44,083. We expect slightly to modestly higher quarterly general and administrative expenses, exclusive of stock-based compensation, in the remainder of 2025 as compared to the first quarter of 2025.

*Sales and Marketing Expenses.* Sales and marketing expenses increased by $21,549, or 7%, to $338,160 in the three months ended March 31, 2025 from $316,611 in the three months ended March 31, 2024. The increase was due to higher personnel costs of $35,896, partly offset by lower stock-based compensation expense of $13,768 and other spending of $579. We expect higher quarterly sales and marketing expenses in the remainder of 2025 as compared to the first quarter of 2025 as we further commercialize our B-TRAN® technology.

*Loss from Operations.* Our loss from operations for the three months ended March 31, 2025 was $2,824,832, or 12% higher, as compared to the $2,526,951 loss from operations for the three months ended March 31, 2024, for the reasons discussed above.

*Interest Income, Net.* Net interest income was $121,808 for the three months ended March 31, 2025, compared to $57,325 for the three months ended March 31, 2024, primarily as a result of the impact of increased interest from a higher cash balance on our money market account.

*Net Loss.* Our net loss for the three months ended March 31, 2025 was $2,703,024, or 9% higher, as compared to a net loss of $2,469,626 for the three months ended March 31, 2024, for the reasons discussed above.

**Liquidity and Capital Resources**

We have incurred losses since inception. We have funded our operations to date primarily through the sale of common stock and pre-funded warrants.

At March 31, 2025, we had cash and cash equivalents of $13.7 million. Our net working capital at March 31, 2025 was $13.4 million. We had no outstanding debt at March 31, 2025.

We believe that our cash and cash equivalents on hand will be sufficient to meet our ongoing liquidity needs for at least the next twelve months from the date of filing this Quarterly Report on Form 10-Q; however, we may require additional funds in the future to fully implement our plan of operation and there can be no assurance that, if needed, we will be able to secure additional debt or equity financing on terms acceptable to us or at all. Although we believe we have adequate sources of liquidity over the long term, the success of our operations, the global economic outlook, and the pace of sustainable growth in our markets could each impact our business and liquidity.

Table of Contents

Operating activities in the three months ended March 31, 2025 resulted in cash outflows of $2,066,774 which were due to the net loss for the period of $2,703,024, partly offset by stock-based compensation of $384,595, favorable balance sheet timing of $139,102 and other non-cash items of $112,553.

Operating activities in the three months ended March 31, 2024 resulted in cash outflows of $1,875,295 which were due to the net loss for the period of $2,469,626, partly offset by stock-based compensation of $381,019, favorable balance sheet timing of $105,817 and other non-cash items of $107,495.

We expect an increase in cash outflows from operating activities in the remainder of 2025 as we further develop and commercialize our B-TRAN® technology.

Investing activities in the three months ended March 31, 2025 and 2024 resulted in cash outflows of $69,878 and $103,550, respectively, for the acquisition of intangible assets and fixed assets.

Financing activities in the three months ended March 31, 2025 resulted in cash outflows of $9,346 from the payment of withholding taxes upon the vesting of restricted stock units.

Financing activities in the three months ended March 31, 2024 resulted in cash inflows of $13,652,663 from issuance of common stock and pre-funded warrants in a public offering and $86,757 from the exercise of stock options.

**Critical Accounting Estimates**

There have been no significant changes during the three months ended March 31, 2025 to the critical accounting estimates disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations in our Annual Report on Form 10-K for the fiscal year ended December 31, 2024.

**Trends, Events and Uncertainties**

There are no material changes from trends, events or uncertainties disclosed in our Annual Report on Form 10-K for the fiscal year ended December 31, 2024.

## ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

As a smaller reporting company, we are not required to provide this information.

## ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the Company's reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. The Company's disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that this information is accumulated and communicated to management, including the principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. The Company conducted an evaluation (pursuant to Rule 13a-15(b) of the Exchange Act), under the supervision and with the participation of its Chief Executive Officer (principal executive officer) and its Chief Financial Officer (principal financial and accounting officer) of the effectiveness of the Company's disclosure controls and procedures as of March 31, 2025 and has concluded that, as of March 31, 2025, the Company's disclosure controls and procedures are effective.

**Changes in Internal Control over Financial Reporting**

There have been no material changes in our internal controls over financial reporting that occurred during the quarter ended March 31, 2025 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**Limitations on the Effectiveness of Controls**

Control systems, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control systems' objectives are being met. Further, the design of any system of controls must reflect the fact that there are resource constraints, and the benefits of all controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of error or mistake. Control systems can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is also based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures.

Table of Contents

## PART II-OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

We may be subject to litigation from time to time in the ordinary course of business. We are not currently party to any legal proceedings.

### ITEM 1A. RISK FACTORS

There are no material changes from the risk factors disclosed in our Annual Report on Form 10-K for the year ended December 31, 2024.

### ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

None.

### ITEM 3. DEFAULTS UPON SENIOR SECURITIES

Not applicable.

### ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

### ITEM 5. OTHER INFORMATION

During the three months ended March 31, 2025, no director or officer of the Company adopted or terminated a "Rule 10b5-1 trading arrangement" or non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408(a) of Regulation S-K.

Table of Contents

**ITEM 6. EXHIBITS**

| Exhibit Number | Document |
|---|---|
| 31.1* | Certification of Principal Executive Officer pursuant to Exchange Act Rule, 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Certification of Principal Financial Officer pursuant to Exchange Act Rule, 13a-14(a) and 15d-14(a), as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Certification pursuant to 18 U.S.C. 1350, adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS* | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 10.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document and contained in Exhibit 101). |

* Filed herewith
** Furnished herewith

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Dated: May 15, 2025

**IDEAL POWER INC.**

By: /s/ R. Daniel Brdar
R. Daniel Brdar
Chief Executive Officer

By: /s/ Timothy W. Burns
Timothy W. Burns
Chief Financial Officer

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO SECTION 302(a) OF THE SARBANES-OXLEY ACT OF 2002**

I, R. Daniel Brdar, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Ideal Power Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2025

/s/ R. Daniel Brdar
R. Daniel Brdar
Chief Executive Officer (Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO SECTION 302(a) OF THE SARBANES-OXLEY ACT OF 2002**

I, Timothy W. Burns, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Ideal Power Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2025

/s/ Timothy W. Burns

Timothy W. Burns
Chief Financial Officer (Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the periodic report of Ideal Power Inc. (the "Company") on Form 10-Q for the quarter ended March 31, 2025 as filed with the Securities and Exchange Commission (the "Report"), we, R. Daniel Brdar, Chief Executive Officer (Principal Executive Officer) and Timothy W. Burns, Chief Financial Officer (Principal Financial Officer) of the Company, hereby certify as of the date hereof, solely for purposes of Title 18, Chapter 63, Section 1350 of the United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of our knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated.

Date: May 15, 2025

/s/ R. Daniel Brdar
R. Daniel Brdar
Chief Executive Officer (Principal Executive Officer)

/s/ Timothy W. Burns
Timothy W. Burns
Chief Financial Officer (Principal Financial Officer)

# EXHIBIT 5

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

**(Mark One)**
X **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2025**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

Commission File Number 001-36216

IDEAL POWER INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE**<br>(State or other jurisdiction of incorporation or organization) | **14-1999058**<br>(I.R.S. Employer Identification No.) |

5508 Highway 290 West, Suite 120
**Austin, Texas 78735**
(Address and zip code of principal executive offices)

**(512) 264-1542**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | IPWR | The Nasdaq Capital Market |

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No X

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No X

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes X No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes X No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company.

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer X | Smaller reporting company X |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark whether the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the issuer is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No X

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant was approximately $37.5 million as of June 30, 2025, the last business day of the registrant's most recently completed second fiscal quarter, based upon the last sales price reported for such date on The Nasdaq Capital Market. For purposes of the foregoing calculation, all directors and executive officers of the registrant and holders of more than 10% of the registrant's common equity are assumed to be affiliates of the registrant. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of March 25, 2026, the issuer had 12,089,389 shares of common stock, par value $0.001, outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required by Part III of this Annual Report on Form 10-K is incorporated herein by reference from the registrant's definitive proxy statement relating to the 2026 annual meeting of stockholders, which shall be filed with the Securities and Exchange Commission within 120 days after the end of the registrant's fiscal year ended December 31, 2025.

**TABLE OF CONTENTS**

| | |
|---|---|
| PART I. | 4 |
| ITEM 1: BUSINESS | 4 |
| ITEM 1A: RISK FACTORS | 8 |
| ITEM 1B: UNRESOLVED STAFF COMMENTS | 16 |
| ITEM 1C: CYBERSECURITY | 16 |
| ITEM 2: PROPERTIES | 17 |
| ITEM 3: LEGAL PROCEEDINGS | 17 |
| ITEM 4: MINE SAFETY DISCLOSURES | 17 |
| PART II. | 17 |
| ITEM 5: MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 17 |
| ITEM 6: [RESERVED] | 17 |
| ITEM 7: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 18 |
| ITEM 7A: QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 22 |
| ITEM 8: FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 22 |
| ITEM 9: CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 37 |
| ITEM 9A: CONTROLS AND PROCEDURES | 37 |
| ITEM 9B: OTHER INFORMATION | 37 |
| ITEM 9C: DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS. | 38 |
| PART III. | 38 |
| ITEM 10: DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 38 |
| ITEM 11: EXECUTIVE COMPENSATION | 38 |
| ITEM 12: SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 38 |
| ITEM 13: CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 38 |
| ITEM 14: PRINCIPAL ACCOUNTANT FEES AND SERVICES | 38 |
| PART IV. | 39 |
| ITEM 15: EXHIBITS, FINANCIAL STATEMENT SCHEDULES | 39 |
| ITEM 16: FORM 10-K SUMMARY | 40 |
| Signatures | 41 |

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS REPORT**

This report contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 and the provisions of Section 27A of the Securities Act of 1933, as amended, or the Securities Act, and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Forward-looking statements give our current expectations or forecasts of future events. You can identify these statements by the fact that they do not relate strictly to historical or current facts. You can find many (but not all) of these statements by looking for words such as "approximates," "believes," "hopes," "expects," "anticipates," "estimates," "projects," "intends," "plans," "would," "should," "could," "may" or other similar expressions in this report. In particular, these include statements relating to future actions, prospective products, applications, customers, technologies, future performance or results of anticipated products, expenses, and financial results. These forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from our historical experience and our present expectations or projections. Factors that could cause actual results to differ from those discussed in the forward-looking statements include, but are not limited to:

- our history of losses;
- our ability to generate revenue;
- our limited operating history;
- the size and growth of markets for our technology;
- regulatory developments that may affect our business;
- our ability to successfully develop new products and the expected and actual performance of those products;
- the performance of third-party consultants and service providers whom we have and will continue to rely on to assist us in development and commercialization of our B-TRAN® and related packaging and drive circuitry;
- the rate and degree of market acceptance for our B-TRAN® and current and future B-TRAN® products;
- the time required for third parties to redesign, test and certify their products incorporating our B-TRAN®;
- our ability to successfully commercialize our B-TRAN® technology;
- our ability to secure strategic partnerships with semiconductor fabricators and others related to our B-TRAN® technology;
- our ability to obtain, maintain, defend and enforce intellectual property rights protecting our technology;
- the success of our efforts to manage cash spending, particularly prior to the commercialization of our B-TRAN® technology at scale;
- trade protectionism, tariffs, and other barriers to trade that impact the availability or cost of the raw materials and components used in our products;
- general economic conditions and events, including inflation, and the impact they may have on us and our potential partners and licensees;
- our dependence on the global supply chain and the impacts of supply chain disruptions;
- our ability to obtain adequate financing in the future, if and when we need it;
- the impact of global health pandemic on our business, financial conduction and results of operations;
- our success at managing the risks involved in the foregoing items; and
- other factors discussed in this report.

The forward-looking statements are based upon management's beliefs and assumptions and are made as of the date of this report. We undertake no obligation to publicly update or revise any forward-looking statements included in this report, except as required by applicable law. You should not place undue reliance on these forward-looking statements.

**PART I**

**ITEM 1: BUSINESS**

**Our Company**

Ideal Power Inc. was formed in Texas on May 17, 2007 and converted to a Delaware corporation on July 15, 2013. Unless otherwise stated or the context otherwise requires, the terms "Ideal Power," "we," "us," "our" and the "Company" refer to Ideal Power Inc.

We are solely focused on the further development and commercialization of our Bidirectional bipolar junction TRANsistor ("B-TRAN®") solid-state switch technology.

To date, operations have been funded primarily through the sale of common stock and pre-funded warrants and we have generated $3.7 million in grant revenue for bidirectional power switch development. We may pursue additional research and development grants, if and when available, to further develop and/or improve our technology.

We are in the process of commercializing our B-TRAN® technology and have launched our first two commercial products, the discrete B-TRAN® and the SymCool® Power Module. We generated $37,728 and $86,032, respectively, in commercial revenue in the years ended December 31, 2025 and 2024.

***CEO Transition***

Effective November 2, 2025, R. Daniel Brdar, the then President and Chief Executive Officer and member of the Board of Directors of the Company (the "Board"), retired from all positions with us. Effective November 3, 2025, the Board appointed David Somo as the President and Chief Executive Officer and as a member of the Board.

***Product Launches***

Our first commercial product launch was the discrete B-TRAN®. This single B-TRAN® die packaged for electrical connection is designed to meet the very low conduction loss needs of the solid-state circuit protection and electric vehicle ("EV") contactor markets.

Our second commercial product launch was the SymCool® Power Module. This multi-die B-TRAN® module is also designed to meet the very low conduction loss needs of the solid-state circuit protection and EV contactor markets.

Upon product launch, we design and build initial prototypes for testing and to solicit customer feedback. Based on the results of testing and customer feedback, we incorporate any necessary changes into the product design, build final prototypes and complete additional testing prior to full commercial release. To date, our customers have purchased prototypes in small quantities for evaluation and provided us feedback that has been incorporated into our final product designs. We expect significantly higher volume orders from customers once we secure a design win from them, and they start to build inventory in advance of launching their OEM products. For the products described above, we would expect the time from announcing a design win to the sale of the related OEM product to be roughly twelve to eighteen months, although it may vary considerably depending on the customer and application. We would expect a significantly longer design cycle for automotive applications. Design wins are expected to result in significant revenue growth for us over time as product life cycles tend to be relatively long for power electronics products as changing to another technology would require an OEM to redesign their product. See "First Design Win" below.

***Development Agreement***

In 2022, we announced, and began the first phase of, a product development agreement with Stellantis, a top 10 global automaker, for a custom B-TRAN® power module for use in the automaker's EV drivetrain inverters in its next generation EV platform. In the first phase of the program, we provided packaged B-TRAN® devices, test kits and technical data to Stellantis for their evaluation. In 2023, we secured, and began the second phase of, this program. In the second phase of the program, we collaborated with Stellantis and the program partners, including both the program's packaging company and the organization building the initial drivetrain inverter, to supply B-TRAN® devices for integration into the custom power module and inverter designs. Also, as part of the second phase of the program, we provided Stellantis a comprehensive test plan for the testing required to achieve certification to automotive standards for B-TRAN®. The test plan was subsequently approved as submitted. In 2024, we successfully completed the second phase of the program. In August 2025, we secured an order from Stellantis for custom development and packaged devices targeting multiple EV applications. We completed the first of five deliverables under this purchase order in 2025. Also in 2025, Stellantis informed us that they are prioritizing the EV contactor application over the drivetrain inverter application. We are currently working to complete the remaining deliverables under the August 2025 purchase order and engaged with Stellantis on a potential EV contactor program.

***Customer Engagements***

We have announced several engagements and/or initial orders with large companies, including Stellantis and other global automakers, Forbes Global 500 diverse power management market leaders, global tier 1 automotive suppliers, circuit protection market leaders, inverter / energy storage market leaders and others. These companies intend to test and evaluate, or are already in the process of testing and evaluating, our technology for use in their applications. These engagements could lead to future design wins or custom development agreements. We also announced agreements with multiple distribution partners. We may add other distribution partners in the future. Recently, we signed a letter of intent with a power module maker in Asia to manufacture and offer B-TRAN®-based power modules for sale to their customers. We may engage with other power module manufacturers or others in the power semiconductor ecosystem in the future to further expand the channels to market for products incorporating our technology.

***First Design Win***

In late 2024, we announced our first design win for solid-state circuit breakers ("SSCBs") with one of the largest circuit protection equipment manufacturers in Asia serving the data center, renewable energy, energy storage, EV and other industrial markets. In connection with this design win, we entered into a joint development agreement for a SSCB product incorporating multiple B-TRAN® devices. The agreement included the product design, prototype builds and testing of the SSCB. We completed our deliverables, including SSCB prototypes, under this agreement in the first quarter of 2025. In the third quarter of 2025, the customer successfully completed their testing of updated SSCB prototypes that included enhancements requested by the customer. The customer plans on gathering feedback on this new product from their end customers ahead of product launch. In February 2026, we entered into a multi-year strategic cooperation agreement with this customer for the design, development and worldwide sales of circuit protection solutions including SSCBs, battery disconnect units and EV contactors featuring B-TRAN®. We expect to announce additional design wins and/or custom development agreements with this customer and/or other customers in 2026.

***February 2026 Offering***

In February 2026, we issued and sold 3,505,855 shares of our common stock at a price of $2.75 per share and 952,881 pre-funded warrants to purchase shares of common stock at a price of $2.749 per pre-funded warrant in an underwritten public offering and 631,332 pre-funded warrants to purchase shares of common stock at a price of $2.749 per pre-funded warrant in a concurrent private placement (taken together, the "February 2026 Offering"). The pre-funded warrants have an exercise price of $0.001 per share. The estimated net proceeds to us from the February 2026 Offering are $12.6 million. We intend to use the net proceeds from the February 2026 Offering to fund further commercialization and development of our B-TRAN® technology and products and general corporate and working capital purposes.

**Industry Background**

A semiconductor material is a substance that is characterized for "conducting" electricity easily, while at the same time, working as an insulator to prevent the flow of electricity. By using semiconductors, it becomes possible to perform rectification for the unidirectional flow of electricity, amplification for increasing electrical signals, and switching to open and close the flow of electricity.

Power semiconductors possess a structure that is different from regular semiconductors, enabling them to handle high voltages and large currents without damage. Failures may occur due to a rise in temperature resulting from heat generated from handling large amounts of power. Therefore, methods have been developed to reduce the amount of power semiconductor loss, which is the cause of the heat generation, while also effectively releasing the generated heat to the outside.

These semiconductor devices are primarily used in power conversion such as in changing voltages and frequencies, as well as changing direct current ("DC") to alternating current ("AC") and AC to DC. They play an indispensable role in accurately driving motors from low to high speeds, controlling the voltage and flow of electricity in electric and hybrid electric vehicles, supplying power grids with power generated from solar cells or wind turbines with less power loss, and providing a stable source of electricity to various home appliances and electrical equipment. In recent years, there has been greater demand placed on the power grid to support the substantial growth in AI data centers as well as vehicle electrification and renewable energy sources, this in turn is driving the quest for energy-savings and power consumption reductions and, as a result, the need for power semiconductors that minimize power loss has been increasing.

Power semiconductors are solid-state devices that act as a switch without any mechanical movement. Solid-state devices are completely made from a solid material, typically silicon, and their flow of charges is confined within this solid material. The term solid-state is often used to show a difference from the earlier technologies of vacuum and gas-discharge tube devices and also to exclude conventional electromechanical devices such as relays, switches, hard drives and other devices with moving parts. Solid-state devices are typically smaller, lighter and faster acting than electromechanical devices.

The global power semiconductor market may be categorized by component, material, end-use and geography. Based on component, the market includes power metal-oxide semiconductor field-effect transistors ("MOSFETs"), thyristors, rectifiers, bipolar junction transistors, insulated gate bipolar transistors ("IGBTs") and power diodes. With respect to material, the power semiconductor market is split several ways into silicon, silicon carbide and gallium nitride.

The end-use market is classified into automotive, industrial, renewable energy, telecommunication, consumer electronics, aerospace and defense, data centers and others. Among these, automotive electronics accounts for significant consumption of power semiconductors. The number of semiconductors in vehicles has surged in recent years with the rising adoption of electric vehicles and hybrid electric vehicles. Further, the advent of drive-by-wire or x-by-wire technologies has led to a rise in number of electric components in vehicles over mechanical vehicle parts. This rise helps reduce vehicle weight which is directly related to improved fuel efficiency and reduced vehicular emissions. The heavy consumption of power semiconductors across several end-use markets such as AI data centers, industrial, automotive and renewable energy is a key growth driver of the power semiconductor market.

Geographically, Asia Pacific accounts for the leading consumption of power semiconductors among other key regions. The region is also one of the leading exporters of power semiconductors in the world. The growth in the region is mainly attributed to China, which is the leading automotive and passenger vehicle market in the world. China is currently the leading consumer of power semiconductors. Furthermore, demand for power semiconductors is increasing from renewable energy sectors in the region. Europe and North America are also leading consumers of power semiconductors among others in the global market.

Leading players in the global power semiconductor market include Infineon Technologies AG, Texas Instruments, onsemi, Fuji Electric Co. Ltd., ST Microelectronics N.V., Mitsubishi Electric Group, Rohm Semiconductor, and Renesas Electronics. While these companies are potential competitors, they are also potential licensees for our B-TRAN® technology as there is not, to our knowledge, a high-efficiency bidirectional design available in the market. See "—Competition."

**Our Technology**

To further improve the performance of bidirectional technologies and products, we identified the need for a true bidirectional power switch and applied for and, in 2012, received a grant from the U.S. Department of Energy's Advanced Research Projects Agency-Energy ("ARPA-E") to develop a bidirectional solid-state power switch. At the outset, our efforts under the ARPA-E grant were focused on the development of, including the manufacturing process development for, a bidirectional insulated gate bipolar transistor ("BD-IGBT"). Although work on BD-IGBTs had previously been done by others in research labs, it was a technology that had not been commercialized.

A bidirectional circuit incorporates multiple IGBTs, which are power switches used in the process to convert power from one current form to another. IGBTs switch current in only one direction and require the use of a blocking diode to prevent current from flowing back through the device. To enable a product to perform bidirectional power conversion, for each IGBT and diode used in a circuit, a second IGBT and diode must also be utilized. These additional components add voltage drops that affect the electrical efficiency of end-use products and generate heat that must be dissipated. To eliminate the need to utilize four devices to create one bidirectional switch and to improve the performance of bidirectional switching, a true bidirectional switch is necessary. While we initially focused on the development of a BD-IGBT under the ARPA-E grant, we shifted our focus under the grant to the development of a new, highly efficient power switch called a bidirectional bipolar junction transistor, or B-TRAN®, that would allow product manufacturers to substitute one B-TRAN® for two pairs of IGBTs and diodes used in bidirectional circuits in their products and, more importantly, be a potential replacement for conventional power switches, such as IGBTs, in the broader power semiconductor market. The B-TRAN® leverages many of the same processing steps we had developed for the BD-IGBT while also providing certain key advantages including patentability, reduced component count and higher efficiency compared to a BD-IGBT.

Based on discrete B-TRAN® device and SymCool® Power Module testing, we believe that the B-TRAN® can significantly improve electrical efficiency in solid-state circuit protection and power converters along with many other power conversion applications. Compared to conventional power switches, such as IGBTs, B-TRAN® can reduce power losses by 50% or more depending on the application. This higher efficiency will substantially reduce the heat generated by the operation of products utilizing this technology. As a result, products incorporating B-TRAN® have lower thermal management requirements. This in turn requires a significantly smaller surface area for heat dissipation which enables increased power density, or power per pound, and potentially smaller original equipment manufacturer, or OEM, products. In addition, B-TRAN®'s symmetric bidirectional operation reduces the number of components by 75% as compared to a conventional bidirectional switch utilizing IGBTs and diodes. This highly efficient and, we believe, unique symmetric operation should provide a strong competitive advantage in bidirectional applications which are growing at rapid rates due to the growth in AI data centers, the electrification of transportation, the shift to renewable energy coupled with energy storage and utility grid modernization.

We have qualified two foundries that both successfully fabricated B-TRAN® wafers, validating the ability to make B-TRAN® semiconductor power switches using conventional silicon semiconductor fabrication equipment and processes. Test results measured B-TRAN® electrical losses at less than 50% that of conventional power switches such as silicon IGBTs.

As part of the B-TRAN® development and commercialization process and in partnership with our semiconductor fabrication partners, we continue with additional B-TRAN® wafer runs, incorporating the results of prior runs and subsequent testing into the B-TRAN® wafer fabrication. With the double-sided transistor behavior and low conduction losses validated and upgrades and improvements in the manufacturing process implemented, we began shipping prototype discrete B-TRAN® devices to large companies in mid-2023. In early 2024, we commenced shipments of prototype SymCool® Power Modules to fulfill customer orders.

The primary raw material used in the fabrication of B-TRAN® devices is silicon wafers. Silicon is abundant and the production of silicon wafers is a large, global business with most manufacturers in Europe and Asia.

**Business Strategy and Target Markets**

We utilize a strategic partnership model focused on leveraging the existing silicon processing infrastructure, allowing us to focus on the further development and commercialization of our B-TRAN® technology.

Target markets for current and future B-TRAN®-based products include, but are not limited to, AI data centers, solid-state circuit protection, static transfer switches ("STS"), electric and plug-in hybrid electric vehicles, electric vehicle charging, renewable energy and energy storage systems uninterruptible power supplies ("UPS"), industrial motor drives, solid state transformers ("SST"), power distribution and transmission switches and other industrial and defense markets. These markets typically utilize IGBTs and more recently silicon carbide ("SiC") MOSFETs for power switching in their applications. According to Mordor Intelligence, the power electronics market is forecasted to grow to $37.7 billion by 2028. We are initially targeting markets where B-TRAN® is an enabling technology, such as solid-state circuit breakers, static transfer switches and EV contactors, and large and growing segments of the power semiconductor market, such as AI data centers, electric and hybrid electric vehicles, electric vehicle charging, renewable energy and energy storage. We believe that B-TRAN® provides a competitive advantage in several applications due to its higher efficiency and inherent bidirectionality

**Intellectual Property**

We rely on a combination of patents, trade secrets, laws that protect intellectual property, confidentiality procedures and contractual restrictions with our employees and others to establish and protect our intellectual property rights. As of December 31, 2025, we had 52 U.S. and 47 foreign issued patents as well as 76 additional pending U.S. and international patent applications on our B-TRAN® technology. Our first B-TRAN® patent issued in 2015 and our patents generally have a 20-year life from the date of initial filing prior to expiration. We expect to continue to build our patent estate for our B-TRAN® technology and other technological developments that broaden the scope of our technology platform. In addition, we treat the proprietary dual-sided wafer fabrication process we developed to produce B-TRAN® wafers as a trade secret.

**License Agreements**

In 2015, we entered into a licensing agreement which expires in February 2033. Per the agreement, we have an exclusive royalty-free license associated with semiconductor power switches which enhances our intellectual property portfolio. We pay $100,000 annually under this agreement.

In 2023, we amended a 2021 license agreement which expires in February 2034. Per the agreement, we have an exclusive royalty-free license associated with semiconductor drive circuitry which enhances our intellectual property portfolio. We pay $50,000 annually under this agreement.

At December 31, 2025, the estimated present value of future payments under these licensing agreements was $1,036,538 with $150,000 due and payable in 2026. We are accruing interest for future payments related to these agreements.

**Competition**

We compete against well-established incumbent power semiconductor device suppliers, including companies that already operate at a large scale in the single-sided (unidirectional) power switch market with IGBTs and MOSFETs, including silicon carbide MOSFETs. Many of these suppliers are now selling modules that utilize multiple conventional power switches to form a bidirectional circuit. We continue to monitor the competitive landscape for offerings or potential offerings based on new technologies with inherent bidirectionality. Many, if not all of our competitors, have greater financial resources, more comprehensive product offerings, broader market presence, longer standing relationships with business partners, longer operating histories, greater manufacturing capabilities, stronger brand recognition, and greater sales and marketing resources than we have. To date, we are not aware of any offerings or potential offerings based on a true high efficiency bidirectional design for high power applications other than potential products based on our B-TRAN® technology.

Power semiconductor device providers typically compete based on voltage, current and frequency capabilities with the larger providers offering a broad range of standard products, including discrete devices and modules. Smaller providers generally take a niche approach focused on a unique or customized device capability. Customers for these devices are typically looking for demonstrable product or system level improvements in efficiency and/or power density for their applications. Power semiconductor device providers utilize direct and indirect sales teams focused on capturing customer design wins.

**Government Approval and Regulation**

Government approval is not required for us to license our B-TRAN® technology or sell B-TRAN® devices or products. However, government support for semiconductors and certain of our target markets including electric and hybrid electric vehicles, electric vehicle charging infrastructure, renewable energy, grid storage and improved grid resiliency may impact the size and growth rate of semiconductors and these potential target markets. In recent years, there has been a trend in both the United States and abroad to support the adoption of electric vehicles and renewable energy due to increased concern regarding the effects of climate change. In the United States and under the Trump administration, this governmental support has significantly diminished. Government support for semiconductors and our potential target markets in the United States and abroad could have a material and positive impact on our business if our B-TRAN® technology is successfully commercialized, particularly in these markets. A lack of government support, on the other hand, may have a material and negative impact on our business if this lack of support results in slower adoption of products in our target markets, like electric vehicles, until such time that the cost and performance improve for these products enough that government support is unnecessary for mass adoption. Regardless of the administration in the U.S., the market for semiconductors and our target markets is global and we believe there continues to be strong macro-trends regarding the growth in AI data centers, the adoption of electric vehicles and associated charging systems, renewable energy and energy storage, and electrification, including grid modernization.

**Employees**

As of February 28, 2026, we had 17 full-time employees. None of these employees are covered by a collective bargaining agreement, and we believe our relationship with our employees is good.

**Available Information**

Our Internet address is www.idealpower.com and our investor relations website is located at idealpower.com/investors-overview/. We make available free of charge on our investor relations website under the heading "SEC Filings" our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports and our Proxy Statement as soon as reasonably practicable after such materials are electronically filed with (or furnished to) the SEC. These reports are also available free of charge via EDGAR through the Securities and Exchange Commission's ("SEC") website (www.sec.gov) as soon as reasonably practicable after such materials are electronically filed with (or furnished to) the SEC. We also make available on our website, our corporate governance documents, including our code of business conduct and ethics. Information contained on our website (or any other website referred to in this Annual Report on Form 10-K) is not incorporated by reference into this Annual Report on Form 10-K.

**ITEM 1A: RISK FACTORS**

*We are subject to various risks that may materially harm our business, prospects, financial condition and results of operations. An investment in our common stock is speculative and involves a high degree of risk. In evaluating an investment in shares of our common stock, you should carefully consider the risks described below, together with the other information included in this report.*

*The risks described below are not the only risks we face. If any of the events described in the following risk factors actually occurs, or if additional risks and uncertainties later materialize that are not currently known to us or that we currently deem immaterial, then our business, prospects, results of operations and financial condition could be materially adversely affected. In that event, the trading price of our common stock could decline, and you may lose all or part of your investment in our shares. The risks discussed below include forward-looking statements, and our actual results may differ substantially from those discussed herein.*

**Risks Related to the Company**

***We lack an established operating history on which to evaluate our business and determine if we will be able to execute our business plan. We have also incurred losses in prior periods, expect to incur losses in the future, currently generate limited commercial revenue and we may not achieve or maintain profitability in the future.***

We have a limited operating history that makes it difficult to evaluate our business. Our focus is on the development and commercialization of our B-TRAN® technology. We cannot say with certainty when we will successfully commercialize our B-TRAN® technology, if ever, and thus we may not generate significant commercial revenue in the near future, or ever.

Since inception, we have sustained approximately $118 million in net losses and we had net losses for the years ended December 31, 2025 and 2024 of approximately $10.6 million and $10.4 million, respectively. We expect to incur losses and negative cash flows from operating activities at least until such time as we have commercialized our B-TRAN® technology and developed a substantial and stable revenue base. We cannot assure you that we can develop a substantial and stable revenue base or achieve or sustain profitability in the future.

We have been funding operations primarily through the sale of common stock and pre-funded warrants. We currently generate limited commercial revenue, and, in order to fund our operations until we are profitable, we will need to raise additional funds and such funds may not be available on commercially acceptable terms, if at all. If we are unable to raise funds on acceptable terms if and as needed, we may not be able to execute our business plan and generate sustainable revenue. This may seriously harm our business, financial condition and results of operations. In the event we are not able to continue operations, you will likely suffer a complete loss of your investment in our securities.

***Product development and commercialization is an inherently uncertain process, and we may encounter unanticipated development and/or commercialization challenges and may not be able to meet our product design and/or commercialization milestones.***

Prototype and product development and testing may be subject to unanticipated and significant delays, expenses and technical or other problems. We cannot guarantee that we will successfully achieve our milestones within our planned timeframe or ever. We have developed and tested discrete B-TRAN® devices and SymCool® power modules. We cannot predict whether future prototypes of, or actual, B-TRAN® products will achieve results consistent with our expectations, third-party simulations or the expectations of our potential customers and/or licensees. A prototype or product could cost significantly more than expected or the prototype or product design fabrication process could uncover problems that are not consistent with our expectations. Prototypes of B-TRAN® devices and new product introductions are a material part of our business plan, and if they are not proven to be successful, our business and prospects would be harmed. In addition, for both testing and commercialization purposes, the B-TRAN® needs to be packaged and paired with an efficient driver. Driver development is subject to similar risks as B-TRAN® prototype and product development including being subject to unanticipated and significant delays, expenses and technical or other problems.

More generally, the commercialization of products using our technology and designs may also be adversely affected by many factors not within our control, including:

- the willingness of market participants to try new products incorporating our technology and the perceptions of these market participants of the safety, reliability, functionality and cost effectiveness of these products;

- the emergence of newer, possibly more effective technologies;

- the cost and availability of the raw materials and components needed to manufacture and use products incorporating our technology; and

- the adoption of new regulatory or industry standards that may adversely affect the use or cost of products incorporating our technology.

Accordingly, we cannot predict that products incorporating our technology will be accepted on a scale sufficient to support the development of mass markets for them.

***Our semiconductor fabrication partners may be unable to successfully and cost-effectively develop and implement new process steps necessary for bidirectional semiconductor device fabrication at scale.***

While the fabrication of B-TRAN® wafers uses conventional equipment and process steps, there is heightened risk in the fabrication process due to the handling and processing of both sides of the wafer and achieving the required front to back alignment of the features. Two-sided wafer processing and handling is necessary as the B-TRAN®, unlike conventional power semiconductor devices, is a two-sided bidirectional device. In addition, the cost to manufacture a B-TRAN® will be impacted by the number of process steps, the processing time and the size of the wafer. B-TRAN® fabrication currently utilizes smaller 6-inch diameter wafers resulting in fewer die per wafer. As a result, the cost per die is higher than if larger diameter wafers were utilized. For example, if an 8-inch wafer was used it would have almost two and one half times the area and produce almost two and one half times as many die as a 6-inch wafer, resulting in a lower cost per die. If we, in partnership with our semiconductor fabrication partners, are unable to successfully and cost-effectively develop and implement new process steps necessary for bidirectional semiconductor device fabrication at scale or encounter unforeseen issues in transitioning to larger diameter wafers, our business, financial condition and results of operations would be materially and adversely affected.

There are a limited number of semiconductor fabrication development facilities in the United States and abroad. Furthermore, from time to time there has been insufficient fabrication capacity for, and shortages of, certain semiconductor devices and related electronic components. Disruptions to the supply chain for semiconductors and related electronic components could delay our critical development and commercialization activities and/or result in significantly higher costs for us for semiconductor components and/or semiconductor foundry and related services. This risk is magnified for us as a small company as we are at a disadvantage relative to larger, more established companies in securing semiconductor fabrication capacity as we do not have longstanding relationships with semiconductor foundries and, as a new technology, it will take time to scale to the volume necessary to attract and retain certain semiconductor foundries. There are also a limited number of well-capitalized semiconductor fabricators working with the smaller diameter wafers currently utilized by us for development and production. Our inability to engage such partners in a cost-effective manner, the loss of any fabrication partner once engaged or industry supply chain disruptions may materially delay our development efforts and may have a materially adverse effect on our business, financial condition and results of operations.

***We, or our potential future licensees, must achieve design wins to obtain customers, although design wins achieved may not necessarily result in substantial sales or licensing revenue to us.***

We anticipate that our current and future designs will typically be integrated into systems by our current and potential customers. This may result in the need to customize our designs, generally the packaging and/or driver rather than the B-TRAN® die, for certain applications or customers. We will need to work with semiconductor partners and/or manufacturers early in their design cycles to ensure that our designs will meet the requirements of their systems. Manufacturers typically choose one or two vendors to provide the components for use in their systems. Selection as one of these vendors is called a design win. It is critical that we, or our licensees, achieve these design wins in order to obtain customers and generate sales and/or licensing revenue. We can provide no assurance that customer engagements whereby potential customers evaluate and test our products will result in a design win. Although we secured our first design win in late 2024, we also can provide no assurance that we will secure additional design wins in a timely manner or at all or that any such design wins will result in significant revenue growth for us.

We believe that equipment manufacturers often select their suppliers based on factors including long-term relationships and end user demand. Accordingly, we may have difficulty achieving design wins from equipment manufacturers as our products are, and new products will be, new entrants into the market. Our efforts to achieve design wins or assist our potential future licensees in achieving design wins may be time consuming and expensive and may not be successful. If we or our potential future licensees are not successful in achieving design wins, or if we or our potential future licensees do achieve design wins but the customers' systems that utilize our designs are not successful, our business, financial condition, and results of operations could be materially and adversely impacted.

Even if we, or our potential future licensees, achieve design wins, the timing of generation of sales and/or licensing revenue will be dependent on the customer's product design cycle. There may be significant time between when we, or our potential future licensees, achieve design wins and when we generate initial sales and/or licensing revenue from these design wins. Significant delays in our customers' product design cycles, or long product design cycles by these customers, could materially and adversely affect our business, financial condition and result of operations.

Once a manufacturer chooses a component for use in a particular system, it is likely to retain that component for the life of that system. In addition, the sales cycle into certain of our target markets, such as the automotive market, is typically very long. Our future growth could experience material and prolonged adverse effects if we fail to achieve design wins or if the design wins do not result in substantial revenue for us within a reasonable timeframe.

***We previously received grant funds from the United States for the development of a bidirectional switch. In certain instances, the United States may obtain title to inventions related to this effort. If we were to lose title to those inventions, we may have to pay to license them from the United States in order to manufacture the inventions. If we were unable to license those inventions from the United States, it could slow down our product development.***

In conjunction with the ARPA-E grant we received from the Department of Energy, we granted to the United States a non-exclusive, nontransferable, irrevocable, paid-up license to practice or have practiced for or on behalf of the United States inventions related to a bidirectional switch and made within the scope of the grant. If we failed to disclose to the Department of Energy an invention made with grant funds that we disclosed to patent counsel or for publication, or if we elect not to retain title to the invention, the United States may request that title to the subject invention be transferred to it.

We also granted "march-in-rights" to the United States in connection with any bidirectional switch inventions in which we choose not to retain title, if those inventions were made under the ARPA-E grant. Pursuant to the march-in-rights, the United States has the right to require us, any person to whom we have assigned our rights, or any exclusive licensee to grant a non-exclusive, partially exclusive, or exclusive license in any field of use to a responsible applicant upon terms that are reasonable. If the license is not granted as requested, the United States has the right to grant the license if it determines that we have not achieved practical application of the invention in the field of use, the action is necessary to alleviate health or safety needs, the action is necessary to meet requirements for public use specified by Federal regulations and such requirements have not been satisfied, or the action is necessary because an agreement to manufacture the invention in the United States has not been obtained or waived or because any such agreement has been breached.

If we lost title to the United States as a result of any of these events, we would have to pay to license the inventions, if needed, from the United States to manufacture the applicable bidirectional switch. If we were unable to license those inventions from the United States, it could materially and adversely impact our business, financial condition and results of operations.

***As we continue to grow and to develop our intellectual property, we could attract threats from patent monetization firms or competitors alleging infringement or competitors could infringe upon our intellectual property. We may incur substantial costs as a result of litigation or other proceedings relating to patent and other intellectual property rights.***

As we continue to grow and to develop our intellectual property, we could attract threats from patent monetization firms or competitors alleging infringement of intellectual property rights. In that event, we may incur significant costs to defend against such a claim even if the claim proves to have no merit. In addition, some of our future competitors will be able to sustain the costs of complex patent litigation more effectively than we can because they have substantially greater resources. If we do not prevail in this type of litigation, we may be required to: pay monetary damages; stop commercial activities relating to our technology; obtain one or more licenses in order to secure the rights to manufacturing or marketing certain future products incorporating our technology; or attempt to compete in the market with substantially similar products. Uncertainties resulting from the initiation and continuation of any litigation could limit our ability to continue some or all of our operations. We may face significant expenses and liability in connection with the protection of our intellectual property and, if we are unable to successfully protect our rights or resolve intellectual property conflicts with others, our business or financial condition could be adversely affected.

Our success depends in large part on our proprietary technology for which we seek protection under patent, copyright, trademark and trade secret laws in the United States and abroad. Such protection is also maintained in part using proprietary information and inventions agreements and non-disclosure agreements. The agreements we use in an effort to protect our intellectual property, confidential information, and other unpatented proprietary information may be ineffective or insufficient to prevent unauthorized use or disclosure of such trade secrets and information. A party to one of these agreements may breach the agreement and we may not have adequate remedies for such breach. As a result, our trade secrets, confidential information, and other unpatented proprietary rights and information may become known to others, including our competitors. Using third-party manufacturers, both domestically and abroad, may increase the risk of misappropriation of our trade secrets, confidential information and other unpatented proprietary information. Protection of our technology is important to us so that we may offer our future customers proprietary products unavailable from our competitors, and so that we may prevent our competitors from using technology that we have developed or exclusively licensed. If we are unable to effectively protect our intellectual property, our business and competitive position may be adversely affected.

***We may license our technology in the future; however the terms of any such agreements may not prove to be advantageous to us. If the license agreements we may enter into do not prove to be advantageous to us, our business and results of operations will be adversely affected.***

Although we are initially employing a product sales strategy for products incorporating our B-TRAN® technology, we also expect to employ a licensing strategy for the production and potentially the sale of our B-TRAN® products in certain instances. However, we may not be able to secure license agreements with semiconductor fabrication partners or other strategic partners at all or on terms that are advantageous to us. Furthermore, the timing and volume of revenue earned from license agreements will be outside of our control. If the license agreements we may enter in the future do not prove to be advantageous to us, our business and results of operations will be adversely affected.

***Future revenue may rely on the marketing and sales efforts of third parties whom we do not control.***

The marketing and sale of our future products to end user customers may be conducted by us, distributors, sales representatives, future licensees of our technology or likely a combination thereof. Consequently, the commercial success of our products may depend, to a great extent, on the efforts of others. We may not be able to identify, maintain or establish appropriate relationships in the future. We can give no assurance that any such third parties will focus adequate resources on selling our products or will be successful in selling them. In addition, these third parties may require customization of our designs or other concessions that could reduce the potential profitability of these relationships. Failure to develop favorable licensing relationships in our target markets may adversely affect our commercialization schedule and, to the extent we enter into such relationships, the failure of our licensees to focus adequate resources on selling our products or be successful in selling them or to meet their monetary obligations to us may adversely affect our financial condition and results of operations. In the last two years, we added four distribution partners. We can provide no assurance that these distributors will be successful in selling our products or that we will be able to secure additional distribution partners in the future.

***A material part of our success depends on our ability to manage third-party resources. Our failure to properly select, manage and retain qualified third-party resources could materially and adversely affect our results of operations and relations with our partners and future customers.***

Our development efforts are highly dependent on third-party resources for semiconductor expertise and manufacturing. These third-party resources include experts in power semiconductor switches and drivers, semiconductor fabrication suppliers, and other resources within the power switch ecosystem. The loss of one or more of our third-party resources could have a material adverse effect on the timing of our development and/or commercialization efforts which could, in turn, result in our business and results of operations being adversely affected. We also rely on our semiconductor fabrication partners and packaging firms to develop commercial devices and modules. There can be no assurance that these manufacturing partners will provide devices and/or modules in a timely and cost-efficient manner, provide quality devices and/or modules or otherwise meet our needs and expectations. Our ability to manage such relationships and timely replace such partners, if necessary, is critical to our success. The loss of and our failure to timely replace third-party resources, fabrication partners and other suppliers within the power switch ecosystem, should that become necessary, could materially and adversely affect our results of operations and relations with our partners and future customers. See also "*—Our semiconductor fabrication partners may be unable to successfully and cost-effectively develop and implement new process steps necessary for bidirectional semiconductor device fabrication at scale.*"

***Supply chain disruptions and barriers to trade, such as tariffs, could interrupt product manufacturing and global logistics and increase product costs.***

We currently rely upon the facilities of our semiconductor fabricator and packaging partners in the United States and abroad to support our development and production as well as vendors throughout the United States and abroad to supply silicon wafers and other materials and processing and engineering capabilities and expertise. In recent years, there have been global industry-wide logistics challenges. While these logistics challenges have caused some disruption in our business, these disruptions were manageable and their impact on us was not significant. Future facility closures and/or disruptions may occur if additional pandemic breakouts or geopolitical events occur in areas where we rely on third parties. Also, if tariffs are imposed on raw materials and components utilized in our products, the costs of our products could increase and, as a result, our products could become less competitive. In that situation, we may need to identify other sources for these raw materials and components resulting in a temporary disruption to our business or reduce margins if we are unable to identify and engage alternative lower cost suppliers.

We and certain of our suppliers also rely on international shipping to transport wafers, circuit boards and other electronic components to us and our other suppliers. Delays in shipping may cause us or our suppliers to have to use more expensive air freight or other more costly methods. In addition, global inflation has contributed to already higher incremental freight and component costs and such inflation may continue to result in higher costs. Logistics delays could result in delays to critical development and commercialization activities. Further, failure to adequately fabricate and timely ship our products to customers could lead to delays in their testing and evaluation and/or adoption of our technology, lost potential revenue, failure to meet customer demand and strained relationships with customers.

***Changes in U.S. trade policies, the imposition of tariffs by the U.S. and retaliatory responses from other countries may significantly increase our costs of production and materially and adversely affect our business.***

We import raw materials and components required to manufacture our products primarily from suppliers outside of the U.S., including Asia. While we are working to mitigate risk through alternate sourcing in disparate geographies, any imposition by the U.S. of new or increased tariffs applicable to these imported materials or components or other restrictive trade policies or import regulations could increase our manufacturing costs, limit our ability to procure raw materials or components, make our products less competitive, cause adverse financial impacts due to volatility in foreign exchange rates, increase inflationary pressures on raw materials and energy, and negatively impact our financial condition. New or increased tariffs could also negatively affect U.S. national or regional economies, which could affect demand for our products in the U.S. Further, in response to evolving U.S. trade policies and new and increased tariffs, foreign governments, including China, may respond by imposing or increasing tariffs, duties and/or trade restrictions on U.S. goods, and may consider other measures. Such trading conflicts and related escalating governmental actions that result in additional tariffs, duties and/or trade restrictions could increase our production costs further, cause disruptions or shortages in our supply chains, impede or slow the movement of our products across borders, negatively impact the U.S., regional or local economies, and, individually or in the aggregate, materially and adversely affect our business, ability to successfully commercialize our products, and future sales and operating results.

***Our ability to successfully commercialize our products and future operating results depend on the continued growth of our target markets and related technologies.***

We are in the process of developing and commercializing products for use in our target markets, which include, among others, AI data centers, solid-state circuit protection, electric and plug-in hybrid electric vehicles, electric vehicle charging infrastructure, renewable energy, grid storage and improved grid resiliency. Governmental support for these markets and technologies may impact the size and growth rate of these markets and, as a result, our business. In recent years, the federal government and many states adopted regulations and established incentives to accelerate a transition to electric vehicles and promote the development and use of renewable energy in the United States. However, after the new U.S. administration took office in January 2025, there has been less support for these markets and technologies at the federal level as priorities have shifted to other areas. For example, in January 2025, the new U.S. administration took action to revoke the prior administration’s order that EVs make up half of all new cars sold in the U.S. by 2030, repealed certain tax credit programs for EV purchases and paused funding under the Inflation Reduction Act for a network of EV charging stations. While it is difficult to gauge the impact that the U.S. administration and its actions will have on the global growth and scaling of our target markets and related technologies, reduced government support in the United States and abroad could cause growth in these global markets to slow or contract, which may have a material adverse effect on our prospects, business, future operating results and financial condition.

In addition, our ability to successfully develop and commercialize our products may be negatively impacted by any change in consumer interests or preferences that results in reduced demand for our products. For example, if electric or hybrid vehicle sales growth slows or contracts or certain car manufacturers determine to cease or reduce production of electric or hybrid models, we may have fewer opportunities to commercialize our products within these markets and the opportunities that continue to exist may become more competitive. If shifts in consumer interests or preferences or other factors result in slowed growth or contraction of any of our target markets, our efforts to commercialize our products in these markets may be unsuccessful or fall short of our current expectations and our business, prospects, future results of operations and financial condition may be materially and adversely affected.

***We will need additional financing to execute our business plan and fund operations, which additional financing may not be available on commercially reasonable terms or at all.***

We have and, prior to profitable commercialization at scale, may continue to rely on raising funds from investors and/or other sources to support our research and development activities and execute our business plan. Macro-economic conditions in the United States and abroad may result in a tightening of the credit markets and/or less capital available for small public companies, which may make it more difficult for us to raise capital on commercially reasonable terms or at all. If we are unable to raise funds on acceptable terms if and as needed, we may be forced to curtail our operations or even cease operating altogether. Therefore, unfavorable macroeconomic conditions, particularly in the United States, including as a result of inflation, and any recession or slowed economic growth, could have an outsized negative impact on us. This may seriously harm our business, financial condition and results of operations.

***A failure to obtain additional government grants could have a material adverse effect on our development efforts and our ability to fund operations and execute on our business plan.***

We may pursue funding a portion of our development efforts with funds received under government grants. However, we may not be awarded any such grants in the future, any such grant awards may be insufficient to fund a meaningful portion of our development spending and/or the timing of the receipt of any such award or awards may not coincide with the planned timing of our development efforts. Grants are subject to long procurement cycles, typically 6 to 12 months, and there may not be open grant solicitations for topics relevant to our B-TRAN® technology. Grant topics are typically identified 1 to 2 years prior to the opening of the grant solicitation and the windows to submit proposals are discrete time periods. Further, the award of grants is a subjective process and government agencies often do not provide detailed feedback on why a grant was not received.

A factor that could negatively impact our ability to obtain government grants is that our technology is in the early stages of commercialization. If, in the future, grant agencies determine that our technological readiness is not sufficiently advanced for a funded demonstration incorporating B-TRAN® or potential partners determine that our technological readiness is not sufficient to partner with us on grant proposals, we may be unable to obtain additional government grants. Overall, there is a high degree of uncertainty in obtaining grants and we can provide no assurance that we will be able to obtain additional government grants to offset a significant, or any, portion of our development spending. If we do not obtain additional grants or our efforts to obtain additional grants take longer than expected to be successful, we will need to rely on other means to fund our development.

***We are highly dependent on the services of key members of our management and technical teams. Our inability to retain these individuals could impede our business plan and growth strategies, which could have a negative impact on our business and the value of your investment.***

Our ability to implement our business plan depends, to a critical extent, on the continued efforts and services of key members of our management and technical teams. If we unexpectedly lose the services of any of these persons during this important time in the development and commercialization of our B-TRAN® technology, the loss may result in a delay in the implementation of our business plan and plan of operations. We can give no assurance that we could find satisfactory replacements for these individuals within a reasonable time or on terms that would not be unduly expensive or burdensome to us. We do not currently carry a key-man life insurance policy that would assist us in recouping our costs in the event of the death or disability of any of these persons.

In addition, as a small team we will need additional commercial and semiconductor expertise to successfully develop products and further commercialize our technology. We can give no assurance that we will be able to identify and secure the necessary expertise at the appropriate time or at all.

***Our operating results for any quarterly reporting period may fluctuate significantly depending on the timing and pace of our development spending and costs to commercialize our technology.***

Our research and development costs may vary significantly from quarter to quarter depending on the current phase of development and commercialization of our technology and the timing of semiconductor fabrication, commercial production and revenue generation and negotiations with potential strategic partners. We also may intentionally accelerate our development and/or commercialization costs or may be faced with unexpected delays or challenges with development and/or commercialization that could significantly impact our operating results. Significant adverse fluctuations in our research and development spending and other operating costs from period to period could adversely affect the market price for our common stock.

***New technologies in the power semiconductor switch industry may supplant our technology in this market, which would harm our business and operations, and we may not be able to compete effectively in this industry and with any such new technologies.***

The power semiconductor switch industry is subject to significant technological change. Our future success will depend on the cutting-edge relevance of our technology, and thereafter on our ability to appropriately respond to changing technologies and changes in function of products and product quality. If new technologies supplant our technology, our business would be adversely affected and we will have to revise our plan of operation.

We or our potential licensees could be competing against large power semiconductor device suppliers with substantially greater resources than us, financial and otherwise. These competitors may also have more comprehensive product lines, broader market presence, longer standing relationships with customers, longer operating histories, greater manufacturing and/or product development capabilities, stronger brand recognition, and greater marketing resources than we and/or our licensees have. If any of these competitors develop products to compete with our technology, we may not be able to successfully commercialize our technology and our technology may not result in sufficient product revenue and/or sufficient, or any, licensing revenue.

***We may not be able to use some or all of our net operating loss carryforwards to offset future income.***

We have net operating loss carryforwards due to prior period losses generated before January 1, 2026 which if not utilized will begin to expire in 2031 for net operating loss carryforwards prior to 2018 and which do not expire for net operating loss carryforwards for 2018 and thereafter. If we are unable to generate sufficient taxable income to utilize our net operating loss carryforwards, pre-2018 carryforwards could expire unused and be unavailable to offset future income tax liabilities.

In addition, under Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, a corporation that undergoes an "ownership change" (generally defined as a greater than 50% change (by value) in its equity ownership over a three-year period) is subject to limitation on its ability to utilize its pre-change net operating loss and credit carry-forwards, or net operating losses, to offset future taxable income. We may have experienced one or more ownership changes under these Sections in connection with our initial public offering and one or more subsequent financings. However, we do not anticipate performing a complete analysis of the limitation on the annual use of the net operating loss and tax credit carryforwards until such time we project we will be able to utilize these tax attributes. In addition, future changes in our stock ownership, which may be outside of our control, may trigger an ownership change, as may future equity offerings or acquisitions that have equity as a component of the purchase price. If an ownership change has occurred or does occur in the future, our ability to utilize our net operating losses to offset income if we attain profitability may be limited.

**Risks Related to Owning Our Common Stock**

***The public market for our common stock may be volatile. This may affect the ability of our investors to sell their shares as well as the price at which they sell their shares.***

The market price for our shares has experienced significant price and volume fluctuations. We cannot predict whether the price of our common stock will rise or fall. Our stock price may be significantly affected by factors such as, among others:

- variations in the volume of trading activity;
- actual or anticipated fluctuations in our liquidity, financial condition and operating results;
- quarterly and yearly operating results compared to market expectations;
- quarterly and yearly operating results of other companies in our industry compared to market expectations;
- general trends in markets we expect to serve;
- competition from existing products or new products that may emerge;
- future announcements concerning our business or our competitors' businesses;
- additions or departures of key management or other technical personnel;
- the public's reaction to our press releases, other public announcements and filings with the SEC;
- issuances or sales, or expected issuances or sales, of our capital stock;
- disputes or other developments related to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our technologies;

- litigation involving us, our general industry or both; and
- changes in state or federal regulations affecting us and our industry.

Furthermore, in recent years the stock market has experienced extreme price and volume fluctuations that are unrelated or disproportionate to the operating performance of the affected companies. Such broad market fluctuations may adversely affect the market price of our common stock. In addition, price volatility may be greater if the public float and trading volume of our common stock is low. As a result, you may suffer a loss on your investment.

***We have the right to issue, and have in the past issued, shares of preferred stock. If we were to issue additional preferred stock, it may have rights, preferences and privileges that may adversely affect the common stock.***

We are authorized to issue 10,000,000 shares of "blank check" preferred stock, with such rights, preferences and privileges as may be determined from time-to-time by our Board. Our Board is empowered, without stockholder approval, to issue preferred stock in one or more series, and to fix for any series the dividend rights, dissolution or liquidation preferences, redemption prices, conversion rights, voting rights, and other rights, preferences and privileges for the preferred stock. The issuance of shares of preferred stock, depending on the rights, preferences and privileges attributable to the preferred stock, could reduce the voting rights and powers of our common stock and the portion of our assets allocated for distribution to common stockholders in a liquidation event, and could also result in dilution in the book value per share of our common stock. The preferred stock could also be utilized, under certain circumstances, as a method for raising additional capital or discouraging, delaying or preventing a change in control of the Company, to the detriment of the investors in our common stock. We cannot assure you that we will not, under certain circumstances, issue shares of our preferred stock. At December 31, 2025, we had no shares of preferred stock outstanding.

***We have not paid dividends in the past and have no immediate plans to pay dividends.***

We plan to reinvest all of our earnings, to the extent we have earnings, in order to market our products and to cover operating costs and to otherwise become and remain competitive. We do not plan to pay any cash dividends with respect to our securities in the foreseeable future. As a result, only appreciation in the price of our common stock, which may never occur, will provide a return to stockholders. We cannot assure you that we would, at any time, generate sufficient surplus cash that would be available for distribution to the holders of our common stock as a dividend. Therefore, you should not expect to receive cash dividends on our common stock.

***Shares eligible for future sale, including pre-funded warrants and options exercisable into shares of our common stock and restricted stock units and performance stock units subject to future vesting, may cause dilution to our existing stockholders and may adversely affect the market for our common stock.***

Sales of substantial amounts of our common stock in the public market, or the perception that these sales could occur, could cause the market price of our common stock to decline. These sales could also make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate.

At December 31, 2025, we had 8,537,387 shares of common stock outstanding and 653,827 pre-funded warrants with an exercise price of $0.001 that are included in our computation of basic earnings per share. Shares beneficially owned by our affiliates, if any, and employees are subject to volume and other restrictions under Rules 144 and 701 under the Securities Act, various vesting agreements, our insider trading policy and/or any applicable 10b5-1 trading plan. Shares that are not beneficially owned by our affiliates and employees generally can be freely sold in the public market, potentially subject in some cases to restrictions under Rule 144.

At December 31, 2025, we had 1,373,809 potentially dilutive shares outstanding, exclusive of pre-funded warrants to purchase shares of common stock that are considered outstanding common shares and included in our computation of basic earnings per share, and we may grant additional options, restricted stock units, performance stock units, other stock-based awards and/or warrants in the future. The holders of vested options or pre-funded warrants may exercise their options and/or pre-funded warrants and sell a large number of shares. Any sale of a substantial number of shares of our common stock may have a material adverse effect on the market price of our common stock.

***Raising additional capital, as necessary, may cause dilution to our existing stockholders, restrict our operations or require us to relinquish rights to our technologies.***

We may seek additional capital through a combination of public and private equity offerings, debt financings, strategic partnerships and licensing arrangements. To the extent that we raise additional capital through the sale or issuance of equity, warrants or convertible debt securities, the ownership interest of our existing stockholders will be diluted, and the terms of such securities may include liquidation or other preferences that adversely affect your rights as a stockholder. If we raise capital through debt financing, it may involve agreements that include covenants limiting or restricting our ability to take certain actions, such as incurring additional debt, making capital expenditures or declaring dividends. If we raise additional funds through strategic partnerships or licensing agreements with third parties, we may have to relinquish valuable rights to our technologies, or grant licenses on terms that are not favorable to us. If we are unable to raise additional funds if and when needed, we may be required to delay, limit, reduce or terminate our development and commercialization efforts.

***Our charter documents and Delaware law may inhibit a takeover that stockholders consider favorable.***

Our certificate of incorporation (as amended and restated to date, our "certificate") and our bylaws (as amended and restated to date, our "bylaws") and applicable provisions of Delaware law may delay or discourage transactions involving an actual or potential change in control or change in our management, including transactions in which stockholders might otherwise receive a premium for their shares, or transactions that our stockholders might otherwise deem to be in their best interests. The provisions in our certificate and bylaws:

- authorize our Board to issue preferred stock without stockholder approval and to designate the rights, preferences and privileges of each class; if issued, such preferred stock would increase the number of outstanding shares of our capital stock and could include terms that may deter an acquisition of us;
- limit who may call stockholder meetings;
- do not permit stockholders to act by written consent;
- do not provide for cumulative voting rights; and
- provide that all vacancies may be filled by the affirmative vote of a majority of directors then in office, even if less than a quorum.

In addition, Section 203 of the Delaware General Corporation Law may limit our ability to engage in any business combination with a person who beneficially owns 15% or more of our outstanding voting stock unless certain conditions are satisfied. This restriction lasts for a period of three years following the share acquisition. These provisions may have the effect of entrenching our management team and may deprive you of the opportunity to sell your shares to potential acquirers at a premium over prevailing prices. This potential inability to obtain a control premium could reduce the price of our common stock.

***If securities or industry analysts do not publish or do not continue to publish research or reports about our business, or if they issue an adverse or misleading opinion regarding our stock, our stock price and trading volume could decline.***

The trading market for our common stock may be influenced by the research and reports that industry or securities analysts publish about us or our business. As of December 31, 2025, one securities analyst published reports on us. If this securities analyst stops publishing reports on us and no other securities analysts initiate coverage on us, we could lose visibility in the financial markets, which in turn could cause our stock price or trading volume to decline. In addition, if this securities analyst downgrades his rating of our stock or one or more analysts initiate coverage on us but issues an adverse opinion regarding our stock, our stock price may decline.

## ITEM 1B: UNRESOLVED STAFF COMMENTS

None.

## ITEM 1C: CYBERSECURITY

Our Board oversees our comprehensive cybersecurity program. Our cybersecurity program is managed by our Chief Financial Officer in collaboration with a specialized third-party service provider. Our Chief Financial Officer has over ten years' experience managing information technology ("IT"), including cybersecurity, and is the designated Chief Information Officer under our Information Resources Policy. As of the date of this Annual Report on Form 10-K, we know of no cybersecurity incident that has or is likely to materially affect us, our business strategy, our results of operations, or our financial condition. We employ a robust, multi-layer approach to identify and mitigate cybersecurity risks, such as anti-virus and content filtering to protect against malware and inappropriate content, weekly patch management, network firewall monitoring to detect and prevent unauthorized access, off-site email back-ups to safeguard data integrity and availability, endpoint threat detection and threat hunting to identify and respond to potential threats, and multi-factor authentication and security hardening to reinforce system defenses. Previously, we conducted a thorough cybersecurity assessment with our third-party service provider. Based on their recommendations, we implemented several cybersecurity enhancements in 2024. We did not make any significant changes to our cybersecurity environment in 2025. To date and to our knowledge, no external entity has successfully breached our systems. If a breach were to be discovered, our Chief Financial Officer would promptly inform our Chief Executive Officer, who would then communicate the details to our Board.

In addition to our cybersecurity program, we have implemented operational improvements intended to streamline business processes, reduce certain risks, and fuel growth. Led by a Senior Engineer, our third-party service provider proactively assesses security, risk, and productivity to ensure optimal coverage and investment in the rapidly changing IT industry. Our IT partner's responsible IT architecture program aims to:

- Create a network of defense against hacks
- Protect against outages, disasters, and data loss
- Continuously patch, monitor, and remediate vulnerabilities
- Meet and align with cyber risk insurance requirements
- Implement proper authentication and access protocols
- Secure all endpoints
- Install content filtering and quarantine tools
- Calibrate backups to match usage and data needs

This program also helps to identify system gaps and provides solutions to align us with best practices and security measures against any cybersecurity threats.

## ITEM 2: PROPERTIES

Our principal office is located at 5508 Highway 290 West, Suite 120, Austin, Texas 78735. We lease 5,775 square feet of office and laboratory space. The lease, as amended, commenced on July 1, 2024 and, as of December 31, 2025, the remaining term of the lease is 44 months.

## ITEM 3: LEGAL PROCEEDINGS

We may be subject to litigation from time to time in the ordinary course of business. We are not currently party to any legal proceedings.

## ITEM 4: MINE SAFETY DISCLOSURES

Not applicable.

# PART II

## ITEM 5: MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock is listed on the Nasdaq Capital Market under the symbol "IPWR." As of March 25, 2026, we had 21 shareholders of record.

***Dividends***

We have not paid any cash dividends on our common stock since our inception and do not anticipate paying any cash dividends in the foreseeable future. We plan to retain our earnings, if any, to provide funds for the expansion of our business. The payment of future dividends, if any, will be at the discretion of our Board and will depend on our financial condition, results of operations, capital requirements, restrictions contained in future financing agreements, provisions of applicable law and any other factors our Board deems relevant.

***Performance Graph***

As a smaller reporting company, we are not required to provide this information.

***Recent Sales of Unregistered Securities***

None.

***Purchases of Equity Securities by the Issuer***

None.

## ITEM 6: [Reserved]

**ITEM 7: MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the audited financial statements and related notes included elsewhere in this Annual Report on Form 10-K. In addition to historical information, this discussion and analysis here and throughout this Form 10-K contains forward-looking statements that involve risks, uncertainties and assumptions. Our actual results may differ materially from those anticipated in these forward-looking statements.*

**Overview**

Ideal Power is located in Austin, Texas. We are solely focused on the further development and commercialization of our B-TRAN® solid-state switch technology.

To date, operations have been funded primarily through the sale of common stock and pre-funded warrants and we have generated $3.7 million in grant revenue for bidirectional power switch development. We may pursue additional research and development grants, if and when available, to further develop and/or improve our technology.

We are in the process of commercializing our B-TRAN® technology and have launched our first two commercial products, the discrete B-TRAN® and the SymCool® Power Module. We generated $37,728 and $86,032, respectively, in commercial revenue in the years ended December 31, 2025 and 2024.

***CEO Transition***

Effective November 2, 2025, R. Daniel Brdar, the then President and Chief Executive Officer and member of the Board of Directors of the Company (the "Board"), retired from all positions with us. Effective November 3, 2025, the Board appointed David Somo as the President and Chief Executive Officer and as a member of the Board.

***Product Launches***

Our first commercial product launch was the discrete B-TRAN®. This single B-TRAN® die packaged for electrical connection is designed to meet the very low conduction loss needs of the solid-state circuit protection and electric vehicle ("EV") contactor markets.

Our second commercial product launch was the SymCool® Power Module. This multi-die B-TRAN® module is also designed to meet the very low conduction loss needs of the solid-state circuit protection and EV contactor markets.

Upon product launch, we design and build initial prototypes for testing and to solicit customer feedback. Based on the results of testing and customer feedback, we incorporate any necessary changes into the product design, build final prototypes and complete additional testing prior to full commercial release. To date, our customers have purchased prototypes in small quantities for evaluation and provided us feedback that has been incorporated into our final product designs. We expect significantly higher volume orders from customers once we secure a design win from them, and they start to build inventory in advance of launching their OEM products. For the products described above, we would expect the time from announcing a design win to the sale of the related OEM product to be roughly twelve to eighteen months, although it may vary considerably depending on the customer and application. We would expect a significantly longer design cycle for automotive applications. Design wins are expected to result in significant revenue growth for us over time as product life cycles tend to be relatively long for power electronics products as changing to another technology would require an OEM to redesign their product. See "First Design Win" below.

***Development Agreement***

In 2022, we announced, and began the first phase of, a product development agreement with Stellantis, a top 10 global automaker, for a custom B-TRAN® power module for use in the automaker's EV drivetrain inverters in its next generation EV platform. In the first phase of the program, we provided packaged B-TRAN® devices, test kits and technical data to Stellantis for their evaluation. In 2023, we secured, and began the second phase of, this program. In the second phase of the program, we collaborated with Stellantis and the program partners, including both the program's packaging company and the organization building the initial drivetrain inverter, to supply B-TRAN® devices for integration into the custom power module and inverter designs. Also, as part of the second phase of the program, we provided Stellantis a comprehensive test plan for the testing required to achieve certification to automotive standards for B-TRAN®. The test plan was subsequently approved as submitted. In 2024, we successfully completed the second phase of the program. In August 2025, we secured an order from Stellantis for custom development and packaged devices targeting multiple EV applications. We completed the first of five deliverables under this purchase order in 2025. Also in 2025, Stellantis informed us that they are prioritizing the EV contactor application over the drivetrain inverter application. We are currently working to complete the remaining deliverables under the August 2025 purchase order and engaged with Stellantis on a potential EV contactor program.

***Customer Engagements***

We have announced several engagements and/or initial orders with large companies, including Stellantis and other global automakers, Forbes Global 500 diverse power management market leaders, global tier 1 automotive suppliers, circuit protection market leaders, inverter / energy storage market leaders and others. These companies intend to test and evaluate, or are already in the process of testing and evaluating, our technology for use in their applications. These engagements could lead to future design wins or custom development agreements. We also announced agreements with multiple distribution partners. We may add other distribution partners in the future. Recently, we signed a letter of intent with a power module maker in Asia to manufacture and offer B-TRAN®-based power modules for sale to their customers. We may engage with other power module manufacturers or others in the power semiconductor ecosystem in the future to further expand the channels to market for products incorporating our technology.

***First Design Win***

In late 2024, we announced our first design win for solid-state circuit breakers ("SSCBs") with one of the largest circuit protection equipment manufacturers in Asia serving the data center, renewable energy, energy storage, EV and other industrial markets. In connection with this design win, we entered into a joint development agreement for a SSCB product incorporating multiple B-TRAN® devices. The agreement included the product design, prototype builds and testing of the SSCB. We completed our deliverables, including SSCB prototypes, under this agreement in the first quarter of 2025. In the third quarter of 2025, the customer successfully completed their testing of updated SSCB prototypes that included enhancements requested by the customer. The customer plans on gathering feedback on this new product from their end customers ahead of product launch. In February 2026, we entered into a multi-year strategic cooperation agreement with this customer for the design, development and worldwide sales of circuit protection solutions including SSCBs, battery disconnect units and EV contactors featuring B-TRAN®. We expect to announce additional design wins and/or custom development agreements with this customer and/or other customers in 2026.

**Trends, Events and Uncertainties**

***Research and Development***

Research and development of new technologies is, by its nature, unpredictable. We cannot assure you that our research and development will be successful, our technology will be adopted, that we will ever earn revenues sufficient to support our operations or that we will ever be profitable. Furthermore, since we have no committed source of financing, we cannot assure you that we will be able to raise additional capital if and when we need it to continue our operations. If we cannot raise funds if and when we need them, we may be required to severely curtail, or even to cease, our operations.

***February 2026 Offering***

In February 2026, we issued and sold 3,505,855 shares of our common stock at a price of $2.75 per share and 952,881 pre-funded warrants to purchase shares of common stock at a price of $2.749 per pre-funded warrant in an underwritten public offering and 631,332 pre-funded warrants to purchase shares of common stock at a price of $2.749 per pre-funded warrant in a concurrent private placement (taken together, the "February 2026 Offering"). The pre-funded warrants have an exercise price of $0.001 per share. The estimated net proceeds to us from the February 2026 Offering are $12.6 million. We intend to use the net proceeds from the February 2026 Offering to fund further commercialization and development of our B-TRAN® technology and products and general corporate and working capital purposes.

**Critical Accounting Estimates**

The following discussion and analysis of our financial condition and results of operations is based upon our financial statements, which have been prepared in conformity with accounting principles generally accepted in the United States of America. Certain accounting estimates are particularly important to the understanding of our financial position and results of operations and require the application of significant judgment by our management. As a result, they are subject to an inherent degree of uncertainty. In applying these policies, we use our judgment to determine the appropriate assumptions to be used in the determination of certain estimates. Those estimates may be based on our historical operations, our future business plans and projected financial results, the terms of existing contracts, our observance of trends in the industry, information provided by our customers and/or information available from other outside sources, as appropriate. Please see Footnote 2 to our financial statements for a summary of our significant accounting policies.

Stock-Based Compensation. We apply FASB ASC 718, "Stock Compensation," when recording stock-based compensation. Grants to non-employees are also accounted for under ASC 718. The fair value of each restricted stock unit award is the closing pricing of our stock on the date of grant. The fair value of each performance stock unit award with market conditions is estimated on the date of grant using a Monte Carlo simulation. The fair value of each performance stock unit award with performance conditions is determined based on the closing price of our stock on the date of grant and on whether it is probable that the performance conditions will be achieved. We reassess the probability of vesting at each reporting period for performance stock units with performance conditions. We did not grant any stock option awards in the years ended December 31, 2025 and 2024.

The Company issues common stock upon exercise of equity awards and warrants and upon the vesting of performance stock units and restricted stock units.

Intangible Assets. Our intangible assets are composed of patents and trademarks, which are recorded at cost, and other intangible assets, which are recorded at cost plus the estimated present value of all future payments associated with the other intangible assets. We capitalize third-party legal costs and filing fees, if any, associated with obtaining patents, trademarks or other intangible assets. Once the patent asset has been placed in service, we amortize these costs over the shorter of the asset's legal life, generally 20 years from the initial filing date, or its estimated economic life using the straight-line method. Trademarks are not amortized as they have an indefinite useful life. For the other intangible assets, we amortize the asset over the 17-year term of the underlying agreements.

Impairment of Long-Lived Assets. The long-lived assets, consisting of property and equipment and intangible assets, held and used by us are reviewed for impairment no less frequently than annually or whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In the event that facts and circumstances indicate that the cost of any long-lived assets may be impaired, an evaluation of recoverability is performed. We determined that there was a $41,122 impairment in the value of long-lived assets during the year ended December 31, 2025 and a $77,444 impairment in the value of long-lived assets during the year ended December 31, 2024.

Income Taxes. We account for income taxes using an asset and liability approach which allows for the recognition and measurement of deferred tax assets based upon the likelihood of realization of tax benefits in future years. Under the asset and liability approach, deferred taxes are provided for the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A valuation allowance is provided for deferred tax assets if it is more likely than not these items will either expire before we are able to realize their benefits, or that future deductibility is uncertain. Tax benefits from an uncertain tax position are recognized only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position.

We have concluded that it is more likely than not that we will not have sufficient foreseeable taxable income within the carryforward period as applicable and permitted by current law to allow for the utilization of certain of the deductible amounts generating the deferred tax assets; therefore, a full valuation allowance has been established to reduce the net deferred tax assets to zero at December 31, 2025 and 2024.

**Results of Operations**

**Comparison of the year ended December 31, 2025 to the year ended December 31, 2024**

*Revenue.* Revenue was $37,728 in the year ended December 31, 2025 compared to $86,032 in the year ended December 31, 2024. In both years, our revenue related to development agreements and low-volume product sales. We expect to recognize modest revenue from both product sales and development agreements in 2026.

*Cost of Revenue.* Cost of revenue was $60,408 and $93,409 for the years ended December 31, 2025 and 2024, respectively.

*Gross Loss.* Our gross loss was $22,680 for the year ended December 31, 2025 compared to $7,377 for the year ended December 31, 2024 due to the higher costs associated with initial low volume production and, in 2025, costs exceeding revenue under the development agreement with our first design win customer. We expect a gross loss in 2026 due to the higher costs associated with low volume production.

*Research and Development Expenses.* Research and development expenses decreased by $160,007, or 3%, to $6,047,211 in the year ended December 31, 2025 from $6,207,218 in the year ended December 31, 2024. The decrease was due to lower stock-based compensation expense of $856,914, primarily due to the forfeiture of unvested performance stock units and restricted stock units, and prototyping, packaging and testing costs of $198,296, partly offset by higher semiconductor foundry costs, as we were engaged for the full year with two foundries, of $755,390, search and placement fees of $104,286 and other B-TRAN® spending of $35,527. We expect higher research and development expenses in 2026 due to significantly lower expected stock unit forfeitures as well as higher spending to further develop our B-TRAN® technology and products and related drive circuitry.

*General and Administrative Expenses.* General and administrative expenses increased by $158,254, or 4%, to $3,766,790 in the year ended December 31, 2025 from $3,608,536 in the year ended December 31, 2024. The increase was due to higher search and placement fees of $220,519, stock-based compensation expense of $137,535, legal fees of $94,161 and other spending of $35,366, partly offset by lower investor relations spending of $329,327. We expect moderately higher general and administrative expenses, exclusive of stock-based compensation, in 2026.

*Sales and Marketing Expenses.* Sales and marketing expenses decreased by $151,536, or 12%, to $1,096,508 in the year ended December 31, 2025 from $1,248,044 in the year ended December 31, 2024. The decrease was due primarily to lower stock-based compensation expense, on the forfeiture of previously granted but unvested equity awards, of $147,703 and personnel costs of $103,918, partly offset by higher search and placement fees of $72,454 and other costs of $27,631. We expect higher sales and marketing expenses in 2026 as we add sales personnel, expand our engagement and sales pipeline with prospective customers, and further commercialize our B-TRAN® technology and related products.

*Loss from Operations.* Our loss from operations for the year ended December 31, 2025 was $10,933,189 or 1% lower than our $11,071,175 loss from operations for the year ended December 31, 2024, driven by the factors discussed above.

*Interest Income, Net.* Interest income, net decreased by $298,593 to $354,769 for the year ended December 31, 2025 from $653,362 for the year ended December 31, 2024 due to a declining cash balance in, and lower interest rates on, our money market account in 2025 compared to 2024.

*Net Loss.* Our net loss increased by $160,607 or 2%, to $10,578,420 for the year ended December 31, 2025 from a net loss of $10,417,813 for the year ended December 31, 2024 for the reasons discussed above.

**Liquidity and Capital Resources**

In 2025, we generated revenue of $37,728. In 2026, we expect growth in revenue from product development agreements and product sales although we do not expect to recognize a gross profit. We have incurred losses since our inception. We have funded our operations to date primarily through the sale of common stock and common stock equivalents.

As of December 31, 2025 and 2024, we had cash and cash equivalents of $6,129,049 and $15,842,850, respectively. Our net working capital and long-term debt at December 31, 2025 were $5,567,488 and $0, respectively.

We believe that our cash and cash equivalents on hand will be sufficient to meet our ongoing liquidity needs for at least the next 12 months. See "*February 2026 Offering*" below. Additional future financing may be necessary to fund our operations and there can be no assurance that, if needed, we will be able to secure additional debt or equity financing on terms acceptable to us or at all. Although we believe we have adequate sources of liquidity over the long term, the success of our operations, the global economic outlook, and the pace of sustainable growth in our markets could each impact our business and liquidity.

Operating activities in the year ended December 31, 2025 resulted in cash outflows of $9,135,479, which were due to the net loss for the period of $10,578,420, partly offset by other non-cash items including stock-based compensation of $729,173, depreciation and amortization of $371,419, amortization of right of use asset of $86,100, and asset impairments of $77,109 as well as favorable balance sheet timing of $179,140.

Operating activities in the year ended December 31, 2024 resulted in cash outflows of $8,742,580, which were due to the net loss for the period of $10,417,813, unfavorable balance sheet timing of $399,667 and a non-cash gain on lease termination of $15,319, partly offset by other non-cash items including stock-based compensation of $1,596,254, depreciation and amortization of $341,045, the write-off of long-lived assets of $77,444 and amortization of right of use asset of $75,476.

We expect an increase in cash outflows from operating activities in 2026 as we further commercialize our B-TRAN® technology.

Investing activities in the years ended December 31, 2025 and 2024 resulted in cash outflows of $449,494 and $506,428, respectively. For the year ended December 31, 2025, cash outflows for the acquisition of intangible assets were $330,013 and capital expenditures were $119,481. For the year ended December 31, 2024, cash outflows for the acquisition of intangible assets were $309,162 and capital expenditures were $197,266. Our capital expenditures in both years were primarily for lab testing equipment.

Financing activities in the year ended December 31, 2025 resulted in a net cash outflow of $128,828 due to the payment of withholding taxes on the vesting of restricted stock units of $128,938, slightly offset by $110 in proceeds from the exercise of pre-funded warrants. Financing activities in the year ended December 31, 2024 resulted in a net cash inflow of $16,617,023 due to net proceeds from our 2024 Public Offering of $15,724,818 and proceeds from warrant and stock option exercises of $1,120,513, slightly offset by $228,308 for the payment of withholding taxes on the vesting of restricted stock units.

***February 2026 Offering***

In February 2026, we issued and sold 3,505,855 shares of our common stock at a price of $2.75 per share and 952,881 pre-funded warrants to purchase shares of common stock at a price of $2.749 per pre-funded warrant in an underwritten public offering and 631,332 pre-funded warrants to purchase shares of common stock at a price of $2.749 per pre-funded warrant in a concurrent private placement (taken together, the "February 2026 Offering"). The pre-funded warrants have an exercise price of $0.001 per share. The estimated net proceeds to us from the February 2026 Offering are $12.6 million. We intend to use the net proceeds from the February 2026 Offering to fund further commercialization and development of our B-TRAN® technology and products and general corporate and working capital purposes.

**Contractual Obligations and Commitments**

Lease

In March 2021, we entered into a lease agreement (the "Original Lease") for 4,070 square feet of office and laboratory space located in Austin, Texas (the "Original Suite"). The commencement of the lease occurred on June 1, 2021 and the initial term of the lease was 63 months.

In April 2024, we entered into a first amendment and relocation agreement (the "Amended Lease") with our landlord. Under the Amended Lease, we relocated to another, larger suite in the same office building. The Amended Lease is for 5,775 square feet of office and laboratory space (the "New Suite") and, upon occupancy, replaced the 4,070 square feet of office and laboratory space previously leased by us. The term of the Amended Lease expires sixty-two (62) months from July 1, 2024, the commencement date. The annual base rent for the first year of the Amended Lease is $118,388 and the annual base rent increases approximately 2.75% each year during the lease term. We are required to pay our proportionate share of operating costs for the building under this triple net lease.

In accordance with ASC 842, we accounted for the modification of the lease contract as a separate lease contract. The lease for the Original Suite terminated on June 30, 2024 and we recorded a gain on the termination of the lease for the Original Suite of $15,319 in general and administrative expenses. We recognized a right of use asset of $524,025 and a corresponding lease liability for the Amended Lease on the commencement date. For purposes of calculating the right of use asset and lease liability, we estimated our incremental borrowing rate at 8.5% per annum.

Future minimum payments under the Amended Lease are as follows:

| **For the Year Ended December 31,** | | |
|---|---|---|
| 2026 | $ | 123,297 |
| 2027 | | 126,703 |
| 2028 | | 130,197 |
| 2029 | | 88,579 |
| Total lease payments | | 468,776 |
| Less: imputed interest | | (65,441) |
| Total lease liability | | 403,335 |
| Less: current portion of lease liability | | (93,435) |
| Long-term lease liability | $ | 309,900 |

Licensing Agreements

In 2015, we entered into a licensing agreement which expires in February 2033. Per the agreement, we have an exclusive royalty-free license associated with semiconductor power switches which enhances our intellectual property portfolio. We pay $100,000 annually under this agreement.

In 2023, we amended a 2021 license agreement which expires in February 2034. Per the agreement, we have an exclusive royalty-free license associated with semiconductor drive circuitry which enhances our intellectual property portfolio. We pay $50,000 annually under this agreement.

At December 31, 2025, the estimated present value of future payments under these licensing agreements was $1,036,538 with $150,000 due and payable in 2026. We are accruing interest for future payments related to these agreements.

**ITEM 7A: QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

As a smaller reporting company, we are not required to provide this information.

**ITEM 8: FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

# REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of
Ideal Power Inc.

**Opinion on the Financial Statements**

We have audited the accompanying balance sheets of Ideal Power Inc. (the "Company") as of December 31, 2025 and 2024, and the related statements of operations, stockholders' equity and cash flows for each of the two years in the period ended December 31, 2025, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2025 and 2024, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2025, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing separate opinions on the critical audit matter or on the accounts or disclosures to which they relate.

***Carrying Value of Intangible Assets***

As described in Notes 2 and 5 to the financial statements, the Company's intangible asset, net balance was $2.7 million as of December 31, 2025. The Company capitalizes third-party legal costs and filing fees, if any, associated with obtaining patents or other intangible assets. Once the patent asset has been placed in service, the Company amortizes these costs over the shorter of the asset's legal or estimated economic life using the straight-line method. The Company also evaluates for potential impairment of long-lived assets, including intangible assets composed of patents, no less frequently than annually or whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.

The principal considerations for our determination that performing procedures relating to the carrying value of intangible assets is a critical audit matter are the significant amount of judgment by management in developing the assumptions of future economic benefit in an impairment analysis, which in turn led to significant auditor judgment, subjectivity and effort in performing audit procedures and evaluating audit evidence relating to the analysis.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the financial statements. These procedures included, among others, reviewing current and forecasted operating conditions for indication of impairment. We also reviewed board minutes, news, and industry reports for indications of impairment. Last, we obtained an understanding of potential future customers indicating future recoverability.

/s/ BPM LLP

We have served as the Company's auditor since 2013.

San Jose, California
March 27, 2026

**IDEAL POWER INC.**

**Balance Sheets**

| | December 31, | |
|---|---|---|
| | 2025 | 2024 |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 6,129,049 | $ 15,842,850 |
| Accounts receivable, net | 24,000 | 692 |
| Inventory | 9,700 | 96,406 |
| Prepayments and other current assets | 377,901 | 356,658 |
| Total current assets | 6,540,650 | 16,296,606 |
| | | |
| Property and equipment, net | 376,717 | 415,232 |
| Intangible assets, net | 2,687,466 | 2,611,998 |
| Right of use asset | 397,397 | 483,497 |
| Other assets | 44,459 | 19,351 |
| Total assets | $ 10,046,689 | $ 19,826,684 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 408,398 | $ 104,117 |
| Accrued expenses | 471,329 | 374,012 |
| Current portion of lease liability | 93,435 | 82,681 |
| Total current liabilities | 973,162 | 560,810 |
| | | |
| Long-term lease liability | 309,900 | 403,335 |
| Other long-term liabilities | 886,538 | 1,007,375 |
| Total liabilities | 2,169,600 | 1,971,520 |
| | | |
| Commitments and contingencies (Note 8) | | |
| | | |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value; 10,000,000 shares authorized; 0 shares issued and outstanding at December 31, 2025 and 2024 | — | — |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 8,538,708 shares issued and 8,537,387 shares outstanding at December 31, 2025 and 8,336,812 shares issued and 8,335,491 shares outstanding at December 31, 2024 | 8,539 | 8,337 |
| Additional paid-in capital | 125,927,443 | 125,327,300 |
| Treasury stock, at cost; 1,321 shares at December 31, 2025 and 2024, respectively | (13,210) | (13,210) |
| Accumulated deficit | (118,045,683) | (107,467,263) |
| Total stockholders' equity | 7,877,089 | 17,855,164 |
| Total liabilities and stockholders' equity | $ 10,046,689 | $ 19,826,684 |

The accompanying notes are an integral part of these financial statements.

**IDEAL POWER INC.**

**Statements of Operations**

| | For the Year Ended December 31, 2025 | For the Year Ended December 31, 2024 |
|---|---|---|
| Revenue | $ 37,728 | $ 86,032 |
| Cost of revenue | 60,408 | 93,409 |
| Gross loss | (22,680) | (7,377) |
| Operating expenses: | | |
| Research and development | 6,047,211 | 6,207,218 |
| General and administrative | 3,766,790 | 3,608,536 |
| Sales and marketing | 1,096,508 | 1,248,044 |
| Total operating expenses | 10,910,509 | 11,063,798 |
| Loss from operations | (10,933,189) | (11,071,175) |
| Interest income, net | 354,769 | 653,362 |
| Net loss | $ (10,578,420) | $ (10,417,813) |
| Net loss per share – basic and diluted | $ (1.16) | $ (1.28) |
| Weighted average number of shares outstanding – basic and diluted | 9,135,261 | 8,165,485 |

The accompanying notes are an integral part of these financial statements.

**IDEAL POWER INC.**

**Statement of Stockholders' Equity**
**For the Years Ended December 31, 2025 and 2024**

| | Common Stock | | Additional Paid-In | Treasury Stock | | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Capital | Shares | Amount | Deficit | Equity |
| Balances at December 31, 2023 | 5,998,018 | $ 5,998 | $ 107,116,362 | 1,321 | $ (13,210) | $ (97,049,450) | $ 10,059,700 |
| Issuance of common stock and pre-funded warrants | 1,666,668 | 1,667 | 15,723,151 | — | — | — | 15,724,818 |
| Exercise of options and warrants | 575,829 | 576 | 1,119,938 | — | — | — | 1,120,514 |
| Vesting of restricted stock units | 96,297 | 96 | (228,405) | — | — | — | (228,309) |
| Stock-based compensation | — | — | 1,596,254 | — | — | — | 1,596,254 |
| Net loss for the year ended December 31, 2024 | — | — | — | — | — | (10,417,813) | (10,417,813) |
| Balances at December 31, 2024 | 8,336,812 | 8,337 | 125,327,300 | 1,321 | (13,210) | (107,467,263) | 17,855,164 |
| Exercise of pre-funded warrants | 110,000 | 110 | — | — | — | — | 110 |
| Vesting of restricted stock units | 91,896 | 92 | (129,030) | — | — | — | (128,938) |
| Stock-based compensation | — | — | 729,173 | — | — | — | 729,173 |
| Net loss for the year ended December 31, 2025 | — | — | — | — | — | (10,578,420) | (10,578,420) |
| Balances at December 31, 2025 | 8,538,708 | $ 8,539 | $ 125,927,443 | 1,321 | $ (13,210) | $ (118,045,683) | $ 7,877,089 |

The accompanying notes are an integral part of these financial statements.

**IDEAL POWER INC.**

**Statements of Cash Flows**

| | For the Year Ended December 31, | |
|---|---|---|
| | **2025** | **2024** |
| Cash flows from operating activities: | | |
| Net loss | $ (10,578,420) | $ (10,417,813) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 371,419 | 341,045 |
| Amortization of right of use asset | 86,100 | 75,476 |
| Write-off of inventory | 35,987 | — |
| Write-off of capitalized patents | 34,363 | 62,073 |
| Write-off of property and equipment | 6,759 | 15,371 |
| Gain on lease termination | — | (15,319) |
| Stock-based compensation | 729,173 | 1,596,254 |
| Decrease (increase) in operating assets: | | |
| Accounts receivable | (23,308) | 69,308 |
| Inventory | 50,719 | (14,956) |
| Prepaid expenses and other assets | (46,351) | 119,915 |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | 304,281 | (300,981) |
| Accrued expenses and other liabilities | (23,520) | (198,898) |
| Lease liability | (82,681) | (74,055) |
| Net cash used in operating activities | (9,135,479) | (8,742,580) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of property and equipment | (119,481) | (197,266) |
| Acquisition of intangible assets | (330,013) | (309,162) |
| Net cash used in investing activities | (449,494) | (506,428) |
| | | |
| Cash flows from financing activities: | | |
| Net proceeds from issuance of common stock and pre-funded warrants | — | 15,724,818 |
| Exercise of options and warrants | 110 | 1,120,514 |
| Payment of taxes upon vesting of restricted stock units | (128,938) | (228,309) |
| Net cash provided by (used in) financing activities | (128,828) | 16,617,023 |
| | | |
| Net increase (decrease) in cash and cash equivalents | (9,713,801) | 7,368,015 |
| Cash and cash equivalents at beginning of year | 15,842,850 | 8,474,835 |
| Cash and cash equivalents at end of year | $ 6,129,049 | $ 15,842,850 |

The accompanying notes are an integral part of these financial statements.

**Ideal Power Inc.**

**Notes to Financial Statements**

**Note 1 — Organization and Description of Business**

Ideal Power Inc. (the "Company") was incorporated in Texas in May 2007 under the name Ideal Power Converters, Inc. The Company changed its name to Ideal Power Inc. and re-incorporated in Delaware on July 2013. With headquarters in Austin, Texas, the Company is focused on the further development and commercialization of its Bidirectional bipolar junction TRANsistor (B-TRAN®) solid-state switch technology.

Since its inception, the Company has financed its research and development efforts and operations primarily through the sale of common stock and pre-funded warrants. The Company's continued operations are dependent upon, among other things, its ability to obtain adequate sources of funding through future revenues, follow-on stock offerings, issuances of warrants, debt financing, co-development agreements, government grants, sale or licensing of developed intellectual property or other alternatives.

**Note 2 — Summary of Significant Accounting Policies**

Basis of Presentation

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make certain estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Liquidity

These financial statements have been prepared on a going concern basis, which assumes the Company will continue in operation for the foreseeable future and will be able to realize its assets and discharge its liabilities in the ordinary course of business. The Company completed an underwritten public offering and concurrent private placement subsequent to December 31, 2025. See Note 13. As a result, the Company alleviated the substantial doubt regarding its ability to continue as a going concern for a period of twelve months from the issuance of this Annual Report on Form 10-K.

Cash and Cash Equivalents

The Company considers all highly liquid investments purchased with an original maturity of three months or less to be cash equivalents.

Accounts Receivable

Trade accounts receivable are stated net of a provision for credit losses. The provision for credit losses represents an estimate of the lifetime expected credit losses inherent in trade receivables as of the balance sheet date. The Company assesses the adequacy of the provision for credit losses on a quarterly basis based on historical information and current economic conditions and forecasts. Subsequent changes in the provision for credit losses are recorded in current earnings and reversal of previous losses are permitted under the current guidance. While the Company believes it has exercised prudent judgment and applied reasonable assumptions, there can be no assurance that in the future, changes in economic conditions or other factors will not cause changes in the financial health of its customers. If the financial health of customers deteriorates, the timing and level of payments received could be impacted and therefore, could result in a change to the Company's estimated losses.

Trade accounts receivable at December 31, 2025 relate to development revenue. At December 31, 2025, the provision for credit losses was $0.

Property and Equipment

Property and equipment are stated at historical cost less accumulated depreciation and amortization. Major additions and improvements are capitalized while maintenance and repairs that do not improve or extend the useful life of the respective asset are expensed. Depreciation and amortization of property and equipment is computed using the straight-line method over their estimated useful lives. Leasehold improvements are amortized over the shorter of the life of the asset or the related leases. Estimated useful lives of the principal classes of assets are as follows:

| | |
|---|---|
| Leasehold improvements | Shorter of lease term or useful life |
| | (in years) |
| Machinery and equipment and furniture and fixtures | 5 |
| Software and IT equipment | 3 |

Intangible Assets

The Company's intangible assets are composed of patents and trademarks, which are recorded at cost, and other intangible assets, which are recorded at cost plus the estimated present value of all future payments associated with the other intangible assets. The Company capitalizes third-party legal costs and filing fees, if any, associated with obtaining patents, trademarks or other intangible assets. Once the patent asset has been placed in service, the Company amortizes these costs over the shorter of the asset's legal life, generally 20 years from the initial filing date, or its estimated economic life using the straight-line method. Trademarks are not amortized as trademarks have an indefinite useful life. For the other intangible assets, the Company amortizes the assets over the 11-year and 17-year terms of the underlying agreements.

Impairment of Long-Lived Assets

The long-lived assets, consisting of property and equipment and intangible assets, held and used by the Company are reviewed for impairment no less frequently than annually or whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In the event that facts and circumstances indicate that the cost of any long-lived assets may be impaired, an evaluation of recoverability is performed. Management has determined that there was an impairment in the value of long-lived assets in the amount of $41,122 and $77,444, respectively, during the years ended December 31, 2025 and 2024.

Fair Value

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Assets and liabilities measured at fair value are categorized based on whether or not the inputs are observable in the market and the degree that the inputs are observable. The categorization of financial assets and liabilities within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. The three levels of inputs used to establish fair value are the following:

- Level 1 — Quoted prices in active markets for identical assets or liabilities;
- Level 2 — Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities; and
- Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities

The Company's financial instruments primarily consist of cash and cash equivalents, accounts receivable, net, accounts payable and long-term liabilities. As of the balance sheet dates, the estimated fair values of the financial instruments were not materially different from their carrying values as presented on the balance sheets. This is primarily attributed to the short-term nature of these instruments.

In 2015, the Company recorded a long-term liability for the estimated present value of future payments under licensing agreements. In 2021, the Company recorded an adjustment to increase the long-term liability due to an increase in the future payments due under these licensing agreements. In 2023, the Company recorded a long-term liability for the estimated present value of future payments under a separate licensing agreement. The Company determined the discount rate to estimate the present value of the future payments based on the applicable treasury rates. The Company's long-term liability is classified within Level 3. See Note 5 and Note 8 for more details regarding the licensing agreements. The Company did not identify any other assets and liabilities that are required to be presented in the balance sheets at fair value.

Revenue Recognition

The Company recognizes revenue and related cost of revenue in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 606, "Revenue from Contracts with Customers."

Commercial revenue relates to either the development agreements with customers or product sales. Commercial revenue under development agreements is generally recognized upon the completion of contractual deliverables. Commercial revenue from product sales is generally recognized upon shipment of products.

Research and Development

Research and development costs are presented as a line item under operating expenses and are expensed as incurred. Research and development costs include costs to further develop the Company's B-TRAN® technology and related products and include, but are not limited to, the cost of engineering personnel, wafer fabrication, contract labor, driver design and fabrication, device packaging, product development, testing and other engineering services, stock-based compensation for engineering personnel, consulting and materials and supplies.

Income Taxes

The Company accounts for income taxes using an asset and liability approach which allows for the recognition and measurement of deferred tax assets based upon the likelihood of realization of tax benefits in future years. Under the asset and liability approach, deferred taxes are provided for the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A valuation allowance is provided for deferred tax assets if it is more likely than not these items will either expire before the Company is able to realize their benefits, or that future deductibility is uncertain. At December 31, 2025 and 2024, the Company established a full reserve against all the net deferred tax assets.

Tax benefits from an uncertain tax position are recognized only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. The tax benefits recognized in the financial statements from such a position are measured based on the largest benefit that has a greater than 50 percent likelihood of being realized upon ultimate resolution.

Net Loss Per Share

The Company applies FASB ASC 260, "Earnings per Share." Basic earnings (loss) per share is computed by dividing earnings (loss) available to common stockholders by the weighted-average number of common shares outstanding. Diluted earnings (loss) per share is computed similar to basic earnings (loss) per share except that the denominator is increased to include additional common shares available upon exercise of equity awards and warrants using the treasury stock method. In periods with a net loss, no common share equivalents are included because their effect would be anti-dilutive.

In accordance with ASC 260, shares issuable for little or no cash consideration are considered outstanding common shares and included in the computation of basic earnings per share. As such, the Company includes pre-funded warrants to purchase shares of common stock in its computation of earnings per share. The pre-funded warrants were issued in March 2024 and November 2019 with an exercise price of $0.001. See Note 11.

At December 31, 2025 and 2024, potentially dilutive shares outstanding amounted to 1,373,809 and 1,297,369 shares, respectively, and exclude pre-funded warrants to purchase shares of common stock.

Segment Information

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker ("CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the Company's CODM. The CODM reviews financial information presented on a company-wide basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. As such, the Company has determined that it operates as one operating segment. The Company has concluded that net income (loss) is the measure of segment profitability. The CODM assesses performance for the Company, monitors budget versus actual results, and determines how to allocate resources based on net income (loss) as reported in the statements of operations. There are no other expense categories regularly provided to the CODM that are not already included in the financial statements herein.

During the years ended December 31, 2025 and 2024, the Company did not generate material international revenues and as of December 31, 2025 and 2024, the Company did not have material assets located outside of the United States.

Stock Based Compensation

The Company applies FASB ASC 718, "Stock Compensation," when recording stock-based compensation. Grants to non-employees are also accounted for under ASC 718. The fair value of each restricted stock unit award is the closing pricing of the Company's stock on the date of grant. The fair value of each performance stock unit award with market conditions is estimated on the date of grant using a Monte Carlo simulation. The fair value of each performance stock unit award with performance conditions is determined based on the closing price of the Company's stock on the date of grant and on whether it is probable that the performance conditions will be achieved. The Company reassesses the probability of vesting at each reporting period for performance stock units with performance conditions.

The Company issues common stock upon exercise of equity awards and warrants and upon the vesting of performance stock units and restricted stock units. The Company accounts for forfeitures of stock-based awards when they occur.

Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk consist primarily of cash and cash equivalents. The Company maintains its cash with a major financial institution located in the United States. Balances are insured by the Federal Deposit Insurance Corporation up to $250,000. The Company maintains balances in excess of federally insured limits. The Company has not experienced losses in such accounts and believes it is not exposed to significant credit risk regarding its cash and cash equivalents.

Recent Accounting Pronouncements

In December 2023, FASB issued Accounting Standards Update ("ASU") 2023-09, "Income Taxes (Topic 740): Improvements to Income Tax Disclosures," to enhance disclosures about income taxes. The amendments in this ASU require a public entity to disclose in tabular format, using both percentages and reporting currency amounts, specific categories in the rate reconciliation and to provide additional information for reconciling items that meet a quantitative threshold. The amendments in this ASU also require taxes paid (net of refunds received) to be disaggregated by federal, state, and foreign taxes and further disaggregated for specific jurisdictions to the extent the related amounts exceed a quantitative threshold. For public business entities, the provisions of ASU 2023-09, which are required on an annual basis, are effective for fiscal years beginning after December 15, 2024. The Company adopted this ASU on a prospective basis.

Management does not believe that any recently issued, but not yet effective, accounting standards, if adopted, would have a material impact on the Company's financial statements.

**Note 3 — Prepayments and Other Current Assets**

Prepayments and other current assets consisted of the following:

| | December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Prepaid insurance | $ 171,344 | $ 165,590 |
| Prepaid software | 106,568 | 103,256 |
| Prepaid investor relations | 42,732 | 53,579 |
| Other | 57,257 | 34,233 |
| | $ 377,901 | $ 356,658 |

**Note 4 — Property and Equipment**

Property and equipment, net consisted of the following:

| | December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Machinery and equipment | $ 593,505 | $ 494,683 |
| Software and IT equipment | 133,373 | 142,474 |
| Furniture and fixtures | 70,092 | 66,807 |
| Building leasehold improvements | 25,515 | 18,984 |
| | 822,485 | 722,948 |
| Accumulated depreciation and amortization | (445,768) | (307,716) |
| | $ 376,717 | $ 415,232 |

Depreciation expense amounted to $151,237 and $125,888 for the years ended December 31, 2025 and 2024, respectively. During the year ended December 31, 2025, the Company wrote off $19,944 in property and equipment and related accumulated depreciation of $13,185 for a net write-off of $6,759 of which $6,642 is included in research and development expenses and $117 is included in sales and marketing expenses in the accompanying statements of operations. During the year ended December 31, 2024, the Company wrote off $52,551 in property and equipment and related accumulated depreciation of $37,180 for a net write-off of $15,371 of which $10,293 is included in research and development expenses and $5,078 is included in general and administrative expenses in the accompanying statements of operations.

**Note 5 — Intangible Assets**

Intangible assets, net consisted of the following:

| | December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Patents | $ 2,062,262 | $ 1,770,374 |
| Trademarks | 26,529 | 22,767 |
| Other intangible assets | 1,843,036 | 1,843,036 |
| | 3,931,827 | 3,636,177 |
| Accumulated amortization - patents | (430,710) | (349,279) |
| Accumulated amortization – other intangible assets | (813,651) | (674,900) |
| | $ 2,687,466 | $ 2,611,998 |

At December 31, 2025 and 2024, the Company had capitalized $723,156 and $541,081, respectively, for costs related to patents that have not been awarded. Costs related to patents that have not been awarded are not amortized until patent issuance. For the years ended December 31, 2025 and 2024, the Company wrote-off capitalized patents of $34,363 and $62,073, respectively, included in general and administrative expenses in the accompanying statements of operations.

At December 31, 2025 and 2024, the Company had capitalized $26,529 and $22,767, respectively, for costs related to trademarks. Costs related to indefinite life trademarks are not amortized but are subject to evaluation for potential impairment.

Amortization expense amounted to $220,182 and $215,157 for the years ended December 31, 2025 and 2024, respectively. Amortization expense for the succeeding five years and thereafter is $224,376 annually (2026-2030) and $815,901 (thereafter).

**Note 6 — Accrued Expenses**

Accrued expenses consisted of the following:

| | December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Accrued compensation | $ 181,993 | $ 118,443 |
| Accrued licensing fees | 100,000 | 100,000 |
| Accrued professional fees | 81,650 | 80,410 |
| Accrued Board fees | 62,500 | 62,500 |
| Other | 45,186 | 12,659 |
| | $ 471,329 | $ 374,012 |

**Note 7 — Lease**

In March 2021, the Company entered into a lease agreement (the "Original Lease") for 4,070 square feet of office and laboratory space located in Austin, Texas (the "Original Suite"). The commencement of the lease occurred on June 1, 2021 and the initial term of the lease was 63 months.

In April 2024, the Company entered into a first amendment and relocation agreement (the "Amended Lease") with its landlord. Under the Amended Lease, the Company relocated to another, larger suite in the same office building. The Amended Lease is for 5,775 square feet of office and laboratory space (the "New Suite") and, upon occupancy, replaced the 4,070 square feet of office and laboratory space previously leased by the Company. The term of the Amended Lease expires sixty-two (62) months from July 1, 2024, the commencement date. The annual base rent for the first year of the Amended Lease is $118,388 and the annual base rent increases approximately 2.75% each year during the lease term. The Company is required to pay its proportionate share of operating costs for the building under this triple net lease.

In accordance with ASC 842, the Company accounted for the modification of the lease contract as a separate lease contract. The lease for the Original Suite terminated on June 30, 2024 and the Company recorded a gain on the termination of the lease for the Original Suite of $15,319 in general and administrative expenses. The Company recognized a right of use asset of $524,025 and a corresponding lease liability for the Amended Lease on the commencement date. For purposes of calculating the right of use asset and lease liability, the Company estimated its incremental borrowing rate at 8.5% per annum.

Future minimum payments under the Amended Lease are as follows:

| For the Year Ended December 31, | |
|---|---|
| 2026 | $ 123,297 |
| 2027 | 126,703 |
| 2028 | 130,197 |
| 2029 | 88,579 |
| Total lease payments | 468,776 |
| Less: imputed interest | (65,441) |
| Total lease liability | 403,335 |
| Less: current portion of lease liability | (93,435) |
| Long-term lease liability | $ 309,900 |

For the year ended December 31, 2025, operating cash outflows for lease payments totaled $120,005, and the operating lease cost, recognized on a straight-line basis, totaled $123,424. For the year ended December 31, 2024, operating cash outflows for lease payments totaled $99,046 and the operating lease cost, recognized on a straight-line basis, totaled $100,466. At December 31, 2025, the remaining lease term was 44 months.

**Note 8 — Commitments and Contingencies**

Licensing Agreements

In 2015, the Company entered into a licensing agreement which expires in February 2033. Per the agreement, the Company has an exclusive royalty-free license associated with semiconductor power switches which enhances its intellectual property portfolio. The Company pays $100,000 annually under this agreement.

In 2023, the Company amended a 2021 license agreement which expires in February 2034. Per the agreement, the Company has an exclusive royalty-free license associated with semiconductor drive circuitry which enhances its intellectual property portfolio. The Company pays $50,000 annually under this agreement.

At December 31, 2025, the estimated present value of future payments under these licensing agreements was $1,036,538 with $150,000 due and payable in 2026. The Company is accruing interest for future payments related to these agreements.

Legal Proceedings

The Company may be subject to litigation from time to time in the ordinary course of business. The Company is not currently party to any legal proceedings.

Indemnification Obligations

The employment agreements of Company executives include an indemnification provision whereby the Company shall indemnify and defend, at the Company’s expense, its executives so as long as an executive’s actions were taken in good faith and in furtherance of Company’s business and within the scope of executive’s duties and authority.

**Note 9 — Equity**

All shares of common stock have a par value of $0.001. Each holder of common stock is entitled to one vote per share outstanding.

2024 Public Offering

In March 2024, the Company issued and sold 1,366,668 shares of its common stock at a price of $7.50 per share and 633,332 pre-funded warrants to purchase shares of common stock at a price of $7.499 per pre-funded warrant in an underwritten public offering. The pre-funded warrants have an exercise price of $0.001 per share. The underwriter had a 30-day option to purchase up to an additional 300,000 shares of common stock at the offering price, less the underwriting discounts and commissions. In April 2024, the underwriter exercised in full its 30-day option to purchase an additional 300,000 shares of the Company’s common stock at the offering price of $7.50 per share, less underwriting discounts and commissions. The net proceeds to the Company from the public offering, including the underwriter’s exercise of its option to purchase additional shares, were $15.7 million.

**Note 10 — Equity Incentive Plan**

In May 2013, the Company adopted the 2013 Equity Incentive Plan (as amended and restated, the "Plan”) and reserved shares of common stock for issuance under the Plan, which was last amended in June 2023. The plan is administered by the Compensation Committee of the Company’s Board of Directors (the "Board”). At December 31, 2025, there were 240,567 shares of common stock available for issuance under the Plan.

During the year ended December 31, 2025, the Company granted 38,660 restricted stock units to Board members, 40,000 restricted stock units and 80,000 performance stock units to executives, and 230,427 restricted stock units and 30,000 performance stock units to employees under the Plan. The estimated fair value of these equity grants was $2,029,516, of which $755,500 was recognized in the respective department expenses in the accompanying statements of operations for the year ended December 31, 2025.

In connection with the retirement of the Company's former CEO, certain of his awards were modified and he forfeited 70,000 performance stock units prior to achievement of the underlying performance metrics. The grant date fair value of, and previously recognized expense for, these performance stock units of $597,841 was recognized as a reduction in research and development expenses in the accompanying statements of operations for the year ended December 31, 2025. The former CEO's unvested restricted stock units, otherwise subject to forfeiture, were modified to vest fifty percent (50%) on January 3, 2026 and fifty percent (50%) on April 3, 2026, subject to his continued service as a consultant through the vesting dates. In addition, a prior grant of 60,000 performance stock units, otherwise subject to forfeiture, were modified to remain outstanding and be eligible for vesting through November 2, 2026 subject to his continued service as a consultant through the vesting date. The incremental cost of these modifications was $600,566 and is being recognized over the requisite service period, as applicable.

During the year ended December 31, 2025, the Company granted awards of 247,438 restricted stock units and 247,438 performance stock units to its CEO as a material inducement to enter into employment with the Company. The inducement awards were granted outside of the Plan but are subject to its applicable terms. The estimated fair value of these equity awards was $2,083,739, of which $67,712 was recognized in general and administrative expenses in the accompanying statements of operations for the year ended December 31, 2025.

During the year ended December 31, 2024, the Company granted 38,710 restricted stock units to Board members, 125,000 restricted stock units to executives and 128,922 restricted stock units to employees under the Plan. The estimated fair value of these equity grants was $2,072,676, of which $541,957 was recognized in the respective department expenses in the accompanying statements of operations for the year ended December 31, 2024.

As permitted by SAB 107, management utilizes the simplified approach to estimate the expected term of stock options, which represents the period of time that options granted are expected to be outstanding. The risk-free interest rate for periods within the contractual life of the option is based on the U.S. treasury yield in effect at the time of grant. The volatility is estimated based on the historical volatilities of comparable companies. The Company has never declared or paid dividends and has no plans to do so in the foreseeable future.

No stock options were granted in the years ended December 31, 2025 and 2024.

A summary of the Company's stock option activity and related information is as follows:

| | 2025 | | | 2024 | | |
|---|---|---|---|---|---|---|
| | Stock Options | Weighted Average Exercise Price | Weighted Average Remaining Life (in years) | Stock Options | Weighted Average Exercise Price | Weighted Average Remaining Life (in years) |
| Outstanding at January 1 | 509,414 | $ 7.56 | 4.6 | 525,948 | $ 7.69 | 5.7 |
| Granted | — | $ — | | — | $ — | |
| Exercised | — | $ — | | (8,334) | $ 10.41 | |
| Forfeited / Expired | (138,600) | $ 7.78 | | (8,200) | $ 12.95 | |
| Outstanding at December 31 | 370,814 | $ 7.48 | 2.6 | 509,414 | $ 7.56 | 4.6 |
| Exercisable at December 31 | 370,814 | $ 7.48 | 2.6 | 497,414 | $ 7.44 | 4.5 |

The following table sets forth additional information about stock options outstanding at December 31, 2024:

| Range of Exercise Prices | Options Outstanding | Weighted Average Remaining Life (in years) | Weighted Average Exercise Price | Options Exercisable |
|---|---|---|---|---|
| $1.99 – $2.85 | 122,557 | 2.1 | $ 2.36 | 122,557 |
| $4.25 – $9.31 | 176,736 | 2.9 | $ 7.33 | 176,736 |
| $10.41 – $17.25 | 67,468 | 2.8 | $ 14.86 | 67,468 |
| $31.50 – $79.40 | 4,053 | 0.7 | $ 46.45 | 4,053 |
| | 370,814 | | | 370,814 |

Stock options granted under the Plan have ten-year terms. All outstanding stock options are exercisable at December 31, 2025.

The estimated aggregate pretax intrinsic value (the difference between the Company's stock price on the last day of the year ended December 31, 2025 and the exercise prices, multiplied by the number of in-the-money options) is $89,764 for outstanding options. This amount changes based on the fair value of the Company's stock.

A summary of the Company's restricted stock unit ("RSU") and performance stock unit ("PSU") activity is as follows:

| | 2025 | | 2024 | |
|---|---|---|---|---|
| | RSUs | PSUs | RSUs | PSUs |
| Outstanding at January 1 | 331,715 | 114,000 | 171,530 | 114,000 |
| Granted | 556,525 | 357,438 | 292,632 | — |
| Vested | (121,252) | — | (130,447) | — |
| Forfeited | (121,431) | (114,000) | (2,000) | — |
| Outstanding at December 31 | 645,557 | 357,438 | 331,715 | 114,000 |

In the year ended December 31, 2025, 121,252 restricted stock units vested of which 29,356 restricted stock units were forfeited to cover employee and executive payroll tax withholding obligations. In the year ended December 31, 2024, 130,447 restricted stock units vested of which 31,450 restricted stock units were forfeited to cover employee and executive payroll tax withholding obligations. The payment of the taxes on the vesting of the restricted stock units is shown as a financing activity on the accompanying statements of cash flows.

As of December 31, 2025, there was $3,874,071 of unrecognized compensation cost related to non-vested share-based compensation arrangements. That cost is expected to be recognized over a weighted average period of 1.0 years.

**Note 11 — Warrants**

Warrants

During the year ended December 31, 2025, 342,240 warrants with an exercise price of $8.90 expired. No warrants were outstanding at December 31, 2025.

During the year ended December 31, 2024, warrant holders exercised 444,180 warrants with a weighted average exercise price of $2.33. At December 31, 2024, there were 342,240 warrants outstanding at an exercise price of $8.90.

Pre-Funded Warrants

All pre-funded warrants have an exercise price of $0.001 and no expiration date.

During the year ended December 31, 2025, warrant holders exercised 110,000 pre-funded warrants. At December 31, 2025, there were 653,827 pre-funded warrants outstanding.

During the year ended December 31, 2024, the Company issued 633,332 pre-funded warrants (See Note 9) and warrant holders exercised 123,333 pre-funded warrants. At December 31, 2024, there were 763,827 pre-funded warrants outstanding.

All pre-funded warrants were exercisable at December 31, 2025 although pre-funded warrants may generally be exercised only to the extent that the total number of shares of common stock then beneficially owned by these shareholders does not exceed 9.99% of the outstanding shares of the Company's stock.

The estimated aggregate pre-tax intrinsic value (the difference between the Company's stock price on the last day of the year ended December 31, 2025 and the exercise price, multiplied by the number of pre-funded warrants) is $2.0 million.

**Note 12 — Income Taxes**

Income taxes are disproportionate to income due to net operating loss carryforwards, which are fully reserved. As of December 31, 2025, the Company has federal net operating loss carryforwards of approximately $94 million. The federal net operating loss carryforward for years prior to 2018 expire from 2031 through 2038. Federal net operating loss carryforwards for year 2018 and thereafter do not expire.

Pursuant to Internal Revenue Code Sections 382 and 383, use of the Company's net operating loss and credit carryforwards may be limited if a cumulative change in ownership of more than 50% occurs within any three-year period since the last ownership change. The Company may have had one or more changes in control under these Sections. However, the Company does not anticipate performing a complete analysis of the limitation on the annual use of the net operating loss and tax credit carryforwards until the time that it projects it will be able to utilize these tax attributes.

Management has concluded that it is more likely than not that the Company will not have sufficient foreseeable taxable income within the carryforward period as applicable and permitted by current law to allow for the utilization of certain of the deductible amounts generating the deferred tax assets; therefore, a full valuation allowance has been established to reduce the net deferred tax assets to zero at December 31, 2025 and 2024.

The following is a summary of the significant components of the Company's net deferred income tax assets and liabilities as of December 31, 2025 and 2024:

| | For the Year Ended December 31, | |
|---|---|---|
| | **2025** | **2024** |
| Non-current deferred income tax assets and (liabilities): | | |
| Net operating loss | $ 19,761,000 | $ 16,049,000 |
| Research and development credit | 18,000 | 18,000 |
| Research and experimental costs | 597,000 | 2,018,000 |
| Accrued compensation and other | 20,000 | 8,000 |
| Depreciation and amortization | 7,000 | 6,000 |
| Exercise of options and warrants | (49,000) | (49,000) |
| Stock based compensation | 1,798,000 | 1,968,000 |
| Intangibles and other | (572,000) | (561,000) |
| Less: valuation allowance | (21,580,000) | (19,457,000) |
| Net non-current deferred tax assets | $ — | $ — |

The Company has applied the provisions of FASB ASC 740, *Income Tax,* which clarifies the accounting for uncertainty in tax positions. FASB ASC 740 requires the recognition of the impact of a tax position in the financial statements if that position is more likely than not of being sustained on a tax return upon examination by the relevant taxing authority, based on the technical merits of the position. At December 31, 2025 and 2024, the Company had no unrecognized tax benefits.

The Company recognizes interest and penalties related to income tax matters in interest expense and operating expenses, respectively. As of December 31, 2025 and 2024, the Company has no accrued interest and penalties related to uncertain tax positions.

The Company is subject to tax in the United States ("U.S.") and files tax returns in the U.S. federal and certain state jurisdictions. The details of income taxes paid, net of refunds received, for the year ended December 31, 2025 are as follows:

| | 2025 |
|---|---|
| U.S Federal | $ — |
| U.S State and Local | |
| California | 800 |
| New Jersey | 500 |
| Total U.S. income taxes paid | 1,300 |
| Foreign | |
| Foreign income taxes paid | — |
| Total income taxes paid | $ 1,300 |

The Company is generally no longer subject to U.S. federal, state and local income tax examinations by tax authorities for all tax years since inception due to the carryover of unused net operating losses and tax credits. The Company currently is not under examination by any tax authority.

The reconciliation between the statutory income tax rate and the effective tax rate is as follows:

| | For the Year Ended December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Statutory federal income tax rate | (21)% | (21)% |
| State and local income taxes, net of federal income tax effect | — | — |
| Nontaxable or nondeductible items | | |
| Stock based compensation | 1 | — |
| Other | — | — |
| Other adjustments | — | (2) |
| Valuation allowance | 20 | 23 |
| | —% | —% |

| | For the Year Ended December 31, | |
|---|---|---|
| | 2025 | 2024 |
| Statutory federal income tax rate | $ (2,221,468) | $ (2,187,741) |
| State and local income taxes, net of federal income tax effect | 1,300 | — |
| Nontaxable or nondeductible items | | |
| Stock based compensation | 82,023 | 11,785 |
| Other | 7,228 | 1,290 |
| Other adjustments | 6,798 | (172,224) |
| Valuation allowance | 2,125,419 | 2,346,890 |
| | $ 1,300 | $ — |

**Note 13 — Subsequent Event**

In February 2026, the Company issued and sold 3,505,855 shares of its common stock at a price of $2.75 per share and 952,881 pre-funded warrants to purchase shares of common stock at a price of $2.749 per pre-funded warrant in an underwritten public offering and 631,332 pre-funded warrants to purchase shares of common stock at a price of $2.749 per pre-funded warrant in a concurrent private placement (taken together, the "February 2026 Offering"). The pre-funded warrants have an exercise price of $0.001 per share. The estimated net proceeds to the Company from the February 2026 Offering are $12.6 million.

**ITEM 9: CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

Not applicable.

**ITEM 9A: CONTROLS AND PROCEDURES**

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Exchange Act is accumulated and communicated to the issuer’s management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer ("CEO”), our principal executive officer, and our Chief Financial Officer ("CFO”), our principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. The evaluation was undertaken in consultation with our accounting personnel. Based on that evaluation, our CEO and CFO concluded that, as of December 31, 2025, our disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC’s rules and forms.

**Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Internal control over financial reporting is a process designed by, or under the supervision of, our CEO and CFO and effected by our Board, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our management, under the supervision and with the participation of our CEO and CFO, conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations (COSO). Our management engaged a third-party firm to assist them in the testing and assessment of our internal controls over financial reporting. Based on such evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2025.

This Annual Report does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting. Management’s report was not subject to attestation requirements by our independent registered public accounting firm pursuant to rules of the SEC that permit us to provide only management’s report in this Annual Report.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting identified in management’s evaluation pursuant to Rule 13a-15(d) or 15d-15(d) of the Act during the three months ended December 31, 2025 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Inherent Limitations on Effectiveness of Controls**

Our management, including our CEO and CFO, do not expect that our disclosure controls or our internal control over financial reporting will prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system’s objectives will be met. The design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Further, because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of a simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Projections of any evaluation of control effectiveness to future periods are subject to risks. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures.

**ITEM 9B: OTHER INFORMATION**

During the three months ended December 31, 2025, no director or officer of the Company adopted or terminated a "Rule 10b5-1 trading arrangement" or "non-Rule 10b5-1 trading arrangement," as each term is defined in Item 408(a) of Regulation S-K.

**ITEM 9C: DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

None.

**PART III**

**ITEM 10: DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by this item is incorporated herein by reference from our definitive proxy statement relating to the 2026 annual meeting of stockholders to be filed no later than 120 days after the end of our fiscal year ended December 31, 2025.

**ITEM 11: EXECUTIVE COMPENSATION**

The information required by this item is incorporated by reference from our definitive proxy statement relating to the 2026 annual meeting of stockholders to be filed no later than 120 days after the end of our fiscal year ended December 31, 2025.

**ITEM 12: SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS**

The following table provides information as of December 31, 2025, concerning shares of our common stock authorized for issuance under our equity compensation plans.

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants, and Rights(1),(2) | Weighted Average Exercise Price of Outstanding Options, Warrants, and Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in the First Column)(3) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 370,814 | $ 7.48 | 240,567 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 370,814 | $ 7.48 | 240,567 |

(1) Excludes 508,119 unvested shares outstanding as of December 31, 2025 in the form of restricted stock units or performance-based restricted stock units under our 2013 Plan, which do not require the payment of any consideration by the recipients.

(2) Excludes 494,876 unvested shares outstanding as of December 31, 2025 in the form of restricted stock units or performance-based restricted stock units that were not approved by security holders but were granted in accordance with Section 5635(c)(4) of the Nasdaq Listing Rules as a material inducement for our current CEO to enter into an employment agreement with the Company, which do not require the payment of any consideration by the recipient. The inducement awards were granted outside of our 2013 Plan but are generally subject to the same terms and conditions that apply to awards granted under our 2013 Plan.

(3) The 2013 Plan provides for the grant of stock options, restricted stock, restricted stock units, performance shares, performance units and other share-based awards.

**ITEM 13: CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this item is incorporated by reference from our definitive proxy statement relating to the 2026 annual meeting of stockholders to be filed no later than 120 days after the end of our fiscal year ended December 31, 2025.

**ITEM 14: PRINCIPAL ACCOUNTANT FEES AND SERVICES**

The information required by this item is incorporated by reference from our definitive proxy statement relating to the 2026 annual meeting of stockholders to be filed no later than 120 days after the end of our fiscal year ended December 31, 2025.

**PART IV**

**ITEM 15: EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a) Documents Filed with Report

(1) *Financial Statements.*

Report of Independent Registered Accounting Firm (PCAOB ID: 207)
Balance Sheets as of December 31, 2025 and 2024
Statements of Operations for the years ended December 31, 2025 and 2024
Statement of Stockholders' Equity for the years ended December 31, 2025 and 2024
Statements of Cash Flows for the years ended December 31, 2025 and 2024

(2) *Schedules.*

All financial statement schedules have been omitted because they are not required, are not applicable or the information is included in the consolidated financial statements or related notes thereto.

(3) *Exhibits.*

The following exhibits are filed as part of this Annual Report on Form 10-K or incorporated by reference, as indicated:

**EXHIBIT INDEX**

| Exhibit No. | Description of Document |
|---|---|
| 3.1 | Delaware Certificate of Conversion including Certificate of Incorporation of Ideal Power Inc. (1) |
| 3.2 | Certificate of Amendment of the Certificate of Incorporation of Ideal Power Inc. (2) |
| 3.3 | Certificate of Designation of Preferences, Rights and Limitations of Series A Convertible Preferred Stock (3) |
| 3.4 | Second Amended and Restated Bylaws of Ideal Power Inc. (4) |
| 4.1 | Specimen Common Stock Certificate (5) |
| 4.2 | Form of Series B Pre-Funded Common Stock Warrant (6) |
| 4.3 | Form of Pre-Funded Warrant issued in March 2024 (7) |
| 4.4 | Form of Pre-Funded Warrant issued in February 2026 (17) |
| 4.5 | Description of Registrant's Securities * |
| 10.1 | Ideal Power Inc. Amended and Restated 2013 Equity Incentive Plan (8) + |
| 10.2 | Employment Agreement, effective November 3, 2025, between Ideal Power Inc. and David Somo (9) + |
| 10.3 | Employment Agreement between the registrant and Timothy W. Burns dated September 16, 2014 (10) + |
| 10.4 | Second Revised and Restated Employment Agreement between the Company and R. Daniel Brdar dated April 8, 2020 (11) + |
| 10.5 | Retirement and Transition Services Agreement, dated November 2, 2025, between Ideal Power Inc. and R. Daniel Brdar (12) + |
| 10.6 | Form of Restricted Stock Units Agreement (13) + |
| 10.7 | Form of Performance Stock Units Agreement (14) + |
| 10.8 | Securities Purchase Agreement for February 2026 Offering (18) |
| 19 | Insider Trading Policy (15) |
| 23.1 | Consent of BPM LLP, Independent Registered Public Accounting Firm* |
| 31.1 | Certification of Principal Executive Officer, pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities and Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 31.2 | Certification of Principal Financial and Accounting Officer pursuant to Rule 13a-14(a) or 15d-14(a) of the Securities and Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 32.1 | Certification of Principal Executive Officer and Principal Financial and Accounting Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002** |
| 97 | Incentive Compensation Recovery Policy (16) |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document* |
| 101.SCH | Inline XBRL Taxonomy Extension Schema* |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase* |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase* |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase* |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase* |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document and contained in Exhibit 101). |

* Filed herewith

** Furnished herewith

+ Indicates a management contract or compensatory agreement

(1) Incorporated by reference to Exhibit 3.1 to the registrant's registration statement on Form S-1, file no. 333-190414, originally filed with the Securities and Exchange Commission on August 6, 2013, as amended.

(2) Incorporated by reference to Exhibit 3.1 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on August 20, 2019.

(3) Incorporated by reference to Exhibit 3.1 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 27, 2017.

(4) Incorporated by reference to Exhibit 3.1 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 17, 2022.

(5) Incorporated by reference to Exhibit 4.1 to the registrant's Quarterly Report on Form 10-Q, filed with the Securities and Exchange Commission on May 14, 2021.

(6) Incorporated by reference to Exhibit 4.2 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 13, 2019.

(7) Incorporated by reference to Exhibit 4.1 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on March 28, 2024.

(8) Incorporated by reference to Exhibit 10.1 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 16, 2023.

(9) Incorporated by reference to Exhibit 10.2 of the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 3, 2025.

(10) Incorporated by reference to Exhibit 10.2 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on September 19, 2014.

(11) Incorporated by reference to Exhibit 10.1 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on April 14, 2020.

(12) Incorporated by reference to Exhibit 10.1 of the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 3, 2025

(13) Incorporated by reference to Exhibit 99.1 of the registrant's Registration Statement on Form S-8 filed with the Securities and Exchange Commission on November 3, 2025

(14) Incorporated by reference to Exhibit 99.2 of the registrant's Registration Statement on Form S-8 filed with the Securities and Exchange Commission on November 3, 2025

(15) Incorporated by reference to Exhibit 19 to the registrant's Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 28, 2025.

(16) Incorporated by reference to Exhibit 97 to the registrant's Annual Report on Form 10-K filed with the Securities and Exchange Commission on April 1, 2024.

(17) Incorporated by reference to Exhibit 4.1 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 25, 2026

(18) Incorporated by reference to Exhibit 10.1 to the registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 25, 2026

**ITEM 16: FORM 10-K SUMMARY**

None.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Austin, State of Texas, on this 27th day of March 2026.

IDEAL POWER INC.

By: /s/ David Somo
David Somo,
Chief Executive Officer

By: /s/ Timothy Burns
Timothy Burns,
Chief Financial Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| | |
|---|---|
| Dated: March 27, 2026 | /s/ David Somo<br>David Somo,<br>Chief Executive Officer<br>(principal executive officer),<br>President and Director |
| Dated: March 27, 2026 | /s/ Timothy Burns<br>Timothy Burns,<br>Chief Financial Officer<br>(principal financial officer),<br>Secretary and Treasurer |
| Dated: March 27, 2026 | /s/ Michael Turmelle<br>Michael Turmelle, Chairman of the Board |
| Dated: March 27, 2026 | /s/ Drue Freeman<br>Drue Freeman, Director |
| Dated: March 27, 2026 | /s/ Greg Knight<br>Greg Knight, Director |
| Dated: March 27, 2026 | /s/ Ted Lesster<br>Ted Lesster, Director |

**Exhibit 4.5**

**DESCRIPTION OF SECURITIES REGISTERED PURSUANT TO SECTION 12 OF THE SECURITIES EXCHANGE ACT OF 1934**

*Ideal Power (the "Company," "we," "our," or "us") has one class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended: our common stock, par value $0.001 per share (our "common stock").*

**DESCRIPTION OF CAPITAL STOCK**

*The following description of our capital stock is intended as a summary only. This description is based upon, and is qualified by reference to, our certificate of incorporation, as amended to date (our "certificate of incorporation"), our certificate of designation of preferences, rights and limitations of Series A convertible preferred stock (our "certificate of designation"), our second amended and restated bylaws (our "bylaws"), and applicable provisions of the General Corporation Law of the State of Delaware (the "DGCL"). This summary is not complete. You should read our certificate of incorporation (including the certificate of amendment thereto), our certificate of designation and our bylaws, which are incorporated by reference as exhibits to our Annual Report on Form 10-K.*

**Authorized Capital Stock**

Our certificate of incorporation provides that we may issue up to 50,000,000 shares of common stock, par value $0.001 per share, and 10,000,000 shares of preferred stock, par value $0.001 per share. 3,000,000 shares of our authorized preferred stock have been designated as Series A Convertible Preferred Stock, par value $0.001 per share (the "Series A Preferred Stock").

**Common Stock**

Each holder of our common stock is entitled to one vote for each such share outstanding in the holder's name. No holder of common stock is entitled to cumulate votes in voting for directors, which means that the holders of a majority of the outstanding shares of our common stock will be entitled to elect all of the directors standing for election.

Holders of our common stock are entitled to such dividends as may be declared by our board of directors (our "Board") out of funds legally available for such purpose, subject to any preferential dividend rights of any then outstanding preferred stock.

In the event of our liquidation, dissolution or winding up, the holders of our common stock are entitled to receive pro rata our assets, which are legally available for distribution, after payments of all debts and other liabilities and subject to the prior rights of any holders of preferred stock then outstanding.

The shares of common stock are neither redeemable nor convertible. Holders of common stock have no preemptive or subscription rights to purchase any of our securities. The shares of common stock are not subject to further calls or assessment by us. There are no redemption or sinking fund provisions applicable to the common stock. All of the outstanding shares of our common stock are fully paid and non-assessable.

**Preferred Stock**

***General***

Our certificate of incorporation provides that our Board has the authority, without any further action by our stockholders, to designate and issue up to 10,000,000 shares of preferred stock in one or more classes or series and to fix the powers, rights, preferences, and privileges of each class or series of preferred stock, including dividend rights, conversion rights, voting rights, terms of redemption, liquidation preferences and the number of shares constituting any class or series, which may be greater than the rights of the holders of the common stock.

***Series A Preferred Stock***

On February 23, 2017, we filed a certificate of designation with the Secretary of State of the State of Delaware creating our Series A Preferred Stock and establishing the designations, preferences, and other rights of the Series A Preferred Stock, which became effective upon filing.

Our Series A Preferred Stock ranks senior to our common stock with respect to dividend rights and rights on liquidation, winding-up and dissolution. Our Series A Preferred Stock has a stated value of $2.535. Holders of Series A Preferred Stock are entitled to receive dividends declared or paid on our common stock. The holders of the Series A Preferred Stock do not have the right to vote on any matter except to the extent required by Delaware law. There were no shares of Series A Preferred Stock outstanding.

**Warrants**

***Pre-Funded Warrants issued in March 2024***

The following is a summary of certain terms and provisions of the pre-funded warrants issued in March 2024 and is not complete and is subject to, and qualified in its entirety by, the provisions of pre-funded warrants, the form of which are filed as an exhibit to our Annual Report on Form 10-K.

*Duration and Exercise Price*

Each pre-funded warrant has an exercise price of $0.001 per share. The pre-funded warrants were exercisable commencing on the date of issuance and may be exercised until they are exercised in full.

*Exercise Price Adjustments*

The exercise price of the pre-funded warrants is subject to adjustment in the event of certain stock dividends and distributions, stock splits, stock combinations, reclassifications or similar events affecting our common stock.

*Exercisability*

The pre-funded warrants are exercisable, at the option of the holder, in whole or in part, by delivering to us a duly executed exercise notice accompanied by payment in full for the number of shares of our common stock purchased upon such exercise (except in the case of a cashless exercise as discussed below). The holder (together with its affiliates) may not exercise any portion of such holder's pre-funded warrants to the extent that the holder would own more than 4.99% (or, at the election of the holder prior to the issuance of any pre-funded warrants, 9.99%) of the outstanding common stock immediately after exercise, except that upon at least 61 days' prior notice from the holder to us, the holder may increase the amount of ownership of outstanding stock after exercising the holder's pre-funded warrants up to 9.99% of the number of shares of our common stock outstanding immediately after giving effect to the exercise, as such percentage ownership is determined in accordance with the terms of the pre-funded warrants.

*Cashless Exercise*

In lieu of making the cash payment otherwise contemplated to be made to us upon such exercise in payment of the aggregate exercise price, the holder may elect instead to receive upon such exercise (either in whole or in part) the net number of shares of common stock determined according to a formula set forth in the pre-funded warrants.

*Fundamental Transactions*

In the event of a fundamental transaction, as described in the pre-funded warrants and generally including any reorganization, recapitalization or reclassification of our shares of common stock, the sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of our assets, our consolidation or merger with or into another person, the acquisition of 50% or more of our outstanding shares of our common stock or 50% or more of the voting power of our common equity, any purchase offer, tender offer or exchange offer that has been accepted by the holders of 50% or more of our outstanding common stock or 50% or more of the voting power of our common equity, then upon any subsequent exercise of a pre-funded warrant, the holder will have the right to receive as alternative consideration, for each share of our common stock that would have been issuable upon such exercise immediately prior to the occurrence of such fundamental transaction, the number of shares of common stock of the successor or acquiring corporation or of our company, if it is the surviving corporation, and any additional consideration receivable as a result of such transaction by a holder of the number of shares of our common stock for which the pre-funded warrant is exercisable immediately prior to such event.

*Transferability*

Subject to applicable laws, a pre-funded warrant may be transferred at the option of the holder upon surrender of the pre-funded warrant to us together with the appropriate instruments of transfer.

*Fractional Shares*

No fractional shares of common stock will be issued upon the exercise of the pre-funded warrants. Rather, the number of shares of common stock to be issued will, at our election, either be rounded up to the next whole share or we will pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the exercise price.

*Trading Market*

There is no established public trading market for the pre-funded warrants, and we do not expect such a market to develop. We do not intend to apply to list the pre-funded warrants on any securities exchange or other nationally recognized trading system.

*Right as a Stockholder*

Except as otherwise provided in pre-funded warrants or by virtue of a holder's ownership of shares of our common stock, such holder of pre-funded warrants does not have the rights or privileges of a holder of our common stock, including any voting rights, until such holder exercises such holder's pre-funded warrants. The pre-funded warrants provide that the holders of the pre-funded warrants have the right to participate in distributions or dividends paid on our shares of common stock.

*Waivers and Amendments*

The pre-funded warrants may be modified or amended or the provisions of such pre-funded warrants waived with the written consent of the Company and the holder of the applicable pre-funded warrants.

***Pre-Funded Warrants issued in November 2019***

The terms and provisions of the pre-funded warrants issued in November 2019 are substantially the same as the terms of the pre-funded warrants issued in March 2024 described above, except as set forth below. This summary is not complete and is subject to, and qualified in its entirety by, the provisions of the pre-funded warrants, the form of which are filed as an exhibit to our Annual Report on Form 10-K.

*Fundamental Transactions*

In the event of a fundamental transaction, as described in the pre-funded warrants and generally including any reorganization, recapitalization or reclassification of our shares of common stock, the sale, lease, license, assignment, transfer, conveyance or other disposition of all or substantially all of our assets, our consolidation or merger with or into another person, the acquisition of 50% or more of our outstanding shares of our common stock, or any purchase offer, tender offer or exchange offer that has been accepted by the holders of 50% or more of our outstanding common stock, then upon any subsequent exercise of a pre-funded warrant, the holder will have the right to receive as alternative consideration, for each share of our common stock that would have been issuable upon such exercise immediately prior to the occurrence of such fundamental transaction, the number of shares of common stock of the successor or acquiring corporation or of our company, if it is the surviving corporation, and any additional consideration receivable as a result of such transaction by a holder of the number of shares of our common stock for which the pre-funded warrant is exercisable immediately prior to such event.

*Transferability*

Subject to applicable laws and certain conditions stated in the pre-funded warrants, a pre-funded warrant may be transferred at the option of the holder upon surrender of the pre-funded warrant to us together with the appropriate instruments of transfer.

***Pre-Funded Warrants issued in February 2026***

The terms and provisions of the pre-funded warrants issued in February 2026 are substantially the same as the terms of the pre-funded warrants issued in March 2024 described above. This summary is not complete and is subject to, and qualified in its entirety by, the provisions of the pre-funded warrants, the form of which are filed as an exhibit to our Annual Report on Form 10-K.

**Anti-Takeover Effects of Certain Provisions of Delaware Law and Our Charter Documents**

Provisions of Delaware law and our charter documents could have the effect of delaying or preventing a third party from acquiring us, even if the acquisition would benefit our stockholders. These provisions may delay, defer or prevent a tender offer or takeover attempt of our Company that a stockholder might consider in his, her or its best interest, including those attempts that might result in a premium over the market price for the shares held by our stockholders. These provisions are intended to enhance the likelihood of continuity and stability in the composition of our Board and in the policies formulated by the Board and to discourage types of transactions that may involve our actual or threatened change of control. These provisions are designed to reduce our vulnerability to an unsolicited proposal for a takeover that does not contemplate the acquisition of all of our outstanding shares, or an unsolicited proposal for the restructuring or sale of all or part of us.

***Effect of Delaware Anti-Takeover Statute.*** We are subject to Section 203 of the DGCL, an anti-takeover law. In general, Section 203 prohibits a Delaware corporation from engaging in any business combination (as defined below) with any interested stockholder (as defined below) for a period of three years following the date that the stockholder became an interested stockholder, unless:

- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares of voting stock outstanding (but not the voting stock owned by the interested stockholder) those shares owned by persons who are directors and officers and by excluding employee stock plans in which employee participants do not have the right to determine whether shares held subject to the plan will be tendered in a tender or exchange offer; or

- on or subsequent to that date, the business combination is approved by the board of directors of the corporation and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock that is not owned by the interested stockholder.

Section 203 defines "business combination" to include the following:

- any merger or consolidation involving the corporation and the interested stockholder;
- any sale, lease, exchange, mortgage, transfer, pledge or other disposition of 10% or more of the assets of the corporation involving the interested stockholder;
- subject to certain exceptions, any transaction that results in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder;
- subject to limited exceptions, any transaction involving the corporation that has the effect of increasing the proportionate share of the stock of any class or series of the corporation beneficially owned by the interested stockholder; or
- the receipt by the interested stockholder of the benefit of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation.

In general, Section 203 defines an "interested stockholder" as any entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation, or who beneficially owns 15% or more of the outstanding voting stock of the corporation at any time within a three-year period immediately prior to the date of determining whether such person is an interested stockholder, and any entity or person affiliated with or controlling or controlled by any of these entities or persons.

***Our Charter Documents.***

*Effects of authorized but unissued common stock and blank check preferred stock*. One of the effects of the existence of authorized but unissued common stock and undesignated preferred stock may be to enable our Board to make more difficult or to discourage an attempt to obtain control of our Company by means of a merger, tender offer, proxy contest or otherwise, and thereby to protect the continuity of management. If, in the due exercise of its fiduciary obligations, the Board were to determine that a takeover proposal was not in our best interest, such shares could be issued by the Board without stockholder approval in one or more transactions that might prevent or render more difficult or costly the completion of the takeover transaction by diluting the voting or other rights of the proposed acquirer or insurgent stockholder group, by putting a substantial voting block in institutional or other hands that might undertake to support the position of the incumbent Board, by effecting an acquisition that might complicate or preclude the takeover, or otherwise.

In addition, our certificate of incorporation grants our Board broad power to establish the rights and preferences of authorized and unissued shares of preferred stock. The issuance of additional shares of preferred stock could decrease the amount of earnings and assets available for distribution to holders of shares of common stock. The issuance also may adversely affect the rights and powers, including voting rights, of those holders and may have the effect of delaying, deterring or preventing a change in control of our Company.

*Cumulative Voting.* Our certificate of incorporation does not provide for cumulative voting in the election of directors, which would allow holders of less than a majority of the stock to elect some directors.

*Blank Check Preferred Stock*. As noted above, our certificate of incorporation allows our Board to fix the designation, powers, preferences and rights of the shares of each series of preferred stock and any of their qualifications, limitations or restrictions, in each case without further vote or action by our stockholders.

*No Stockholder Action by Written Consent.* Our certificate of incorporation expressly prohibits stockholders from acting by written consent. This means that stockholders may only act at annual or special meetings.

*Vacancies.* Our certificate of incorporation and bylaws provide that all vacancies may be filled by the affirmative vote of a majority of directors then in office, even if less than a quorum.

*Special Meeting of Stockholders.* A special meeting of stockholders may only be called by the chairman of the Board, the chief executive officer, or the Board at any time and for any purpose or purposes as shall be stated in the notice of the meeting, and shall be called by the secretary upon the written request of the holders of record of at least 25% of the outstanding shares of common stock. This provision could prevent stockholders from calling a special meeting because, unless certain significant stockholders were to join with them, they might not obtain the percentage necessary to request the meeting. Therefore, stockholders holding less than 25% of the issued and outstanding common stock, without the assistance of management, may be unable to propose a vote on any transaction that would delay, defer or prevent a change of control, even if the transaction were in the best interests of our stockholders.

*Requirements for Advance Notification of Stockholder Nominations and Proposals.* Our certificate of incorporation and bylaws have advance notice procedures with respect to stockholder proposals and nominations of candidates for election as directors, other than nominations made by or at the direction of our Board or a committee of our Board. The business to be conducted at a meeting will be limited to business properly brought before the meeting, in accordance with our certificate of incorporation and bylaws. Failure to follow the procedures set forth in our certificate of incorporation and bylaws will result in the chairman of the meeting disregarding the nomination or declaring that the proposed business will not be transacted.

**Transfer Agent and Registrar**

Our transfer agent and registrar for our common stock is EQ Shareowner Services.

**Listing**

Our common stock is listed on The Nasdaq Capital Market under the symbol "IPWR."

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in Registration Statements on Form S-8 (Nos. 333-291236, 333-278432, 333-261024, 333-239270, 333-205627 and 333-201337) and Form S-3 (Nos. 333-292492, 333-248466, 333-235500 and 333-217088) of Ideal Power Inc. of our report dated March 27, 2026 relating to the financial statements, which appears in this Annual Report on Form 10-K.

/s/ BPM LLP

March 27, 2026
San Jose, California

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO SECTION 302(a) OF THE SARBANES-OXLEY ACT OF 2002**

I, David Somo, certify that:

1. I have reviewed this annual report on Form 10-K of Ideal Power Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 27, 2026

/s/ David Somo
David Somo
Chief Executive Officer (Principal Executive Officer)

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO SECTION 302(a) OF THE SARBANES-OXLEY ACT OF 2002**

I, Timothy W. Burns, certify that:

1. I have reviewed this annual report on Form 10-K of Ideal Power Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15-d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 27, 2026

/s/ Timothy W. Burns
Timothy W. Burns
Chief Financial Officer (Principal Financial Officer)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the annual report of Ideal Power Inc. (the "Company") on Form 10-K for the year ended December 31, 2025 as filed with the Securities and Exchange Commission (the "Report"), we, David Somo, Chief Executive Officer (Principal Executive Officer) and Timothy W. Burns, Chief Financial Officer (Principal Financial Officer) of the Company, hereby certify as of the date hereof, solely for purposes of Title 18, Chapter 63, Section 1350 of the United States Code, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of our knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934, and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the dates and for the periods indicated.

Date: March 27, 2026

/s/ David Somo
David Somo
Chief Executive Officer (Principal Executive Officer)

/s/ Timothy W. Burns
Timothy W. Burns
Chief Financial Officer (Principal Financial Officer)

# EXHIBIT 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the**
**Securities Exchange Act of 1934**

**Date of report (Date of earliest event reported): October 31, 2025**

# IDEAL POWER INC.
(Exact name of registrant as specified in Charter)

| **Delaware** | **001-36216** | **14-1999058** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File No.) | (IRS Employee Identification No.) |

**5508 Highway 290 West, Suite 120**
**Austin, Texas, 78735**
(Address of Principal Executive Offices)

**512-264-1542**
(Issuer Telephone number)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the Registrant under any of the following provisions (see General Instruction A.2 below).

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b)).
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13(e)-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.001 par value | IPWR | Nasdaq Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Retirement of Chief Executive Officer*

On October 31, 2025, R. Daniel Brdar, the President and Chief Executive Officer and member of the Board of Directors (the "Board") of Ideal Power Inc. (the "Company"), gave notice of his retirement from all positions with the Company, effective November 2, 2025.

In connection with Mr. Brdar's retirement, Mr. Brdar and the Company entered into a Retirement and Transition Services Agreement (the "Transition Agreement"), pursuant to which Mr. Brdar will provide transition services for twelve months following the date of his retirement (the "Transition Period"). Pursuant to the Transition Agreement, Mr. Brdar will receive certain accelerated and continued vesting during the Transition Period of certain prior equity awards granted by the Company.

The foregoing description of the Transition Agreement is qualified in its entirety by reference to the Transition Agreement, a copy of which is filed as Exhibit 10.1 to this Current Report on Form 8-K, and is incorporated by reference herein.

*Appointment of Chief Executive Officer and Director*

On October 31, 2025, the Board appointed David Somo as the President and Chief Executive Officer of the Company and as a member of the Board, each effective November 3, 2025. Mr. Somo will not serve on any committees of the Board.

Mr. Somo, age 59, has more than 30 years of experience in the semiconductor industry spanning the industrial, automotive, data center, consumer, computing, and communications end-markets. Prior to his appointment as President and Chief Executive Officer of the Company, Mr. Somo served as President and CEO of Preciseley Microtechnology Corporation, a manufacturer of optic micro-electromechanical system mirror products designed for the telecommunications, data communications, and 3D sensing markets, from June 2021 to September 2024. Before that, Mr. Somo was the Senior Vice President of Corporate Strategy and Marketing at ON Semiconductor Corporation, a designer and manufacturer of semiconductors and image sensors, from October 2009 to June 2021. Mr. Somo received his B.S. in electrical engineering from Arizona State University.

In connection with his appointment as President and Chief Executive Officer, the Company and Mr. Somo entered into an Employment Agreement (the "Employment Agreement"), pursuant to which Mr. Somo will (a) receive an annual base salary of $425,000, subject to periodic review by the Board, and (b) be eligible to participate in the Company's discretionary bonus program with a target award equal to 100% of Mr. Somo's base salary. Mr. Somo will also be able to participate in the Company's employee benefit plans from time to time in effect for executive officers or employees. In addition, as an inducement to enter into the Employment Agreement, Mr. Somo will receive an initial grant of (1) restricted stock units equal to 2.5% of the Fully Diluted Common Stock (as defined in the Employment Agreement) of the Company, vesting in three equal annual installments beginning on November 3, 2026, and (2) performance restricted stock units equal to equal to 2.5% of the Fully Diluted Common Stock for the Company, vesting upon achievement of certain performance milestones, in each case subject to the terms of the Employment Agreement and the applicable award agreements, including continue vesting during a 12-month severance period (as set forth in the Employment Agreement) (collectively, the "Inducement Awards"). The Employment Agreement also provides for the reimbursement of expenses incurred by Mr. Somo in connection with his relocation to Austin, Texas in an amount not to exceed $50,000.

If Mr. Somo is terminated for any reason other than for "cause" or terminates his employment for "good reason" (each as defined in the Employment Agreement), he will be entitled to, in addition to the continued vesting set forth above, (A) earned and accrued base salary, bonus, vacation time and other benefits, and (B)(i) a severance payment equal to 12 months of base salary, (ii) payment of annual bonus amounts he would have otherwise received, subject to the terms of the Employment Agreement, and (iii) continued COBRA health coverage for 12 months following termination of employment with the Company, in each case in Section (B), subject to execution of a customary release set forth in the Employment Agreement (collectively, the "Severance Benefits"). If Mr. Somo is terminated upon a "Change in Control" (as defined in the Employment Agreement), Mr. Somo would be entitled to the Severance Benefits and immediate vesting of all outstanding equity awards.

The foregoing description of the Employment Agreement is qualified in its entirety by reference to the Employment Agreement, a copy of which is filed as Exhibit 10.2 to this Current Report on Form 8-K, and is incorporated by reference herein.

There is no arrangement or understanding between Mr. Somo and any other person pursuant to which he was appointed as an officer or director of the Company. Mr. Somo has no family relationships with any of the Company's directors or executive officers. There are no transactions involving the Company and Mr. Somo that the Company would be required to report pursuant to Item 404(a) of Regulation S-K.

**Item 7.01. Regulation FD Disclosure.**

On November 3, 2025, the Company issued a press release announcing the appointment of Mr. Somo and the Inducement Awards. A copy of the press release is furnished as Exhibit 99.1 to this Current Report on Form 8-K.

The information in this Item 7.01 and Exhibit 99.1 furnished hereto shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such a filing.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 10.1 | Retirement and Transition Services Agreement, dated November 2, 2025, between Ideal Power Inc. and R. Daniel Brdar. |
| 10.2 | Employment Agreement, effective November 3, 2025, between Ideal Power Inc. and David Somo. |
| 99.1 | Press Release, dated November 3, 2025. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: November 3, 2025

**IDEAL POWER INC.**

By: /s/ Timothy Burns
Timothy Burns
Chief Financial Officer

**Exhibit 10.1**

**RETIREMENT AND TRANSITION SERVICES AGREEMENT**

This **RETIREMENT AND TRANSITION SERVICES AGREEMENT** (this "Agreement") is entered on November 2, 2025, by and between **IDEAL POWER INC.**, a corporation incorporated and existing under the laws of the State of Delaware (the "Company"), and R. Daniel Brdar ("Executive"). The Company and Executive may each be referred to herein as a "Party" and collectively as the "Parties."

**RECITALS**

A. Executive currently serves as President and Chief Executive Officer and as a member of the Board of Directors of the Company (the "Board").

B. Executive and the Company are parties to a Second Revised and Restated Employment Agreement dated April 8, 2020 (as amended, the "Employment Agreement").

C. Executive wishes to retire from his employment with the Company, and the Parties desire to set forth the terms of Executive's retirement to facilitate a smooth and orderly transition from the Company.

D. The Company desires to engage Executive in a twelve (12) month Transition Agreement to perform the services based on the terms set forth below.

**AGREEMENTS**

**NOW, THEREFORE**, in consideration of the mutual covenants and premises contained herein, the Parties hereby agree as follows:

1. Retirement. Executive hereby resigns as (i) President, Chief Executive Officer of the Company and all other positions and titles held with the Company, and (ii) a member of the Board, in each case effective at the end of the day on November 2, 2025 (the "Retirement Date").

2. Transition Compensation. Executive will continue to receive the compensation and benefits under the Employment Agreement through the Retirement Date. In consideration for Executive's promises and obligations under this Agreement, including the General Release of Claims in Section 10 below, the Company will also provide the following consideration to Executive under this Agreement (collectively, the "Transition Compensation"):

    a. Restricted Stock Units: Executive's restricted stock units ("RSUs") held as of the date of this Agreement will vest as to fifty percent (50%) on January 3, 2026 (with those RSUs having the earliest grant date vesting first) and as to the remaining fifty percent (50%) on April 3, 2026, subject to Executive's continued Services (as defined below) on such dates.

    b. Performance Stock Units: Executive's outstanding award for 70,000 performance stock units ("PSUs") granted on December 15, 2022 will be forfeited as of the Retirement Date and Executive's outstanding 60,000 PSUs granted on June 12, 2025 will remain outstanding and eligible to vest through the twelve (12) month transition period contemplated by this Agreement in accordance with the performance vesting terms applicable to such PSUs and set forth in the applicable award agreement evidencing such PSUs. Any PSUs that do not vest during such transition period (or upon an earlier termination of Services) will be automatically forfeited.

c. Options: Executive's outstanding stock options are fully vested as of the date of this Agreement. Upon termination of Services under this Agreement, the stock options will remain exercisable until the earlier of (i) three (3) months after termination of Services under this Agreement and (ii) the original expiration date of the maximum term of an applicable option, subject to earlier termination in the event of a corporate transaction as set forth in the Company's Amended and Restated 2013 Equity Incentive Plan.

3. Duties After Retirement Date. After the Retirement Date, the Employment Agreement will no longer be effective, and Executive hereby agrees to devote his expertise, capabilities, and talent to perform the services as described in ***Exhibit A*** attached hereto (the "Services") under the terms and conditions set forth in this Agreement.

4. Performance of the Services. Executive shall perform the Services in a prompt, diligent and competent manner according to his own means and methods of work that are reasonably calculated to achieve the objectives of this Agreement.

5. Section 409A. The Parties intend that no payments to Executive be subject to the additional tax on deferred compensation imposed by Section 409A of the Internal Revenue Code of 1986, as amended, and any regulations thereunder (the "Code"), and this Agreement shall be interpreted and administered in a manner consistent with such intent. The Parties shall treat all payments made pursuant to this Agreement as short-term deferrals as defined under Treasury Regulation section 1.409A-1(b)(4). All payments and benefits made pursuant to this Agreement are hereby designated as separate payments and will not collectively be treated as a single payment, as provided in Treasury Regulation section 1.409A-2(b)(2)(iii).

6. Independent Contractor. Following the Retirement Date and during the term of this Agreement, Executive represents and warrants that Executive is an independent contractor and that the performance of the Services hereunder shall be as an independent contractor. Nothing contained herein is intended to or shall be construed as making Executive an employee of the Company or conferring upon Executive any rights, privileges or benefits as an employee of the Company.

7. Designated Agent of the Company. Executive shall perform the Services in a manner consistent with directives received from a designated representative of the Company. Unless Executive is otherwise advised, the Company's Chief Executive Officer, **David Somo,** shall be the Company's designated representative for this purpose. The Company may designate substitute or additional designated representatives, who shall be empowered to act on behalf of the Company in connection with this Agreement.

8. No Third Party Liability. The Parties shall look solely to each other for purposes of the performance and enforcement of any and all rights and obligations imposed hereunder. No liability for performance shall be imputed to any third party absent the express written consent of the third party.

9. Reimbursement of Expenses. The Company shall reimburse Executive on a regular basis for all reasonable out-of-pocket expenses incurred by Executive in providing the Services hereunder, including but not limited to, telecopy, photocopying, postage, delivery and overnight courier services as well as travel expenses; provided, however, that Executive shall not incur any travel expenses without the prior approval of the Company. Executive shall submit an Expense Report, if applicable, no less often than once per month.

10. General Release of Claims by Executive. In consideration of the Transition Compensation and other valuable consideration provided herein, Executive shall and hereby does fully release Company from any and all Claims (as defined below) that Executive may have against the Company and all of its subsidiaries, predecessors, affiliates, present and former owners, directors, officers, employees, attorneys, insurers, accountants and tax advisors, agents, successors, investors, assignees, and all other representatives of Company, individually and in their corporate or other representative capacities (hereinafter these released parties are referred to collectively as "Releasees") arising on or prior to the date of Executive's execution and delivery of this Agreement. "Claims" means any and all actions, charges, controversies, demands, causes of action, suits, rights, and/or claims whatsoever for debts, sums of money, wages, salary, severance pay, commissions, fees, bonuses, unvested stock options, vacation pay, sick pay, fees and costs, attorneys' fees, losses, penalties, damages (including damages for pain and suffering and emotional harm), arising, directly or indirectly, out of or relating to any promise, agreement, offer letter, contractor, understanding, common law, tort, the laws, statutes, and/or regulations of the State of Texas, or any other applicable state or local government, and the United States, including, but not limited to: federal, state, and local wage and hour laws (to the extent waivable); federal and state whistleblower laws; the Employee Retirement Income Security Act; the National Labor Relations Act; Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Civil Rights Act of 1866 including but not limited to Section 1981 and 1983; the Rehabilitation Act of 1973; the Americans with Disabilities Act; the Genetic Information Nondiscrimination Act; the Immigration Reform and Control Act; the Age Discrimination in Employment Act ("ADEA"); the Older Workers Benefit Protection Act ("OWBPA"); the Worker Adjustment and Retraining Notification Act ("WARN"); the Family and Medical Leave Act; the Fair Credit Reporting Act; the Uniformed Services Employment and Reemployment Rights Act; the Occupational Safety and Health Act; the Families First Coronavirus Response Act; any state and local employment laws regarding COVID-19; the Texas Commission on Human Rights Act; Section 451.001 of the Texas Workers Compensation Act; and the *Sabine Pilot* doctrine.

Notwithstanding the foregoing provisions of this Section 10, this Agreement shall not, and is not intended to, operate to preclude Executive from filing any claims before government agencies, including, without limitation, claims before the Equal Employment Opportunity Commission or the National Labor Relations Board, which claims may not, under applicable law, be waived or released by way of this Agreement. However, to the extent permitted by law, in the event that any government agency seeks to obtain any relief on behalf of Executive with regard to any claim released and waived herein, Executive covenants not to accept, recover, or receive any monetary relief or award that may arise out of or in connection with any such proceeding. This waiver does not apply if it is otherwise prohibited by law, including whistleblower awards under Section 21F of the Securities Exchange Act.

This release by Executive does not cover any claim or right Executive cannot waive as a matter of law, such as rights to workers' compensation benefits, unemployment benefits, vested benefits under the Company's fringe benefit plans, claims against the Company for breach of its obligations under this Agreement, and any claims that might arise after the Retirement Date.

11. Release of Claims by Company. For good and valuable consideration, Company hereby fully waives and releases Executive, including Executive's successors, heirs, executors, administrators, and, to the extent permitted by the terms of this Agreement, assigns, ("Executive Releasees") from any and all claims Company may have against the Executive Releasees, including, without limitation, claims arising in contract or tort. Company represents and warrants that Company has neither assigned, nor transferred any interest in, any claim which Company may have against Executive.

12. Waiver of Unknown Claims. Executive and Company waives (a) all rights that either party may have based on any unknown and undiscovered facts, and (b) all rights that are provided for under any law which limits the scope of a release based on unknown facts

13. Promise Not to Sue. Executive and Company represents that neither party has filed any complaints, charges, or lawsuits against the other nor Releasees with any governmental agency (excluding the Securities and Exchange Commission ("SEC")) or any court. For avoidance of doubt, this Section and Agreement does not require Parties to disclose or make any representation as to any prior communications or other dealings with the SEC, and nothing in this Section and Agreement prohibits either Party from communicating with or providing information (including Confidential Information) to the SEC under Section 21F of the Securities Exchange Act. Executive agrees that Executive will not initiate any actions (in civil court or arbitration) regarding the claims released under this Agreement, whether on Executive's own behalf or in a class or representative capacity, and will not be a member of a class or other collective mechanism with respect to any released claims (including, but not limited to, claims pursuant to any unfair competition law of any jurisdiction), and warrants and represents that Executive will take all steps necessary to ensure that Executive is not a member of a class or collective with respect to such claim

14. Taxes. Executive shall bear the full responsibility for and indemnify the Company against liability for any other taxes, duties, imposts and fiscal charges for its performance arising under this Agreement. Executive shall be solely responsible for the reporting, estimation and payment of all income taxes, fees and other contributions on or attributable to self-employment income attributable to the renumeration received hereunder.

15. Confidential Information.

15.1 For purposes of this Agreement, "Confidential Information" means all information and materials (including but not limited to Company Inventions, Intellectual Property Rights and works made for hire (each as defined in Section 15 below)) of any kind (tangible or intangible, written or oral, and including information contained in or transmitted through any electronic medium) disclosed or made available to Executive by the Company or its representatives (regardless of whether such information and materials are owned by the Company or by a third party) or that otherwise relates to the Company's actual or proposed business, including, without limitation, (i) research, development, technical data, trade secrets or know-how, drawings, engineering, hardware configuration information, products and product plans, services, marketing, selling and business plans, strategies, forecasts, budgets, financial information, licenses, prices, costs, assets, contracts and other agreements, suppliers, customers (including, but not limited to, the Company's customers with whom Executive became acquainted during the term of this Agreement) and customer lists, and other business information; (ii) the identity, personal data, skills and compensation of employees, contractors, and consultants; (iii) specialized training; (iv) information related to Inventions owned by the Company or licensed from third parties; and (v) other non-public information relating to the Company that is not readily ascertainable (including, without limitation, any information designated in writing as "confidential" or "proprietary" prior to or at the time such information is disclosed to Executive). Notwithstanding the foregoing, the obligations of confidentiality assumed by Executive pursuant to this Agreement shall not apply to the extent Executive can demonstrate, by clear and convincing evidence, that such information: (i) is part of the public domain without any breach of this Agreement by Executive; (ii) is or becomes generally known to companies engaged in the same or similar businesses as the parties hereto on a non-confidential basis, through no wrongful act of Executive; (iii) was known by Executive prior to disclosure hereunder without any obligation to keep it confidential; (iv) was disclosed to Executive by a third party which, to the best of Executive's knowledge, is not required to maintain its confidentiality; or (v) was independently developed by Executive without reference to or use of any Confidential Information.

15.2 All Confidential Information shall be the sole property of the Company and the Company shall be the sole owner of all right, title and interest therein. Executive shall not use Confidential Information of the Company for any purpose other than the performance of the Services in accordance with the terms of this Agreement. Executive shall hold the Company's Confidential Information in confidence, and shall not disclose such Confidential Information to any persons.

15.3 Executive shall institute and/or maintain such procedures as are reasonably required to maintain the confidentiality of the Confidential Information, and shall apply at least the same level of care as it employs to protect its own confidential information of like nature. If Executive becomes aware of any actual or threatened breach of this Agreement (including any threatened or actual unauthorized use or disclosure of any Confidential Information), or in the event of any loss of, or inability to account for, Confidential Information previously received, Executive will notify the Company and will reasonably cooperate with the Company's efforts to seek appropriate injunctive relief or otherwise to prevent or curtail such threatened or actual breach, or to recover its Confidential Information.

15.4 Executive shall ensure that all copyright or other proprietary notice or indication of confidentiality contained on or included in any item of Confidential Information shall be reproduced by Executive on any reproduction, modification or translation of such Confidential Information.

15.5 If Executive shall be under a legal obligation in any administrative or judicial circumstance to disclose any Confidential Information, Executive shall give the Company prompt notice thereof (unless it has a legal obligation to the contrary) so that the Company may seek a protective order or other appropriate remedy. In the event that such protective order is not obtained, Executive shall furnish only that portion of the information that is legally required and shall disclose the Confidential Information in a manner reasonably designed to preserve its confidential nature. Notwithstanding anything to the contrary contained herein, Executive may disclose the Company's Confidential Information at the request of any regulatory or supervisory authority having jurisdiction over it, provided that Executive requests confidential treatment of such information to the extent permitted by law.

15.6 Executive agrees that it will ensure that Confidential Information received hereunder or any materials derived from it are not disclosed or communicated to any individual or entity in any country to which the export of such information is prohibited by U.S. export laws or regulations.

15.7 There are important limitations on the confidentiality obligations described in this Section, which are set forth in Sections 15.7 of this Agreement and contained in 18 U.S.C. § 1833(b), the federal Defend Trade Secrets Act. Nothing in this Agreement: (i) prohibits, restricts, or impedes Executive from discussing the terms and conditions of employment (including wages, hours or working conditions) to the extent such rights cannot be waived by agreement; and/or (iii) prevents Executive from providing testimony as a witness in any proceeding, providing information or testimony as permitted by applicable law, or filing a charge or complaint with, maintaining the confidentiality of, or participating in or assisting with, an investigation or proceeding conducted by the Equal Employment Opportunity Commission, the National Labor Relations Board, the SEC, or any other federal, state, or local agency charged with the enforcement of any laws. Pursuant to 18 USC Section 1833(b), Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (I) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (II) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

16. Ownership and Assignment of Inventions.

16.1 Definitions. As used in this Agreement:

a. "Company Inventions" means all Inventions that (i) relate to the business or proposed business of the Company and that are discovered, developed, created, conceived, reduced to practice, made, learned or written by Executive, either alone or jointly with others, during the term of this Agreement; (ii) utilize, incorporate or otherwise relate to Confidential Information; or (iii) are discovered, developed, created, conceived, reduced to practice, made, or written by Executive using Company time, property or equipment.

b. "Intellectual Property Rights" means all intellectual property and industrial property rights of any kind whatsoever throughout the world, including but not limited to patent rights, copyrights (including but not limited to mask work rights), trademark rights, trade secret rights, and, if recognized, Moral Rights (where "Moral Rights" means all rights related to paternity, integrity, disclosure, and withdrawal), whether or not patentable or registrable under copyright or similar statutes.

c. "Inventions" means discoveries, developments, improvements, trade secrets, processes, formulas, data, lists, software programs, and all other works of authorship, mask works, ideas, concepts, know-how, designs, methodologies and techniques, whether or not any of the foregoing is or are patentable or registrable under copyright or any other intellectual property laws or industrial property laws in the United States or elsewhere.

d. "Ownership Rights" means all rights, title and interest (including but not limited to Intellectual Property Rights) in property, whether that property is tangible or intangible.

16.2 Assignment. Executive hereby irrevocably assigns to and vests all title, interest, and right in the Company of all of Executive's Ownership Rights in and to any and all Company Inventions and acknowledges that all Company Inventions shall be the sole property of the Company and that the Company shall be the sole owner of all Ownership Rights in connection therewith. Executive understands and agrees that the decision whether or not to commercialize or market any Company Inventions is within the Company's sole discretion and for the Company's sole benefit and that no royalty will be due to Executive as a result of the Company's efforts to commercialize or market any such Company Inventions.

16.3 Exception to Assignments. The provisions of this Agreement requiring assignment of Company Inventions to the Company does not apply to any Invention that (i) Executive has developed entirely on Executive's own time and not in any manner in the course of performing the Services to the Company without using the Company's equipment, supplies, facilities, trade secret information or Confidential Information (an "Other Invention"), (ii) does not relate at the time of conception or reduction to practice of such Other Invention to the business or proposed business of the Company, its products, or actual or demonstrably anticipated research or development of the Company, and (iii) does not result from any work that Executive performed for the Company. The Executive will advise the Company promptly in writing of any Invention that Executive believes constitutes an Other Invention.

16.4 License to Incorporated Inventions. The Executive agrees that Executive will not incorporate, or permit to be incorporated, any Other Invention owned by Executive or in which Executive has an interest into a Company Invention, product or service without the Company's prior written consent. Notwithstanding the foregoing sentence, if, during the term of this Agreement, Executive incorporates an Other Invention owned by Executive or in which Executive has an interest into a Company Invention, product or service or relies upon any such Other Invention in discovering, developing, creating, conceiving, or reducing to practice any Company Invention, Executive hereby unconditionally grants to the Company a non-exclusive, perpetual, irrevocable, worldwide, royalty-free, fully paid, assignable, right and license, with the right to sublicense through multiple levels of sublicensees, (i) to reproduce, create derivative works of, distribute, publicly perform, publicly display, digitally perform, transmit and display, and otherwise use such Other Invention, as applicable, in any medium or format, whether now known or hereafter discovered, as part of or in connection with such Company Invention, product or service, (ii) to use, make, have made, sell, offer to sell, import, and otherwise exploit such Other Invention, as applicable as part of or in connection with such Company Invention, product or service, and (iii) to exercise any and all other present or future rights in such Other Invention, as applicable, as part of or in connection with such Company Invention, product or service.

16.5 Maintenance of Records; Disclosure of Inventions. The Executive agrees to keep and maintain adequate and current written records of all Company Inventions made by Executive (solely or jointly with others) during the term of this Agreement, which records will remain the sole property of the Company. During the term of this Agreement, Executive will promptly disclose to the Company fully and in writing and will hold in trust for the sole right and benefit of the Company any and all Company Inventions. In addition, after termination of this Agreement, Executive will cooperate with the Company with respect to any patent applications and copyright registration applications (including but not limited to any mask work registration applications) filed by the Company that names Executive as an inventor, co-inventor, author, co-author, creator, co-creator, developer, or co-developer of a Company Invention, including signing any assignments necessary to reflect ownership in the Company.

16.6 Works of Authorship. The Executive acknowledges and agrees that any work of authorship that is made by Executive (either alone or jointly with others) during the term of this Agreement comprising Company Inventions shall be deemed to be a "***work made for hire***," as that term is defined in the United States Copyright Act (17 U.S.C. § 101), and shall be the sole and complete property of the Company. To the extent that any such work of authorship may not be deemed to be a work made for hire, Executive hereby irrevocably assigns and vests all title, interest, and right of all Executive's Ownership Rights in and to such work to the Company. If any such work of authorship cannot be assigned, Executive hereby grants to the Company an exclusive, assignable, irrevocable, perpetual, worldwide, sublicenseable (through one or multiple tiers), royalty-free, unlimited license to use, make, modify, sell, offer for sale, reproduce, distribute, create derivative works of, publicly perform, publicly display and digitally perform and display such work in any media now known or hereafter known. Outside the scope of the Services, Executive agrees not to (i) modify, adapt, alter, translate, or create derivative works from any such work of authorship or (ii) merge any such work of authorship with other Inventions or works of authorship. To the extent Moral Rights may not be assignable under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, Executive hereby irrevocably waives such Moral Rights and consents to any action of the Company that would violate such Moral Rights in the absence of such consent.

16.7 No License to Company Inventions. The Executive acknowledges and agrees that nothing in this Agreement shall be deemed to grant, by implication, estoppel or otherwise, (i) a license from the Company to Executive to make, use, license, or transfer in any way a Company Invention, or (ii) a license from the Company to Executive regarding any of the Company's existing or future Ownership Rights.

17. Mutual Non-Disparagement. To the maximum extent permitted by applicable law, Executive agrees not to disparage the Company or Releasees, including, without limitation, the Company's and/or a Releasee's current and former officer, directors, employees, agents, representative, investors, products, or services, in any manner likely to be harmful to them or their business, business reputation, or personal reputation. To the maximum extent permitted by applicable law, Company agrees to instruct its officers, directors, and employees not to disparage Executive in any manner likely to be harmful to the Executive or Executive's business or personal reputation. Notwithstanding the foregoing, Executive and Company (including each of its officers and directors) may respond accurately and fully to any request for information if required by legal process or in connection with a government investigation. In addition, nothing in this provision or this Agreement is intended to prohibit or restrain any party in any manner from making disclosures that are protected under the whistleblower provisions of federal law or regulation or under other applicable law or regulation.

18. Right to Legal Advice and ADEA Consideration Period. This Agreement is intended to comply with the OWBPA for the release of claims under the ADEA. Executive acknowledges receipt of this Agreement on October 31, 2025. Executive acknowledges that Executive is entitled to twenty-one (21) days to consider whether to sign this Agreement up to November 21, 2025 ("Consideration Period"). By accepting this Agreement, Executive acknowledges and agrees that Executive is waiving rights and claims under the ADEA, as well as any similar state law. The proposed terms of this Agreement shall not be amended, modified, or revoked by the Company during the Consideration Period. Executive may sign this Agreement or reject it at any time during the Consideration Period. If Executive signs this Agreement before the Consideration Period has ended, Executive has voluntarily waived any remaining Consideration Period and does so on a knowing and voluntary basis. The Consideration Period allows Executive time to consider whether to execute this Agreement and to seek the advice of legal counsel or other advisors to be able to make an informed decision. Executive has the right-and is hereby advised in writing-to consult an attorney about this Agreement before signing it. Executive and the Company agree that any changes, whether material or immaterial, do not restart the running of the twenty-one (21) day period, as permitted under applicable law. Executive understands that it is Executive's voluntary decision to sign before the end of the Consideration Period

19. Revocation of Agreement. Within seven (7) days of signing this Agreement, Executive may revoke it. This Agreement will not become effective and enforceable, and Executive will not receive the Severance, unless and until the seven (7)-day revocation period passes without such a written revocation. If Executive decides to revoke this Agreement, the revocation must be made in writing and delivered during the seven (7)-day period to Tim Burns, at Ideal Power Inc., 5508 Highway 290 West, Suite 120, Austin, Texas 78735.

20. Further Assurances. Executive will assist the Company in every proper way to obtain and from time to time enforce Ownership Rights relating to Company Inventions in any and all countries. To that end Executive will execute, verify, and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining, and enforcing such Ownership Rights and the assignment thereof. In addition, Executive will execute, verify, and deliver assignments of such Ownership Rights to the Company. The Executive's obligation to assist the Company with respect to Ownership Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of this Agreement, but the Company shall compensate Executive at a reasonable rate after such termination for the time actually spent by Executive at the Company's request on such assistance.

21. Attorney-in-Fact. In the event the Company is unable for any reason, after reasonable effort, to secure Executive's signature on any document needed in connection with the actions specified in the preceding paragraph, Executive hereby irrevocably designates and appoints the Company's and its assigns' duly authorized officers and agents as Executive's agent and attorney-in-fact, to act for and in Executive's behalf to execute, verify, and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph thereon with the same legal force and effect as if executed, verified, and filed by Executive. Executive hereby waives and quitclaims to the Company any and all claims, of any nature whatsoever, that Executive may have for infringement of any Ownership Rights assigned hereunder to the Company.

22. Term. The term of this Agreement is twelve (12) months from November 3, 2025 to November 2, 2026. Upon termination, Executive shall not be entitled to be reimbursed for the expenses incurred after such termination (expenses incurred prior to the date of termination shall be reimbursable). Upon any termination of this Agreement, all of the completed work and the work in progress prepared by Executive for the Company in the performance thereof shall become the property of the Company and shall be delivered to the Company at the time of termination. Sections 14 through 17, and 20 through 25 shall survive termination of this Agreement.

23. Executive Cannot Bind the Company. It is expressly agreed that Executive has no authority to act for or on behalf of the Company or to bind the Company to any contract or agreement or in any other manner without the prior express written approval of the Company. Nothing contained herein shall be construed to create a partnership, joint venture or association of any kind, nor shall Executive be considered as an employee or agent of the Company. Executive is an independent contractor with the responsibility for, and control over, the details and means of performing the Services required to be performed hereunder. Nothing contained in this Agreement shall be construed as constituting Executive as an agent or employee of the Company.

24. Negotiation of Dispute and Disagreements. In the event of any dispute or disagreement arising out of or relating to the implementation or performance of this Agreement which the Parties have been unable to settle or agree upon within 30 days after such dispute or disagreement arises, each Party shall nominate a senior representative to meet in Austin, Texas in an attempt to resolve such dispute or disagreement. Should the resolution of such dispute or disagreement not be obtained within 15 days after the meeting of senior representatives for such purpose, either Party may then submit the dispute to arbitration in accordance with the provisions of this paragraph upon providing proper notice. Any claim, dispute or controversy arising out of or relating to this Agreement shall be submitted to binding arbitration before a single arbitrator in accordance with the International Institute for Conflict Prevention and Resolution Rules for non-administered arbitration by a sole arbitrator. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The place of the arbitration shall be Travis County, Texas. Fourteen (14) calendar days before the hearing, the parties will exchange and provide to the arbitrator (i) a list of witnesses they intend to call (including any experts) with a short description of the anticipated direct testimony of each witness and an estimate of the length thereof, and (ii) premarked copies of all exhibits they intend to use at the hearing. Depositions for discovery purposes shall not be permitted. The costs and expenses of the arbitration (including reasonable attorneys' fees) will be borne by the losing Party unless the arbitrator determines that it would be manifestly unfair and determines a different allocation of costs.

25. Miscellaneous.

25.1 Governing Law. The validity, construction, interpretation and enforceability of this Agreement shall be determined and governed by the laws of the State of Texas.

25.2 Compliance with Applicable Law. Executive shall observe and abide by all applicable laws, including federal, state and local laws, regulations, ordinances, codes and other rules of governmental or any other duly constituted authority having jurisdiction over the Services. Executive agrees to defend, indemnify and hold the Company and its affiliates harmless (including expenses and reasonable legal fees) from any liability or penalty which may be imposed by reason of Executive's failure to observe and abide by applicable laws.

25.3 Validity. The invalidity or unenforceability of any provision of this Agreement as applied to a particular occurrence or circumstance shall not affect the validity or enforceability of any of the other provisions of this Agreement or the other applicability of such provision, as the case may be.

25.4 Understandings. The present instrument and the Schedule(s) incorporated herein contain all the conditions negotiated by and between the Parties with respect to the subject matter hereof and supersede any and all previous written and oral commitments and understandings between the Parties with respect to such subject matter.

25.5 Notices. Any notices, requests, demands or other communications hereunder from Executive shall be in writing and shall be deemed to have been duly given when delivered to the Company at the following addresses:

IDEAL POWER INC.
Attn: Chief Financial Officer
5508 Highway 290 West, Suite 120
Austin, TX 78735

Any notices, requests, demands or other communications hereunder from the Company shall be in writing and shall be deemed to have been duly given when delivered to Executive at an address provided by Executive no later than three (3) business days after the effective date of this Agreement.

Either Party may change its address for notices, requests, demands or other communications hereunder by notifying the other party in writing.

25.6 Indemnity; Limitation of Liability. Each Party (each, an "Indemnifying Party") agrees to indemnify and hold harmless the other Party and its directors, officers, stockholders and employees (each, an "Indemnified Party") from and against any loss or liability, including attorneys' fees, arising directly or indirectly from or in connection with (i) any negligent, reckless or intentionally wrongful act of such Indemnifying Party or its employees or agents, or (ii) any breach by such Indemnifying Party or its employees or agents of any of the covenants contained in this Agreement, in each case except to the extent such loss or liability is due to the negligence or willful misconduct of any Indemnified Party; provided, however, that each Party's aggregate liability under this Section 25.6 shall not exceed an amount equal to the aggregate compensation paid by the Company for the Services hereunder.

25.7 Acknowledgement. The Company hereby acknowledges and agrees that this Agreement does not contemplate the performance of legal services by Executive and Executive shall not be obligated to render any legal services to the Company.

25.8 No Waiver. Any failure by the Company or Executive, at any time, to enforce or to require the strict keeping and performance of any of the terms or conditions of this Agreement shall not constitute a waiver of such terms or conditions and shall not affect or impair such terms or conditions in any way or the right of the Company or Executive at any time to avail itself of such remedies as it may have for any breach or breaches of such terms or conditions. No term, condition or provision of any invoice, delivery ticket or other document submitted by Executive to the Company shall have the effect of modifying or waiving in any manner the provisions of this Agreement unless any such document shall be accepted and executed by an officer of the Company.

26. Force Majeure. Neither Party shall be liable for any failure to perform the terms of this Agreement when such failure is due to "force majeure" as hereinafter defined. The term "force majeure" as used in this Agreement shall mean any delay or default in performance due to any cause beyond the control of the Party claiming force majeure and without such Party's fault or negligence, including but not restricted to: acts of God or the public, civil disturbances, arrests and restraints by rulers and people; acts of the public enemy, terrorism, wars, riots, insurrections or sabotage; acts, requests or interruptions of the federal, state or local government or any agency thereof; court orders, present and future valid orders of any governmental authority or any officer, agency or any instrumentality thereof; floods, fires, storms, epidemics, landslides, lightning, earthquakes, washouts, explosions or quarantine; strikes, lockouts, or industrial disturbances; interruption of transportation, freight embargoes or delays in delivery of equipment or services necessary to the performance of any provision of this Agreement; or inability to secure right of way, labor shortages, breakage or accident to machinery or lines of pipe, or any other cause, whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming force majeure. Nothing contained in this paragraph, however, shall be construed to require either Party to settle a labor dispute against its will. If, as a result of force majeure, either Party is unable, wholly or in part, to carry out its obligations under this Agreement, then, upon such Party's giving notice and a description of such cause in writing to the other Party as soon as possible after the occurrence of the cause, the obligation of the Party giving such notice, so far as it is affected by the cause specified in such notice, shall be suspended for the duration of the cause. Such cause shall, as far as possible, be remedied with all reasonable dispatch.

27. Effect of Invalid Provision. Executive and the Company agree that, in the event any provision (or portion thereof), of this Agreement is determined to be invalid for any reason, such invalidity shall not affect the validity of any remaining language which can be given effect without the invalid provision.

28. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one instrument.

**SIGNATURE PAGE**

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first written above.

**COMPANY:**

**IDEAL POWER INC**

By: /s/ Michael C. Turmelle
Michael C. Turmelle
Chairman of the Board

.

**EXECUTIVE:**

By: /s/ R. Daniel Brdar
R. Daniel Brdar

**EXHIBIT A**
**Scope of Work**

The Parties have agreed that Executive will perform a variety of services for Company on an "as-requested" basis. Executive's responsibilities shall include, but are not necessarily limited to, assisting the incoming Chief Executive Officer and the Company with support and historical background information as needed in the following areas:

- Assistance with the transition process for employees
- Strategic supply chain relationships (e.g. senior management relationships with wafer fabs and packaging suppliers)
- Key consultants
- Investor relations
- New employee candidate screening
- In process patent prosecution and intellectual property historical support
- Other items, as mutually agreed upon by the Parties

**Exhibit 10.2**

# EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** ("Agreement"), which is made effective as of the 3rd day of November 2025 (the "Effective Date"), is made by and between Ideal Power Inc., a Delaware corporation, with headquarters located at 5508 Highway 290 West, Ste. 120, Austin, Texas 78735, hereinafter referred to as "Company", and David Somo, hereinafter referred to as "Executive." The purpose of this Agreement is to confirm the terms of the employment relationship between Company and Executive.

## ***RECITALS***

**WHEREAS,** Company wishes to retain the services of Executive, and Executive wishes to render services to Company, as its Chief Executive Officer and President and, until otherwise removed in accordance with Article IV, Section 4 of Company's bylaws, a member of Company's Board of Directors (for which position no additional compensation will be paid) (the "Board");

**WHEREAS,** Company and Executive wish to set forth in this Agreement the duties and responsibilities that Executive has agreed to undertake on behalf of Company, and the responsibilities that Company will owe to Executive.

**THEREFORE,** in consideration of the foregoing and of the mutual promises contained in this Agreement, Company and Executive (who are sometimes individually referred to as a "Party" and collectively referred to as the "Parties") agree as follows:

## ***AGREEMENT***

**1. TERM; POSITION.**

Company hereby employs Executive as Company's Chief Executive Officer and President, and Executive hereby accepts employment with Company pursuant to the terms of this Agreement, which will continue until terminated pursuant to Section 11 or 12 below.

**2. GENERAL DUTIES.**

Executive shall devote his time, ability, and attention to Company's business during Executive's employment, Executive shall report to the Board and agrees to keep the Board fully informed with regard to critical issues affecting the value and reputation of Company. Furthermore, in his capacity as Chief Executive Officer, Executive shall be primarily responsible for the exercise of the powers and the discharge of the duties of Company that are not reserved for the Board, and shall have authority and control over all personnel of Company, shall be responsible for managing the overall operations of Company and shall act as the main point of communication between the Board and Company's operations. Executive shall do and perform all services, acts, or things reasonably necessary or advisable to discharge his duties under this Agreement, and such other duties as are commonly performed by an employee of his rank in a publicly traded corporation or which may, from time to time, be prescribed by Company through the Board. Executive agrees to cooperate with and work to the best of his ability with Company's management team, which includes the Board and the officers and other employees, to continually improve Company's reputation in its industry for quality products and performance.

**3. NONSOLICITATION AND PROPRIETARY PROPERTY AND CONFIDENTIAL INFORMATION PROVISIONS.**

As a condition of his employment with Company, Executive has executed a Proprietary Information and Inventions Agreement ("PIIA"), the terms of which are included by reference into this Agreement.

**4. COMPLIANCE WITH SECURITIES LAWS.**

Executive acknowledges that he is subject to the provisions of Sections 10 and 16 of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder. Executive acknowledges that Sections 10 and 16 and the rules and regulations promulgated thereunder may prohibit Executive from selling or transferring his securities in Company. Executive agrees that he will comply with Company's policies, as stated from time to time, relating to selling or transferring Company's securities.

**5. COMPENSATION.**

**(a) Base Salary.** Executive will receive a base salary in the amount of $425,000/year. The salary paid during Executive's employment shall be referred to in this Agreement as the "Base Salary". The Base Salary shall be subject to any tax withholdings and/or employee deductions that are applicable. The Base Salary shall be paid to Executive in equal installments in accordance with the periodic payroll practices of the Company for its employees. The Base Salary will be subject to adjustment at the discretion of the Board no less frequently than annually.

**(b) Bonus.** In addition to the Base Salary, Executive shall be eligible to participate in a discretionary bonus program established and approved by the Board and/or its Compensation Committee (the "Program") and, pursuant to the Program, Executive may earn a cash bonus ("Bonus") on an annual or shorter performance period basis ("Bonus Performance Cycle") with a target amount of 100% of Executive's Base Salary. At least annually, the Compensation Committee of the Board (the "Compensation Committee") shall establish (i) performance targets, standards and goals ("Standards and Goals") to be met by Executive and (ii) the Bonus amounts payable based on the Standards and Goals that are achieved. Nothing in this subsection (b) shall prevent the Compensation Committee establishing alternatives to the computation of the Bonus, which may be approved and paid to Executive in place of the Bonus described herein. The Bonus shall be subject to any applicable tax withholdings and/or employee deductions and shall be paid on or before March 15th of the following calendar year; Given the retention aspects of the Bonus, and subject to the applicable provisions of Section 12(f) of this Agreement, the Bonus for any Bonus Performance Cycle shall not be earned unless Executive is employed on the day of payment of such Bonus.

**(c) Participation In Employee Benefit Plans.** Executive shall have the same rights, privileges, benefits and opportunities to participate in any of Company's employee benefit plans which may now or hereafter be in effect on a general basis for executive officers or employees. During Executive's employment, the Company shall provide, at Company's sole expense, medical and dental benefits for Executive, his spouse and children under the same policy or policies generally available to other executive officers of the Company. Company may also provide, at its sole expense (i) disability insurance which, in the event of Executive's disability, will replace no less than 60% of the Base Salary being paid to Executive at the time the disability occurred and (ii) life insurance in an amount to be agreed upon by the Board and Executive. Irrespective of the foregoing, Company may change any benefits contractor or change, alter, or terminate any benefit plans, rights, privileges, or opportunities at any time in its discretion, and any such change, alteration, or termination will not be a breach of this Agreement. In the event Executive receives payments from the disability insurer, Company shall have the right to offset such payments against the Base Salary otherwise payable to Executive during the period for which such payments are made.

**6. EQUITY COMPENSATION.**

**(a)** The Company will issue to Executive: (1) an award of restricted stock units of the Company ("RSUs") equivalent to 2.5% of the Fully Diluted Common Stock (as defined herein) outstanding as of the closing of the Nasdaq Capital Market on the Effective Date; and (2) an award of performance stock units of the Company ("PSUs") equivalent to 2.5% of the Fully Diluted Common Stock outstanding as of the closing of the Nasdaq Capital Market on the Effective Date (the RSUs and the PSUs collectively, the "Inducement Award"). The Inducement Award grant will occur after market close on the Effective Date. The RSUs will vest in equal increments over 3 years on each anniversary of the grant date and the PSUs will vest upon achievement of certain performance milestones to be set by the Board or the Compensation Committee. For purposes of this Agreement, "Fully Diluted Common Stock" means all issued and outstanding shares of the Company's common stock ("Common Stock"), plus all shares of Common Stock issuable upon the exercise, conversion, or exchange of any options, warrants, or other rights to acquire Common Stock and upon the conversion or exchange of any securities convertible into or exchangeable for Common Stock, in each case regardless of whether such options, warrants, rights, or other securities are then vested, exercisable, convertible, or in the money. The Inducement Award shall be subject to applicable tax withholding. The Parties intend that the Inducement Award be exempt from, or compliant with, Section 409A of the Internal Revenue Code of 1986, as amended.

**(b)** During Executive's employment and subject always to the discretion of the Compensation Committee, Executive may be eligible to receive additional equity awards under the Company's Amended and Restated 2013 Equity Incentive Plan (or any other equity incentive plan adopted by the Board or the Compensation Committee).

**7. REIMBURSEMENT OF EXPENSES.**

**(a) Reimbursement of Business Expenses.** Company shall promptly reimburse Executive for all reasonable business expenses incurred by Executive in connection with the business of Company. However, each such expenditure shall be reimbursable only if Executive furnishes to Company adequate records and other documentary evidence required by federal and state statutes and regulations issued by the appropriate taxing authorities for the substantiation of each such expenditure as an income tax deduction.

**(b) <u>Reimbursement of Moving and Temporary Living Expenses.</u>** Company shall reimburse Executive for all expenses associated with his relocation to Austin, Texas in an amount not to exceed $50,000. Eligible expenses for purposes of this Section 7(b) shall include, but not be limited to, apartment rent and initial furnishings, local transportation and car lease payments, initial utilities, fees, and deposits, reasonable temporary storage, and reasonable travel related to the initial relocation. Company will reimburse all such expenses within thirty (30) days after receipt of Executive's request for reimbursement Executive acknowledges that some reimbursements will be treated as taxable income subject to all applicable withholdings and deductions required by law. For those expenses deemed to be taxable, the Company shall make additional payments to Executive as are necessary to ensure Executive receives the full, intended amount after all taxes are deducted.

**8. <u>PAID TIME OFF</u>.**

Executive shall be entitled to four weeks of paid time off each year; provided, however, failure to use paid time off will prevent the accumulation of additional paid time off in excess of four weeks.

**9. <u>LIABILITY INSURANCE; INDEMNIFICATION OF LOSSES</u>.**

**(a) <u>Directors' and Officers' Liability Insurance</u>**. Company shall, at its sole expense, obtain and maintain directors' and officers' liability insurance ("D&O Insurance") providing coverage to Executive on terms that are no less favorable than the coverage provided to other similarly situated directors and senior offices of the Company as of the Effective Date. Upon any termination of coverage (including following a Change in Control or Executive's termination of employment for any reason), Company shall obtain a "tail" policy providing coverage, with terms no less favorable than the D&O Insurance in effect immediately prior to such termination.

**(b) <u>Indemnification</u>.** So long as Executive's actions were taken in good faith and in furtherance of Company's business and within the scope of Executive's duties and authority, Company shall indemnify and hold Executive harmless to the full extent of the law from any and all claims, losses and expenses sustained by Executive as a result of any action taken by him to discharge his duties under this Agreement, and Company shall defend Executive, at Company's expense, in connection with any and all claims by stockholders or third parties. The rights to indemnification provided in this Section 9(b) are not and will not be deemed exclusive of any other rights or remedies to which Executive may at any time be entitled under applicable law, the organizational documents of the Company or any of its subsidiaries, any agreement, or otherwise, and each such right under this Section 9(b) will be cumulative with all such other rights, if any.

**10. <u>PERSONAL CONDUCT</u>.**

Executive agrees to comply with all present and future policies, requirements, directions, requests and rules and regulations of Company in connection with Company's business. Executive further agrees to comply with all applicable laws and regulations and not at any time to commit any act or become involved in any situation or occurrence that would reasonably be expected to harm the reputation, business interests or operations of the Company. Notwithstanding the foregoing, no adverse action shall be taken under this Section 10 based on alleged, rumored, or media-reported conduct, unless, after notice to Executive and a reasonable opportunity to respond, the Board determines in good faith, based on reasonably verified facts, that Executive engaged in conduct that has had, or is reasonably likely to have, an adverse effect on the Company. For the avoidance of doubt, events outside Executive's control, including false, manipulated, or content generated by artificial intelligence (including, but not limited to, "deep fakes"), or lawful off-duty conduct that does not adversely affect the Company's reputation, business interests or operations, shall not constitute a violation of this Section 10.

**11. <u>TERMINATION FOR CAUSE</u>.**

The Company may terminate Executive for cause immediately, without notice, if Company reasonably concludes that Executive has committed fraud, theft, embezzlement, misappropriation of Company funds or other property, or any felony. The Company may also terminate Executive for cause for any of the following:

(a) Breach by Executive of any material provision of this Agreement;

(b) Violation by Executive of any statutory or common law duty of loyalty to Company under applicable law; or

(c) A material violation by Executive of Company's employment policies and/or Code of Business Conduct and Ethics; or

(d) Commission of such acts of dishonesty, gross negligence, or willful misconduct as would prevent the effective performance of Executive's duties or which result in material harm to Company or its business.

The Company may terminate this Agreement for cause by giving written notice of termination to Executive, provided, however, if the Company determines Executive to be in default of this Agreement under subsection (a) or (c) above, the Company shall deliver a written demand that identifies the manner in which the Company believes that Executive is in default, and Executive shall have a period of 30 days to correct the alleged default. Upon termination for cause, the obligations of Executive and Company under this Agreement shall immediately cease. Such termination shall be without prejudice to any other remedy to which Company may be entitled either at law, in equity, or under this Agreement. If Executive's employment is terminated pursuant to this paragraph, Company shall pay to Executive (i) Executive's accrued but unpaid Base Salary and the value of unused paid time off through the effective date of the termination; and (ii) business expenses incurred prior to the effective date of termination. Executive shall not be entitled to continue to participate in any employee benefit plans except to the extent provided in such plans for terminated participants, or as may be required by applicable law.

**12. <u>OTHER TERMINATIONS</u>.**

**(a) <u>Death</u>.** Executive's employment shall terminate upon the death of Executive. Upon such termination, the obligations of Executive and Company under this Agreement shall immediately cease.

**(b) <u>Disability</u>.** The Company reserves the right to terminate Executive's employment upon 30 days written notice if, for a period of 90 days, Executive is prevented from discharging his substantial or material duties due to any physical or mental disability, except otherwise required by law.

**(c) <u>Election By Executive</u>.** Executive's employment may be terminated at any time by Executive for any reason upon not less than 30 days written notice by Executive to the Board. A termination by Executive for Good Reason (as defined herein) pursuant to Section 12(d) shall not be deemed a termination by Executive pursuant to this Section 12(c).

**(d) <u>Election By Company or by Executive for Good Reason</u>.** Executive's employment may be terminated at any time by Company without cause upon not less than 30 days written notice by the Company to Executive. Executive may terminate his employment hereunder for Good Reason, and, except as provided in Section 12(e), any such termination shall be deemed a termination by Company without cause pursuant to this Section 12(d). For purposes of this Agreement, "Good Reason" shall mean: (a) a material reduction in Base Salary or target Bonus opportunity (b) a material diminution in Executive's authority, duties, or responsibilities; (c) a requirement to relocate Executive's principal work location by more than fifty (50) miles (other than the relocation contemplated in connection with Executive's hire); or (d) a material breach by Company of this Agreement; provided that Executive provides written notice within thirty (30) days after the initial occurrence, the Company fails to cure within thirty (30) days after receipt of such notice, and Executive resigns within thirty (30) days after the cure period ends. For the avoidance of doubt, "Good Reason" will not exist (i) if the Company places Executive on administrative leave, a temporary suspension or similar leave pending the Company's investigation into potential misconduct or violation of Company policy by Executive , or (ii) due to termination pursuant to Sections 11 or 12(a)-(c). This administrative leave, temporary suspension,or similar leave cannot exceed sixty (60) days in any case.

**(e) <u>Termination Due to a Change in Control</u>.** Executive's employment may be terminated upon a Change in Control. For purposes of this Agreement, the term "Change in Control" shall mean the sale or disposition by Company to an unrelated third party of substantially all of its business or assets, or the sale of the capital stock of Company in connection with the sale or transfer of a Controlling Interest in Company to an unrelated third party, or the merger or consolidation of Company with another corporation as part of a sale or transfer of a Controlling Interest in Company to an unrelated third party. For purposes of this definition, the term "Controlling Interest" means the sale or transfer of Company's securities representing at least 50.1% of the voting power. It will be presumed that a termination by Company is a termination under this subsection (e) if Executive's employment is terminated by Company, or Executive resigns for Good Reason, during the period that begins when negotiations for the Change in Control begin (but no earlier than three months prior to such Change in Control) and ends on the 9-month anniversary of the closing of the Change in Control transaction (the "Protection Period") and such termination is not a termination for cause pursuant to Section 11 or a termination resulting from Executive's death, disability or election pursuant to subsections (a), (b) or (c) of this Section 12.

**(f) <u>Effect of Various Terminations; Severance.</u>**

(i) If Executive's employment is terminated pursuant to subsections (a), (b), or (c) of this paragraph, Company shall pay to Executive (i) Executive's accrued but unpaid Base Salary and the value of unused paid time off through the effective date of the termination; and (ii) all expenses incurred pursuant to Section 7 of this Agreement prior to the effective date of termination ("Reimbursable Expenses"). Executive shall not be entitled to continue to participate in any employee benefit plans except to the extent provided in such plans for terminated participants, or as may be required by applicable law.

(ii) If Executive's employment is terminated pursuant to subsection (d) of this paragraph, Company shall pay to Executive: (A) Executive's accrued but unpaid Base Salary and the value of unused paid time off through the effective date of the termination; (B) all Reimbursable Expenses; (C) a severance payment ("Severance") equal to 12 months of Executive's Base Salary as of the date of termination, contingent upon Executive first signing and not revoking a general release of claims in the form attached to this Agreement as <u>Exhibit A</u> (the "Release") within thirty days of Executive's termination of employment and otherwise complying with all other provisions of this Agreement, including the PIIA (the "Prerequisites"). The Severance shall be paid over time in equal installments, with the first payment made on the thirtieth day following Executive's termination and subsequent payments made on Company paydays during the 12-month severance period (the "Severance Period"), provided Executive has satisfied the Prerequisites; (D) payment of the amount of annual Bonus that the Executive would have otherwise received due to meeting some or all of the bonus goals and objectives, but did not receive due to his termination without cause before the Bonus payment date, which shall be payable at the time Company normally pays the Bonus provided that (I) Executive met some/all of the Standards and Goals outlined by the Compensation Committee for the applicable Bonus, with the determination of meeting any subjective portion of the Bonus standards and goals to be determined by the Board in its good-faith sole discretion, (II) Executive was terminated by Company without cause or resigned for Good Reason prior to the Bonus payment date, and (III) Executive has satisfied the Prerequisites; (E) provided Executive timely elects to continue his health insurance through the applicable provisions of COBRA and satisfies the Prerequisites, Company agrees to pay directly to the Company's COBRA administrator as and when due the cost for the COBRA premiums for coverage through the earliest to occur ("COBRA Premiums"): (I) the Severance Period (as defined herein); (II) the date on which Executive is no longer eligible for COBRA continuation coverage, and (III) the date on which Executive is eligible for group health insurance coverage through another employer that applies to Executive ("COBRA Subsidy Period"); *provided, however*, that if (1) any plan pursuant to which such benefits are provided is not, or ceases prior to the expiration of the COBRA Subsidy Period to be, exempt from the application of Section 409A under Treasury Regulation Section 1.409A-1(a)(5), (2) the Company is otherwise unable to continue to cover Executive or Executive's dependents under its group health plans, or (3) the Company cannot provide the benefit without violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), then, in such case, the Company will pay to Executive each month the amount the Company would otherwise pay to the COBRA administrator, subject to tax withholdings and deductions, with the payment made on the last day of each month over the remainder of the COBRA Subsidy Period. Vesting of RSUs will continue during the Severance Period. If Executive does not satisfy the Prerequisites, then Executive will not have any right or entitlement to the payments and benefits outlined in 12(f)(ii)(C)-(E).

(iii) If Executive's employment is terminated pursuant to subsection (e) of this Section 12, Executive shall receive (i) Executive's accrued but unpaid Base Salary and the value of unpaid time off through the effective date of the termination; (ii) all Reimbursable Expenses; and (iii) the Severance and COBRA Premiums (as defined above) that Executive would receive under a termination pursuant to subsection (d) of this Section 12, provided the Prerequisites have been satisfied. In addition, any equity award that is scheduled to vest any time after the termination of Executive's employment will vest immediately upon the termination of Executive's employment pursuant to this subsection (e).

(iv) Subject to Section 12(e), all other rights Executive has under any benefit or stock option plans and programs shall be determined in accordance with the terms and conditions of such plans and programs. The Change in Control vesting and acceleration terms in Section 12(e) shall control should there be a conflict with any applicable equity incentive plan and award agreements covering Executive, which shall not be interpreted, amended or enforced to diminish the benefits provided herein.

(v) With the exception of the terms of this paragraph 12 and any obligations, duties and responsibilities Executive has under the PIIA, upon termination of Executive's employment the obligations of Executive and Company under this Agreement shall immediately cease.

**13. MISCELLANEOUS.**

**(a) Preparation of Agreement.** It is acknowledged by each Party that such Party either had separate and independent advice of counsel or the opportunity to avail itself or himself of same. In light of these facts it is acknowledged that no Party shall be construed to be solely responsible for the drafting hereof, and therefore any ambiguity shall not be construed against any Party as the alleged draftsman of this Agreement.

**(b) Cooperation.** Each Party agrees, without further consideration, to cooperate and diligently perform any further acts, deeds and things and to execute and deliver any documents that may from time to time be reasonably necessary or otherwise reasonably required to consummate, evidence, confirm and/or carry out the intent and provisions of this Agreement, all without undue delay or expense.

**(c) Interpretation.**

(i) Entire Agreement/No Collateral Representations. Each Party expressly acknowledges and agrees that this Agreement, including all exhibits attached hereto and the PIIA Executive signed concurrently with this Agreement, which is expressly incorporated herein by reference: (1) is the final, complete and exclusive statement of the agreement of the Parties with respect to the subject matter hereof; (2) supersedes any prior or contemporaneous agreements, promises, assurances, guarantees, representations, understandings, conduct, proposals, conditions, commitments, acts, course of dealing, warranties, interpretations or terms of any kind, oral or written, including but not limited to the Former Agreement (collectively and severally, the "Prior Agreements"), and that any such prior agreements are of no force or effect except as expressly set forth herein; and (3) may not be varied, supplemented or contradicted by evidence of Prior Agreements, or by evidence of subsequent oral agreements. Any agreement hereafter made shall be ineffective to modify, supplement or discharge the terms of this Agreement, in whole or in part, unless such agreement is in writing and signed by the Party against whom enforcement of the modification or supplement is sought.

(ii) Waiver. No breach of any agreement or provision herein contained, or of any obligation under this Agreement, may be waived, nor shall any extension of time for performance of any obligations or acts be deemed an extension of time for performance of any other obligations or acts contained herein, except by written instrument signed by the Party to be charged or as otherwise expressly authorized herein. No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof, or a waiver or relinquishment of any other agreement or provision or right or power herein contained.

(iii) Remedies Cumulative. The remedies of each Party under this Agreement are cumulative and shall not exclude any other remedies to which such Party may be lawfully entitled.

(iv) Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be determined to be invalid, illegal or unenforceable under present or future laws effective during the term of this Agreement, then and, in that event: (A) the performance of the offending term or provision (but only to the extent its application is invalid, illegal or unenforceable) shall be excused as if it had never been incorporated into this Agreement, and, in lieu of such excused provision, there shall be added a provision as similar in terms and amount to such excused provision as may be possible and be legal, valid and enforceable, and (B) the remaining part of this Agreement (including the application of the offending term or provision to persons or circumstances other than those as to which it is held invalid, illegal or unenforceable) shall not be affected thereby and shall continue in full force and effect to the fullest extent provided by law.

(v) No Third Party Beneficiary. Notwithstanding anything else herein to the contrary, the parties specifically disavow any desire or intention to create any third party beneficiary obligations, and specifically declare that no person or entity, other than as set forth in this Agreement, shall have any rights hereunder or any right of enforcement hereof.

(vi) Headings; References; Incorporation; Gender. The headings used in this Agreement are for convenience and reference purposes only, and shall not be used in construing or interpreting the scope or intent of this Agreement or any provision hereof. References to this Agreement shall include all amendments or renewals thereof. Any exhibit referenced in this Agreement shall be construed to be incorporated in this Agreement. As used in this Agreement, each gender shall be deemed to include the other gender, including neutral genders or genders appropriate for entities, if applicable, and the singular shall be deemed to include the plural, and vice versa, as the context requires.

**(d) Enforcement.**

(i) Applicable Law. This Agreement and the rights and remedies of each Party arising out of or relating to this Agreement (including, without limitation, equitable remedies) shall be solely governed by, interpreted under, and construed and enforced in accordance with the laws (without regard to the conflicts of law principles thereof) of the State of Texas, as if this agreement were made, and as if its obligations are to be performed, wholly within the State of Texas.

(ii) Consent to Jurisdiction and Venue. Any action or proceeding arising out of or relating to this Agreement shall be filed in and heard and litigated solely before the state courts of Texas within Travis County.

(iii) Attorneys' Fees. If court proceedings are required to enforce any provision of this Agreement, the substantially prevailing or successful Party shall be entitled to an award of the reasonable and necessary expenses of litigation, including reasonable attorneys' fees.

**(e) No Assignment of Rights or Delegation of Duties by Executive.** Executive's rights and benefits under this Agreement are personal to him and therefore (i) no such right or benefit shall be subject to voluntary or involuntary alienation, assignment or transfer; and (ii) Executive may not delegate his duties or obligations hereunder.

**(f) Notices.** Unless otherwise specifically provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (collectively and severally called "Notices") required or permitted to be given hereunder, or which are given with respect to this Agreement, shall be in writing, and shall be given by: (A) personal delivery (which form of Notice shall be deemed to have been given upon delivery), (B) by private overnight delivery service (which forms of Notice shall be deemed to have been given upon confirmed delivery by the delivery agency), or (C) by mailing in the United States mail by registered or certified mail, return receipt requested, postage prepaid (which forms of Notice shall be deemed to have been given upon the 5th business day following the date mailed). Notices shall be addressed to the address hereinabove set forth in the introductory paragraph of this Agreement, or to such other address as the receiving Party shall have specified most recently by like Notice, with a copy to the other Parties hereto. Any Notice given to the estate of a Party shall be sufficient if addressed to the party as provided in this subparagraph.

**(g) Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument, binding on all parties hereto. Any signature page of this Agreement may be detached from any counterpart of this Agreement and reattached to any other counterpart of this Agreement identical in form hereto by having attached to it one or more additional signature pages.

**(h) Execution by All Parties Required to be Binding; Electronically Transmitted Documents**. This Agreement shall not be construed to be an offer and shall have no force and effect until this Agreement is fully executed by all Parties hereto. If a copy or counterpart of this Agreement is originally executed and such copy or counterpart is thereafter transmitted electronically by facsimile or similar device, such facsimile document shall for all purposes be treated as if manually signed by the Party whose facsimile signature appears.

*[Remainder of page left intentionally blank]*

*[Signature page follows]*

**IN WITNESS WHEREOF**, the parties have executed this Agreement.

**Company:**
**IDEAL POWER INC.**

/s/ Michael C. Turmelle
Michael C. Turmelle
Chairman of the Board of Directors

**Executive**:

/s/ David Somo

**EXHIBIT A**

**FORM OF GENERAL RELEASE OF CLAIMS**

# CONFIDENTIAL SEPARATION AGREEMENT AND GENERAL RELEASE

**1. Intent.** This is a Confidential Separation Agreement and General Release (the "***Agreement***") between **David Somo** ("***Executive***") and **Ideal Power Inc.** (the "***Company***") concerning Executive's separation from employment with the Company. Executive and the Company shall be collectively referred to herein as the "***Parties***," or may be referred to individually as, a "***Party***". Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Employment Agreement entered into between Executive and the Company effective as of November 3, 2025 (the "***Employment Agreement***").

**2. Wages and Notice.** The Company has notified Executive that Executive's employment shall end effective ________________ (the "***Separation Date***"). Within six (6) days following the Separation Date, the Company will pay Executive all accrued but unpaid wages (including any accrued bonuses, commissions, and other compensation), due to Executive for services through the Separation Date. Executive is entitled to receive the accrued but unpaid wages even if Executive does not sign this Agreement and accept the Severance Package identified below in Section 4. Executive acknowledges that Executive is not entitled to any other payments or compensation from the Company except as identified in and provided by this Agreement and the Employment Agreement.

**3. Benefits.** Unless expressly set forth in Section 4 below, this Agreement does not affect Executive's rights to receive the vested benefits under the Company's employee benefit plans, including any retirement and equity compensation plans. Executive's rights to benefits under those plans are governed by the terms of those plans. Executive's rights to elect continued group health insurance coverage is governed by the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("***COBRA***") and any state laws of similar effect. The Company will provide information about electing such coverage in a separate notice.

**4. Severance Package.** In consideration for Executive's promises and obligations under this Agreement, including the General Release of Claims in Section 5, the Company will provide the following payments and benefits as severance (the "***Severance Package***"):

**a.** The Company will continue to pay Employee's base salary on the normal payroll schedule for the first twelve (12) months after the Separation Date, subject to applicable withholdings and deductions, provided that no amount will be paid prior to the Effective Date. On the first regular payroll pay date following the 30th day after the Separation Date, the Company will pay all amounts that would otherwise have been paid under the prior sentence through such date with the balance of the payments made thereafter on the normal payroll schedule.

**b.** If Executive timely elects continued group health insurance coverage under COBRA, the Company will pay directly to the Company's COBRA administrator as and when due the premiums for such coverage for Executive for coverage through the earliest to occur of (i) the end of the first twelve (12) months of such coverage, (ii) the date on which Executive is no longer eligible for COBRA continuation coverage, and (iii) the date on which Executive is eligible for group health insurance coverage through another employer (the "***COBRA Subsidy Period***"); *provided, however*, that if (1) any plan pursuant to which such benefits are provided is not, or ceases prior to the expiration of the COBRA Subsidy Period to be, exempt from the application of Section 409A under Treasury Regulation Section 1.409A-1(a)(5), (2) the Company is otherwise unable to continue to cover Executive under its group health plans or (3) the Company cannot provide the benefit without violating applicable law (including, without limitation, Section 2716 of the Public Health Service Act), then, in such case, the Company will pay to Executive each month the amount the Company would otherwise pay to the COBRA administrator, subject to tax withholdings and deductions, with the payment made on the last day of each month over the remainder of the COBRA Subsidy Period.

**c.** If applicable, the Company will pay a pro-rata share of the Bonus (if any) pursuant to Section 12(f)(ii)(D) of the Employment Agreement at the time the Company normally pays the Bonus.

**d.** In the event Executive's employment is terminated by Company without cause or Executive terminates his employment for Good Reason pursuant to Section 12(d) of the Employment Agreement, then Executive's RSU grants will continue vesting during the 12-month severance period (the "***Severance Period***").

**e.** The value of unpaid time off through the Separation Date.

**f.** The Reimbursable Expenses.

**g.** In the event Executive's employment is terminated by Company without cause or Executive terminates his employment for Good Reason pursuant to Section 12(e) of the Employment Agreement, any equity award, including, but not limited to, any unvested RSUs, PSUs, and any unvested equity underlying the Inducement Award, that is scheduled to vest any time after the Separation Date, will: (i) with respect to any unvested RSUs, fully and immediately vest; and (ii) with respect to any unvested PSUs, immediately vest as if the performance goals with respect to each such award had been achieved at the target level of performance.

Executive acknowledges that Executive is entitled to the Severance Package only by entering this Agreement and having it becoming effective in accordance with its terms. Executive further acknowledges that the Severance Package constitutes sufficient consideration for Executive's promises and obligations in this Agreement.

**5. General Release of Claims.** In consideration of the Severance Package and other valuable consideration provided herein, Executive shall and hereby does fully release the Company from any and all legal claims, whether known or unknown, suspected or unsuspected, that might arise from acts or omissions, which occurred up to and including the date Executive signs this Agreement. This release covers Company and all of its parent companies, subsidiaries, predecessors, affiliates, and present and former owners, directors, officers, employees, attorneys, insurers, accountants, tax advisors, managing agents, agents, successors, investors, assignees, and all other representatives of the Company, individually and in their corporate or other representative capacities (hereinafter these released parties are referred to collectively as "***Releasees***"). The claims released here against Releasees include, without limitation:

**a.** Any claim for damages, fees, costs, equitable relief, restitution, or for any other kind of remedy, arising out of Executive's relationship with and contacts with the Company and Releasees.

**b.** Any claims in federal, state, or local statutory or common law, including ordinances, regulations, and wage orders relating to Executive's employment with the Company and Executive's separation from employment, including, without limitation: (i) claims for any form of discrimination, harassment, retaliation, wrongful termination, failure to accommodate, failure to provide leave, or notice regarding employment status, including any claims under: the Employee Retirement Income Security Act; the National Labor Relations Act; Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Civil Rights Act of 1866 including but not limited to Section 1981 and 1983; the Rehabilitation Act of 1973; the Americans with Disabilities Act; the Genetic Information Nondiscrimination Act; the Immigration Reform and Control Act; the Age Discrimination in Employment Act ("***ADEA***"); the Older Workers Benefit Protection Act ("***OWBPA***"); the Worker Adjustment and Retraining Notification Act ("***WARN***"); the Family and Medical Leave Act; the Fair Credit Reporting Act; the Uniformed Services Employment and Reemployment Rights Act; the Occupational Safety and Health Act; the Families First Coronavirus Response Act; any state and local employment laws regarding COVID-19; the Texas Labor Code, including the Texas Commission on Human Rights Act; all local laws that may be legally waived, all including any amendments and their respective implementing regulations, and any other state or local law (statutory, regulatory, or otherwise) that may be legally waived and released; and the Constitutions of the State of Texas and the United States; (ii) claims relating to the payment of wages, salary, compensation, or penalties under any local, state, or federal law, statute, regulation, or ordinance, including any claims under: the Federal Fair Labor Standards Act; the Texas Payday Law (Chapter 61 of the Texas Labor Code); and the Equal Pay Act; (iii) breach of contract; breach of the implied covenant of good faith and fair dealing (to the extent such covenant is recognized under Texas law); violation of any privacy right; defamation; libel; slander; intentional and negligent infliction of emotional distress; (iv) any and all claims for equitable relief, restitution, and other money damages and damages; (v) any and all claims for attorney's fees and/or costs; and (vi) any other legal limitation on the employment relationship. The identification of specific statutes is for purposes of example only, and the omission of any specific statute or law shall not limit the scope of this general release in any manner.

**c.** For avoidance of doubt, this Agreement releases any claims Executive may have related to Executive's employment with the Company, including, but not limited to, any claims for severance pay, breach of contract, salary, bonus pay, commissions, incentive pay, overtime pay, final wages, minimum wages, off-the-clock work, penalties, or any pay, premium, or penalty provided for under the Fair Labor Standards Act, the Texas Payday Law (Chapter 61 of the Texas Labor Code), and any other applicable wage-and-hour statute (collectively "***Wages***"). By accepting this Agreement, Executive acknowledges that the Company disputes any claim Executive may have for Wages, whether known or unknown. Executive does not contend that the Company's dispute is anything other than a bona fide (meaning a genuine and good faith) dispute.

**d.** The Company intends to pay, and shall pay to, Executive within six (6) days of the Separation Date, all compensation due through the Separation Date as set forth above, and Executive has received all compensation; thus, any claim by Executive, or made on Executive's behalf for further, other, or additional compensation or reimbursement is subject to, and will constitute, a good faith dispute.

**e.** Executive agrees that, to the extent rights that may exist under any statute or regulation encompassed in this Section cannot be released as a matter of law, Executive waives the right to recover anything under such statutes or regulations to the maximum extent permitted by applicable law, and Executive further agrees to provide reasonable assistance if any released claim requires judicial approval or requires the submission of any documents to any governmental agency.

Notwithstanding any provision to the contrary in this Section 5 or elsewhere in this Agreement, this release by Executive does not apply to or cover: (a) any claim or right Executive cannot waive as a matter of law, such as rights to workers' compensation benefits, unemployment benefits, vested benefits under the Company's benefit plans, claims against the Company for breach of its obligations under this Agreement, claims for indemnification, or any claims that might arise after the Effective Date; (b) to the extent not covered by subsection (a) of this Section 5, (i) any rights to receive any payments or benefits to which Executive is entitled under COBRA, (ii) Executive's rights to payment of all amounts and benefits provided for under the Employment Agreement or any other compensation or employee benefit plans in which Executive is eligible to participate at the time of execution of this Agreement, (iii) any rights or claims that may arise as a result of events occurring after the date this Agreement is executed, any indemnification and advancement rights Executive may have as a former employee, officer, or director of the Company or its subsidiaries or affiliated companies, including, without limitation, any rights arising pursuant to the articles of incorporation, bylaws, or any other organizational documents of the Company or any of its subsidiaries, (iv) any claims for benefits under any directors' and officers' liability policy maintained by the Company or its subsidiaries or affiliated companies in accordance with the terms of such policy, and (v) any rights as a holder of equity securities, whether vested or unvested, of the Company.

**6. Reserved.**

**7. Promise Not to Sue.** Executive represents that Executive has not filed any complaints, charges, or lawsuits against the Company or Releasees with any governmental agency (excluding the Securities and Exchange Commission ("***SEC***")) or any court. For avoidance of doubt, this Section and Agreement do not require Executive to disclose or make any representation as to any prior communications or other dealings with the SEC, and nothing in this Section and Agreement prohibits Executive from communicating with or providing information to the SEC under Section 21F of the Securities Exchange Act. Executive agrees that Executive will not initiate any actions (in civil court or arbitration) regarding the claims released under this Agreement, whether on Executive's own behalf or in a class or representative capacity, and will not be a member of a class or other collective mechanism with respect to any released claims (including, but not limited to, claims pursuant to any unfair competition law of any jurisdiction), and warrants and represents that Executive will take all steps necessary to ensure that Executive is not a member of a class or collective with respect to such claim.

**8. Reaffirmation of Obligations Regarding Proprietary Information.** Executive acknowledges that, during Executive's employment with the Company, Executive has received confidential and proprietary information that belongs to the Company. Executive represents and warrants that Executive has complied with, and is currently in compliance with, the obligations contained in Executive's Proprietary Information and Invention Assignment Agreement (the "***Confidentiality Agreement***"), which is attached as **Attachment A**, and Executive hereby reaffirms and agrees that the Confidentiality Agreement is fully valid, supported by mutually agreed-upon consideration, and enforceable and shall remain in full force and effect following Executive's Separation Date. There are important limitations on the confidentiality obligations described in this Section and in the Confidentiality Agreement, which are set forth in Sections 7 and 12 of this Agreement and contained in 18 U.S.C. § 1833(b), the federal Defend Trade Secrets Act. Nothing in this Agreement or the Confidentiality Agreement is intended to penalize, prevent, hinder, or discourage any disclosure protected by those sections. Accordingly, Executive may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

**9. Supervisor or Manager Under the NLRA.** Executive acknowledges and agrees that Executive qualifies as a supervisor and/or manager under the National Labor Relations Act (the "***NLRA***"). Executive acknowledges and agrees that: (1) Executive's position included the authority, in the interest of the Company, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, and/or discipline other employees; to have responsibility for them; to adjust their grievances; and/or effectively to recommend such action; and/or (2) Executive formulated and effected management policies by expressing and making operative the decisions of the Company and had discretion in the performance of Executive's job independent of the Company's established policies. Executive further acknowledges and agrees that Executive's exercise of authority is not of a merely routine or clerical nature but requires the use of Executive's independent judgment.

**10. Confidentiality.** Executive agrees that the terms of this Agreement and the facts and matters giving rise to this Agreement are and shall remain confidential to the maximum extent permitted by applicable law. Executive shall not discuss or disclose the terms of this Agreement or the facts and matters giving rise to this Agreement to anyone, in any forum, through any means, except that Executive may disclose this Agreement and its terms to Executive's tax and legal advisors, immediate family, and as otherwise permitted by Sections 7 and/or 12 of this Agreement.

If Executive discloses this Agreement or its terms as permitted to Executive's tax and legal advisors and immediate family, Executive shall take reasonable steps to ensure that the recipient of this information complies with this confidentiality obligation. Only if compelled by lawful court order or subpoena may Executive otherwise disclose the terms of the Agreement. Executive may not utilize others to disclose the terms on Executive's behalf, and Executive may not post, blog, or use social media as a platform for disclosure. This Section is not intended to impose upon Executive the obligation to resist a court order, government order, or subpoena mandating disclosure of this Agreement or its terms. However, if this Agreement is intended to be offered for any purpose or pursuant to any compelled production, and so long as permitted by Sections 7 and 12, Executive agrees to notify the Company in writing at least seven (7) business days in advance of the proposed production of the Agreement to permit the Company and/or the Releasees to file protective motions or otherwise seek to protect their rights and interests, as necessary. Confidentiality is a material term of this Agreement.

**11. Non-disparagement and Neutral Job Reference.** To the maximum extent permitted by applicable law, Executive agrees not to make any written or oral disparaging statements (including on any social media platform) about the Company or Releasees, including, without limitation, the Company's and/or a Releasee's current and former officers, directors, employees, agents, representatives, investors, products, or services. The Company agrees that, in response to any inquiries by prospective employers, the Company will only provide dates of employment and job title/position held by Executive during Executive's employment with the Company so long as all requests are directed to [name, title] at the Company.

**12. Disclosure of Information**. Nothing in this Agreement, the Confidentiality Agreement, the Employment Agreement or any other agreement between Executive and the Company, or any Company policy:

**a.** Prevents Executive from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination, or any other conduct that Executive has reason to believe is unlawful.

**b.** Prohibits, restricts, or impedes Executive from discussing the terms and conditions of employment (including wages, hours or working conditions) to the extent such rights cannot be waived by agreement.

**c.** Prevents Executive from communicating, in any manner, with the SEC (including providing Proprietary Information, as defined in the Confidentiality Agreement, not otherwise protected from disclosure by any applicable law or privilege, such as the attorney-client privilege) or requires Executive to provide the Company notice when communicating, in any manner, with the SEC.

**d.** Prohibits Executive from providing truthful information (including Proprietary Information, as defined by applicable law and/or the Confidentiality Agreement, not otherwise protected from disclosure by any applicable law or privilege, such as the attorney-client privilege) or testimony to a governmental, judicial, regulatory, legislative, and/or administrative entity, agency, or court, or to third parties, such as when acting as a witness or participating in a legal investigation.

**e.** Prevents Executive from providing testimony as a witness in any proceeding, providing information or testimony as permitted by applicable law, or filing a charge or complaint with, maintaining the confidentiality of, or participating in or assisting with, an investigation or proceeding conducted by the Equal Employment Opportunity Commission, the National Labor Relations Board, the SEC, or any other federal, state, or local agency charged with the enforcement of any laws. By entering into this Agreement, however, Executive is waiving rights to individual relief based on claims asserted in such a charge or complaint. This waiver does not apply if it is otherwise prohibited by law, including whistleblower awards under Section 21F of the Securities Exchange Act. Notwithstanding the foregoing, Executive agrees to waive the right to receive future monetary recovery directly from the Company, other than as set forth in this Agreement. This waiver includes Company payments that result from any complaints or charges that Executive files with any governmental agency or that are filed on Executive's behalf.

**13. Return of Company Property.** By signing this Agreement, Executive represents and affirms that (a) Executive will return to the Company all property belonging to the Company, including, but not limited to, Proprietary Information (as defined in the Confidentiality Agreement) and any and all computers, laptops, cell phones, electronic devices, keys, keycards, files, hard-copy documents, documents, emails, chats, information and/or data stored in electronic files and/or electronic storage devices, USB drives, other electronic media, equipment, software, and any and all copies of such Proprietary Information and Company property, both electronic and hard copy, that were in Executive's possession, custody, or control (including on Executive's personal computers, cell phones, email accounts, cloud-based accounts, or other electronic storage devices); (b) Executive no longer possesses or has control over any Company property, including Proprietary Information; and (c) Executive has not made or distributed any copies, duplicates, reproductions, or excerpts of such materials. Executive further agrees to provide the Company with access to all Company-related computer files, software, accounts, computers, laptops, electronic storage devices, and any and all passwords needed to access those items. Executive further represents and affirms that Executive has not used or disclosed any Proprietary Information or other Company property for competitive purposes.

**14. Cooperation.** During the Severance Period, Executive agrees to reasonably cooperate with the Company, including any attorney or other consultant retained by the Company, in connection with any pending or future litigation, arbitration, business, or investigatory matter. The Parties acknowledge and agree that such cooperation may include, but shall in no way be limited to, Executive being available for interview by the Company, or any attorney or other consultant retained by the Company and providing to the Company any documents in Executive's possession or under Executive's control. The Company agrees to provide Executive with reasonable notice of the need for assistance and that such cooperation provided by Executive pursuant to this Section 14 may be performed remotely and will, to the extent practicable, not unreasonably interfere with Executive's subsequent employment, consulting, or personal commitments; cooperation may be provided remotely. Following the end of the Severance Period, the Company will compensate Executive for any cooperation obligations performed pursuant to this Section 14 at an hourly rate of $[650] per hour, billed in 0.25-hour increments. Notwithstanding any provision in this Section 14 or elsewhere in this Agreement to the contrary, Company shall, within thirty days after Executive submits a request to Company for the same, reimburse Executive for all reasonable and documented out-of-pocket expenses incurred during or after the Severance Period in connection with Executive's cooperation obligations pursuant to this Section 14.

**15. Section 409A.** The Parties intend that all payments and benefits in this Agreement are exempt from Section 409A of the US Internal Revenue Code of 1986, as amended (the "***Code***"), and any ambiguities will be interpreted to the greatest extent possible consistent with that intention. To the extent not so exempt, the Parties intend that all payments and benefits comply with Section 409A, and any ambiguities will be interpreted to the greatest extent possible consistent with that intention. Every payment, installment and benefit payable under this Agreement is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations. Executive shall have no right to control the timing of the payments under this Agreement. Notwithstanding anything to the contrary in this Agreement, the Company makes no guarantee or representation that payments provided for under this Agreement will be exempt from, or comply with, Section 409A and the Treasury Regulations promulgated thereunder. Notwithstanding the foregoing, if Executive is a "specified employee" within the meaning of Section 409A, then no amounts payable to Executive due to a separation from service, whether pursuant to this Agreement or otherwise, that are considered deferred compensation for purposes of Section 409A (together, the "***Deferred Payments***") will be paid until the date that is six (6) months and one (1) day following the date of Executive's separation from service, at which time all amounts previously due will be paid in a lump sum, with the balance paid on the original schedule.

**16. Tax Consequences**. The Company makes no representations or warranties with respect to the tax consequences of the payments and any other consideration provided to Executive or made on Executive's behalf under the terms of this Agreement. Executive agrees and understands that Executive is responsible for payment, if any, of local, state, and/or federal taxes on the payments and any other consideration provided hereunder by the Company and any penalties or assessments thereon. Executive further agrees to indemnify and hold the Company harmless from any claims, demands, deficiencies, penalties, interest, assessments, executions, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of (a) Executive's failure to pay or delayed payment of federal or state taxes, or (b) damages sustained by the Company by reason of any such claims, including attorneys' fees and costs.

**17. Right to Legal Advice and ADEA Consideration Period.** This Agreement is intended to comply with the OWBPA for the release of claims under the ADEA. Executive acknowledges receipt of this Agreement on [DATE]. Executive acknowledges that Executive is entitled to twenty-one (21) days to consider whether to sign this Agreement up to [DATE] ("***Consideration Period***"). By accepting this Agreement, Executive acknowledges and agrees that Executive is waiving rights and claims under the ADEA, as well as any similar state law. The proposed terms of this Agreement shall not be amended, modified, or revoked by the Company during the Consideration Period. Executive may sign this Agreement or reject it at any time during the Consideration Period. If Executive signs this Agreement before the Consideration Period has ended, Executive has voluntarily waived any remaining Consideration Period and does so on a knowing and voluntary basis. The Consideration Period allows Executive time to consider whether to execute this Agreement and to seek the advice of legal counsel or other advisors to be able to make an informed decision. **Executive has the right-and is hereby advised in writing-to consult an attorney about this Agreement before signing it.** Executive and the Company agree that any changes, whether material or immaterial, do not restart the running of the twenty-one (21) day period, as permitted under applicable law. Executive understands that it is Executive's voluntary decision to sign before the end of the Consideration Period.

**18. Revocation of Agreement.** Within seven (7) days of signing this Agreement, Executive may revoke it. This Agreement will not become effective and enforceable, and Executive will not receive the Severance, unless and until the seven (7)-day revocation period passes without such a written revocation. If Executive decides to revoke this Agreement, the revocation must be made in writing and delivered during the seven (7)-day period to [NAME], at [ADDRESS, EMAIL ADDRESS].

**19. Effective Date.** This Agreement becomes effective and binding eight (8) days after Executive signs and returns the fully and properly executed Agreement to the Company, so long as Executive has not revoked it ("***Effective Date***").

**20. Amendment.** This Agreement may not be modified or amended except in writing signed by Executive and an authorized executive of the Company.

**21. Choice of Law and Severability.** The laws of the State of Texas, without respect to its provisions for conflict of laws, shall govern this Agreement. If any provision in this Agreement is found to be illegal or unenforceable, it will not affect the remaining provisions, and the rest of this Agreement shall continue in effect to the fullest extent possible. Any court or tribunal of competent jurisdiction shall have the power to modify any illegal or unenforceable provision as necessary to comply with applicable law and to make this Agreement enforceable to the maximum extent allowed. If any portion of this Agreement or if the entire Agreement is found illegal, unenforceable, or invalid, the Parties agree to enter into a new agreement whereby Executive agrees to a valid, full and general release of claims.

**22. No Admissions.** The Parties agree that entering into this Agreement and their negotiations regarding this Agreement shall not be deemed or construed as an admission of fault, liability, or as the truth of any claim, demand, charge, cause of action, or alleged fact relating to the subject matter and terms of this Agreement.

**23. Entire Agreement.** This is the entire Agreement between Executive and the Company concerning Executive's separation from employment. It supersedes all prior agreements except the Confidentiality Agreement and the Employment Agreement, which continue in full force and effect according to their terms.

**24. Knowing and Voluntary Agreement.** Executive has read this Agreement, and understands its terms, including the fact that it releases any claim Executive might have against the Company, including claims under the ADEA. Executive acknowledges Executive has not relied on any statement or promise that is not written in this Agreement. Executive enters into this Agreement voluntarily and was not coerced into signing it; Executive agrees to all the Agreement's terms and significance, knowingly, deliberately, without duress or reservation of any kind, and after having given the matter full and careful consideration. Executive understands Executive is not waiving any rights or claims that may arise after the date on which this Agreement is executed, and Executive is executing this Agreement, including the waiver and release, in exchange for good and valuable consideration in addition to anything of value to which Executive is otherwise entitled. Executive was advised in writing, through this Agreement, to consult with an attorney of Executive's choice about this Agreement, and Executive has had an opportunity to consult counsel of Executive's choice, if Executive so desires, and Executive has either done so or voluntarily chosen not to do so.

**25. Counterparts.** This Agreement may be executed in counterparts and each counterpart, when executed, shall have the legal effect of a second original. Photographic or facsimile copies of any such signed counterparts may be used in lieu of the original for any purpose. The Parties mutually agree to use electronic signature technology to expedite the execution of this Agreement, pursuant to the Electronic Signatures in Global National Commerce Act, the Uniform Electronic Transaction Act, and/or any other applicable state or local law, and such electronic signatures will be enforceable as if original/handwritten.

**AGREEING TO AND ACCEPTING ALL OF THE PRECEDING TERMS:**

**David Somo**

______________________________
Signature

______________________________
Date

**Ideal Power Inc.**

______________________________
Signature of Company Representative

______________________________
Printed Name

______________________________
Date

**Exhibit 99.1**

Ideal Power

# Ideal Power Appoints David Somo as President and Chief Executive Officer

AUSTIN, TX - November 3, 2025 -- Ideal Power Inc. (Nasdaq: IPWR) ("Ideal Power," the "Company," "we," "us" or "our"), developer and innovative provider of the highly efficient and broadly patented B-TRAN® bidirectional semiconductor power switch, today announced that its Board of Directors appointed David Somo as President and Chief Executive Officer effective November 3, 2025. Somo, who also joined the Company's Board of Directors, succeeds Dan Brdar, who retired as President and CEO and from the Board on November 2, 2025.

"We are delighted that David is joining us as President and CEO at a time when we are commercializing our innovative, low-loss bidirectional power semiconductor technology. He brings a deep understanding of global sales and marketing, business development, corporate strategy and new product development along with decades of experience and a proven track record in the semiconductor industry," said Michael C. Turmelle, Chairman of Ideal Power's Board of Directors. "On behalf of the Board of Directors, I'd like to thank Dan for his leadership and invaluable contributions in developing B-TRAN®, launching our first products and preparing Ideal Power for commercial success. With the ongoing electrification of our society, we are commercializing our technology at an opportune time with innovative and enabling power semiconductor solutions for a broad array of growing and B-TRAN® enabled applications."

"I am proud of what we have accomplished at Ideal Power to develop a unique low-loss bidirectional semiconductor architecture, establish a production-ready double-sided wafer process, launch our initial commercial products and drive customer engagement with multiple Forbes Global 500 companies, global automakers and Tier 1 automotive suppliers. These successes and those to come are a credit to the world-class team I was fortunate to lead over the past several years," stated Brdar. "David's strong commercial background in the semiconductor industry will play a key role in driving Ideal Power's continued growth and success."

David Somo is an accomplished global technology executive with over 30 years of experience in the semiconductor industry spanning the industrial, automotive, data center, consumer, computing, and communications end-markets. He has held leadership roles in several prominent companies, including serving as Senior Vice President at onsemi, where he was responsible for corporate strategy along with marketing and business development, and, most recently, as President and CEO of Preciseley Microtechnology Corporation. David has a proven track record of driving revenue growth with extensive experience in worldwide sales, marketing, business development, corporate strategy, M&A, and product development, with full business P&L responsibility.

"I am thrilled to join Ideal Power at an inflection point. There is a multi-billion dollar addressable market for our B-TRAN® technology, and it brings several compelling advantages to the marketplace. I plan on leveraging my extensive commercial experience to accelerate growth in our target markets including those for industrial, data center and automotive applications," said Somo. "I'd also like to take this opportunity to thank my predecessor, Dan Brdar, for his continued support in this transition and for providing a strong foundation for our future growth."

**Inducement Awards**

In accordance with Section 5635(c)(4) of the Nasdaq Listing Rules and as a material inducement to his appointment as President and Chief Executive Officer of Ideal Power, the independent members of the Board and the Compensation Committee of Ideal Power approved the grant of inducement awards to Mr. Somo.

Mr. Somo's inducement awards include (i) restricted stock units ("RSUs") for 247,438 shares of Company common stock, to vest in three equal annual installments beginning on November 3, 2026, subject to Mr. Somo's continued service with Ideal Power as of each vesting date, and (ii) performance restricted stock units ("PSUs") for 247,438 shares of Company common stock, with vesting subject to achievement of certain performance goals. The inducement awards were granted outside of the Ideal Power Amended and Restated 2013 Equity Incentive Plan but are generally subject to the same terms and conditions that apply to awards granted under such plan.

**Conference Call and Webcast: Third Quarter 2025**

The Company will hold its quarterly conference call on Thursday, November 13, 2025 at 10:00 AM Eastern Time to discuss its third quarter 2025 results and host a question-and-answer session. Analysts and investors may pose questions for management during the live conference call on November 13, and may submit questions HERE in advance of the conference call.

Interested persons may access the live conference call by dialing 888-506-0062 (U.S./Canada callers) or 973-528-0011 (international callers), using passcode 264361. The live webcast and interactive Q&A will be accessible on the Company's Investor Relations website under the Events tab HERE. The webcast will be archived on the Company's website for future viewing.

**About Ideal Power Inc.**

Ideal Power (Nasdaq: IPWR) is the developer and innovative provider of its broadly patented bidirectional semiconductor power switch, creating highly efficient and ecofriendly energy control solutions for electric vehicle, electric vehicle charging, renewable energy, energy storage, UPS/data center, solid-state circuit breaker and other industrial and military applications. The Company is focused on its patented Bidirectional, Bipolar Junction Transistor (B-TRAN®) semiconductor technology. B-TRAN® is a unique double-sided bidirectional AC switch that delivers substantial performance improvements over today's conventional power semiconductors. Ideal Power's B-TRAN® can reduce conduction and switching losses, complexity of thermal management and operating cost in AC power switching and control circuitry. For more information, visit the Company's website at www.IdealPower.com, on LinkedIn, on Twitter, and on Facebook.

**Safe Harbor Statement**

All statements in this release that are not based on historical fact are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 and the provisions of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. While Ideal Power's management has based any forward-looking statements included in this release on its current expectations, the information on which such expectations were based may change. Such forward-looking statements include, but are not limited to, statements regarding the appointment of new management of the Company. These forward-looking statements rely on a number of assumptions concerning future events and are subject to a number of risks, uncertainties and other factors, many of which are outside of our control that could cause actual results to materially differ from such statements. Such risks, uncertainties, and other factors include, but are not limited to, the success of our B-TRAN® technology, including whether the patents for our technology provide adequate protection and whether we can be successful in maintaining, enforcing and defending our patents, our inability to predict with precision or certainty the pace and timing of development and commercialization of our B-TRAN® technology, the rate and degree of market acceptance for our B-TRAN®, the impact of global health pandemics on our business, supply chain disruptions, and the expected performance of future products incorporating our B-TRAN®, and uncertainties set forth in our quarterly, annual and other reports filed with the Securities and Exchange Commission. Furthermore, we operate in a highly competitive and rapidly changing environment where new and unanticipated risks may arise. Accordingly, investors should not place any reliance on forward-looking statements as a prediction of actual results. We disclaim any intention to, and undertake no obligation to, update or revise forward-looking statements, except as required by applicable law.

**Ideal Power Investor Relations Contact**

Jeff Christensen
Darrow Associates Investor Relations
jchristensen@darrowir.com
703-297-6917

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system and caused service of same via email to the below party of record:

Jiankang Bu (*pro se*)
45190 Key Circle
Temecula, CA 92592
Tel. 951-666-0355
Email: jiankang.bu@gmail.com

/s/ *John R. Hardin*
John Hardin