**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

**FILED**
September 16, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: pg
DEPUTY

| | |
|---|---|
| JIANKANG BU,<br>Plaintiff,<br>v.<br>Ideal Power Inc.,<br>Defendant | No. 1:26-cv-01557-RP<br><br>Honorable Robert Pitman |

**PLAINTIFF'S SECOND AMENDED COMPLAINT**

I. Parties:

Plaintiff: Jiankang Bu, Defendant: Ideal Power Inc.

II. Basis for Jurisdiction:

Federal Question.

Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 based on Defendant's alleged materially false or misleading statements and omissions in connection with securities.

III. Statement of Claims:

**1. Ideal Power Inc.'s Statements Concerning B-TRAN Prequalification and Reliability Testing.**

1.1 Ideal Power Inc.'s Statement.

On August 14, 2025, during Ideal Power Inc.'s Q2 2025 earnings call, CEO, Dan Brdar, stated, "…and seventh, we successfully completed the third-party automotive prequalification and reliability testing of B-TRAN devices with 0 failures. We expect to complete full third-party automotive qualification and reliability testing later this year…"

1.2 This statement is false and misleading.

a. On July 2, 2025, testing reports from this same third-party who did tests that quoted by Ideal Power Inc. on August 14, 2025, clearly showed among 86 initially good devices tested, 47 failed after testing 500 hours. It's huge failure by any standard, not 0 failure in prequalification.

b. The argument that failure was due to packaging so can claim "0 die failure" is also false and misleading. Ideal Power Inc.'s own failure analysis demonstrated it's a die failure.

1.3 Scienter

1.3.1: Ideal Power Inc. knew clearly the failure before August 14, 2025, but still chose to tell the public and investors false and misleading information on August 14, 2025, during Q2 2025 call.

- On July 6, 2025, Plaintiff, then serving as Chief Technology Officer, sent his weekly progress report directly to Ideal Power Inc. CEO, Dan Brdar, by email. Page 2 specifically stated "500 hrs: 50% BTRAN devices passed 500 hrs HTRB at 150C…", i.e. 50% didn't pass.
- On July 21, 2025, Plaintiff sent this failure info again to CEO of Ideal Power Inc. , in weekly progress report, by email.
- On August 14, 2025, Ideal Power Inc still reported "0 failure" "0 die failure" when it had knowledge of huge failures already.

1.3.2: Telling the public and investors the truth about qualification results may have disastrous consequences for Ideal Power Inc.:

- Ideal Power Inc. is a publicly traded company in Nasdaq, listed as IPWR. The company has had no commercial products since 2019 and thus has very little income. For example, year 2025 revenue is $37,728, net income was negative $10.58 million (net loss). The company needs the stock price to be high. For

example, if stock price is $0.01, selling 1 million shares would only trade for $10k cash.

- Announcing good qualification news would help increase stock price.

- Qualification and reliability testing results are particularly important to BTRAN. BTRAN is a high voltage power device. Reliability is important to such devices, because devices are supposed to isolate high voltage, 1200V, and conduct high current, 75A. Disappointing news about technology development and qualification will cause stock price downward and has devastating effect to company income.

- Most importantly, defected high power devices may shock/kill people, cause fire…BTRAN can also potentially be used in all-electrical military vessels and tanks, such as United States Naval Sea Systems Command (NavSea) project. Ideal Power Inc.'s such statements should have "0 ambiguity", not ambiguous 0 failure, 0 die failure…

**2. Ideal Power Inc.'s Statements Concerning a New Product Launch: SymCool IQ**

2.1 Ideal Power Inc.'s Statements

On Sep. 28, 2023, Ideal Power Inc. made a press release, titled "Ideal Power Adds SymCool™ IQ to its Commercial Product Offerings", stated "…The SymCool™ IQ, rated at 1200V and 160A, has significant advantages compared to IGBT modules, including lower losses and inherent bidirectionality… The addition of an integrated intelligent driver in the SymCool™ IQ provides protection features such as overcurrent protection, undervoltage protection and temperature sensing. OEM customers will also recognize its popular 62-millimeter package as it is a standard for industrial power semiconductor packaging…", calls SymCool IQ: its "second commercial product".

Ideal Power Inc. also made similar statements during Video Interview with Proactive Investors on Dec. 4, 2024, and some other media.

2.2 These statements are false and misleading.

Ideal Power Inc.'s statements called SymCool IQ the company's "second commercial product" and put it in its "Commercial Product Offerings." It then made concrete present-tense representations and with concrete specifications: "The SymCool™ IQ, rated at 1200V and 160A, has significant advantages…", "…The addition of an integrated intelligent driver in the SymCool™ IQ provides protection features such as overcurrent protection, undervoltage protection and temperature sensing…62-mm package" . These statements are

not corporate puffery. These were concrete representations concerning the characteristics and status of the purported product, rather than merely an announcement that development of a future product had commencement. Ideal Power Inc. even further announced “Ideal Power secures multi-unit order”. Dan Brdar, then CEO, called the multi-unit order “a significant milestone in the commercialization of our B-TRAN technology.” “This customer is evaluating SymCool IQ for pairing renewable energy with energy storage to leverage its improved efficiency and bidirectionality.”

A capable design that can support such product was not proposed until May 11, 2025 and approved by Ideal Power board meeting in June 2025.

Plaintiff's allegation does not depend upon a particular definition of the word “product launch”, although public perceptions about product launch are different from Ideal Power Inc.

Further, Ideal Power Inc.’s own definition of “product launch” was just one sentence of one page buried among 167 pages in Company’s Q1 2025 Form 10-Q filing to SEC. Company’s other statements, interviews, press releases, didn’t explain this special meaning of “product launch”. Ordinary investors get product launch information from Ideal Power Inc.’s statements, press release, video interview, not by digging out one sentence from one page out of a 167 page file.

2.3 Scienter

The contemporaneous internal communications support a strong inference that Ideal Power knew, or was severely reckless in disregarding, that its September 28, 2023 description of SymCool IQ materially overstated the product's then-existing development and commercial status.

In the same September 22, 2023 communication, Plaintiff, then Ideal Power's Chief Technology Officer, specifically objected to the proposed implementation. Plaintiff explained that after accounting for PCB layers, screw holes, and the mechanical spring, “it will be a very tall product,” defeating the intended “drop and place” purpose. Plaintiff expressly reserved his objection. Burns responded that Plaintiff, as CTO, was responsible for “productization to PRD details.”

Subsequent internal engineering records further support the inference that the September 2023 public description materially exceeded the product's actual development status.

From Sep. 2023 to April 2025, Plaintiff’s weekly progress reports to Ideal Power Inc. CEO, clearly showed that this product didn’t exist.

The timing and specificity of these communications support an inference stronger than mere corporate awareness or hindsight.

Taken collectively, these contemporaneous facts support a strong inference that Ideal Power knew, or was severely reckless in not knowing, that its September 28, 2023 characterization of SymCool IQ materially overstated the product's actual development and commercial status.

**3. Ideal Power Inc.'s Statements Concerning old BTRAN vs new BTRAN technology.**

3.1 Ideal Power Inc.'s Statements

From 2019 to 2021, Ideal Power Inc. released many Press Releases and made numerous statements in Quarterly Earnings Reports to boast the performance of BTRAN, particularly, stated BTRAN had lower forward voltage drop than IGBT.

On August 14, 2019, in Q2 2019 Earnings Call, Ideal Power Inc.'s Chief Commercial Officer, Dan Brdar, the same person who became CEO later, stated, "…Our wafer testing provided repeatable test results…BTRAN forward voltage drop was .2 to .3 volts consistent with our simulation, and measured breakdown voltage were up to 1,200 volts…".

Ideal Power's FY2019 results release, filed with the SEC, again said "…Measured forward voltage drop of 0.2V, consistent with our simulations. This value is substantially lower than the corresponding junction voltage drop of approximately 1.75V for an IGBT switch…".

On Oct. 27, 2021, in Ideal Power Inc. press release, President and CEO, Dan Brdar said, "We are very excited to make this first announcement for the evaluation and potential adoption of B-TRAN™ for industrial and utility SSCB applications, building on our work with the Department of Defense and Department of Energy on B-TRAN™ enabled SSCBs," It further states, "… Power semiconductor replacements such as IGBTs and MOSFETs have not seen widespread deployment in circuit breakers despite their higher switching speed. The lack of widespread adoption is primarily because of their high conduction losses, which result in wasted energy and the need to dissipate the heat this energy produces. B-TRAN™, with its fast-switching speed and low conduction losses, is a potentially enabling solution for large-scale SSCB adoption…"

From 2022 to 2026, Ideal Power Inc. continued making numerous statements that stated BTRAN had lower forward voltage drop than IGBT, 0.2 volts forward voltage drop, 1,200 volts breakdown voltage.

3.2 These statements are misleading.

By Oct. 27, 2021, what Ideal Power Inc. was developing was Technology A. It operates as a bidirectional transistor, so called B-TRAN. Devices based on Technology A was not able to get the results that Ideal Power Inc. announced in 2016-2019, nor the company

delivered any samples to projects of the Department of Defense and Department of Energy. Technology A was not repeatable either. Engineering test and Ideal Power Inc's technology consultant's analysis report both showed Technology A didn't work as company announced. Plaintiff alleges the statements between 2019 and 2021 are misleading.

In 2021, Ideal Power Inc. gave up Technology A completely and switched to Technology B in 2021. After thousands of failures, four functional devices based on Technology B were achieved in July 2022. Two of them were delivered to project of the Department of Defense (NavSea). Technology A and Technology B are materially different in structure, process, operation… Technology B works as a "resistor", not "transistor". Technology B results were reported to Ideal Power Inc.'s quarterly meeting of Board of Directors on Sep. 15, 2022.

Ideal Power Inc. didn't correct their earlier representation of Technology A performance, didn't report the major technological discontinuity, and continued presenting Technology B as "B-TRAN" to the public and investors. Plaintiff alleges that the omission was material because disclosure of the technological discontinuity would have raised questions concerning whether the historical Technology A performance results had ever actually been achieved and concerning the true state and maturity of the company's core technology. Ideal Power Inc. had very limited commercial revenue, and its ability to raise capital through equity offerings was therefore economically significant. Honest disclosure would cause stock price drop significantly.

To avoid detailed semiconductor physics confusing the Court, Plaintiff, former CTO of Ideal Power Inc., compared Technology A and Technology B in one page, to illustrate the difference.

3.3 Technology A

In November 2021, Dr. Constantin Bulucea, an IEEE Life Fellow and a prestigious scholar with more than 50 patents and 3 books in power semiconductor who then was serving as a technology consultant to Ideal Power Inc., , prepared a confidential technical assessment expressly for Ideal Power management. The assessment reviewed the original B-TRAN white paper and patents and concluded that high-voltage B-TRAN structures could not function as bipolar junction transistors as originally described, identifying carrier recombination as an inherent limitation. Particular, Page 14, "…Confirmation of our finding of why high-voltage BTRANs do not function: voltage-imposed excessive collector-emitter distance!..."; Page 17, "…no more spending on BTRAN process development…"

In May 2021, Ideal Power Inc. was awarded a Small Business Innovation Research project (Department of Energy SBIR Award No. DE-SC0021715). B-Tran technology in this project was Technology A. Ideal Power Inc. was never able to deliver any samples with performance close to what Ideal Power Inc. announced between 2019-2021. On February 5, 2022, Ideal Power submitted its final report for DOE SBIR Award No. DE-SC0021715 All

the quantitative performance results for the 1200-V/50-A B-TRAN were expressly identified as TCAD simulations. The report stated that the device design and fabrication process were also optimized using Silvaco TCAD simulations. The report did not present any measured silicon data substantiating the 2019 public representation that actual B-TRAN had produced **repeatable measured** forward-voltage results of 0.2–0.3 V together with approximately 1200-V breakdown.

In November 2021, Plaintiff, then serving as Vice President of Engineering of Ideal Power Inc., tested available Technology A samples stored in Ideal Power's laboratory. The measured forward drop was approximately 4 V at 2 A, substantially above the 0.2-0.3 V figure publicly attributed to B-TRAN in August 2019.

On Feb. 13, 2025, Plaintiff, then CTO of Ideal Power Inc., instructed fab technician to test Technology A samples, independently. The Technology A sample was fabricated with optimized fab process. Technician attached raw data in email, which showed Technology A forward voltage drop was 1.45 volts at 5A. This is much higher than what Ideal Power Inc. stated between 2019 and 2021, and much higher than IGBT in any standard.

Plaintiff alleges that these results were inconsistent with the historical performance represented to investors. Plaintiff, during the term serving as VP of Engineering and CTO of Ideal Power Inc., didn't find any evidence to support Ideal Power Inc.'s disclosures and statements to investors about Technology A performance. Ideal Power Inc. didn't have any SEC filing to disclose what their definition of "repeatable measured results" mean.

3.4 Technology B

Because Technology A didn't work, from 2021, Ideal Power Inc. gave up Technology A and switched to Technology B completely. Ideal Power Inc's all statements, press release and qualification effort about "B-TRAN", after Sep. 2022, have been Technology B.

After day and night's hard work, and thousands failures, engineering team achieved 4 fully functional Technology B devices in July 2022. Two of them were delivered to United States Naval Sea Systems Command (NavSea) project. On Sep. 15, 2022, Technology B results were reported to Ideal Power Inc's Board of Directors' Quarterly Meeting. From 2021-2022, there were numerous email communications, daily, reporting progress how team finally got 4 functional Technology B devices. Ideal Power Inc. officers were copied. Technology B has been further optimized after 2022 and did achieve "repeatable measured results on silicon" as Ideal Power Inc. announced between 2019-2021.

3.5 Scienter

The foregoing facts support a strong inference of scienter when considered collectively. Plaintiff alleges that these facts, taken together, support the inference that management knew,

or was at least severely reckless in not knowing, that the earlier historical performance narrative required correction or clarification once the contrary internal technical information and subsequent redesign became known. Plaintiff alleges that the omission was material because disclosure of the technological discontinuity would have raised questions concerning whether the historical Technology A performance results had ever actually been achieved and concerning the true state and maturity of the company's core technology, and thus negative impact to stock price.

Plaintiff's email and whole working record with Ideal Power Inc. are stored in Ideal Power Inc.'s online "OneDrive" storage. Plaintiff requests the Court to order Ideal Power Inc. allow Plaintiff access to such information that are exclusively under Defendant's possession.

The chronology also bears on Plaintiff's allegations concerning later qualification testing and SymCool IQ. Plaintiff alleges that if Technology A was truly available, it would be time to complete qualification and product launch between 2022 and 2024. But because the Company stopped Technology A by 2021, and Technology B prototypes were not achieved until July 2022, by common sense, Technology B still needs a couple of years to optimize, manufacturable and repeatable, which is true as happened between 2023 and 2025, before applying in any product or passing qualification. The chronology reveals why Ideal Power Inc. made false statements and announcements on qualification results (Item 1 in this document) and new product SymCool IQ.

**4. Misleading Visual Information Concerning B-TRAN Production**

On May 19, 2026, Proactive Investors published through Yahoo Finance an article titled "Ideal Power closes $30M registered direct offering." The article reported that Ideal Power Inc. had raised approximately $30 million and intended to use the proceeds in part to support commercialization of B-TRAN technology. The article displayed an image depicting approximately 52 packaged B-TRAN devices arranged together.

The depicted devices, however, appear not to represent 52 separately photographed physical B-TRAN devices. Instead, substantially identical characteristics repeat across the devices, consistent with digital duplication of a single device image to construct the array. Plaintiff further alleges that actual packaged devices exhibit package-to-package physical variation resulting from the packaging process.

Plaintiff alleges that, when displayed immediately in connection with an article concerning Ideal Power's $30 million financing, B-TRAN commercialization, the composite image was capable of creating the visual impression that Ideal Power Inc. can manufacture a substantial quantity of BTRAN repeatably.

Plaintiff testifies once saw this image on Ideal Power Inc.'s historical version website. Plaintiff presently does not allege, without discovery, whether Ideal Power Inc., or another person created or supplied the composite image. The provenance of the image, including its creator and source, may be determined through discovery. If discovery establishes that Ideal Power Inc. created or knowingly supplied the composite image, that evidence would further support Plaintiff's allegation of scienter.

**5. Former CEO's "Planned Retirement"**

On November 3, 2025, Ideal Power Inc. filed a Form 8-K reporting that on October 31, 2025, R. Daniel Brdar, then President, Chief Executive Officer, and a director of the Company, "gave notice of his retirement from all positions with the Company, effective November 2, 2025." The Company further disclosed that Brdar entered into a Retirement and Transition Services Agreement providing for twelve months of transition services.

On November 13, 2025, during the Company's Q3 2025 earnings call, CFO Timothy Burns was specifically asked whether the CEO transition was planned. Burns responded: "Yes, Dan's retirement was planned," and stated that an extensive search led by the Board resulted in the appointment of David Somo.

Plaintiff had previously reported the matters described above to the FBI and participated in an in-person interview on August 20, 2025. Plaintiff was informed that the FBI intended to contact members of Ideal Power's Board of Directors and the Company's auditor. Approximately two and one-half months later, on Oct. 31 2025, Brdar gave notice of retirement effective Nov. 2, 2025.

Plaintiff alleges that the timing and circumstances make the Company's subsequent public characterization of Brdar's retirement as "planned" a matter warranting further factual development.

Information concerning when the Board first contemplated Brdar's departure, what reasons were discussed for Brdar's departure, and whether the Board or Company personnel had received communications from law-enforcement authorities before the retirement announcement is principally within Defendants' possession and may be established through discovery, including Board minutes, communications, succession-search records, and other contemporaneous documents.

If discovery establishes that Brdar's departure was prompted or materially accelerated by matters known to the Board but inconsistent with the Company's public characterization that his retirement was "planned," such evidence would be relevant to whether that characterization was misleading and, depending upon the subject matter of

those communications, may also provide circumstantial evidence concerning Defendants' knowledge or recklessness regarding the matters alleged elsewhere in this Complaint.

**6. SymCool Power Module Commercial Shipment Statements**

6.1 Ideal Power Inc.'s Statements

On Feb. 20, 2024: Ideal Power Inc. press release stated, "**the Company commenced commercial shipment of its SymCool™ Power Module to a large, global customer.**"

On Feb. 29, 2024: management repeats commercial shipment and says SymCool should be an early source of the sales ramp. In Exhibit 99.1 furnished with Ideal Power's February 29, 2024 Form 8-K, CEO Dan Brdar stated: "We recently completed Phase II of our development agreement with Stellantis and **commenced shipment of SymCool™ power modules to fulfill customer orders**." He immediately continued: "We expect industrial markets, particularly the solid-state circuit breaker market served by our SymCool™ power module, **to be the earliest source of our product sales ramp.**" And immediately below, under "Key Fourth Quarter and Recent Operational Highlights," Ideal Power made the statement even more explicit: "**Commenced commercial shipment of SymCool™ power modules to fulfill customer orders**."

6.2 These Statements are Misleading

These representations concealed the actual condition/progress/risks from investors and therefore distorted the market's understanding of Ideal Power's prospects. What shipped were just a couple of prototypes, called SymCool V1, which had many issues: warpage, spacers breaking/tilting, serious voiding, high manufacturing cost, large size... More importantly, the best breakdown voltage achieved was only 1140V / 1140V, lower than 1200V breakdown voltage that SymCool power module product datasheet specified.

Plaintiff led engineering team come out a new design, SymCool V2, and finalized on August 1, 2024. New design solved the above issues, but building samples took time. In Oct. 2024, Plaintiff made a trip to package house and wrote a trip report, submitted to Dan Brdar, then CEO of Ideal Power, clearly reported "if 4 weeks lead time, can build some V2 in Dec. 2024."

SymCool V2 didn't yield any functional samples by June 2025. Simultaneously team started to develop SymCool V3 based on SymCool V2 learning, still prototypes development.

Ideal Power's characterization of the February 2024 shipment as commencement of "commercial shipment," when considered together with its statements concerning execution of its commercialization roadmap and the anticipated SymCool sales ramp, was materially misleading because it omitted that the SymCool Power Module failed an important published specification, remained subject to substantial unresolved prototype, manufacturing, cost, and design problems requiring significant subsequent redesign and validation before commercially ready samples could be produced.

The truth actually was revealed by Ideal Power Inc. itself on August 14, 2025 Q2 10-Q filing, Ideal Power Inc. admitted: "**To date, our customers have purchased prototypes in small quantities for evaluation...**" This presents a clear and material contrast to the original announcement on Feb. 20, 2024, **"the Company commenced commercial shipment of its SymCool™ Power Module to a large, global customer".**

6.3 Scienter

On Dec. 14, 2023, Ideal Power Inc.'s Q4 2023 board meeting, Plaintiff reported to the board that "Expect **prototype** (SymCool V1) testing and to be completed and full production release in mid-December".

Before Feb. 20, 2024's announcement, SymCool V1 prototypes' actual results and the need to redesign, were reported to Dan Brdar, then CEO, by emails.

In Q1 2025 Quarterly Board Meeting, Plaintiff reported "Zero yield from Q1 builds (SymCool V2)", forecasted releasing to production by Q3 2025. Plaintiff also reported team was developing SymCool V3 based on V2 packaging learning. No samples available.

**7. Loss Causation**

The Fifth Circuit expressly recognizes that loss causation may arise through gradual revelation rather than a single corrective disclosure. In Lormand v. US Unwired, Inc., 565 F.3d 228, 261 (5th Cir. 2009), the court held that "**Loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation.**" Subsequently, in Public Employees' Retirement System of Mississippi v. Amedisys, Inc., 769 F.3d 313, 322 (5th Cir. 2014), the Fifth Circuit, citing *Lormand*, reiterated that "**the truth can be gradually perceived in the marketplace through a series of partial disclosures**," and instructed that alleged partial disclosures should be "**consider[ed] . . . collectively in determining whether a corrective disclosure has occurred.**"

**Stock inflation:** After Feb. 20, 2024 press release that stated, "the Company commenced commercial shipment of its SymCool™ Power Module to a large, global customer", stock price jumped from $6.6 to more than $10. Volume increased 10x, as data below showed.




IPWR (Ideal Power Inc. stock ticker symbol ) : before: roughly **$6.6–$6.8.** On/after Feb. 20, it jumped rapidly **above $10**. Trading volume exploded at the same time. The week ending Feb. 23 averaged about 96,384 shares/day, versus only 9,654/day the preceding week—roughly **10×.**

Over time, the allegedly concealed truth gradually entered the market through Defendant's subsequent SEC filings, reported financial results and limited commercial revenue, continuing prototype/evaluation disclosures, prototype sample delays, and other information.

Total FY2024 commercial revenue: $86,032. Stellantis-related revenue/development-project revenue was $78,517, Nexperia: $225. The two totaled $78742. Little or no SymCool Power Module commercial-shipment revenue.

FY 2025 total revenue was only $37,728. Most were from Lazzen project. Little or no SymCool Power Module revenue.

August 14, 2025 Q2 10-Q: "**To date, our customers have purchased prototypes in small quantities for evaluation.**.."

**Stock deflation**: As that reality became apparent, IPWR's stock price declined, from highest $12.40/share on 3/7/2024, to lowest $3.94/share on August 12, 2025. Defendant made another misleading announcement about "0 failure" prequalification results on August 14, 2025. Stock increased to $5/share before decreasing to $3/share again on Dec. 30, 2025.

Plaintiff chose to sell all shares between August 16 to August 26, 2025 and suffered the claimed economic loss. Plaintiff didn't suffer the worst loss, $12.40/share→$3/share, but this doesn't change the aforementioned loss causation.




Such patterns repeated on other items alleged in Plaintiff's First Amended Complaints, "SymCool IQ", "0 Failure", "Technology A vs Technology B", "52 duplicated devices". Over time, the promised commercial/technical outcomes failed to materialize, and information/results entering the market increasingly revealed the reality that had previously been concealed.

## IV. Relief

Plaintiff respectfully requests that the Court:

1. Award Plaintiff $90,000 for securities losses;
2. Award Plaintiff compensatory damages in an amount to be proven at trial for injury to Plaintiff's professional reputation and resulting economic harm;
3. Grant appropriate declaratory or equitable relief concerning Defendant's alleged materially false or misleading statements, including corrective disclosure to the extent authorized by law;
4. Award Plaintiff costs and any other relief available under applicable law; and
5. Grant such other and further relief as the Court determines just and proper.

### IV – 1 Securities Loss

On December 15, 2022 and December 14, 2023, Plaintiff received awards totaling 58,500 Restricted Stock Units ("RSUs") as equity compensation for services performed for Defendant. The shares obtained through those awards had substantial economic value, $223,618. Plaintiff's equity and brokerage records document the awards, subsequent share transactions, and Plaintiff's eventual sales.

Plaintiff sold the remaining shares between August 18 and August 26, 2025, receiving a total of approximately $93,093.34. Plaintiff's records reflect a difference of approximately $130,524.

The shares were equity compensation earned by Plaintiff through his employment and services to Defendant. No free lunch. They had substantial economic value and exposed Plaintiff to the economic gains and losses associated with Ideal Power's publicly traded stock. SEC regulations expressly recognize securities issued under compensatory benefit plans and even state that the value of services exchanged for securities is measured by reference to the securities' value.

Plaintiff alleges that the challenged statements presented materially inaccurate information concerning Defendant's technological accomplishments, testing results, products, and commercialization progress, and that the subsequent disclosure or emergence of the true conditions caused or contributed to the removal of artificial inflation from Ideal Power's stock price and resulting economic loss to Plaintiff.

Plaintiff estimates the securities loss due to Defendant's misconduct is $90K but respect the Court's discovery and trial stage.

1. Plaintiff's Personal Knowledge vs Stock Price

   a. Plaintiff served as Ideal Power Inc.'s CTO, but was not a Company officer. Plaintiff was nominated by the CEO, not by the Board. The Company officers identified in SEC filings were CEO Dan Brdar and CFO Tim Burns.

   b. Plaintiff's personal engineering knowledge should not be treated as knowledge of securities fraud. Plaintiff had technical knowledge concerning B-TRAN development and testing but had no control or approval authority over the Company's public statements, press releases, earnings calls, or SEC filings. Plaintiff also had no control over or ability to predict the Company's stock price.

   c. Plaintiff's knowledge that certain technical information differed from a public statement does not necessarily establish that Plaintiff knew at that time the facts constituting securities fraud, including the knowledge or intent of the persons who made or approved the public statements.

2. Timing:

Under 28 U.S.C. § 1658(b), a securities-fraud claim generally must be filed within two years after discovery of the facts constituting the violation, and no later than five years after the violation. Knowing that a statement is factually wrong is not necessarily the same as discovering facts showing securities fraud, including scienter. The Supreme Court recognized this distinction in Merck & Co. v. Reynolds, 559 U.S. 633 (2010).

Accordingly, Plaintiff's earlier knowledge of certain technical facts does not, by itself, establish that the two-year limitations period began when each challenged statement was made. Plaintiff's allegations in Items 1–4 include statements and conduct occurring within the applicable limitations period.

**IV – 2 Professional Reputational Injury**

A. Plaintiff's Established Professional Reputation

Before joining Ideal Power Inc. in April 2021, Plaintiff has been an accomplished technologist. On May 6, 2021, Ideal Power Inc. announcement, "Ideal Power Inc…. named Dr. Jiankang Bu Vice President of Engineering. Dr. Bu is a 20-year power semiconductor and power electronics engineer with deep technical expertise in semiconductor device physics, process and device simulation, wafer fabrication, process optimization, and product design. He holds over 30 issued patents and is the author of numerous technical publications…We are delighted to welcome Dr. Jiankang Bu, an accomplished power semiconductor engineering and technical leader…"

When Plaintiff started working for Ideal Power Inc. from April 2021, there was only one engineer, and Technology A didn't work. Plaintiff devoted himself completely to Ideal Power Inc. work, committed night and weekend time, expanded engineering team to 12 engineers, led engineering team work out Technology B and co-invented more than 50 patents (in multiple countries) and several publications... Plaintiff genuinely wishes to achieve technology success in an honest way.

B. Defendant Publicly Identified Plaintiff as Responsible for B-TRAN Technology.

Ideal Power Inc. announced, "…he (Plaintiff) will direct the continued advancement of our B-TRAN™ technology and products and our research and development and product design team…"

On Sep. 19, 2022, after Technology B first 4 functional devices were realized, in CTO promotion announcement, Ideal Power Inc. stated, "… As Chief Technology Officer, Jiankang will formally take leadership of our technical efforts and will be tasked with expanding our engineering team…"

C. Concrete Resulting Harm

While Plaintiff was publicly identified with the technology, semiconductor professionals and investors associated those technical representations with Plaintiff. Defendant's knowingly presented materially inaccurate technical accomplishments and results to the public and investors led to concrete real harm to the Plaintiff, including but not limited to professional integrity being challenged, lost foundry / business relationship, lost investment opportunities.

C.1 Dr. Constantin Bulucea, a prestigious scholar with more than 40 years' experience in power semiconductor field, after quit his role at Ideal Power Inc. and continued his role at IEEE as Life Fellow and IEEE Journal of the Electron Devices Society (J-EDS), questioned Plaintiff concerning specific technical representations publicly made by Ideal Power, such as such as Technology B is not transistor? 0 qualification failure? SymCool (power module) was not available yet, then came out SymCool IQ (Symcool power module + Intelligent Control)? … These communications demonstrated that knowledgeable members of Plaintiff's professional field associated Ideal Power's technical representations with Plaintiff because Plaintiff had publicly been identified as the Company's CTO and technical leader.

C.2 The third parties that performed the reliability testing and packaging knew that substantial failures had occurred and it's impossible to get same looking of 52 packaged devices at this stage. The foundry who manufactured Ideal Power Inc,'s wafers laid-off program manager and director who were responsible to Ideal Power Inc.'s project. They refused to provide foundry service to my new start-up effort.

C.3 Particularly, Mr. Weiting Wu, a technologist-turned-entrepreneur, who once invested in the Plaintiff's start-up in 2014 (investment agreement with multiple investors' signatures in 2014 are still available), declined to invest in Plaintiff's new start-up effort. As he briefly explained in a letter, Ideal Power Inc.'s misleading and contractionary statements were the fundamental reasons. "…We are not sure about your recent year's work at Ideal Power: We are not sure if a transistor can do what announced or not. Qualification not demonstrated after so many years. 2025 announcement appears very good. Are products real and available for customer sampling? This led to strong credibility questions on if the proposed new IGBT technology can be successfully developed.…" Mr. Wu would like to provide more info or testify to the Court when requested.

V Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this First Amended Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specially so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Respectfully submitted,

/s/ Jiankang Bu

Jiankang Bu,

Plaintiff, Pro Se

Jiankang.Bu@gmail.com

951-6660355

September 12, 2026