**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

JIANKANG BU,

Plaintiff,

v.

IDEAL POWER INC.,

Defendant.

No. 1:26-cv-01557-RP

Honorable Robert Pitman

# DEFENDANT IDEAL POWER INC.'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 2

ARGUMENT ..... 4

I. STANDARD OF REVIEW ..... 4

II. THE SAC CANNOT OVERCOME FUNDAMENTAL DEFICIENCIES ..... 5

A. Plaintiff Cannot Plead Reliance ..... 5

B. Plaintiff Cannot Plead Loss Causation ..... 7

C. The SymCool IQ, Technology A/B, and Commercial Shipment Claims Are Time-Barred ..... 9

D. Plaintiff Lacks Standing To Bring The Visual Image and CEO Retirement Claims ..... 11

III. THE SAC FAILS TO ALLEGE ACTIONABLE MISSTATEMENTS ..... 11

A. The B-TRAN Claim ..... 11

B. The SymCool IQ Claim ..... 12

C. The Technology A/B Claim ..... 16

D. The Commercial Shipment Claim ..... 16

IV. THE SAC DOES NOT PLEAD SCIENTER ..... 17

V. THE VISUAL IMAGE AND CEO RETIREMENT CLAIMS VIOLATE THE PSLRA'S PLEADING REQUIREMENTS ..... 19

VI. PLAINTIFF'S DAMAGES THEORY FAILS AS A MATTER OF LAW ..... 20

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .....4

*Atari Corp. v. Ernst & Whinney*,
981 F.2d 1025 (9th Cir. 1992) .....6

*Barnett v. Am. Gen. Life Ins. Co.*,
No. A-09-CA-935-SS, 2010 WL 11566353 (W.D. Tex. Oct. 7, 2010 .....19

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .....5, 7, 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .....4

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) .....11

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..... Passim

*FindWhat Inv. Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) .....8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .....5, 6

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
238 F. Supp. 3d 799 (S.D. Tex. 2017) .....8, 20

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
540 F. Supp. 2d 800 (S.D. Tex. 2007) .....5

*In re F45 Training Holdings, Inc. Sec. Litig.*,
No. 1:22-CV-01291-DAE, 2025 WL 4230711 (W.D. Tex. Feb. 21, 2025) .....15

*Landry v. GMAC Mortg.*,
No. CV H-12-0014, 2012 WL 12903540 (S.D. Tex. Aug. 15, 2012) .....4

*Linenweber v. Sw. Airlines Co.*,
693 F. Supp. 3d 661 (N.D. Tex. 2023) .....8

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ....................7, 8

*Lovelace v. Software Spectrum Inc.*,
78 F.3d 1015 (5th Cir. 1996) ....................8

*Marcus v. J.C. Penney Co., Inc.*,
No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331, (E.D. Tex. Aug. 29, 2016) .................... 8

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)....................9, 10

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) ....................11

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ....................12, 17, 18

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*,
9 F.4th 247 (5th Cir. 2021) ....................8

*Pub. Emps. Ret. Sys. of Mississippi v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ....................7

*Royalty Clearinghouse, Ltd. v. CTS Props., Ltd.*,
No. A-16-CV-1342-LY-ML, 2017 WL 5071340 (W.D. Tex. July 12, 2017)....................9

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ....................15, 17, 18, 19

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)....................4, 18

**STATUTES AND RULES**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4.................... passim

15 U.S.C. § 78u-4(b)(1) ....................4, 12, 19

15 U.S.C. § 78u-4(b)(2) ....................4, 17

15 U.S.C. § 78u-5(c) ....................15

28 U.S.C. § 1658(b) ....................9

Federal Rule of Civil Procedure 9(b)....................4

Federal Rule of Civil Procedure 12(b)(6) ....................1, 4

## PRELIMINARY STATEMENT

Defendant Ideal Power Inc. ("Ideal Power" or the "Company") respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Second Amended Complaint ("SAC") of Plaintiff Jiankang Bu ("Plaintiff" or "Bu") pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

Although the SAC is substantially longer than the original one-page Complaint, it fails to cure the fundamental deficiencies that require dismissal with prejudice. Most critically, the SAC makes clear that Plaintiff cannot plead reliance, the sine qua non of any securities-fraud claim. The SAC details that Bu, as Chief Technology Officer, had specific knowledge of the alleged truth. A plaintiff who possessed all the information he claims the market lacked cannot plausibly allege that he relied on the very public statements he knew to be false.

The SAC also fails to plead loss causation. The SAC identifies no actual corrective disclosures that revealed the alleged fraud to the market. Plaintiff sold his shares between August 18 and August 26, 2025, and the SAC's timeline establishes that his decision to sell was driven by personal circumstances, not any market-wide revelation. Moreover, many of the alleged misstatements were made *after* he acquired his shares, meaning the price at which he acquired the shares could not have been artificially inflated.

The SAC's remaining deficiencies are equally fatal. The SymCool IQ, Technology A/B, and Commercial Shipment Claims are time-barred. Plaintiff lacks standing to bring the Visual Image and CEO Retirement Claims. Those also expressly depend on discovery and fail to state a claim even if credited. The SAC fails to plead scienter with the particularity the PSLRA demands, and Plaintiff has failed to allege any actual material misstatements. Each of these independent

deficiencies—none of which can be cured through further amendment—requires dismissal with prejudice.[1]

## STATEMENT OF FACTS

Ideal Power is a technology company headquartered in Austin, Texas, engaged in the development and commercialization of its patented B-TRAN (bi-directional bi-polar transistor) semiconductor technology. The Company's shares trade on Nasdaq.

Plaintiff is a resident of Temecula, California who served as Chief Technology Officer of Ideal Power during the period relevant to his allegations. He filed this action pro se on June 9, 2026. After the Company filed its Motion to Dismiss, on September 3, 2026, Plaintiff filed an expanded First Amended Complaint ("FAC"). On September 11, 2026, Plaintiff filed a motion for leave to file the SAC; Defendant consented by stipulation; and on September 16, 2026, the Court ordered the clerk to file the SAC on the docket.

The SAC asserts claims under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 based on six categories of alleged misstatements: (1) statements regarding B-TRAN prequalification and reliability testing made on the August 14, 2025, earnings call (the "B-TRAN Claim") (SAC § III.1.1 (at 2)); (2) statements regarding the "launch" of the SymCool IQ product beginning with a September 28, 2023, press release (the "SymCool IQ Claim") (*id.* § III.2.1 (at 3)); (3) statements regarding historical B-TRAN performance claims from 2019–2021 (the "Technology A/B Claim") (*id.* § III.3.1 (at 5)); (4) a visual image appearing in a May 2026 third-party article (the "Visual Image Claim") (*id.* § III.4 (at 8)); (5) statements regarding CEO Dan Brdar's retirement in November 2025 (the "CEO Retirement Claim") (*id.* § III.5 (at 9)); and (6) a

---

[1] For convenience, the grounds for dismissal of each claim are shown on the chart attached as Appendix A to this memorandum.

February 20, 2024 press release that described a shipment of prototypes to a customer as "commercial" (the "Commercial Shipment Claim") (*id.* § III.6.1 (at 10)).

According to the SAC, Plaintiff received 58,500 Restricted Stock Units ("RSUs") on December 15, 2022 and December 14, 2023, which Plaintiff valued at $223,618. SAC § IV-1 (at 14). Plaintiff sold his shares between August 18 and August 26, 2025, receiving approximately $93,093.34, and claims a loss of approximately $130,524. *Id.*; § III.7 (at 12). Plaintiff requests $90,000 for securities losses plus compensatory damages untethered to any actual claim. SAC § IV, items 1–2 (at 13).

The SAC's allegations establish that Plaintiff possessed extensive, direct personal knowledge of the matters he claims the Company misrepresented. He served as Ideal Power's Chief Technology Officer. SAC §§ III.1.3.1 (at 2), III.2.3 (at 4), IV-2.B. He personally sent weekly progress reports to CEO Brdar. *Id.* He personally tested Technology A samples in November 2021 and directed independent testing in February 2025. SAC § III.3.3 (at 7). He personally objected to the proposed SymCool IQ characterization in a September 22, 2023, internal email exchange. SAC § III.2.3 (at 4). His weekly reports from September 2023 through April 2025 purportedly showed that SymCool IQ did not exist as a finalized product. *Id.* And he designed the prototypes he contends were misleadingly identified as being the "commercial shipment" described in the February 20, 2024, press release. SAC §§ III.6.2 (at 10), III.6.3 (at 11).

By the time of CEO Brdar's retirement announcement on November 3, 2025, and the May 2026 third-party article, Plaintiff had sold all of his Ideal Power stock. SAC §§ III.7 (at 12); IV-1 (at 19).

## ARGUMENT

### I. STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In securities fraud cases, the PSLRA imposes heightened pleading requirements that are "more exacting" than Federal Rule of Civil Procedure 9(b)'s requirement of pleading fraud with particularity. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), and that inference must be "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc.*, 551 U.S. at 314. To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).

Plaintiff's pro se status does not reduce or alter the heightened pleading standards for fraud-based causes of action like this one. *Landry v. GMAC Mortg.*, No. CV H-12-0014, 2012 WL 12903540, at *6 (S.D. Tex. Aug. 15, 2012), *report and recommendation adopted,* No. CV H-12-14, 2012 WL 12903541 (S.D. Tex. Sept. 17, 2012).

## II. THE SAC CANNOT OVERCOME FUNDAMENTAL DEFICIENCIES

### A. Plaintiff Cannot Plead Reliance

Reliance is an element of Section 10(b) claims. *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 800, 813 (S.D. Tex. 2007). While a plaintiff may invoke a rebuttable presumption of reliance based on the integrity of the market price based on the fraud-on-the-market theory, this presumption is rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 281 (2014).

The SAC's allegations conclusively sever this link. Rather than curing the reliance deficiency identified in Defendant's motion to dismiss the original Complaint, the SAC *underscores* it by detailing the extraordinary breadth of Plaintiff's personal knowledge. Bu served as CTO and alleges he personally sent weekly progress reports to CEO Brdar, including the July 6, 2025, report allegedly documenting a 50% failure rate and the July 21, 2025, report repeating this information. SAC § III.1.3.1 (at 2). He personally tested Technology A samples in his laboratory in November 2021 and allegedly measured a forward voltage drop of "approximately 4 V at 2 A," exceeding the publicly stated 0.2–0.3V. SAC § III.3.3 (at 6-7). He allegedly directed testing of Technology A in February 2025, producing a 1.45V result at 5A. *Id.* He objected to the proposed SymCool IQ product characterization in the September 22, 2023, Burns email, allegedly raising specific technical concerns about the design. SAC § III.2.3 (at 4). And his weekly progress reports from September 2023 through April 2025 allegedly showed that SymCool IQ did not exist as a finalized product. *Id*. He briefed the board and the CEO on the prototypes sold to a customer in 2024. SAC § III.6.3 (at 11).

A plaintiff who already possesses information sufficient to know that public statements are false cannot claim reliance on those statements. *See Halliburton Co.*, 573 U.S. at 281–82 (fraud-

on-the-market presumption is rebuttable by showing that plaintiff was not misled); *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992) ("If the investor already possesses information sufficient to call the representations into question, he cannot claim later that he relied on or was deceived by the lie").

The SAC attempts to salvage the reliance element by arguing that "personal engineering knowledge should not be treated as knowledge of securities fraud." SAC § IV-1.1.b (at 14). But the reliance inquiry does not ask whether the plaintiff knew the legal elements of securities fraud; it asks whether the plaintiff possessed information that severed the link between the alleged misrepresentations and his investment decisions. *See Halliburton Co.*, 573 U.S. at 281. Bu cannot simultaneously maintain that (a) he knew the Company's public statements were false based on his direct personal knowledge as CTO, and (b) he relied on those same statements—or the market price incorporating them—in deciding to acquire or hold shares. These positions are irreconcilable, and Plaintiff's reliance claim therefore fails as a matter of law under Section 10(b).

Plaintiff received his RSUs on December 15, 2022 and December 14, 2023. SAC § IV-1 (at 14). The reliance deficiency is compounded by the fact that many of the alleged misstatements were made *after* Bu acquired (or in some instances, sold) his shares: the "commercial shipment" statement (February 20, 2024); the B-TRAN prequalification statements (August 14, 2025); the CEO retirement disclosure (November 3, 2025); and the visual image (May 19, 2026). SAC §§ III.6.1 (at 10), III.1.1 (at 2), III.5 (at 9) and III.4 (at 8). He could not have "relied" on statements that post-date his receipt of shares (all four of these claims) or his sale of shares (the CEO Retirement and Visual Image Claims).

The fraud-on-the-market presumption is separately unavailable because Plaintiff acquired his shares through RSU grants that vested as part of his employee compensation. Those vestings were not transactions "in" the market—shares were delivered directly from the Company without

any arm's-length purchase at the prevailing market price. Because the fraud-on-the-market theory requires that the plaintiff "traded the [securities]" in an efficient market at the price set by the market, *Basic Inc.*, 485 U.S. at 247, 248 n.27, it has no application to non-market, non-negotiated compensation arrangements. Plaintiff cannot invoke the fraud-on-the-market presumption and must demonstrate actual, direct reliance—which, as shown above, his own allegations foreclose.

**B. Plaintiff Cannot Plead Loss Causation**

A plaintiff must allege that the defendant's fraud caused the claimed economic loss—typically through a "corrective disclosure" or some other event that reveals the truth to the market and causes the stock price to decline from its price allegedly inflated by the misstatements. *See Dura*, 544 U.S. at 342; *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255–56 (5th Cir. 2009).

The SAC claims that a series of partial disclosures lead to price correction. But to plead partial disclosures, a plaintiff must identify them specifically and cannot rely on future discovery. *See Pub. Emps. Ret. Sys. of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 317–18 (5th Cir. 2014) (considering five specific partial disclosures). Here, Plaintiff states "information/results entering the market increasingly revealed the reality that had previously been concealed." SAC § III.7 (at 13). This is precisely the kind of conclusory pleading the PSLRA forbids.

The one purported partial disclosure the SAC does point to—a statement in the August 14, Q2 2024 10-Q regarding the sale of prototypes that purportedly corrects the February 2024 statements about the "commercial shipment" of the SymCool Power Module—is not a corrective disclosure at all. SAC §§ III.6.2 (at 11) and III.7 (at 12). The purportedly "corrective" information was already available to the market through the Company's prior filings. These made clear that the SymCool Power Module was still early in its development timeline (*see* Section III.B below discussing the product development timeline starting with product "launch") and made clear that "initial orders [were] from customers evaluating our technology"—that is to say, evaluating

prototypes. Riccardi Decl. Ex. 1 at 13.[2] Disclosure is not "corrective" when the allegedly concealed information was already in the public domain. *FindWhat Inv.r Grp. v. FindWhat.com*, 658 F.3d 1282, 1311–12 (11th Cir. 2011); *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331, at * 7 (E.D. Tex. Aug. 29, 2016) (citing *Basic*, 485 U.S. at 248-49) (information already disclosed cannot form the basis of a corrective disclosure theory).

The SAC's timeline demonstrates that Plaintiff's losses were caused by his personal decision to sell, not by any market revelation. Plaintiff sold his shares between August 18 and August 26, 2025—commencing just days before his FBI interview on August 20, 2025. SAC § IV-1 (at 14); § III.5 (at 9). The implication from this timing is not that he learned the truth from a corrective disclosure but that he thought an investigation sparked by his allegations would drive the share price down and he wanted to sell before such an investigation was public. Without a corrective disclosure or other cognizable loss causation theory, Plaintiff cannot establish that any alleged misrepresentation caused his losses. *See Lormand*, 565 F.3d at 255–56.

Like reliance, the SAC's loss causation theory also fails because Plaintiff acquired his shares through the granting and vesting of RSUs. Under *Dura*, a plaintiff's "loss" from securities fraud is measured by the artificial inflation in the price at which the plaintiff transacted, not the total decline in portfolio value. *See Dura*, 544 U.S. at 342–44. A plaintiff who acquired shares at no cost through equity compensation (i.e. zero basis) and later sold them has only realized a gain—not a loss attributable to any alleged fraud. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 897 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925

---

[2] "SEC filings . . . may be properly judicially noticed to the extent that they are 'considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents.'" *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021) (quoting *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996)). The same applies to earnings call transcripts. *Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 674 (N.D. Tex. 2023).

F.3d 727 (5th Cir. 2019) (holding that loss causation and damages cannot be calculated where "plaintiffs have not claimed that they individually bargained for their stock options").

### C. The SymCool IQ, Technology A/B, and Commercial Shipment Claims Are Time-Barred

Under 28 U.S.C. § 1658(b), a securities-fraud claim must be filed within two years of discovery of the facts constituting the violation, and no later than five years after the violation. The limitations period begins when the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, the facts constituting the violation. *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010); *Royalty Clearinghouse, Ltd. v. CTS Props., Ltd.*, No. A-16-CV-1342-LY-ML, 2017 WL 5071340, at *16 (W.D. Tex. July 12, 2017), *report and recommendation adopted*, No. A-16-CV-1342-LY-ML, 2017 WL 5127241 (W.D. Tex. Aug. 4, 2017).

*SymCool IQ Claim.* The SAC alleges that Plaintiff personally objected to the characterization of SymCool IQ in the September 22, 2023, internal email exchange—six days before the press release containing the alleged misstatement. SAC § III.2.3 (at 4). He alleges that he raised specific technical concerns, including that the product would be "a very tall product" that defeated the intended "drop and place" purpose. *Id.* According to the SAC's allegations, Bu knew at the time that the September 28, 2023, SymCool IQ press release materially overstated the product's development status and that the Company's officers had allegedly received his objections about the product's unresolved design and development status and proceeded to issue the press release anyway. *Id.* Since Bu had these facts in hand on the day of the press release, this claim was time-barred as of September 28, 2025.

*Technology A/B Claim.* The SAC alleges that Plaintiff personally knew Technology A "didn't work" by November 2021, when he tested laboratory samples and measured a forward voltage drop of "approximately 4 V at 2 A"—exceeding the publicly stated 0.2–0.3V. SAC §§

III.3.2 (at 6), III.3.3 (at 7) and § IV-2.A (at 15). He further alleges that Dr. Bulucea's November 2021 assessment, prepared "expressly for Ideal Power management," concluded that high-voltage B-TRAN structures "could not function as bipolar junction transistors as originally described," *id.*; and that "[f]rom "2021–2022, there were numerous email communications, daily, reporting progress how [the] team finally got 4 functional Technology B devices" copying Ideal Power officers. SAC § III.3.4 (at 7). These are precisely the facts that the SAC now alleges give rise to a "strong inference" of scienter. SAC § III.3.5. By Plaintiff's own allegations, he discovered the factual basis for the Technology A/B Claim no later than November 2021. Thus, this claim was time-barred as of November 2023.

*Commercial Shipment Claim*. The SAC alleges that Plaintiff personally knew that the products described in the February 20, 2024 press release were allegedly faulty prototypes. He alleges that he "reported to Dan Brdar, then CEO" [b]efore the February 20, 2024 announcement" the "protoypes' actual results and the need to redesign." SAC § III.6.3 (at 11). Again, these are the same allegations the SAC alleges constitute scienter. *Id.* By his own allegations, Plaintiff knew the factual basis for the Commercial Shipment Claim no later than February 20, 2024; this claim was time-barred as of February 20, 2026.

The SAC attempts to argue, citing *Merck & Co. v. Reynolds*, that "[k]nowing that a statement is factually wrong is not necessarily the same as discovering facts showing securities fraud, including scienter." SAC § IV.1 item 2 (at 15). But this argument misconstrues *Merck*'s objective standard: the limitations period begins when the plaintiff discovers, or a reasonably diligent plaintiff would have discovered, the facts constituting the violation. 559 U.S. at 637. Bu's allegations establish that—as the CTO—he knew both the allegedly true facts and the basis for his allegations of scienter more than two years before he sued in June 2026.

### D. Plaintiff Lacks Standing To Bring The Visual Image and CEO Retirement Claims

The Visual Image and CEO Retirement Claims fail independently because Plaintiff sold his shares before the alleged misstatements were made. He held no Ideal Power stock after August 26, 2025. SAC §§ III.7 (at 12), IV-1 (at 14). The Visual Image Claim concerns an image in a May 19, 2026, article. SAC § III.4 (at 8). The CEO Retirement Claim challenges a statement on the Q3 2025 earnings call on November 13, 2025, that CEO Brdar's retirement was "planned." SAC § III.5 (at 9). A plaintiff who owns no securities at the time of the challenged statement and does not purchase or sell securities in connection with it cannot satisfy the "in connection with the purchase or sale of any security" requirement of Section 10(b) and Rule 10b-5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730–31 (1975).

## III. THE SAC FAILS TO ALLEGE ACTIONABLE MISSTATEMENTS

Beyond the threshold deficiencies set forth above, the SAC fails to identify an actionable misstatement with the particularity the PSLRA demands. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001).

### A. The B-TRAN Claim

The B-TRAN Claim rests on selective quotation from the Company's Q2 2025 earnings call on August 14, 2025. The SAC quotes only the summary remark—"0 failures"—while omitting Mr. Brdar's detailed clarification elsewhere on the same call: "[W]e successfully completed the third-party automotive prequalification and reliability testing of B-TRAN discrete die last month, achieving 0 die failures." SAC § III.1.1 (at 2). Riccardi Decl. Ex. 2 at 6. The focus on the "die" as opposed to the "packaging" is important and well understood in the semiconductor industry. The die is the silicon chip that actually switches the electrical current, while the "packaging" is the protective casing built around it. A packaging failure is not a defect in the underlying silicon die.

Plaintiff acknowledges this distinction when he alleges that "[t]he argument that failure was due to packaging so can claim '0 die failure' is also false and misleading" (SAC § III.1.1.2.b (at 2))—acknowledging the very die-versus-package distinction Mr. Brdar drew. Plaintiff's conclusory assertion that the company's "own failure analysis demonstrated it's a die failure" does not identify the analysis, when it was conducted, its methodology, its findings, or how it demonstrated that the silicon die—as opposed to the package—was the root cause. This falls short of the PSLRA's requirement that a complaint "specify . . . the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015).

In support of scienter, Bu cites—without attaching—his own July 6, 2025 weekly progress report to the CEO. SAC § III.1.3.1 (at 2). That report, which was attached to the FAC as Exhibit 6 (Dkt. 16-1), shows not that there were die failures but that Bu believed that the failures the SAC describes were due to problems with underfill material (a part of the packaging) and not the die: "Will FA [perform a failure analysis] to see if due to underfill material." FAC Ex. 6 (at 2). As of July 21, 2025, when Bu claims he re-sent the same progress report to CEO Brdar, he apparently still believed the underfill material (i.e., the packaging and not the die) was the issue. *Id.* Nowhere does Bu allege that he told management before the earnings call that in fact the failures were due to the die not packaging underfill material. The SAC's claim that the August 14, 2025, statement of "0 die failures" was false when made is thus unsupported.

**B. The SymCool IQ Claim**

The SAC alleges that the September 28, 2023, press release announcing SymCool IQ as Ideal Power's "second commercial product" was false because, as of that date, the product "didn't exist" and that present-tense specifications (1200V, 160A, overcurrent protection, etc.) were "concrete representations" about an existing product, not merely an announcement. SAC §§ III.2.2 (at 3-4); III.2.3 (at 4-5). This argument fails for multiple reasons.

*First*, the term “product launch” had a specific, disclosed meaning in the Company's product development lifecycle—one the Company communicated consistently to investors both before and after the SymCool IQ announcement. Any investor following the Company understood that a “launch” was the start of a lengthy process—product design, prototyping, customer evaluation, and design iteration—not the delivery of a finished product. In the three earnings calls immediately preceding the September 28, 2023, press release, for example, management told investors that its upcoming “second commercial product” would be “launched” well in advance of commercial sales, and that revenue would follow only after customers completed their own product design cycles. On March 2, 2023, in the Q4 2022 earnings call, CEO Brdar stated that the Company was “on track to launch our second commercial product in the third quarter,” and CFO Burns explained: “we think those would be a logical fit for our second commercial product, the intelligent power module that we expect to launch here in the third quarter of this year. So that revenue would start to ramp and likely in 2024 as it gets through that design cycle.” Riccardi Decl. Ex. 3 at 5, 9. On May 4, 2023, in the Q1 2023 earnings call, Brdar again confirmed: “we're on track to launch our second commercial product in the third quarter,” and stated that “[t]his product revenue will start in 2024 and ramp up in late 2024 and into 2025 as it gets through customers’ OEM product designs.” Riccardi Decl. Ex. 4 at 5–6. And on August 10, 2023, Brdar stated: “We're on track to launch our second commercial product in the third quarter which will build upon the multi-die packaging design of SymCool,” and confirmed that “[r]evenue for the intelligent power module will start in late 2024 and ramp into early 2025 as it gets through OEM product design cycles.” Riccardi Decl. Ex. 5 at 6–7, 10.

Thus, before the challenged press release issued, any investor understood the Company’s development timeline. This was reiterated by Brdar in the December 4, 2024, interview the SAC cites at §§ III.2.1 (at 3) (and which the FAC provided a link to at FAC § III.2.1 (at 5)). There,

discussing SymCool IQ, Brdar explained "as we look at 2025, we want to get through this design win process so that we can start to ramp our revenue and sales of products." Riccardi Decl. Ex. 6 at 3. This made clear that the product was still being developed.

Beginning with the Q1 2025 Form 10-Q, the Company specifically stated: "Upon product launch, we design and build initial prototypes for testing and to solicit customer feedback. Based on the results of testing and customer feedback, we incorporate any necessary changes into the product design, build final prototypes and complete additional testing prior to full commercial release." Riccardi Decl. Exs. 7 at 13; Ex. 8 at 12; Ex. 9 at 12. This codified what the Company had been consistently communicating to investors: that "product launch" was the start of a design, prototyping, and testing process, not the completion of a finished product.

The SAC's attempt to dismiss this definition as "just one sentence of one page buried among 167 pages" (SAC § III.2.2 (at 4)) is unavailing. It appeared in consecutive SEC filings, and the same concept was communicated in repeated earnings calls in the months leading up to the challenged press release—communications to which investors had direct access.

To the extent the SAC characterizes technical parameters—such as the 1200V and 160A ratings and protection features—as "concrete representations" about a finished product, those specifications were part of an announcement that, in the total mix of information available to investors, described the initiation of a product development lifecycle. Read in context—alongside the Company's consistent pre-launch communications explaining that "launch" was expected to precede sales by at least a year, and alongside the press release's own forward-looking language (discussed below)—the announcement's references to technical specifications described the target capabilities of a product entering the design, prototyping, and customer-feedback process.

*Second*, to the extent the SAC challenges qualitative characterizations of SymCool IQ—such as "significant advantages compared to IGBT modules, including lower losses and inherent

bidirectionality" (SAC § III.2.1 (at 3))—such statements constitute non-actionable corporate puffery: vague, optimistic characterizations "too general to cause a reasonable investor to rely upon [them]." SAC § III.2.2 (at 3). *In re F45 Training Holdings, Inc. Sec. Litig.*, No. 1:22-CV-01291-DAE, 2025 WL 4230711, at *11 (W.D. Tex. Feb. 21, 2025); *see also Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). This is particularly evident where the Company's public Form 10-K for 2022 disclosed "no product revenue" for fiscal year 2022 and projected only "initial modest product revenue in late 2023," signaling to any reasonable investor the early and speculative stage of product commercialization. Riccardi Decl. Ex. 10 at 10.

*Third*, the September 28, 2023, press release itself contained forward-looking language: "We look forward to our first commercial sales from this product next year with sales ramping as customers incorporate SymCool IQ into their OEM product designs." Riccardi Decl. Ex. 11. This language signaled to any reasonable investor that commercial sales had not yet begun and that the product was still in an early stage. The press release is thus consistent with both the Company's SEC-filed definition of "product launch" and the earnings call statements that preceded it. To the extent the SAC challenges statements describing anticipated product capabilities—including specific technical parameters such as the 1200V and 160A ratings and integrated protection features—those statements are protected by the PSLRA safe harbor for forward-looking statements, 15 U.S.C. § 78u-5(c). The press release described the capabilities of a product at the beginning of its development lifecycle and was accompanied by meaningful cautionary language, including the express statement that commercial sales were expected "next year"—signaling that the product had not yet been commercially released—as well as a Safe Harbor Statement identifying risks and uncertainties that could cause actual results to differ materially from the forward-looking statements. These cautionary statements satisfy the PSLRA safe harbor.

**C. The Technology A/B Claim**

The SAC points to statements in three specific documents (the August 14, 2019 earnings call transcript, the "FY2019 results," and an October 27, 2021 press release), but it fails to identify exactly what about the quoted statements is allegedly inaccurate. Instead, it states vaguely that "Technology A was not able to get the results . . . announced in 2016-2019," that "Technology A was not repeatable," and that the Company did not "deliver[] any samples to projects of the Department of Defense and Department of Energy." SAC § III.3.2 (at 5-6).

Bu alleges falsity based on two things: (1) his own subsequent testing in November 2021 and February 2025 and (2) a November 2021 "assessment" by a consultant for the Company. SAC § III.3.3 (at 6-7). But testing performed years later, on potentially different samples and under different conditions, does not establish that earlier statements were false when made. The SAC thus fails to plead falsity with the particularity required by the PSLRA.

The SAC's allegations that Technology A "didn't work" and was abandoned are also inconsistent with a fraud theory. SAC § III.3.2 (at 5-6). If the Company discovered that an earlier approach was not viable and transitioned to an improved architecture—which is basically what the SAC alleges—that is evidence of good-faith product development, not securities fraud. What the SAC really describes is an incremental design evolution under a consistent product brand. The SAC does not allege that the Company was required to disclose each internal design change, and no such duty exists under the securities laws.

**D. The Commercial Shipment Claim**

The SAC targets two February 2024 disclosures characterizing early shipment of the Company's SymCool™ Power Module to a customer as "commercial" and alleges these statements were misleading because what shipped were "just a couple of prototypes." SAC §§ III.6.1 (at 10); III.6.2 (at 10). But there is nothing misleading about calling prototype shipments "commercial,"

particularly given the well-disclosed descriptions of the Company's lengthy product development process.

The Company's SEC filings describe a multi-step development process beginning with "product launch" and leading ultimately to a market-ready product. *See* Section III.B above. This disclosed process includes providing prototypes for customer feedback. The February 2024 shipment statements are consistent with this framework and with the Company's contemporaneous disclosures. Nowhere did the Company suggest that this shipment constituted delivery of finished products ready for the market at large. Indeed, the Q2 2024 10-Q stated consistently with the shipment of prototypes that commercial revenue of $1,331 was "related to initial orders from customers evaluating our technology"—i.e., prototype evaluation. Riccardi Decl. Ex. 1 at 13.

The Company's forward-looking statement accompanying the February 20, 2024, press release negates any reasonable inference of immediate commercial readiness. The press release stated: "The Company looks forward to the SymCool™ sales ramp beginning in the second half of 2024 as expected." Riccardi Decl. Ex. 12. A disclosure that projects a "sales ramp beginning" months later could not have created a false impression that the allegedly misleading "commercial shipments" were anything other than prototypes.

## IV. THE SAC DOES NOT PLEAD SCIENTER

The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). For Section 10(b) purposes, scienter means an intent to deceive, manipulate, or defraud. In the Fifth Circuit, severe recklessness may also suffice, but only where the conduct is an extreme departure from ordinary care and presents an obvious danger of misleading investors of which the defendant must have been aware. *See Owens*, 789 F.3d at 535–36; *Southland Sec.*, 365 F.3d at 366. The Court must "consider plausible, nonculpable explanations for the defendant's conduct," and the inference

of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. The SAC fails this standard by a wide margin.

*B-TRAN Claim.* The SAC's scienter theory rests on the July 6, 2025 weekly report and its re-transmittal on July 21, 2025. SAC § III.1.3.1 (at 2). But that report undermines any inference of scienter because it shows that Bu, himself, believed that any failures identified at that time were due to packaging ("underfill material") and not the die. *See* FAC Ex. 6 at 2. The SAC alleges nowhere that Bu told management that the failures noted on the progress report were the result of the die instead of the packaging. The more compelling inference is that he did not do so and that therefore the Company's public statement of "0 die failures" during the August 14, 2025 earnings call was made without fraudulent intent or severe recklessness.

*SymCool IQ Claim.* The SAC's scienter theory for SymCool IQ rests on the September 22, 2023, Burns email exchange. SAC § III.2.3 (at 4). But this communication demonstrates ordinary product development discussion, not fraudulent intent. The fact that Plaintiff objected to certain design aspects does not establish that the subsequent press release was false; it establishes that the product was in active development—precisely what "product launch" means under the Company's disclosed definition. The more compelling inference is that the Company engaged in good-faith product development and used terminology consistent with its publicly disclosed lifecycle.

*Technology A/B Claim.* The SAC does not allege any specific individual's state of mind regarding the 2019–2021 B-TRAN performance statements. Instead, it alleges that "management knew, or was at least severely reckless in not knowing." SAC § III.3.5 (at 7-8). Generic motive allegations—such as the Company's desire to maintain its stock price—are insufficient to plead scienter. *See Southland Sec.*, 365 F.3d at 366; *Owens*, 789 F.3d at 535–36. The nonculpable inference is that the Company transitioned from one architecture as part of iterative product development—an ordinary practice that did not require separate public disclosure.

*Commercial Shipment Claim.* The SAC's three specific scienter allegations (SAC § III.6.3 (at 11)) are fully consistent with the Company's disclosed multi-step development framework and thus do not support an inference of scienter. All three confirm rather than contradict, the Company's publicly disclosed framework in which prototype testing precedes full commercial release. The Company's filings expressly disclose iterative redesign based on testing and customer feedback. *See* Section III.B above. Allegations of knowledge of risks or problems do not establish scienter where the defendant disclosed those same risks to the market. *See Southland Sec.*, 365 F.3d at 373. The reference to the Q1 2025 Board Report is irrelevant to scienter because it postdates the February 2024 challenged statements by more than a year and thus says nothing about what management knew or intended when those statements were made. SAC § III.6.3 (at 11).

## V. THE VISUAL IMAGE AND CEO RETIREMENT CLAIMS VIOLATE THE PSLRA'S PLEADING REQUIREMENTS

The PSLRA requires plaintiffs to "specify each statement alleged to have been misleading" and "state with particularity all facts" supporting the claim, including scienter. 15 U.S.C. § 78u-4(b)(1). The Visual Image and CEO Retirement Claims violate this mandate. The Visual Image Claim expressly concedes: "Plaintiff presently does not allege, without discovery, whether Ideal Power Inc., or another person created or supplied the composite image. The provenance of the image, including its creator and source, may be determined through discovery." SAC § III.4 (at 9). The CEO Retirement Claim does the same. SAC § III.5 (at 9).

These express reservations for discovery are the antithesis of pleading with particularity. A complaint that admits it cannot allege the essential elements of a claim without discovery does not satisfy normal pleading requirements, let alone the PSLRA. *Barnett v. Am. Gen. Life Ins. Co.*, No. A-09-CA-935-SS, 2010 WL 11566353, at *5 (W.D. Tex. Oct. 7, 2010) ("the who, what, when, and

where must be laid out before access to the discovery process is granted"). These claims should be dismissed on this independent ground.

## VI. PLAINTIFF'S DAMAGES THEORY FAILS AS A MATTER OF LAW

The SAC's damages theory is fundamentally flawed. Plaintiff claims a "loss" of approximately $130,524. SAC §§ IV (at 13), IV-1 (at 14-15). But Plaintiff acquired those shares at zero cost through equity compensation. Every dollar he received from selling was a gain, not a loss. Under *Dura*, the measure of damages in a securities-fraud case is the artificial inflation in the price at which the plaintiff transacted—not the decline in portfolio value. 544 U.S. at 342–44. Because Plaintiff paid nothing for his shares, he cannot demonstrate that he was damaged by alleged artificial inflation caused by fraud. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d at 897.

The SAC's request for compensatory damages for reputational harm is similarly unavailing. Section 10(b) provides a cause of action for economic losses resulting from securities fraud—not for professional reputational injury. *See Dura*, 544 U.S. at 341–42. Plaintiff's allegations of reputational harm (SAC § IV-2 (at 15-16))—are not cognizable under the securities laws and cannot substitute for the required showing of economic loss.

## CONCLUSION

For the foregoing reasons, Defendant Ideal Power Inc. respectfully requests that this Court grant its Motion to Dismiss and dismiss the Second Amended Complaint with prejudice.

DATED: September 25, 2026

**ASHURST PERKINS COIE US LLP**

By: */s/ John R. Hardin*
John R. Hardin
john.hardin@ashurstperkins.com
ASHURST PERKINS COIE US LLP
2699 Howell Street, Suite 700
Dallas, TX 75204
Telephone: +1.214.965.7700

Matthew M. Riccardi
*Admitted Pro Hac Vice*
matthew.riccardi@ashurstperkins.com
ASHURST PERKINS COIE US LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.262.6900

*Attorneys for Ideal Power Inc.*

**Appendix A**

**Chart Summarizing Bases for Dismissal by Claim**

| | B-TRAN (Claim 1) | SymCool IQ (Claim 2) | Technology A/B (Claim 3) | Visual Image (Claim 4) | CEO Retirement (Claim 5) | Commercial Shipment (Claim 6) |
|---|---|---|---|---|---|---|
| Failure to Plead Reliance | X | X | X | X | X | X |
| Failure to Plead Loss Causation | X | X | X | X | X | X |
| Time Barred | | X | X | | | X |
| No Standing | | | | X | X | |
| Failure to Plead Scienter | X | X | X | X | X | X |
| Failure to Plead Actionable Misstatement | X | X | X | X – expressly requires discovery | X – expressly requires discovery | X |
| No Damages | X | X | X | X | X | X |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2026, I electronically filed the foregoing Defendant Ideal Power Inc.'s Memorandum of Law in Support of its Motion to Dismiss the Second Amended Complaint and the supporting Riccardi Declaration with the Clerk of the Court using the CM/ECF system and caused service of same via email to the below party of record:

Jiankang Bu (pro se)
45190 Key Circle
Temecula, CA 92592
Tel. 951-666-0355
Email: jiankang.bu@gmail.com

*/s/ John R. Hardin*
John R. Hardin