**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**AUSTIN DIVISION**

| | |
|---|---|
| JIANKANG BU, | No. 1:26-cv-01557-RP |
| Plaintiff, | |
| v. | Honorable Robert Pitman |
| Ideal Power Inc., | |
| Defendant | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT IDEAL POWER INC.'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**1. Scienter**

**1.1** Defendant relies heavily on its later-disclosed definition of "product launch" and "launch process" to argue that its earlier statements concerning commercial products and commercial shipments were not misleading. That argument raises a significant timing problem: the definition on which Defendant now relies was not disclosed to investors until May 15, 2025, after the challenged 2023 and 2024 statements had already been made.

Defendant argues that investors could not have been misled by its 2023–2024 representations regarding a "commercial product launch" and "commercial shipment" because the company had a "well-disclosed, multi-step development process" wherein a "launch" merely signified the initiation of early prototyping.

However, the record squarely contradicts this narrative. Defendant's highly specific definition of "product launch" and launch process — which claims a launch merely initiates early prototype building and testing — was disclosed to the market for the **very first time on May 15, 2025,** inside the Q1 2025 Form 10-Q filing (Def. MTD at 13; Riccardi Decl. Ex. 7 at 13). But the misleading statements, such as adding SymCool IQ to its "Commercial Product Offerings", "the Company commenced commercial shipment of its SymCool™ Power Module to a large, global customer"… were made on **Sep. 28, 2023, Feb. 20, 2024, Feb. 29, 2024**, well before May 15, 2025. **[Exhibit 1, Excerpts of Statements.]** The "total mix of information" available to the market in 2023 and 2024 contained absolutely no mention of this hidden, custom definition. A reasonable investor cannot evaluate a "total mix" of information using disclosures that do not yet exist.

Defendant's reliance on a definition first disclosed in May 2025 does not resolve what a reasonable investor would have understood from the Company's 2023–2024 statements and,

viewed together with Plaintiff's allegations of Defendant's contemporaneous internal knowledge, supports a strong inference of scienter.

**1.2** Plaintiff contemporaneously reported the truth underlying each misleading statement alleged in the Second Amended Complaint ("SAC") directly to Defendant via internal communications, backed by empirical data and photographic evidence. Defendant was fully aware of all the truth, yet consciously chose to disseminate false and misleading information to the public and investing market. This deliberate choice to mislead investors despite actual internal knowledge supports a strong inference of scienter.

**1.3** Defendant's Safe Harbor theory doesn't work here. "We look forward to our first commercial sales from this product next year with sales ramping as customers incorporate SymCool IQ into their OEM product designs." **Riccardi Decl. Ex. 11.** Defendant further states, "The press release is thus consistent with both the Company's SEC-filed definition of "product launch".

First, this forward-looking statement happened on September 28, 2023. Defendant's Company's SEC-filed definition of "product launch" happened on May 15, 2025. The forward-looking statement in 2023 stated clearly "this product", didn't say it's initial prototype building. "Commercial sales from this product next year" is even misleading, because new product sales normally take time to ramp which is true in any industry. But that's not the case for prototypes. Prototypes may fail or never come out; sales wouldn't ramp like products. Accordingly, a reasonable investor could have understood the 2023 statement as referring to an existing commercial product expected to generate commercial sales, rather than an initial prototype still requiring further development and testing.

Secondly, Defendant tried to depict as if he has something for customers to incorporate into customers' OEM product design, so sales ramps next year. This is not true. By Sep. 2023, the SymCool IQ product didn't exist.

Thirdly, customers couldn't incorporate prototypes that missed major datasheet specifications into "OEM product designs". Prototypes have so many uncertainties, with possibilities that even never come out. Customers need to evaluate first even when there were something existing and fully qualified, before considering incorporating their products. The distinction is material because a prototype still requiring evaluation, redesign, and additional testing presents materially different commercialization uncertainty from a product represented as a commercial offering expected to generate a sales ramp.

Defendant's safe-harbor argument does not resolve the alleged misleading nature of the contemporaneous statements. The September 2023 statement did not merely predict future sales; it identified SymCool IQ as a product and stated that Defendant expected "commercial sales from this product next year." Plaintiff alleges that, at that time, SymCool IQ remained at the prototype-development stage and had not reached the condition reasonably conveyed by Defendant's description. Moreover, Defendant's later explanation that a "product launch" begins with building initial prototypes was not disclosed until May 2025. A disclosure made in 2025 cannot establish what information was available to investors when they interpreted Defendant's 2023 statement.

The distinction is material because a prototype requiring customer evaluation, possible redesign, additional testing, and further development before full commercial release carries materially different commercialization uncertainty from a product represented as a commercial offering expected to generate commercial sales.

2. **On Damage and Loss Causation: Defendant's Arguments on Loss Causation and Zero Damages Rely on Groundless Speculation and Inaccurate Legal Premises.**

**2.1** Defendant's Motion to Dismiss relies on the groundless, speculative claim that Plaintiff's decision to sell his shares between August 18 and August 26, 2025, was driven by "personal circumstances"—specifically pointing to an FBI interview—rather than market forces. This is groundless speculation and impermissible under Rule 12(b)(6).




Plaintiff's decision to sell shares was purely market-driven. Following a long-term decline in stock price caused by the gradual leakage of the concealed truth into the market—dropping to $4.02/share by August 12, 2025—the former CEO made a misleading "0 failure" announcement on August 14, 2025. This announcement caused a temporary artificial price bounce back to the $5–$6 range. Plaintiff's decision to sell during this window was a classic exercise in the mitigation of damages—an ordinary investment judgment to avoid further losses before the market is fully corrected. Defendant's historical stock price variation, figure above, clearly demonstrated this.

Furthermore, Defendant's speculation regarding Plaintiff's FBI interview is completely contradicted by the market data. The stock price had no negative correlation with the interview; in fact, the stock price rose higher to $6.67/share on September 19, 2025.

Defendant cannot substitute its own self-serving, speculative timeline for the clear market-driven narrative alleged in the Second Amended Complaint (SAC).

**2.2** Defendant's contention that Plaintiff suffered "zero loss" is a flawed mischaracterization of federal securities law.

There are clear distinctions between Plaintiff's case and precedents that Defendant quoted, particularly *Lampkin v. UBS Financial Services*, 925 F.3d 727 (5th Cir. 2019). In *Lampkin*, it's stock option grant. The plaintiffs' claims were based entirely on the grant. Plaintiffs didn't exercise the options, i.e. didn't become shareholders.

In this case (Bu vs Ideal Power Inc), Plaintiff's RSU agreements with Defendant distinguish the grant and vesting of RSUs from the "subsequent sale of Shares issuable upon settlement of the Restricted Stock Units." Receipt of an RSU, vesting and issuance of common stock, and a subsequent market sale are distinct events. [Exhibit 2, RSU Agreements, filed in seal.] Plaintiff's RSUs vested in 2023, 2024. Plaintiff became shareholders upon vesting. At the time of these vesting, the stock price was artificially inflated by Defendant's material misrepresentations as documented in Plaintiff's SAC. Plaintiff paid tax with shares based on inflated price that is market valuation for withholding. Over the time, the allegedly concealed truth gradually entered the market through Defendant's subsequent SEC filings, reported financial results and limited commercial revenue, continuing prototype and evaluation disclosures, prototype sample delays, and other information. The artificial inflation evaporated, tanking the asset price from over $12.40/share to a low of $3.94/share. Plaintiff sold shares on the open market between

August 18 and August 26, 2025, at a severely depressed price. This is a real market transaction and has incurred concrete economic loss, under the supreme framework of Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005).

In Basic Inc. v. Levinson, 485 U.S. 224 (1988), the plaintiffs were former shareholders who sold their stock while allegedly misleading public statements affected the market price. The Supreme Court recognized their Rule 10b-5 theory and addressed fraud-on-the-market reliance. The relevant transaction was their sale. The Court wasn't asking how those shareholders had originally acquired their shares. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342–46 (2005), requires a plaintiff to allege an economic loss causally connected to the alleged fraud; it does not hold that shares originally received as employee compensation can never produce a cognizable loss when subsequently sold.

**2.3** Defendant's claim that "the SAC identifies no actual corrective disclosures" is factually false and legally untenable.

Before August 18, 2025, the little commercial revenue reported the Q2 2024 10-Q ($1331) , the poor FY2023, FY2024 annual revenue, the May 15, 2025 Q1 2025 10-Q (redefine "product launch" and launch process as initiating prototype building and testing), **[Exhibit 3, Page 16 only.]** the 2025 Q2 10-Q admission ( "To date, our customers have purchased prototypes in small quantities for evaluation...") **[Exhibit 4, Page 19 Only.]** are some partial corrective disclosures that are listed in Plaintiff's SAC.

Under settled Fifth Circuit law (*Lormand v. US Unwired, Inc.*), a corrective disclosure does not require a company to confess to fraud in explicit terms; it merely requires that the truth gradually enter the market to reveal that a prior statement was materially misleading. The dramatic drop in the stock price from a high of $12.40 down to $3.94 as

these consecutive evaluation realities leaked out plausibly pleads the element of loss causation.

### 3. Reliance

Defendant argues that because Plaintiff served as Chief Technology Officer, his direct personal exposure to internal engineering metrics conclusively "severs the link" of reliance under the fraud-on-the-market doctrine, making it impossible for him to be deceived by the Company's public statements (Def. MTD at 5–6). This defense deliberately distorts the legal boundaries of reliance by conflating everyday technical work with corporate market strategy.

**Technical engineering knowledge is completely different from market awareness.** Plaintiff was CTO but was not a corporate officer responsible for, or authorized to approve, Defendant's SEC filings and public investor communications. As explicitly set forth in the Second Amended Complaint, while Plaintiff possessed day-to-day engineering and data-logging knowledge regarding B-TRAN, BTRAN Qualification, SymCool, and SymCool IQ development, he was **not a corporate officer** nominated by the Board, and he possessed no control, predictive insight, or approval authority over Ideal Power's public statements, press releases, or SEC compliance filings.

Knowing engineering facts is not necessarily the same thing as knowing the amount of artificial inflation embedded in a publicly traded stock price. For example, Plaintiff knew internally that the qualification test had more than 54% failures and failures were not packaging failures. It does not necessarily mean Plaintiff knew what the market believed, what information the market had incorporated into Defendant's stock price, how much inflation any public statements created, or when/through what information that inflation would dissipate. Plaintiff relied on the fundamental mechanism of market price integrity to determine when to hold or liquidate his shares, assuming Defendant would communicate the

technical results to the investing public in an honest, transparent manner. Plaintiff did not, and could not, deduce securities fraud has been committed until Defendant **systematically, consistently**, **repeatedly,** overrode internal engineering realities, and made public statements allegedly inconsistent with the underlying technical results.

Using the same example (qualification failure), until today, Defendant still argues there was "0 failures" and keep announcing that way. Plaintiff's internal position/knowledge couldn't possibly sever any link unless Defendant admitted he lied. Defendant's public statements and corrective statements later on dictate the market stock price. Plaintiff relied on the market price to make investment decisions. This is evident in SymCool, SymCool IQ cases: Defendant's **"commercial product offering", second commercial product" "commence commercial shipping**"… public statements inflated the stock price, subsequently reported limited commercial revenue, the corrective public statements that those were just "prototypes" / "To date, our customers have purchased **prototypes** in small quantities for **evaluation**..." deflated the stock price. Plaintiff relied on the market price and sold shares. Plaintiff's reliance is fully and plausibly pleaded.

4. **On Time-bar: Plaintiff's claims are fully timely and not time-barred under 28 U.S.C 28 U.S.C. § 1658(b)(1)**

Defendant's timeliness argument rests on a legally flawed premise: that a plaintiff's internal awareness of ordinary technical engineering bugs or design challenges automatically triggers the two-year statute of limitations for securities fraud. This position flatly contradicts controlling Supreme Court precedent.

In ***Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010)**, the Supreme Court explicitly held that the 2-year limitations period under 28 U.S.C. § 1658(b)(1) does not begin to run until a plaintiff discovers, or a reasonably diligent plaintiff should discover, **"the facts**

**constituting the violation"—which explicitly includes facts showing the required state of mind, *scienter***. The *Merck* Court expressly recognized that an investor's awareness of a factual inaccuracy or an underlying product issue is **not** the same as discovering a actionable claim of securities fraud. Thus, Plaintiff's contemporaneous technical knowledge therefore does not, by itself, establish that the limitations period had begun. Plaintiff alleges that he knew underlying engineering and product-development facts, but did not control Defendant's public disclosures and did not necessarily know from those technical facts alone whether Defendant's officers were making materially misleading statements with the required scienter. Plaintiff further alleges that the significance of Defendant's public representations became apparent through a continuing sequence of events, including repeated commercialization representations, later disclosures concerning Defendant's prototype-development process, limited reported commercial revenue, and the continuing divergence between the underlying technical results and Defendant's public representations. The May 15, 2025 Form 10-Q, for example, disclosed that a "product launch" could precede initial prototype construction, customer feedback, design modification, final prototypes, additional testing, and "full commercial release."

The limitation clock began running only when the fraud fixed and the deflation occurred. Because the true nature of Defendants' deceptive intent and the resulting gradual market deflation occurred well within the two years preceding the June 2026 filing date, Plaintiff's claims are fully compliant with § 1658(b) and cannot be dismissed on limitations grounds.

5. **On BTRAN "0 Failure"**

Plaintiff must make some detailed clarification because Defendant's Motion to Dismiss distorted many facts on this topic.

**5.1** Defendant accused SAC quotes only the summary remark—"0 failures"—while omitting Mr. Brdar's detailed clarification elsewhere on the same call: "[W]e successfully completed the third-party automotive prequalification and reliability testing of B-TRAN discrete die last month, achieving 0 die failures." This is not true.

SAC's 1.2 b clearly addressed Defendant's "0 die failure" theory. Didn't omit anything. SAC 1.2 b: "The argument that failure was due to packaging so can claim "0 die failure" is also false and misleading. Ideal Power Inc.'s own failure analysis demonstrated it's a die failure.

Further, if "the focus on the "die" as opposed to the "packaging" is important", then Defendant's summary remark should call it "0 Die Failure", not to explain the "0 Failure" as "0 Die Failure" somewhere else when was questioned.

This is the repeated style as Defendant used in SymCool, SymCool IQ: announced commercial product, second commercial product offering, commercial shipping in 2023, 2024, then in 2025, buried deep inside a large document, explained the product launch meant initiating prototype building. It misled the public and investors when the announcements were made in 2023 and 2024.

**5.2** Defendant argues "(weekly report)… shows not that there were die failures but that Bu believed that the failures the SAC describes were due to problems with underfill material (a part of the packaging) and not the die…". Defendant intentionally distorted the facts.

"Will FA [perform a failure analysis] to see if due to underfill material." Means Plaintiff believes it's due to packaging and not the die? When "if" means? Nowhere in the July 6, 2025 weekly report mentioned "shows not that there were die failures", or it's packaging failure. **[Exhibit 5, Weekly Report 07062025, filed in seal.]**

Later, "FA [perform a failure analysis]" did show it's die failure (device failure), not packaging failure**. [Exhibit 6, FA Image, filed in seal.]** In "July 21, 2025 weekly report" to Defendant, Plaintiff clearly reported the failure was device (die) failure. Plaintiff sends weekly progress reports to Defendant every week. Weekly reports are different week by week. It's not "same progress report" as Defendant claimed.

If Defendant made judgement on failure reason independently, not counting on Plaintiff's Weekly Report, before August 14, 2025 announcement of "0 failure", the judgement is against common sense: the massive failure was from industry standard "High Temperature Reverse Bias" (HTRB) reliability test. It's a test of die(device) integrity. The massive failure was gradually accumulated during 500 hours test, not instantly. If package failure, usually it will fail instantly at 1200 volts reverse bias, wouldn't last 500 hours.

6. **On 52 Duplicated Images.**

The following picture, duplicating one image to get 52 exactly same devices, was on Defendant's website (www. idealpower.com) throughout most time of year 2025. It disappeared from website in 2026. It misled investors to believe Defendant had commercial products. Prototype devices are different from each other. **[Exhibit 7, Prototype Device Image, Filed in Seal]** Plaintiff respectfully request the Court order Defendant to provide website historical data of 2025. It's important circumstance evidence on Defendant's Scienter.



**7. On CEO's "Planned Retirement"**

Plaintiff does not rely upon post-sale event as independent securities transactions or independent bases for damages. Plaintiff's allegations should be considered collectively in determining whether the SAC pleads the required strong inference of scienter.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss the Second Amended Complaint. Alternatively, if the Court determines that any claim or allegation is insufficiently pleaded, Plaintiff respectfully requests leave to amend rather than dismissal with prejudice.

Respectfully submitted,

Dated: September 30, 2026

*/s/ Jiankang Bu*

Jiankang Bu, *Plaintiff Pro Se*

Jiankang.Bu@gmail.com

951-666-0355