**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

JIANKANG BU,

Plaintiff,

v.

IDEAL POWER INC.,

Defendant.

No. 1:26-cv-01557-RP

Honorable Robert Pitman

**DEFENDANT IDEAL POWER INC.'S**
**REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ............................................................................................................... 1

I. PLAINTIFF'S OPPOSITION CONFIRMS HE CANNOT PLEAD RELIANCE ........ 1

II. THE OPPOSITION DOES NOT CURE THE SAC'S FAILURE TO PLEAD LOSS CAUSATION OR DAMAGES ............................................................... 3

A. Plaintiff Identifies No Actual Corrective Disclosure ........................................ 3

B. On Plaintiff's Own Theory, He Suffered No Loss Caused by the Alleged "0 Die Failure" Misstatement ............................................................... 4

C. Plaintiff's RSU-Based "Loss" Is Not Cognizable ............................................ 5

III. THE OPPOSITION DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER ........................................................................................................ 5

IV. THE SYMCOOL IQ, TECHNOLOGY A/B, AND COMMERCIAL SHIPMENT CLAIMS ARE TIME-BARRED ........................................................................ 6

V. THE OPPOSITION DOES NOT SHOW THE ALLEGED MISSTATEMENTS ARE ACTIONABLE ............................................................................................ 7

A. The B-Tran Claim ............................................................................................ 7

B. The SymCool IQ and Commercial Shipment Claims ........................................ 8

C. The Technology A/B Claim ............................................................................. 9

VI. THE VISUAL IMAGE AND CEO RETIREMENT CLAIMS SHOULD BE DISMISSED AS CONCEDED ........................................................................ 9

VII. DISMISSAL SHOULD BE WITH PREJUDICE .................................................. 10

CONCLUSION ........................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Atari Corp. v. Ernst & Whinney*,
981 F.2d 1025 (9th Cir. 1992) ....................1

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)....................1, 2, 3, 5

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975)....................10

*Brewster v. Dretke,*
587 F.3d 764 (5th Cir. 2009) ....................10

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005)....................4, 5

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ....................10

*Greenberg v. Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) ....................3, 4

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014)....................1, 2

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008)....................3

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.,*
238 F. Supp. 3d 799 (S.D. Tex. 2017) ....................5

*Lampkin v. UBS Fin. Servs., Inc.*,
925 F.3d 727 (5th Cir. 2019) ....................5

*Lormand v. US Unwired, Inc.,*
565 F.3d 228 (5th Cir. 2009) ....................3

*Magruder v. Halliburton Company*,
No. 3:05-CV-1156-M, 2009 WL 854656 (N.D. Tex. Mar. 31, 2009)....................4

*Magruder v. Halliburton Co.*,
359 F. Supp. 3d 452 (N.D. Tex. 2018) ....................3, 4

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) ........ 6, 7

*Nji v. Smartsheet, Inc.*,
No. 1:25-cv-00324-ADA-DH, 2025 WL 1703430 (W.D. Tex. May 14, 2025) ........ 8

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ........ 7

*Pub. Emps. Ret. Sys. of Miss., Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769
F.3d 313 (5th Cir. 2014) ........ 3

*Royalty Clearinghouse, Ltd. v. CTS Props., Ltd.*,
No. A-16-CV-1342-LY-ML, 2017 WL 5071340 (W.D. Tex. July 12, 2017) ........ 6

*Royalty Clearinghouse, Ltd. v. CTS Props., Ltd.*,
No. A-16-CV-1342-LY-ML, 2017 WL 5127241 (W.D. Tex. Aug. 4, 2017 ........ 6

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ........ 6, 9

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ........ 6

**STATUTES AND RULES**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ........ 6, 7

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-5 ........ 9

28 U.S.C. § 1658(b) ........ 7

## PRELIMINARY STATEMENT

The admissions in Plaintiff's Opposition (Dkt. 23, "Opp.") are fatal. Plaintiff cannot show reliance because he "contemporaneously reported the truth underlying each misleading statement alleged in the Second Amended Complaint ("SAC") directly to Defendant via internal communications, backed by empirical data and photographic evidence." Opp. at 3. That admission also means he had the facts constituting each alleged violation when the statements were made, so the SymCool IQ, Technology A/B, and Commercial Shipment Claims are time-barred. He cannot show loss causation: he identifies no corrective disclosure followed by a price decline, and he sold during what he calls an "artificial price bounce" (Opp. at 4–5)—so, on his own theory, he sold into inflation and benefited from the alleged fraud. He pleads no particularized falsity or scienter facts, relying instead on assertions absent from the SAC and requests for discovery. And he does not respond to several independent grounds for dismissal, including the lack of standing to sue for statements made after he sold his shares, the unavailability of the fraud-on-the-market presumption for non-market RSU acquisitions, that there were no false statements related to Technology A/B, and that the securities laws do not permit recovery for reputational damages.

Plaintiff has now had the benefit of two motions to dismiss. Because the defects arise from his own allegations and admissions, not a lack of detail, further amendment would be futile, and dismissal should be with prejudice.

## ARGUMENT

### I. PLAINTIFF'S OPPOSITION CONFIRMS HE CANNOT PLEAD RELIANCE

The Opposition does not dispute that the fraud-on-the-market presumption is rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988)). An investor who "already possesses information sufficient to call the representations into question" cannot claim he relied on them. *Atari Corp. v. Ernst & Whinney*, 981 F.2d 1025, 1030 (9th Cir. 1992). Instead, Plaintiff argues that "[t]echnical engineering knowledge is completely different from market awareness," and that he

relied on "market price integrity" without knowing "how much inflation any public statements created." Opp. at 7–8. That argument fails for three reasons.

First, the Opposition acknowledges that Plaintiff "contemporaneously reported the truth underlying each misleading statement alleged in the [SAC] directly to Defendant." Opp. at 3. An investor who knows the truth underlying "each" challenged statement was not misled by any of them. Plaintiff claims that he "knew internally that the qualification test had more than 54% failures and failures were not packaging failures." Opp. at 8. That is precisely the "truth" he alleges the August 14, 2025 "0 die failures" statement concealed. SAC § III.1.2 (at 2). The same is true of every other claim: Plaintiff alleges he personally objected to the SymCool IQ characterization before the press release issued (SAC § III.2.3 (at 4)), personally tested Technology A in 2021 and 2025 (*id.* § III.3.3 (at 6–7)), and personally reported the SymCool V1 prototype results to the CEO before the February 2024 announcement (*id.* § III.6.3 (at 11)).

Second, the reliance element does not require Plaintiff to have known the precise "amount of artificial inflation" in the stock price. Opp. at 8. The question is whether something "severs the link" between the misrepresentation and the plaintiff's transaction. *Halliburton*, 573 U.S. at 269. An investor's actual knowledge of the falsity of a statement is the paradigmatic severing event. Plaintiff cites no authority—and Ideal Power is aware of none—holding that an insider with actual knowledge of the concealed facts may invoke the presumption merely because he did not know the magnitude of the resulting inflation. Plaintiff's argument that he lacked authority over SEC filings (Opp. at 8) is beside the point: reliance turns on what Plaintiff knew, not on whether he had authority over SEC filings.

Third, Plaintiff sold when the allegedly false August 14, 2025 "0 die failures" statement caused "a temporary artificial price bounce." Opp. at 5. He thus traded on his belief that the price was inflated—the opposite of trusting the "integrity of the market price." *Basic*, 485 U.S. at 247. A plaintiff who trades because he believes the price is distorted is not relying on misstatements.

Finally, the Opposition ignores that the fraud-on-the-market presumption is unavailable because Plaintiff acquired his shares through RSU grants, not market transactions. MTD at 6–7

(citing *Basic*, 485 U.S. at 247, 248 n.27). Plaintiff's new assertion that his RSU agreements treat grant, vesting, and sale as "distinct events" (Opp. at 6) does not show that he made any investment decision in reliance on a challenged statement when his RSUs were granted or vested. This argument is unrebutted and independently requires dismissal.

## II. THE OPPOSITION DOES NOT CURE THE SAC'S FAILURE TO PLEAD LOSS CAUSATION OR DAMAGES

### A. Plaintiff Identifies No Actual Corrective Disclosure

A partial disclosure theory does not permit Plaintiff to allege "merely . . . that that the truth gradually enter[ed] the market." Opp. at 7. He still must plead how specific disclosures revealed "relevant or related truth about the fraud." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009); *see Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320–21 (5th Cir. 2014). Each disclosure must reveal something the market did not already know. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665–66 (5th Cir. 2004); *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 462 n.4 (N.D. Tex. 2018). The plaintiffs in *Lormand* and *Amedisys* did that by pleading specific disclosures, each followed by a quantified price drop. *Lormand*, 565 F.3d at 259–60, 262–63; *Amedisys*, 769 F.3d at 318–19. Plaintiff pleads none of that.

The low revenue reported for FY2023, FY2024, and Q2 2024 (Opp. at 7) reveals nothing false about any challenged statement. The Company repeatedly told investors that revenue would follow only after customers finished evaluation and design cycles. Riccardi Decl. Exs. 3–5, 10. The Q2 2024 10-Q attributed that quarter's revenue to "initial orders from customers evaluating our technology." Riccardi Decl. Ex. 1 at 13. "Disclosure of financial losses generally . . . is not sufficient," and "[m]ere failure to meet earnings forecasts is insufficient to establish loss causation." *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008).

The statement in the August 14, 2025 Q2 2025 10-Q that "[t]o date, our customers have purchased prototypes in small quantities for evaluation" (SAC § III.6.2 (at 11)) is not corrective because the May 15, 2025 Q1 2025 10-Q contains the identical sentence. *Compare* Opp. Ex. 3, *with* Opp. Ex. 4. Repeating a sentence published three months earlier cannot be corrective. *Greenberg*,

364 F.3d at 665–66; *Magruder*, 359 F. Supp. 3d at 462 n.4. And Plaintiff's own allegations show no price decline followed the August filing. The stock hit its low of $3.94 on August 12, 2025, before the 10-Q, and afterward "increased to $5/share." SAC § III.7 (at 12). The Opposition likewise describes a "bounce back to the $5–$6 range," during which Plaintiff sold. Opp. at 5. A disclosure followed by a price increase cannot have caused Plaintiff's loss. *See Greenberg*, 364 F.3d at 666.

What remains is the allegation of a 17-month general decline from $12.40 on March 7, 2024 to $3.94 on August 12, 2025, attributed to unspecified "information/results entering the market." SAC § III.7 (at 12–13). A complaint that "never specifically alleges when and in what amounts the stock price declined following identified corrective disclosures" and makes only a "vague and conclusory allegation that a gradual disclosure of truth" caused the loss is not sufficient. *Magruder v. Halliburton Co.*, No. 3:05-CV-1156-M, 2009 WL 854656, at *128 (N.D. Tex. Mar. 31, 2009).

Plaintiff calls the "product launch" definition in the May 15, 2025 10-Q a corrective disclosure. Opp. at 7. Yet he alleges that the same definition was "buried" in "one sentence of one page" of a 167-page filing that "[o]rdinary investors" would not find. SAC § III.2.2 (at 4). A disclosure cannot be too obscure to inform investors and conspicuous enough to correct the market price at the same time. And if the May 10-Q was corrective, the August 10-Q, which repeated it, necessarily was not.

### B. On Plaintiff's Own Theory, He Suffered No Loss Caused by the Alleged "0 Die Failure" Misstatement

The Opposition states that Plaintiff sold his shares during "a temporary artificial price bounce back to the $5–$6 range" following the alleged misstatements about die failures in August 2025 at issue in the B-Tran Claim. Opp. at 4–5. This concession is dispositive. Loss causation requires that the misrepresentation cause the plaintiff's economic loss—typically when an investor purchases at an inflated price and the truth later emerges. *Dura*, 544 U.S. 336, 342–44 (2005). Plaintiff claims that the alleged "0 die failure" misstatement in August 2025 has never been corrected. Opp. at 9. A plaintiff who sells while the price is (on his theory) artificially inflated is

not harmed by that inflation; he is its beneficiary and therefore has not suffered a loss caused by the alleged misstatement.

### C. Plaintiff's RSU-Based "Loss" Is Not Cognizable

Plaintiff attempts to distinguish *Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019), on the ground that it involved unexercised stock options, whereas his RSUs vested into shares. Opp. at 5–6. But the principle applied in *Lampkin* and the underlying *Enron* decision is not limited to options: damages under Section 10(b) are measured by the artificial inflation in the price the plaintiff actually paid in a bargained-for transaction, and plaintiffs who did not "individually bargain[] for their stock" cannot establish loss causation or damages. *Lampkin*, 925 F.3d at 735–36; *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 897 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019). Plaintiff alleges no such bargain: the RSUs were granted to him "as equity compensation for services performed." SAC § IV-1 (at 14). His new assertion that taxes were withheld based on market value at vesting (Opp. at 6) does not convert a compensatory grant into a purchase, and the RSU agreements he says support it are not before the Court.

*Basic* does not help Plaintiff. Opp. at 6. The *Basic* plaintiffs sold at prices allegedly depressed by the defendant's false denials of merger negotiations—i.e., they sold at an artificially deflated price and suffered loss when the truth (the merger) was later revealed. 485 U.S. at 227–28. Plaintiff alleges the opposite: that the challenged statements inflated the price. On that theory, a seller is harmed only if he bought at an inflated price. Plaintiff did not buy at all. And the $130,524 "loss" he calculates is a measure of portfolio decline, which *Dura* holds is not cognizable. 544 U.S. at 342–43. Finally, the Opposition does not defend the SAC's demand for reputational damages. MTD at 20. That claim should be dismissed as conceded.

## III. THE OPPOSITION DOES NOT PLEAD A STRONG INFERENCE OF SCIENTER

The Opposition's conclusory scienter argument that Plaintiff "contemporaneously reported the truth" and that Defendant "consciously chose" to mislead (Opp. at 3) merely restates a legal conclusion; it pleads no particularized facts. The PSLRA requires the Court to weigh competing

inferences, and the inference of scienter must be "cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Plaintiff's September 22, 2023, email at most reflects a good-faith engineering disagreement about a design choice. FAC Ex. 12 (Dkt. 15-1). His July 6, 2025 report, allegedly sent to management, expressed his concern that test failures were packaging not die-related. FAC Ex. 6 at 2. And the Company's public statements consistently disclosed that its launched products were in a prototyping and customer-evaluation phase with revenue expected later. Riccardi Decl. Exs. 1, 3–5, 10–12. Allegations that the defendant knew of risks or problems do not establish scienter where those same risks were disclosed to the market. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 373 (5th Cir. 2004). Plaintiff's request for production of Ideal Power's 2025 website history to support scienter (Opp. at 12) confirms that he lacks the particularized facts the PSLRA requires—and the PSLRA stays all discovery while a motion to dismiss is pending. 15 U.S.C. § 78u-4(b)(3)(B).

## IV. THE SYMCOOL IQ, TECHNOLOGY A/B, AND COMMERCIAL SHIPMENT CLAIMS ARE TIME-BARRED

Plaintiff misreads *Merck & Co. v. Reynolds* in arguing that the "limitation clock began running only when the fraud fixed and the deflation occurred." Opp. at 9–10. The two-year period runs from when the plaintiff discovered, or a reasonably diligent plaintiff would have discovered, "the facts constituting the violation," including scienter. 559 U.S. 633, 637, 648–50 (2010). The test turns on discovery of facts—not on when the stock price declined or the plaintiff subjectively concluded that those facts amounted to "securities fraud." *See Royalty Clearinghouse, Ltd. v. CTS Props., Ltd.*, No. A-16-CV-1342-LY-ML, 2017 WL 5071340, at *16 (W.D. Tex. July 12, 2017), *report and recommendation adopted*, No. A-16-CV-1342-LY, 2017 WL 5127241 (W.D. Tex. Aug. 4, 2017). Plaintiff cites no authority for his "deflation" trigger.

The SAC pleads that Plaintiff possessed the facts constituting both falsity and scienter when each statement was made more than two years before he sued. SAC § III.2.3 (at 4) (SymCool IQ); *id.* §§ III.3.3, III.3.5 (at 6–8) (Technology A/B); *id.* § III.6.3 (at 11) (Commercial Shipment). The

Opposition confirms this: Plaintiff "contemporaneously reported the truth underlying each misleading statement . . . directly to Defendant." Opp. at 3. He thus had the "facts constituting the violation" in hand. *Merck*, 559 U.S. at 637.

Plaintiff's suggestion that the "significance" of the statements "became apparent through a continuing sequence of events," including the May 15, 2025 10-Q (Opp. at 9–10), confirms that he points to no new fact relevant to scienter learned within two years of suit. The Opposition does not specifically address the Technology A/B Claim. That claim is time-barred by more than two years and, as to the 2019 statements, is also outside the five-year statute of repose. 28 U.S.C. § 1658(b)(2).

## V. THE OPPOSITION DOES NOT SHOW THE ALLEGED MISSTATEMENTS ARE ACTIONABLE

As noted, Plaintiff cannot satisfy the reliance, loss causation, and scienter elements of his claims. The statute of limitations poses an additional bar for three of them. The SAC should also be dismissed because the Opposition cannot explain what was inaccurate about any of the alleged misstatements.

### A. The B-Tran Claim

The Opposition repeats the SAC's conclusory allegation that "Ideal Power Inc.'s own failure analysis demonstrated it's a die failure." Opp. at 11. But Plaintiff still does not identify the analysis, who performed it, when, what it found, or—critically—whether it existed and was communicated to management before August 14, 2025. That does not satisfy the PSLRA. 15 U.S.C. § 78u-4(b)(1); *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015).

Plaintiff's argument that the Company should have said "0 die failures" in its summary remark, rather than clarifying it "somewhere else" (Opp. at 11), concedes that the Company in fact made the "die" qualification on the same call. Statements must be read in context, and the same call also explained that prequalification was designed to identify "issues with . . . packaging design," and that the Company had identified and was implementing packaging improvements. FAC Ex. 1 (Dkt. 15-1) (Q2 2025 earnings call transcript); Riccardi Decl. Ex. 2 at 6. Read as a whole, the call did not represent that no packaged device had failed.

As to Plaintiff's July 6, 2025 weekly report, Plaintiff asks rhetorically, "When 'if' means?" Opp. at 11. The answer is that, as of July 6, Plaintiff himself had not determined that the failures were die failures and was investigating whether they were "due to underfill material"—a packaging component. FAC Ex. 6 at 2 (Dkt. 15-1). That uncertainty defeats any claim that management "knew" before August 14 that the failures were die failures. Plaintiff's new assertion that a different July 21, 2025 report "clearly reported" a die failure (Opp. at 11) is not in the SAC, which alleges only that Plaintiff "sent this failure info again" on July 21. SAC § III.1.3.1 (at 2). It should be disregarded, and in any event the SAC does not plead the contents of that report with any particularity.[1] Plaintiff's technical argument about HTRB test failure modes (Opp. at 12) likewise appears nowhere in the SAC and, at most, reflects an engineering disagreement about root cause—not a fraudulent misstatement.

### B. The SymCool IQ and Commercial Shipment Claims

Plaintiff ignores that, on the three earnings calls preceding the September 28, 2023 press release, management told investors that the "second commercial product" would be "launched" in the third quarter of 2023 and that revenue would "start in 2024" or "late 2024" and "ramp" only "as it gets through customers' OEM product designs." *See* MTD at 13–14. The Q1 2025 10-Q "product launch" language that Plaintiff focuses on did not change the meaning of "launch"; it simply codified what the Company had already told investors.

The challenged statements themselves contained the same message. The September 28, 2023 press release stated that the Company "look[ed] forward to our first commercial sales from this product next year with sales ramping as customers incorporate SymCool IQ into their OEM product designs." Riccardi Decl. Ex. 11. Plaintiff's argument that "commercial sales . . . next year" signaled an "existing commercial product" (Opp. at 3) is implausible: a statement that a product's first sales will occur the following year, and will ramp only as customers design it into their own products, tells a reasonable investor that the product is under development. Likewise, the February

[1] A plaintiff may not cure pleading deficiencies by asserting new facts in an opposition brief. *Nji v. Smartsheet, Inc.*, No. 1:25-cv-00324-ADA-DH, 2025 WL 1703430, at n.3 (W.D. Tex. May 14, 2025).

20, 2024 press release stated that the Company "looks forward to the SymCool™ sales ramp beginning in the second half of 2024," and expressly identified as forward-looking the Company's "expectations that customers will begin implementing B-TRAN™-based products in their OEM designs later this year," accompanied by cautionary language regarding "our inability to predict with precision or certainty the pace and timing of development and commercialization." Opp. Ex. 1 at 2, 4. The "commercial shipment" statement was thus made in the context of an announced, future sales ramp.

The Opposition argues that the forward-looking statements were themselves misleading because the product "didn't exist." Opp. at 2–4. But the safe harbor protects forward-looking statements accompanied by meaningful cautionary language regardless of the speaker's state of mind, 15 U.S.C. § 78u-5(c)(1)(A)(i), and the Opposition does not contend that the cautionary language was inadequate. *See Southland*, 365 F.3d at 371–72. Nor does Plaintiff respond to the argument that the qualitative descriptions he challenges—such as "significant advantages compared to IGBT modules"—are non-actionable puffery. MTD at 14–15. That argument is unopposed.

### C. The Technology A/B Claim

The Opposition does not respond to Ideal Power's showing that the SAC fails to identify what about the 2019–2021 statements was false when made, and that later testing on different samples cannot establish contemporaneous falsity. MTD at 16. Nor does it respond to the argument that a company's transition from one design architecture to an improved one is evidence of ordinary product development, not fraud. *Id.* Plaintiff has therefore abandoned the Technology A/B Claim, which should be dismissed on this ground as well.

## VI. THE VISUAL IMAGE AND CEO RETIREMENT CLAIMS SHOULD BE DISMISSED AS CONCEDED

Plaintiff now concedes that he "does not rely upon post-sale event[s] as independent securities transactions or independent bases for damages" and that the CEO Retirement allegations should be considered only "collectively" for scienter. Opp. at 12. The CEO Retirement Claim

should therefore be dismissed. As to the Visual Image Claim, the Opposition does not dispute that Plaintiff held no Ideal Power stock when the May 19, 2026 article was published, and thus cannot satisfy the "in connection with" requirement. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730–31 (1975). His new suggestion that the image appeared on Ideal Power's website "throughout most time of year 2025" (Opp. at 12) is hopelessly vague and does not cure the SAC's admission that Plaintiff cannot allege "whether Ideal Power Inc., or another person created or supplied the composite image" without discovery. SAC § III.4 (at 9).

## VII. DISMISSAL SHOULD BE WITH PREJUDICE

Three complaints demonstrate conclusively that the dispositive defects arise from Plaintiff's own allegations and admissions and cannot be cured by further pleading. Leave to amend should be denied where amendment would be futile or where the plaintiff has repeatedly failed to cure deficiencies. *See Goldstein v. MCI WorldCom*, 340 F.3d 238, 254–55 (5th Cir. 2003); *Brewster v. Dretke*, 587 F.3d 764, 767–68 (5th Cir. 2009) (denial where *pro se* litigant had plead "best case").

## CONCLUSION

For the foregoing reasons, Defendant Ideal Power Inc. respectfully requests that this Court grant its Motion to Dismiss and dismiss the Second Amended Complaint with prejudice.

DATED: October 8, 2026

**ASHURST PERKINS COIE US LLP**

By: */s/ John R. Hardin*

John R. Hardin
john.hardin@ashurstperkins.com
ASHURST PERKINS COIE US LLP
2699 Howell Street, Suite 700
Dallas, TX 75204
Telephone: +1.214.965.7700

Matthew M. Riccardi
*Admitted Pro Hac Vice*
matthew.riccardi@ashurstperkins.com
ASHURST PERKINS COIE US LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.262.6900

*Attorneys for Ideal Power Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 8, 2026, I electronically filed the foregoing Defendant Ideal Power Inc.'s Reply Memorandum of Law in Support of its Motion to Dismiss the Second Amended Complaint with the Clerk of the Court using the CM/ECF system and caused service of same via email to the below party of record:

Jiankang Bu (*pro se*)
45190 Key Circle
Temecula, CA 92592
Tel. 951-666-0355
Email: jiankang.bu@gmail.com

*/s/ John R. Hardin*
John R. Hardin